**No. 22-1954**

# In the United States Court of Appeals for the Fourth Circuit

---

YAGOUB M. MOHAMED, individually and on behalf of others similarly situated,
*Plaintiff-Appellant,*

v.

BANK OF AMERICA, N.A.,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Maryland at Baltimore
Case No. 1:21-cv-01283-CCB (The Honorable Catherine C. Blake)

---

## OPENING BRIEF OF PLAINTIFF-APPELLANT

---

LEONARD BENNETT
CRAIG MARCHIANDO
TARA KELLER
CONSUMER LITIGATION ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
(757) 930-3660

ROBERT WILLIAM MURPHY
LAW OFFICE OF ROBERT W. MURPHY
440 Premier Circle, Suite 240
Charlottesville, VA 22901
(434) 328-3100

JESSICA GARLAND
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K St NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

January 3, 2023

*Counsel for Plaintiff-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellant Yagoub Mohamed is an individual that has no corporate parent and does not issue stock.

# TABLE OF CONTENTS

Corporate disclosure statement ................................................. i

Table of authorities ............................................................. iv

Introduction ....................................................................... 1

Jurisdictional statement ......................................................... 3

Statement of the issue ........................................................... 3

Statement of the case ............................................................ 3

    I.     Statutory and Regulatory Background ................................. 3

          A.    The Electronic Fund Transfer Act ........................... 3

          B.    Regulations implementing the Electronic Fund Transfer Act. .................................................................. 5

    II.    Factual and Procedural History ...................................... 9

          A.    Maryland contracts with Bank of America to distribute pandemic unemployment assistance through government prepaid debit cards. ............................................... 9

          B.    Bank of America fails to provide Mr. Mohamed his lawfully owed pandemic unemployment assistance for almost a year. ..................................................... 13

          C.    Mr. Mohamed files this case on behalf of himself and others similarly harmed by the Bank's failure to prevent and resolve fraud on its government prepaid debit card accounts. .................................................. 16

          D.    The district court grants the Bank's motion to dismiss the claim. ......................................................... 17

Summary of argument ......................................................... 19

Standard of review ............................................................. 21

Argument .................................................................................................. 22

    I.    Because Mr. Mohamed's account is a "government benefit account" under Regulation E's second definition of a "prepaid account," it is subject to the Electronic Fund Transfer Act. .............. 23

    II.   Because pandemic unemployment assistance is not a "qualified disaster relief payment" under the Internal Revenue Code, the district court improperly excluded Mr. Mohamed's account from Regulation E. ........................................................................... 28

Conclusion ............................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*Bank of America v. City and County of San Francisco,*
  309 F.3d 551 (9th Cir. 2002) ................................................................. 4

*BedRoc Limited, LLC v. United States,*
  541 U.S. 176 (2004) ...................................................................... 23

*Bender v. Elmore & Throop, P.C.,*
  963 F.3d 403 (4th Cir. 2020) .............................................................. 21

*Clemmer v. Key Bank Natioanal Association,*
  539 F.3d 349 (6th Cir. 2008) .............................................................. 25

*Hill v. Coggins,*
  867 F.3d 499 (4th Cir. 2017) .............................................................. 21

*Kensington Volunteer Fire Department, Inc. v. Montgomery County,*
  684 F.3d 462 (4th Cir. 2012) .............................................................. 22

*Wijaja v. JPMorgan Chase Bank, N.A.,*
  21 F.4th 579 (9th Cir. 2021) ............................................................... 3

## Statutes

12 U.S.C. § 5581(b) ......................................................................... 5

12 U.S.C. § 2403 ........................................................................... 4

15 U.S.C. § 1693 ..................................................................... 1, 4, 5, 6

15 U.S.C. § 9021 ....................................................................... 9, 10

26 U.S.C. § 85 ............................................................................ 34

26 U.S.C. § 139 ....................................................................... *passim*

26 U.S.C. § 165(i) ......................................................................... 9

## Rules & Regulations

12 C.F.R. § 205.1 ................................................................................ 6

12 C.F.R. § 1005 ................................................................................. 5

12 C.F.R. § 1005.2 ........................................................................*passim*

12 C.F.R § 1005.15 ................................................................ 7, 19, 23, 25

44 Fed. Reg. 18,468 (Mar. 28, 1979) .................................................... 6

59 Fed. Reg 10,678 (Mar. 7, 1994) .................................................. 6, 25

62 Fed. Reg. 43,467 (Aug. 14, 1997) .................................................... 6

81 Fed. Reg. 83,934 (Nov. 22, 2016) ...........................................*passim*

85 Fed. Reg 23, 217 (Apr. 27, 2020) .................................................. 27

87 Fed. Reg. 10,297 (Feb. 24, 2022) .................................................... 6

I.T. 3230, 1938-2, C.B. 136 (1938) ..................................................... 32

Rev. Rul. 2003-12, 2003-1 C.B. 283 (2003) ........................................ 31

Rev. Rul. 55-652, 1955-2 C.B. 21 (1955) ............................................ 32

Rev. Rul. 63-136, 1963-2 C.B. 19 (1963) ............................................ 32

## Other Authorities

1 Mertens Law of Fed. Income Tax § 6A ............................................ 32

47 Cong. Rec. H10131 (Dec. 13, 2001) .............................................. 33

Board of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* (July 2014) ................................ 26

Board of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* (Oct. 2021) ........................... 26, 37

CFPB, *Bulletin 2022-02: Compliance Bulletin on the Electronic Fund Transfer Act's Compulsory Use Prohibition and Government Benefit Accounts* (Feb. 15, 2022) ............... 26

CFPB, *Federal Regulators Fine Bank of America $225 Million Over Botched Disbursement of State Unemployment Benefits at Height of Pandemic* (July 14, 2022) ....... 27

CFPB, *Prepaid products agreements*, https://perma.cc/4XD7-C4WR ..................................................... 37

H.R. Rep. No. 95-1315 (1978) ................................................................. 4

H.R. Rep. No. 95–1445 (1978) ................................................................ 32

IRS, *IRS reminds U.S. territory residents about U.S. income tax rules relating to pandemic unemployment compensation* (Apr. 8, 2021) ................................................ 34

IRS, *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act*, Notice 2021-20 (2021) ................................... 35

Macmillan Dictionary (Online ed. 2023) .................................................. 24

Maryland Department of Labor, *Division of Unemployment Insurance: Federal Pandemic Unemployment Insurance Programs*, https://perma.cc/AP59-49B4 .......... 10

Merriam-Webster's Collegiate Dictionary (Online ed. 2023) ................................. 24

Office of Chief Counsel of the IRS, Advisory Notice 200648027 (Dec. 1, 2006) .................................................... 31

U.S. Department of Labor, *Unemployment Insurance Relief During Covid-19 Outbreak*, https://perma.cc/DS7Q-FSLT ...................................... 10

West's Tax Law Dictionary (Feb. 2022) ................................................. 34

**INTRODUCTION**

The Electronic Fund Transfer Act is designed to provide protections to consumers who use electronic methods to transfer money. *See* 15 U.S.C. § 1693. It requires financial institutions to establish procedures for error resolution, limits consumer liability for unauthorized electronic fund transfers, and mandates timely investigations of unauthorized transactions. The Act's implementing regulation, Regulation E, applies these protections to prepaid accounts, including those providing government benefits. *See* 12 C.F.R. § 1005.2(b)(3)(i). This appeal is about Bank of America's failure to comply with Regulation E and the Act's requirements. Although the Bank contracted with the state of Maryland to distribute unemployment benefits, including pandemic unemployment assistance, through "government prepaid debit cards," it failed to adhere to the Act's protections for consumers who received these prepaid debit cards.

Yagoub Mohamed is one of those affected consumers. After applying for and receiving a prepaid debit card that was supposed to contain $14,644 of federally provided pandemic unemployment assistance, Mr. Mohamed discovered that an unauthorized user had spent all the funds in his account. Although he immediately notified Bank of America, the Bank failed to complete the timely investigation required by the Act or to timely provide Mr. Mohamed with any provisional credit or an explanation of its findings. Instead, it took the Bank almost seven months to

1

resolve Mr. Mohamed's claim and return his pandemic unemployment assistance payment. In the meantime, Mr. Mohamed was forced to max out his business and personal credit, which crashed his credit score.

When Mr. Mohamed filed this lawsuit, the Bank conceded that, if the Act covered his account, it was liable for statutory damages. But to avoid liability, it argued that Mr. Mohamed's account was excluded from EFTA. The Bank argued that Regulation E's exemption for "qualified disaster relief payments" applied to Mr. Mohamed's account because the account contained Covid-19 pandemic unemployment assistance. In the Bank's view, because the pandemic had been declared a "federal disaster," Mr. Mohamed's pandemic unemployment assistance was necessarily a "qualified disaster relief payment." The district court adopted this argument.

But it is doubly wrong. First, Regulation E covers many different kinds of prepaid accounts, only some of which are subject to the qualified disaster relief payment exception. "Government benefit accounts," such as Mr. Mohamed's unemployment assistance, are covered prepaid accounts that are not subject to the exemption. That, standing alone, is enough to resolve this appeal. And even if that weren't enough, the district court was also wrong about the part of Regulation E the Bank focused on. Contrary to the Bank's theory, this part of the regulation also covers accounts that contain pandemic unemployment assistance. Although there is

an exception for "qualified disaster relief payments," that phrase has a specialized meaning that does not include unemployment compensation. The district court's decision should be reversed.

## JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under 28 U.S.C. § 1331 because this case arises under a federal statute, the Electronic Fund Transfer Act, JA 15–16. This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final order dismissing all of the plaintiff's claims, JA 225. The district court entered judgment on August 11, 2022. JA 225. The plaintiff timely filed a notice of appeal on September 6, 2022. JA 226.

## STATEMENT OF THE ISSUE

Do the Electronic Fund Transfer Act's protections apply to pandemic unemployment assistance payments that governmental agencies contract with financial institutions to distribute?

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

### A.    The Electronic Fund Transfer Act

In the 1970s, Congress grew concerned about the "increasing prevalence" of banking transfers "processed through computer networks without human interaction." *Wijaja v. JPMorgan Chase Bank, N.A.*, 21 F.4th 579, 580–81 (9th Cir. 2021). Known as "electronic fund transfers," these types of transfers are "initiated through

an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7). Unlike with transactions that involve some human interaction, Congress recognized that these electronic transactions "were 'much more vulnerable to fraud, embezzlement, and unauthorized use than the traditional payment methods.'" *Bank of Am. v. San Francisco*, 309 F.3d 551, 564 (9th Cir. 2002) (quoting H.R. Rep. No. 95-1315 at 2 (1978)). So, after studying the new "development" of "electronic fund transfer systems" and "the need to protect the legal rights of users and consumers," 12 U.S.C. § 2403 (1976), Congress enacted the Electronic Fund Transfer Act of 1978, 15 U.S.C. § 1693.

EFTA "provide[s] a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693(b). But the Act's "primary objective" is "the provision of individual consumer rights" for consumers who use electronic methods to transfer and receive money. 15 U.S.C. § 1693(b). The Act includes consumer-protection measures "aimed at promoting disclosure, preventing fraud, and allocating liability." *Bank of Am.*, 309 F.3d at 564; *see, e.g.*, 15 U.S.C. § 1693f (establishing procedures for error resolution); § 1693g (outlining consumer liability); § 1693h (outlining the liability of financial institutions); § 1693i (establishing requirements for issuance of cards). It also limits a

consumer's liability for unauthorized electronic fund transfers. *See* 15 U.S.C. § 1693g (generally limiting consumer's liability for an unauthorized transfer to $50).

In addition, the Act requires financial institutions to timely "investigate" any error, including "an unauthorized electronic fund transfer." 15 U.S.C. § 1693f. In general, the institution must "determine whether an error has occurred, and report or mail the results of such investigation and determination to the consumer within ten business days." *Id.* Although it can extend the time to investigate to forty-five days—so long as it actually performs an investigation—a financial institution must "provisionally recredit the consumer's account for the amount alleged to be in error." *Id.* § 1693f(c). And, "[i]f the financial institution determines that an error did occur, it shall promptly, [within] one business day . . . correct the error." *Id.* § 1693f(b). What's more, even if the institution determines "that an error did not occur," the Act still requires the institution to provide "the consumer an explanation of its findings within 3 business days after the conclusion of its investigation." *Id.* § 1693f(d).

**B.      Regulations implementing the Electronic Fund Transfer Act**

To implement the Act, Congress authorized the Board of Governors of the Federal Reserve to promulgate regulations. 12 U.S.C. § 5581(b). In 2010, that authority was transferred to the Consumer Financial Protection Bureau. *See* 12 C.F.R. §§ 1005.1-1005.20. Both agencies have promulgated regulations relevant to this case.

5

*First*, the Board of Governors has issued what is known as "Regulation E" to "establish[] the basic rights, liabilities, and responsibilities of consumers who use electronic fund transfer services and of financial institutions that offer these services." 12 C.F.R. § 205.1. Regulation E defines the types of accounts that are covered by EFTA. 15 U.S.C. § 1693a(2). The definition is "broad." 87 Fed. Reg. 10,297 (Feb. 24, 2022) (citing 44 Fed. Reg. 18,468 (Mar. 28, 1979)). Initially, it included any "consumer asset account . . . held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes." *Id.* Then, in 1994, the Board extended Regulation E's protections to those accounts used for the electronic distribution of government benefits. 59 Fed. Reg 10,678 (Mar. 7, 1994). Today, "all accounts used to distribute benefits for federally administered programs . . . as well as non-needs tested State and local government benefit programs remain[] covered by Regulation E." 87 Fed. Reg. 10,297 (citing 62 Fed. Reg. 43,467 (Aug. 14, 1997)).

*Second*, the CFPB has issued a "Prepaid Accounts" Rule that extends Regulation E coverage to several types of "prepaid financial products" that require money to be placed in an account or loaded on a card before the consumer can use it. 81 Fed. Reg. 83,934 (Nov. 22, 2016). The Rule adopts the "general definition of account in Regulation E" and EFTA for certain prepaid accounts and applies Regulation E's "comprehensive consumer protections" to those prepaid accounts. 81 Fed. Reg. at 83,961, 83,978. Specifically, the Rule identifies four "types of products

that are included within the general definition of prepaid account." *Id.* at 83,969.

These four are:

> (**A**) A "payroll card account," . . .
> (**B**) A "government benefit account," as defined in § 1005.15(a)(2); or
> (**C**) An account that is marketed or labeled as "prepaid" and that is redeemable upon presentation at multiple, unaffiliated merchants for goods or services or usable at automated teller machines; or
> (**D**) An account . . . [t]hat is issued on a prepaid basis in a specified amount or not issued on a prepaid basis but capable of being loaded with funds thereafter, . . . and [t]hat is not a checking account, share draft account, or negotiable order of withdrawal account.

12 C.F.R. § 1005.2(b)(3)(i).

The second category of a "prepaid account" in this section—a "government benefit account"—cross references the definition contained in § 1005.15(a)(2). That section defines a "government benefit account" as "an account established by a government agency for distributing government benefits to a consumer electronically, such as through automated teller machines or point-of-sale terminals, but does not include an account for distributing needs-tested benefits in a program established under state or local law or administered by a state or local agency." *Id.* 12 C.F.R § 1005.15(a)(2).

For the third and fourth categories of prepaid accounts—but not the second— the Rule limits the definition of "prepaid account" by excluding any "account that is directly or indirectly established through a third party and loaded only with qualified disaster relief payments." *Id.* § 1005.2(b)(3)(ii)(B). The CFPB added this

exception to address concerns, including from a national "disaster relief organization," that some "accounts used to distribute the funds, as well as the funds themselves, are the property of the relief organization, not the consumer" and so "distinct from other consumer asset accounts the Bureau proposed to cover." 81 Fed. Reg. at 83,975. To address this concern, the CFPB agreed that Regulation E should not apply to accounts and funds that "are owned by the relief organization, rather than the consumer." *Id.* at 83,976 (noting that these accounts "warrant exclusion from the rule").

The exemption thus excludes from Regulation E's coverage "qualified disaster relief payments" which are defined as "funds made available through a qualified disaster relief program as defined in 26 U.S.C. § 139(b)." *Id.* at 84,347. The cross-referenced provision of the Internal Revenue Code, 26 U.S.C. § 139(b), defines a "qualified disaster relief payment" as "any amount paid to or for the benefit of an individual . . . if such amount is paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection with a qualified disaster in order to promote the general welfare[.]" 26 U.S.C. § 139(b)(4). Finally, the Internal Revenue Code defines a "qualified disaster" as "a federally declared disaster (as defined in section 165(i)(5)(A))," 26 U.S.C. § 139(c)(2), which is "any disaster subsequently determined by the President of the United States to warrant assistance by the Federal

Government under the Robert T. Stafford Disaster Relief and Emergency Assistance Act," 26 U.S.C. § 165(i)(5)(A).

## II.    Factual and Procedural History

### A.    Maryland contracts with Bank of America to distribute pandemic unemployment assistance through government prepaid debit cards.

In 2020, millions of Americans lost their jobs due to the Covid-19 pandemic. To address this, Congress passed the Coronavirus Aid, Relief, and Economic Security Act, known as the "CARES Act," in March 2020 in response to "the public health emergency declared by the Secretary of Health and Human Services on January 27, 2020." 15 U.S.C. § 9021(a)(2). The CARES Act provided federally funded "Pandemic Unemployment Assistance" (sometimes called PUA) "for unemployment as a result of the COVID–19" pandemic. *Id.* § 9021(b). It also authorized the Secretary of Labor to provide this assistance "through agreements with States which, in the judgment of the Secretary, have an adequate system for administering such assistance through existing State agencies." *Id.* § 9021(f)(1). The Act specifies that the federal government will pay "each state which has entered into an agreement" to administer the assistance "an amount equal to 100 percent of (A) the total amount of assistance provided by the State pursuant to such agreement; and (B) any additional administrative expenses incurred by the State by reason of

such agreement . . . including any administrative expenses necessary to facilitate processing of applications for assistance." *Id.* § 9021(f)(2).

Maryland is one of the states that met these requirements. The Federal Department of Labor instructed Marylanders that they could apply for pandemic unemployment assistance through the Maryland Department of Labor's Division of Unemployment Insurance. *See* U.S. Department of Labor, *Unemployment Insurance Relief During Covid-19 Outbreak*, https://perma.cc/DS7Q-FSLT; Maryland Department of Labor, *Division of Unemployment Insurance: Federal Pandemic Unemployment Insurance Programs*, https://perma.cc/AP59-49B4.

For years, the Division has contracted with private financial institutions to provide unemployment benefits, including standard state-issued unemployment insurance. JA 11–15. In 2013, Maryland contracted with Bank of America to provide prepaid debit cards to disburse unemployment benefit payments. JA 11–12. The Bank defined these "Cards" in its cardholder agreement with consumers as a "Government Prepaid Debit Card issued by [the Bank] on behalf of Maryland Department of Labor . . . to enable [the consumer to] receive unemployment benefits from [the state]" by "link[ing]" them "to individual Bank depository accounts." JA 8, 64. The Bank's contract with Maryland also obligated the Bank to "have in place reasonable security procedures designed to protect . . . cardholder accounts." JA 13. And it required that the accounts only be permitted to "receive deposits from the

10

[Division]" and prohibited "commingling of benefit payments with other funds." JA 15.

When Marylanders signed up to receive pandemic unemployment assistance through Bank-administered government prepaid debit cards, they became subject to the Bank's cardholder agreement. JA 16. That agreement made clear that its liability rules were governed by "Regulation E which covers accounts that involve the use of a Card." JA 70. Consistent with this undertaking, the agreement told consumers that, in the event of a fraud claim, the Bank promised to provide timely dispute resolution services to "correct any error promptly." JA 17. And, the Bank promised, if the investigation lasted for over ten days, the Bank would "credit [the user's] Account . . . so that [they] will have the money during the time it takes us to complete our investigation." JA 17.

The Bank, however, failed to live up to these assurances. In July 2022, Federal regulators fined the Bank $225 million because of "botched disbursement of state unemployment benefits at [the] height of [the] pandemic." JA 171–73. The CFPB explained that "Bank of America changed its practices for investigating prepaid debit card fraud on the unemployment insurance benefit accounts." JA 172. For instance, "[i]nstead of conducting reasonable investigations, it implemented a fraud filter." JA 172. The Bank also "made it very difficult for people to unfreeze their prepaid debit cards or for people to report fraudulent use of their cards." JA 172. That was because

"[p]eople with unemployment insurance benefit prepaid debit cards could not make reports online, or in person at bank branches." JA 172. And although "the bank told customers they had agents [for its claim call center] available 24 hours a day, seven days a week," "in fact, it operated a more limited schedule." JA 172. So, when people needed their unemployment benefits "the most," their only option was to wait "on hold for hours every day for weeks trying to talk to someone at the bank." JA 172.

Bank of America's cards also suffered from a serious security problem. In issuing government prepaid debit cards, the Bank chose not to use the "industry standard" fraud prevention technology. JA 8. Since 2014, "the Bank has used on all its other debit and credit cards . . . fraud preventing EMV chip technology." JA 8. EMV chip cards are "much safer" than cards with just magnetic stripes because they have "more sophisticated encoding." JA 20. But for the government prepaid debit cards issued to consumers as part of the pandemic unemployment assistance program, the Bank chose instead to use less expensive, "outdated magnetic stripe technology" that "makes [debit cards] readily susceptible to cloning and other [fraudulent] schemes." JA 8–9. Unsurprisingly, given the Bank's choice, Marylanders who received their government prepaid debit cards from the Bank experienced a high rate of fraud. JA 9.

**B.      Bank of America fails to provide Mr. Mohamed his lawfully owed pandemic unemployment assistance for almost a year.**

**1.** Mr. Mohamed is one of the consumers affected by the Bank's botched disbursement of pandemic unemployment insurance benefits. Since October of 2017, Mr. Mohamed owned and operated Amanie Express, LLC, which provided automotive mechanic services in Baltimore, Maryland. JA 24. But the pandemic depressed "demand for his automotive repair services," and "Mr. Mohamed experienced a sudden loss of income and had to close his business" in July of 2020. JA 25. As a result, "[l]ike thousands of other Marylanders," Mr. Mohamed "applied for public benefits through programs administered by the Maryland Department of Labor's Division of Unemployment Insurance." JA 8. After Maryland found him eligible to receive the benefits, it gave him two options: The Division could send him the benefits via a paper check, or it could "load the money" on a Bank of America Division of Unemployment Insurance debit card. JA 214, 234.

That July he signed up to receive his benefits on a Bank of America Division of Unemployment Insurance debit card. JA 25. The debit card was governed by the cardholder contract that the Bank used for Maryland unemployment benefits debit card accounts. The Bank told Mr. Mohamed it would issue "the Government Prepaid Debit card . . . on behalf of Maryland Department of Labor . . . to enable [him] to receive unemployment benefits from" the state. JA 64. The contract also

13

defined Mr. Mohamed's "Account" with the Bank as "the account accessed by" his "Government prepaid Debit Card issued by [the Bank] on behalf of Maryland Department of Labor." JA 64.

**2.** Under the CARES Act, "between July and October of 2020, Mr. Mohamed was entitled to receive $14,644.00 in unemployment benefits." JA 25. But by the end of November 2020, Mr. Mohamed "still had not received his [Division of Unemployment Insurance] debit card." JA 25. After a Maryland representative "advised that he should have received it," Mr. Mohamed called the Bank. JA 25–26. A Bank representative claimed "that the Bank had already mailed the card to his home address," but, because he had not received it, the Bank agreed to send another. JA 26. That new card arrived on December 5, 2020. JA 26. Like the Bank's other Division of Unemployment Insurance debit cards, it lacked the EMV chip that is the "industry standard of care." JA 8, 19–21, 26.

When Mr. Mohamed went to activate the card, he was told there were no funds in his account. JA 25. The Bank's customer service informed Mr. Mohamed that "the full disbursement of $14,644.00 had been deposited into his Bank of America [Division of Unemployment Insurance] account, but all of the funds had been depleted." JA 26. An "unauthorized user purchased merchandise and made withdrawals against the $14,644.00 cash balance" between August and October 2020. JA 27. The unauthorized transactions had been made in locations across the United

States, from Maryland to California. JA 26. Mr. Mohamed went through all the charges with a Bank representative and verified that he had "not authorized any of the transactions." JA 27. The representative then instructed Mr. Mohamed to file a police report—which he did—and then to send a copy to the Bank. JA 215. The Bank's claims department then told him that "he would receive a letter from the Bank regarding his claim within forty-five" days. JA 28.

But while Mr. Mohamed waited for word from the Bank, he began to experience serious financial problems. He had been out of a job for most of the past six months and was "without any financial resources." JA 28. He "max[ed] out his business and personal credit and incurred late fees," plummeting his credit score. JA 28. So "between December and January, Mr. Mohamed called Bank of America every week in hopes of receiving information about his claim." JA 28. And Bank representatives just told him "to call back." JA 28. With no information forthcoming, "he struggled with depression, experienced long nights of sleeplessness, and began vomiting due to stress." JA 29. He suffered a panic attack, for which he received care at an Urgent Care center. JA 29.

Despite Mr. Mohamed's frequent appeals, the Bank failed to timely resolve his claim, return his money, or provide him with provisional credit. On January 5, 2021, the Bank sent Mr. Mohamed a "freeze letter" notifying him that his account was frozen because of "irregular, unauthorized, or unlawful activities involved" with

his card. JA 29. But it took another month for the Bank to deposit any funds into his account to help to tide him over—on February 3 the Bank deposited $1,050 into his account. JA 30. Yet the Bank still failed to process his claim. Instead, he later learned, the Bank had stopped processing his fraud claim while his account had been frozen. JA 30. Continued calls to Bank representatives failed to provide any meaningful assistance. JA 31.

Throughout the spring, Mr. Mohamed continued to call the Bank and spoke with multiple representatives as he tried to figure out how to get his claim reconsidered, to no avail. JA 32. Although the Bank failed to provide him his benefits, in April 2021, "Mr. Mohamed received a 1099-G notice from the State of Maryland requiring him to pay income taxes on the full amount of his unemployment benefits." JA 32. It was only after he filed the complaint, on June 25, 2021, that the Bank finally informed Mr. Mohamed that it would credit him the full amount. JA 216.

## C.  Mr. Mohamed files this case on behalf of himself and others similarly harmed by the Bank's failure to prevent and resolve fraud on its government prepaid debit card accounts.

To remedy the Bank's misconduct, Mr. Mohamed filed this case on behalf of himself and other similarly situated consumers. He alleged that the Bank's failure to implement adequate measures to prevent and resolve the fraud on his account was not just limited to his government prepaid debit card. JA 33–37. There are thousands of Marylanders who were issued a Bank of America debit card to access

16

unemployment benefits who were similarly affected. JA 9. He claimed that, among other things, the Bank violated its statutory obligations under the Electronic Fund Transfer Act and Regulation E, including by failing to adequately investigate and provide an explanation of fraud claims. JA 34.

The Bank moved to dismiss. It admitted that, "if Regulation E applie[d]," then it was liable for violating EFTA. JA 220. But the Bank argued that EFTA and Regulation E did not apply to Mr. Mohamed's pandemic unemployment assistance. According to the Bank, the pandemic unemployment assistance was not covered by Regulation E's protections for prepaid accounts. JA 80. The Bank argued that the Regulation's definition of a "government benefit account," 12 C.F.R. § 1005.2(b)(3)(i)(C), did not include Mr. Mohamed's debit card account because it was "established by" the Bank rather than the State. *See* Dkt. 18-1 at 6 n.4; JA 245. Nor, in its view, was the assistance covered by any other definition of a "prepaid account" because the regulation excludes from the other relevant definitions accounts that are "loaded only with qualified disaster relief payments." 12 C.F.R. § 1005.2(b)(3)(ii)(B).

### D. The district court grants the Bank's motion to dismiss the claim.

The district court adopted the Bank's argument and dismissed the claim. "For the EFTA to apply," the court explained, "Mohamed's account must qualify as an account under the EFTA's definition of 'account.'" JA 221. To answer that question,

the court noted that "[t]he relevant CFPB regulation[] defines 'account' to include a prepaid account." JA 221 (citing 12 C.F.R. § 1005.2(b)(3)).

Acknowledging that there are four definitions for a prepaid account, 12 C.F.R. § 1005.2(b)(3)(i), the court focused its analysis only on the last two definitions. JA 222–23 (addressing whether Mr. Mohamed's card qualified as a prepaid account under 12 C.F.R. § 1005.2(b)(3)(i)(C)–(D)). The court did not disagree with Mr. Mohamed that his pandemic unemployment assistance generally fit the third and fourth definition of a prepaid account in 12 C.F.R. § 1005.2(b)(3)(i)(C) and (D). But it held that Mr. Mohamed's card was exempted from the definition because the CARES Act's pandemic unemployment assistance payments loaded on the card were "qualified disaster relief payments." *See* JA 221 (noting that Regulation E exempts from the last two definitions of "prepaid account" any account that is "directly or indirectly established through a third party and loaded only with qualified disaster relief payments"). In the court's view, because the CARES Act "referred to the pandemic" and "the pandemic was in March 2020 declared by President Trump a disaster warranting federal assistance," pandemic unemployment assistance is excluded from Regulation E's second and third categories of a "prepaid account." JA 222–23. As a result, the court held that Regulation E and EFTA did not cover Mr. Mohamed's benefits. JA 223.

Without addressing whether Mr. Mohamed's account met any other definition of a prepaid account, the court granted the motion to dismiss the EFTA claim and "decline[d] to exercise supplemental jurisdiction over the [remaining] state law claims." JA 224.

## SUMMARY OF ARGUMENT

**I.** Although the district court failed to address it, Mr. Mohamed's pandemic unemployment assistance account is covered by Regulation E's second definition of a "prepaid account"—a "government benefit account." 12 C.F.R. § 1005.2(b)(3)(i)(B). A "government benefit account" is "an account established by a government agency for distributing government benefits to a consumer electronically." 12 C.F.R. § 1005.15(a)(2). Here, Maryland's Division of Unemployment Insurance—a government agency—established Mr. Mohamed's account by bringing the account into existence. And Maryland contracted with Bank of America to distribute the benefits by delivering government prepaid debit cards to qualifying residents, including Mr. Mohamed. *See* JA 11–13.

As relevant here, that is all that's required to meet Regulation E's second definition of a "prepaid account" and, in turn, subject the account to the Electronic Fund Transfer Act. Unlike with the regulation's third and fourth definitions, there is no exception from this definition for accounts that include disaster relief payments. This straightforward understanding, moreover, is consistent with the view of both of

19

agencies charged with administering EFTA—the Federal Reserve and CFPB—which have repeatedly recognized that benefits given out in this manner are covered "government benefit accounts" within the meaning of Regulation E's second definition of "prepaid account." Standing alone, this warrants reversal of the district court's grant of the Bank's motion to dismiss.

**II.** The district court was also wrong to conclude that Mr. Mohamed's account was exempt from Regulation E's third and fourth definitions of "prepaid account." It is true that the regulation exempts "qualified disaster relief payments" from its third and fourth categories of covered prepaid accounts. *See* 12 C.F.R. § 1005.2(b)(3)(ii)(B). The district court seized on this exemption to conclude that "qualified disaster relief payments" include the type of pandemic unemployment assistance received by Mr. Mohamed here, meaning that his account and by extension, the Bank, were not subject to the Act.

But in reaching this conclusion, the court ignored a key textual limit on the exemption. The relevant section of the Internal Revenue Code cross-referenced in Regulation E defines a "qualified disaster relief payment" as "any amount paid to or for the benefit of an individual . . . if such amount is paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection with a qualified disaster in order to promote the general welfare[.]" 26 U.S.C. § 139(b)(4). By limiting those payments that are exempted from the Act to only those that are made "in

connection with a qualified disaster *in order to promote the general welfare*," the regulation intentionally *excluded* unemployment compensation, including pandemic unemployment assistance, from this exemption. That is because the phrase "in order to promote the general welfare" is a term of art that that does not include unemployment compensation like the pandemic unemployment assistance at issue here. Unemployment compensation payments, regardless of whether they are provided as part of a qualified disaster, do not fall within this category of tax-exempt payments. This understanding is reinforced by the structure of the Code, which draws a distinction between "qualified disaster relief payments," which are non-taxable payments, and unemployment compensation, which is treated as taxable income. And it's consistent with the purpose of Regulation E's "qualified disaster relief" exemption itself, which is to ensure that "disaster relief organizations" can quickly distribute funds "in the wake of tragic events"—a concern not present here. 81 Fed. Reg. at 83,975.

## STANDARD OF REVIEW

This Court reviews a district court's interpretation of a statute and regulations, as well as its decision granting a motion to dismiss, de novo. *See Bender v. Elmore & Throop, P.C.*, 963 F.3d 403, 406 (4th Cir. 2020); *Hill v. Coggins*, 867 F.3d 499, 505 (4th Cir. 2017). In doing so, the Court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the

plaintiff." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012). It "may consider documents attached to the complaint or the motion to dismiss so long as they are integral to the complaint and authentic." *Id.*

## ARGUMENT

There is no dispute that if EFTA's and Regulation E's protections apply to Mr. Mohamed's account, Bank of America is liable for violating the statute. *See* JA 220 (noting the Bank "concedes that if Regulation E applies to this case, then Mohamed has a claim at least for statutory penalties"). In dismissing Mr. Mohamed's claim under EFTA, however, the district court held that his account did not qualify as a "prepaid account" under Regulation E.

That was wrong. Regulation E includes four definitions of the types of "prepaid accounts" it covers. *See* 12 C.F.R. § 1005.2(b)(3)(i). The district court failed to even analyze whether Mr. Mohamed's account met the regulation's second definition—which covers "government benefit accounts" like those at issue here. Had it done so, it could not have dismissed Mr. Mohamed's claim. And the court's belief that pandemic unemployment assistance is exempted from Regulation E's third and fourth definitions because the benefits are "qualified disaster relief payments" as defined by the Internal Revenue Code conflicts with the Code's own recognition that unemployment assistance—including pandemic-related unemployment assistance—is not a "qualified disaster relief payment." *See* 26 U.S.C.

§ 139(b)(4). Because only one of Regulation E's "prepaid account" definitions need apply for Mr. Mohamed to have a claim under EFTA, the district court's decision warrants reversal.

## I.  Because Mr. Mohamed's account is a "government benefit account" under Regulation E's second definition of a "prepaid account," it is subject to the Electronic Fund Transfer Act.

Although the district court did not analyze it, a straightforward reading of Regulation E's second definition of a "prepaid account"—a "government benefit account"—covers the pandemic unemployment assistance payments Mr. Mohamed received here and subjects the account to EFTA. *See* 12 C.F.R. § 1005.2(b)(3)(i)(B).

That reading starts with Regulation E's definition of a "government benefit account." *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183, (2004) (noting that any inquiry into the meaning of text "begins with the statutory text, and ends there as well if the text is unambiguous"). By its terms, Regulation E defines "government benefit account" as "an account established by a government agency for distributing government benefits to a consumer electronically." 12 C.F.R. § 1005.15(a)(2). Unlike with Regulation E's third and fourth definitions, there is *no* exception under this second definition for benefits that are "qualified disaster relief payments."

Instead, to satisfy this definition, an "account" must be "a demand deposit (checking), savings, or other consumer asset account . . . held directly or indirectly by a financial institution and established primarily for personal, family, or household

purposes." 12 C.F.R. § 1005.2(b)(1). It also must have been "established" which, as both common usage and dictionaries make clear, means "brought about or into existence," by a government agency. *Established*, Black's Law Dictionary (11th ed. 2019); *see also* Merriam-Webster's Collegiate Dictionary, https://perma.cc/M8QT-87LV (Online ed. 2023) (defining "establish" as "to bring into existence"); Macmillan Dictionary, https://perma.cc/K83M-8Z4V (Online ed. 2023) (defining "establish" as "to make something start to exist"). And, finally, the account must also be used for "distributing," i.e., "deliver[ing]," government benefits to a consumer electronically. *Deliver*, Black's Law Dictionary (11th ed. 2019). That is all that's required.

The pandemic unemployment benefits Mr. Mohamed received easily meet this definition of a "prepaid account." Mr. Mohamed's account was established, or brought into existence, by Maryland's Division of Unemployment Insurance—a government agency—for the purpose of distributing government-provided unemployment benefits. JA 11–13. To provide access to these government benefits, Maryland contracted with Bank of America to distribute "electronic payment cards" to qualifying Maryland residents. JA 11–13; *see also* JA 234–35 (describing how Maryland's Division of Unemployment Insurance "provid[ed] a data file over to Bank of America" with a "list of people" like Mr. Mohamed who should be issued a "Government prepaid Debit Card"). Then, to fulfill its contract with Maryland, the Bank sent out these cards to the Maryland residents that the state found eligible for

benefits, and informed these residents that the cards were "issued by [the Bank] on behalf of Maryland Department of Labor, Division of Unemployment Insurance" and were loaded with government funds. JA 11, 64. The account, in short, was "established by a government agency" for the purpose of "distributing government benefits to a consumer electronically." 12 C.F.R. § 1005.15(a)(2).

That an account like Mr. Mohamed's is covered under Regulation E's second definition of "prepaid account" accords with the longstanding views of the agencies that administer the Act. In particular, both the Federal Reserve and Consumer Financial Protection Bureau recognize that, when a government agency contracts with a financial institution to help provide government benefits, the resulting accounts are "government benefit accounts." The Federal Reserve, for example, has explained that, for purposes of an "electronic fund transfer of government benefits," an "account" "mean[s] an account established by a government agency for distributing benefits to a consumer electronically." 59 Fed. Reg. at 10,680. And that remains true "whether or not the account is directly held by the agency or a bank or other depository institution." *Id.*

Because Regulation E defines a government benefit account using the same language—"an account established by a government agency for distributing benefits to a consumer electronically," 12 C.F.R. § 1005.2(b)(3)(i)(B)—the same meaning applies. *See Clemmer v. Key Bank Nat. Ass'n*, 539 F.3d 349, 353 (6th Cir. 2008) ("Unless

demonstrably irrational, Federal Reserve Board staff opinions construing the EFTA or Regulation E should be dispositive."). Indeed, as the Federal Reserve has recently made clear, "[a] prepaid card program is considered government-administered regardless of whether a federal, state, or local government office operates the program or outsources some or all functions to third parties, so long as the program is operated on behalf of a government office." Bd. of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* at 1 n.2 (Oct. 2021), https://perma.cc/4PHS-JSWP; *see also* Bd. of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* at 3 (July 2014), https://perma.cc/7V2E-L2LL (noting that government agencies "commonly" distribute governments benefits via a "contract with a bank issuer to implement a prepaid card payment program").

The Consumer Financial Protection Bureau agrees. It recognizes that an account is a "government benefit account" within the meaning of Regulation E when a government agency contracts with a financial institution to provide government benefits even if, to receive those benefits, consumers must "establish an account for receipt of electronic fund transfers with a particular financial institution." *See* CFPB, *Bulletin 2022-02: Compliance Bulletin on the Electronic Fund Transfer Act's Compulsory Use Prohibition and Government Benefit Accounts* (Feb. 15, 2022), https://perma.cc/4VUB-HCDU; *see also* CFPB, *Federal Regulators Fine Bank of America $225 Million Over Botched*

26

*Disbursement of State Unemployment Benefits at Height of Pandemic* (July 14, 2022), https://perma.cc/EP96-52A2 (recognizing that unemployment payments are "government benefit payments" regardless of whether government agencies contracted with Bank of America to "deliver" the payments through "prepaid debit cards").[1]

The upshot: Both the text of Regulation E and the settled views of the relevant agencies make clear that Mr. Mohamed's account is a "government benefit account," meets the definition of a prepaid account under Regulation E, and is therefore subject to EFTA. The district court's failure to consider whether the account met this definition is, standing alone, enough to warrant reversal of the dismissal of Mr. Mohamed's EFTA claim.

---

[1] In 2020 the CFPB issued an interpretive rule concluding "that certain pandemic-relief payments are not 'government benefits' for purposes of Regulation E and the Electronic Fund Transfer Act." *See* Treatment of Pandemic Relief Payments Under Regulation E and Application of the Compulsory Use Prohibition, 85 Fed. Reg 23,217 (Apr. 27, 2020). But that interpretive rule does not apply to the pandemic unemployment assistance at issue here because the rule's application is limited to payments that were "distributed without a general requirement that consumers apply to the agency to receive funds." *Id.* Here, like others seeking pandemic unemployment assistance, Mr. Mohamad had to apply to the Maryland Division of Unemployment Insurance to receive his benefits. *See* JA 8.

## II. Because pandemic unemployment assistance is not a "qualified disaster relief payment" under the Internal Revenue Code, the district court improperly excluded Mr. Mohamed's account from Regulation E.

Even setting aside Regulation E's second definition of "prepaid accounts," Mr. Mohamed's account also satisfies Regulation E's third and fourth definitions. The district court disagreed, holding that, because Mr. Mohamed's pandemic unemployment assistance benefits were "qualified disaster relief payments" within the meaning of the Internal Revenue Code, they are exempt from the scope of Regulation E's third and fourth definitions of "prepaid accounts." *See* JA 222–24.

That is wrong. The district court simply assumed that pandemic unemployment assistance payments were automatically exempt so long as the pandemic satisfied the definition of a "qualified disaster." But the relevant section of the Internal Revenue Code cross-referenced in Regulation E, 26 U.S.C. § 139(b)(4), requires not only that an account be loaded with "disaster relief payments," but also that the payments be intended "to promote the general welfare"—a term of art that that does not include unemployment compensation like the pandemic unemployment assistance at issue here.

**1.** There is no dispute that, but for the "qualified disaster" exception, pandemic unemployment assistance would be covered by Regulation E's third and fourth definitions of "prepaid accounts." The two definitions cover:

> (**C**) An account that is marketed or labeled as "prepaid" and that is redeemable upon presentation at multiple, unaffiliated merchants for goods or services or usable at automated teller machines; or
> (**D**) An account . . . [t]hat is issued on a prepaid basis in a specified amount or not issued on a prepaid basis but capable of being loaded with funds thereafter, . . . and [t]hat is not a checking account, share draft account, or negotiable order of withdrawal account.

12 C.F.R. § 1005.2(b)(3)(i). Here, Mr. Mohamed's pandemic unemployment assistance was labeled as "prepaid" and was "redeemable" to buy goods and services at many unaffiliated places, thus meeting the first of these two definitions. *See* JA 27, 64. It was also "issued on a prepaid basis" for the specific amount of benefits Maryland found him eligible for—exactly $14,644—and therefore meets the second of these two definitions. *See* JA 26, 64.

Regulation E, however, excludes from these two categories any "account that is directly or indirectly established through a third party and loaded only with qualified disaster relief payments." 12 C.F.R. § 1005.2(b)(3)(ii)(B). In this context, "qualified disaster relief payments" are defined as "funds made available through a qualified disaster relief program as defined in 26 U.S.C. 139(b)." 81 Fed. Reg. at 84,347. The cross-referenced provision of the Internal Revenue Code, § 139(b), then defines a "qualified disaster relief payment" as "any amount paid to or for the benefit of an individual . . . if such amount is paid by a Federal, State, or local government,

or agency or instrumentality thereof, in connection with a qualified disaster in order to promote the general welfare[.]" 26 U.S.C. § 139(b)(4).[2]

**2.** Looking to this exemption, the district court concluded that the pandemic unemployment assistance payments at issue here are exempt from Regulation E because those payments were related to a "qualified disaster." JA 222–23 (holding that, because the pandemic was "declared by President Trump a disaster warranting

---

[2] The cross-referenced provision of the Internal Revenue Code, § 139(b), provides four definitions of a covered "qualified disaster relief payment," although only the fourth is relevant here. The complete definition is as follows:

"[A]ny amount paid to or for the benefit of an individual--

**(1)** to reimburse or pay reasonable and necessary personal, family, living, or funeral expenses incurred as a result of a qualified disaster,
**(2)** to reimburse or pay reasonable and necessary expenses incurred for the repair or rehabilitation of a personal residence or repair or replacement of its contents to the extent that the need for such repair, rehabilitation, or replacement is attributable to a qualified disaster,
**(3)** by a person engaged in the furnishing or sale of transportation as a common carrier by reason of the death or personal physical injuries incurred as a result of a qualified disaster, or
**(4)** if such amount is paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection with a qualified disaster in order to promote the general welfare,

but only to the extent any expense compensated by such payment is not otherwise compensated for by insurance or otherwise.

30

federal assistance," Mr. Mohamed's pandemic unemployment assistance payments "were 'qualified disaster relief payments' under IRC § 139(b)(4), . . . and are excluded from the definition of [a] prepaid account"). The court, in other words, interpreted this exemption to automatically apply to any payments made in connection with a qualified disaster.

That analysis, however, ignores a key textual limit on this exemption. To qualify, a payment must have been made "in connection with a qualified disaster *in order to promote the general welfare*." 26 U.S.C. § 139(b)(4) (emphasis added). And the phrase "to promote the general welfare" "codifies" what is known as the "general welfare" exception—an exception that applies only to certain payments that the IRS treats as non-taxable. Rev. Rul. 2003-12, 2003-1 C.B. 283 (2003) (noting that section 139(b)(4) "codifies" this exception "with respect to certain disaster relief payments").

As the IRS has explained, "payments under legislatively provided social benefit programs" that are "for the *promotion of general welfare*" are "not includible in an individual's gross income." Office of Chief Counsel of the IRS, Advisory Notice 200648027 (Dec. 1, 2006) (emphasis added). Congress, too, has recognized the "long-standing policy on the part of the Internal Revenue Service to exempt from taxation payments made under legislatively provided social benefit programs for promotion of the general welfare." *See* H.R. Rep. No. 95–1445 at 47 (1978). As relevant here, by exempting those "qualified disaster relief payments" that are made "to promote the

31

general welfare," Regulation E exempts from its third and fourth definitions only those disaster relief payments that are non-taxable.

But, as it turns out, unemployment insurance—including the pandemic unemployment assistance at issue here—does not fall within this exception. That is because, in 1978, Congress changed the Internal Revenue Code to make unemployment compensation taxable and removed unemployment compensation from the "general welfare" exception. *See* H.R. Rep. No. 95–1445, at 47 (explaining that, although under the IRS's "long-standing" general welfare policy, "unemployment compensation paid under most government programs is exempt from taxation," the Revenue Act would make "benefits in the nature of unemployment compensation paid pursuant to government programs . . . included in the recipient's adjusted gross income"); 1 Mertens Law of Fed. Income Tax § 6A:121.[3]

As a result, when Congress created the exemption for "qualified disaster relief payments" more than twenty years later and chose to include only those government payments included within the general welfare exception, government unemployment compensation—regardless of whether it was otherwise provided as

---

[3] Before Congress stepped in, the IRS had historically considered unemployment compensation as included within the "general welfare" exception, *see* Rev. Rul. 63-136, 1963-2 C.B. 19 (1963); Rev. Rul. 55-652, 1955-2 C.B. 21 (1955); I.T. 3230, 1938-2 C.B. 136 (1938).

part of a qualified disaster—was excluded from the statutory definition. *See* 147 Cong. Rec. H10131 (Dec. 13, 2001) (recognizing that, "under the present law general welfare exception, the exclusion does not apply to payments in the nature of income replacement, such as payments to individuals of lost wages [or] unemployment compensation").

In short, because Regulation E exempts only those non-taxable, government provided disaster relief payments that fall under the Internal Revenue Code's general welfare exception, *see* 26 U.S.C. § 139(b)(4), pandemic unemployment assistance— which is taxable and not included within the general welfare exception—is not excluded from the scope of Regulation E or the Act.

**3.** The Internal Revenue Code's structure reinforces this point. The Code separates "qualified disaster relief payments" and "unemployment compensation" into two distinct categories. Under the Code, a "qualified disaster relief payment" is located in Part III of Subchapter B and defined as one of a list of "items specifically excluded from gross income." 26 U.S.C. § 139(b)(4). As relevant here, a qualified disaster payment is therefore treated as a payment that is excluded from gross income and not taxable. *See* Nontaxable Income, West's Tax Law Dictionary § N1260 (Feb. 2022) (noting "items [that] are excluded from gross income and hence are nontaxable").

Unemployment compensation, by contrast, is included within gross income and is therefore taxable. *See* 26 U.S.C. § 85 (noting the "general rule" that "gross income includes unemployment compensation"); *see also* 26 U.S.C. § 85(b) (defining taxable unemployment compensation broadly as encompassing "any amount received under a law of the United States or of a State which is in the nature of unemployment compensation"). The IRS has, moreover, specifically found that "Pandemic Unemployment Assistance"—the very assistance at issue in this case—is "subject to the same U.S. tax rules that apply to other unemployment compensation." IRS News Release, *IRS reminds U.S. territory residents about U.S. income tax rules relating to pandemic unemployment compensation* (Apr. 8, 2021), https://perma.cc/7L4M-6D93. And, consistent with this position, Mr. Mohamed's benefits were taxed no differently than other unemployment benefits. *See* JA32 (noting that Mr. Mohamed received a 1099-G notice requiring him to pay income taxes on the full $14,644 of pandemic unemployment assistance for which he was approved). So the Code itself draws a clear distinction between unemployment compensation, including pandemic unemployment assistance, and those non-taxable payments that count as "qualified disaster relief payments."

The IRS itself has recognized as much. In similar circumstances involving payments to individuals who were not working because of COVID-19, the IRS explained that qualified wages—*i.e.*, wages paid by employers to employees during

the first nine months of the pandemic "for time that the employee is not providing services"—are not "qualified disaster relief payments." IRS, *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act*, Notice 2021-20 at 53–54, 90–91 (2021), https://perma.cc/8VY3-CWYC. Unlike qualified wages, "qualified disaster relief payments" are "payments to individuals to reimburse or pay for expenses incurred as a result of a qualified disaster" and are therefore "excluded" "from a taxpayer's gross income." *Id.* But payments to "an employee [who] is not providing services" are not qualified disaster relief payments "because qualified wages are what an individual would otherwise earn as compensation, rather than payment or reimbursement of expenses incurred as a result of a qualified disaster." *Id.* at 90–92.

Just so here. Like qualified wages, pandemic unemployment assistance is designed to reimburse an individual for what they "would otherwise earn as compensation" if not for the pandemic. *See id.*; 15 U.S.C. § 9021(a)(3). There is, therefore, no principled reason why the IRS's view shouldn't also apply to the pandemic unemployment assistance at issue in this case.

**4.** The district court's belief that pandemic unemployment assistance meets the definition of "qualified disaster relief" also conflicts with the purpose behind Regulation E's exemption for "qualified disaster relief payments." The Bureau's "Prepaid Accounts" Rule added the exemption for "qualified disaster relief

payments" to the third and fourth definitions of "prepaid accounts" to address concerns, including from a "disaster relief organization," about being able to quickly distribute funds "in the wake of tragic events." 81 Fed. Reg. at 83,975. The national relief organization also noted that "the accounts used to distribute [their disaster relief] funds, as well as the funds themselves, are the property of the relief organization, not the consumer, which makes these accounts distinct from other consumer asset accounts the Bureau proposed to cover." *Id.* The Bureau therefore agreed that "the nature of these accounts—such as, for example, the fact that the underlying funds are owned by the relief organization, rather than the consumer—warrant their exclusion from the rule." *Id.* at 83,976.

None of these concerns are present here. Unlike a national relief organization, the funds in this case were distributed by a for-profit financial institution, Bank of America, which has never asserted that either the accounts or the funds are its own property. And pandemic unemployment assistance payments are distributed in the same way government agencies commonly distribute unemployment benefits: through contracts with financial institutions to distribute pre-paid debit cards. *See* Bd. of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* (Oct. 2021), *supra* at 1; CFPB, *Prepaid products agreements database*, https://perma.cc/4XD7-C4WR. Indeed, Maryland distributed Mr. Mohamed's unemployment payments using the same method it has used to distribute

government unemployment benefits for a decade—through a Bank of America government pre-paid debit card. So pandemic unemployment assistance, and its manner of distribution, is not "distinct from other consumer asset accounts the Bureau proposed to cover." *See* 81 Fed. Reg. at 83,975. There is, therefore, no reason to treat it differently.

Ultimately, as text, structure, and purpose confirm, because only those government payments made "in connection with a qualified disaster in order to promote the general welfare" are excluded from Regulation E's scope, the district court was wrong to hold that the taxable pandemic unemployment assistance at issue here fell outside Regulation E's coverage.

## CONCLUSION

The district court's judgment should be reversed.

Dated: January 3, 2023

Respectfully submitted,

*/s/ Jessica Garland*
JESSICA GARLAND
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

Matthew W.H. Wessler
GUPTA WESSLER PLLC
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

LEONARD A. BENNETT
CRAIG C. MARCHIANDO
CONSUMER LITIGATION ASSOCIATES,
P.C.
763 J. Clyde Morris Boulevard, Suite 1A
Newport News, VA 23601
(757) 930-3660
*lenbennett@clalegal.com*

ROBERT WILLIAM MURPHY
LAW OFFICE OF ROBERT W. MURPHY
440 Premier Circle, Suite 240
Charlottesville, VA 22901
(434) 328-3100

*Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 8,521 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

*/s/ Jessica Garland*
Jessica Garland

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2023, I electronically filed the foregoing brief of plaintiff-appellant with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jessica Garland*
Jessica Garland