**No. 22-1954**

# In the United States Court of Appeals for the Fourth Circuit

---

YAGOUB M. MOHAMED, individually and on behalf of others similarly situated,
*Plaintiff-Appellant,*

v.

BANK OF AMERICA, N.A.,
*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Maryland at Baltimore
Case No. 1:21-cv-01283-CCB (Hon. Catherine C. Blake)

---

## JOINT APPENDIX

---

WILLIAM M. JAY
THOMAS M. HEFFERON
ROHINIYURIE TASHIMA*
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
*WJay@goodwinlaw.com*

*\*Admitted only in New York and Virginia;
practice supervised by DC-admitted partners of the firm*

*Counsel for Defendant-Appellee*

January 3, 2023

JESSICA GARLAND
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*jessie@guptawessler.com*

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K Street NW
Suite 850 North
Washington, DC 20006
(202) 888-1741

*Counsel for Plaintiff-Appellant*

*(additional counsel on inside cover)*

LEONARD BENNETT
CRAIG MARCHIANDO
TARA KELLER
CONSUMER LITIGATION
ASSOCIATES, P.C.
763 J. Clyde Morris Boulevard,
Suite 1A
Newport News, VA 23601
(757) 930-3660

ROBERT WILLIAM MURPHY
LAW OFFICE OF ROBERT W.
MURPHY
440 Premier Circle, Suite 240
Charlottesville, VA 22901
(434) 328-3100

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

| Dkt. No. | Document | Page |
|---|---|---|
| — | District Court Docket Report ................................................ JA 1 | |
| –1– | Class Action Complaint.......................................................... JA 7 | |
| –1-3– | Exhibit 1: Contract................................................................ JA 51 | |
| –1-4– | Exhibit 2: Maryland Unemployment Benefits Debit Card Terms and Conditions ........................................................ JA 63 | |
| –1-5– | Exhibit 3: Prepaid Debit Card for State Unemployment Benefits Notice Dated January 5, 2021.................................. JA 75 | |
| –1-6– | Exhibit 4: Prepaid Debit Card for State Unemployment Benefits Notice Dated March 3, 2021 .................................. JA 77 | |
| –18– | Defendant Bank of America, N.A.'s Motion to Dismiss ......... JA 79 | |
| –18-2– | Declaration of Shane M. Daniels in Support of Bank of America's Motion to Dismiss .................................. JA 84 | |
| –18-3– | Exhibit 1: Mohamed Claim Review Dated June 25, 2021 ........ JA 86 | |
| –22-1– | Exhibit A: Yick v. Bank of America, N.A. Order Re: Preliminary Injunction ............................................. JA 88 | |
| –22-2– | Exhibit B: Yick v. Bank of America, N.A. Preliminary Injunction ............................................. JA 93 | |
| –22-3– | Exhibit C: In Re: Bank of America, California Unemployment Benefits Litigation – Bank of America, N.A.'s Discovery Position Statement ................................ JA 99 | |
| –22-4– | Exhibit D: Mohamed Dispute Review Dated June 25, 2021 ............................................. JA 106 | |

–22-5–      Exhibit E: Mohamed Claim Closed
            Dated December 9, 2020 ....................................... JA 108

–22-6–      Exhibit F: Mohamed Additional Review Closed
            Dated February 11, 2021 .................................... JA 110

–36–        Plaintiff's Notice of Supplemental Authority ......................... JA 112

–36-1–      Exhibit A: United States Consumer Financial Protection Bureau –
            Matter of Bank of America, N.A.: Stipulation and Consent to the
            Issuance of a Consent Order Dated July 13, 2022 ................... JA 115

–36-2–      Exhibit B: United States Consumer Financial Protection Bureau –
            Matter of Bank of America, N.A.: Consent Order
            Dated July 14, 2022 ................................................. JA 121

–36-3–      Exhibit C: United States Consumer Financial Protection Bureau:
            *Federal Regulators Fine Bank of America $225 Million Over
            Botched Disbursement of State Unemployment Benefits at
            Height of Pandemic* Dated July 14, 2022 ................................ JA 170

–36-4–      Exhibit D: United States of America Department of the Treasury
            Office of the Comptroller of the Currency - In the Matter of:
            Bank of America, N.A. Charlotte, North Carolina –
            Consent Order Dated July 14, 2022 ...................................... JA 175

–36-5–      Exhibit E: United States of America Department of the Treasury
            Office of the Comptroller of the Currency - In the Matter of:
            Bank of America, N.A. Charlotte, North Carolina –
            Consent Order Dated July 14, 2022 ...................................... JA 202

–37–        Court Memorandum .............................................. JA 213

–38–        Court Order Granting Defendant's Motion to Dismiss .......... JA 225

–39–        Plaintiff's Notice of Appeal ................................... JA 226

–42–        Transcript of Proceedings Dated June 9, 2022 ..................... JA 228

**Query**    **Reports ▾**    **Utilities ▾**    **Help**    **Log Out**

APPEAL,CLOSED

# U.S. District Court
## District of Maryland (Baltimore)
### CIVIL DOCKET FOR CASE #: 1:21-cv-01283-CCB

Mohamed v. Bank of America N.A.                     Date Filed: 05/24/2021
Assigned to: Judge Catherine C. Blake              Date Terminated: 08/11/2022
Case in other court:  Fourth Circuit Court of Appeals, 22-01954    Jury Demand: Plaintiff
Cause: 15:1693ef Electronic Funds Transfer Act     Nature of Suit: 480 Consumer Credit
                                                   Jurisdiction: Federal Question

### Plaintiff

**Yagoub M. Mohamed**                represented by    **Kathleen Hyland**
*Individually and on behalf of all others*           Hyland Law Firm, LLC
*similarly situated*                                 222 Severn Avenue
                                                     Suite 17
                                                     Annapolis, MD 21403
                                                     (410) 777-5396
                                                     Fax: (410) 777-8237
                                                     Email: kat@lawhyland.com
                                                     *TERMINATED: 03/16/2022*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Tara Keller**
                                                     Consumer Litigation Associates
                                                     763 J Cyde Morris Blvd Ste 1A
                                                     Newport News, VA 23601
                                                     703-273-7770
                                                     Email: tara@clalegal.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Craig C Marchiando**
                                                     Consumer Litigation Associates PC
                                                     763 J. Clyde Morris Blvd. Ste 1A
                                                     Newport News, VA 23606
                                                     7579303660
                                                     Fax: 7579303662
                                                     Email: craig@clalegal.com
                                                     *PRO HAC VICE*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Leonard Anthony Bennett**
                                                     Consumer Litigation Associates PC
                                                     763 J. Clyde Morris Blvd Ste 1A
                                                     Newport News, VA 23601
                                                     7579303660

JA 1

Fax: 7579303662
Email: lenbennett@clalegal.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robert William Murphy**
Law Office of Robert W. Murphy
440 Premier Circle
Suite 240
CHARLOTTESVILLE, VA 22901
434-328-3100
Fax: 434-328-3101
Email: rwmurphy@lawfirmmurphy.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Bank of America N.A.**                represented by  **James W. McGarry**
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
6175701000
Fax: 6175231231
Email: Jmcgarry@goodwinprocter.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas M Hefferon**
Goodwin Procter LLP
1900 N St. NW
Washington, DC 20036
12023464000
Fax: 12023464444
Email: thefferon@goodwinlaw.com
*ATTORNEY TO BE NOTICED*

**Yvonne W. Chan**
Jones Day - Boston
100 High Street
Ste 21st Floor
Boston, MA 02110-1781
617-449-6914
Fax: 617-449-6999
Email: ychan@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 05/24/2021 | 1 R | COMPLAINT against Bank of America N.A. ( Filing fee $ 402 receipt number 0416-9293518.), filed by Yagoub M. Mohamed. (Attachments: # 1 Civil Cover Sheet, # 2 |

| | | Summons, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4)(Hyland, Kathleen) (Entered: 05/24/2021) |
|---|---|---|
| 05/24/2021 | 2 | Local Rule 103.3 Disclosure Statement by Yagoub M. Mohamed (Hyland, Kathleen) (Entered: 05/24/2021) |
| 05/25/2021 | 3 | Summons Issued 21 days as to Bank of America N.A. (ols, Deputy Clerk) (Entered: 05/25/2021) |
| 05/25/2021 | 4 | NOTICE of Case Assignment. This case has been assigned to Magistrate Judge Beth P. Gesner. Yagoub M. Mohamed or counsel for Yagoub M. Mohamed are required to review and comply with the Magistrate Judge Pilot Project Procedures which can be downloaded here. Pursuant to Standing Order 2019-07, which can be downloaded here, counsel has 14 days from the date of this notice to file their consent, or decline to consent to proceed before a U.S. Magistrate Judge which can be downloaded here. To file your consent, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Consent to Proceed Before a Magistrate Judge*. To file your declination, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Decline to Proceed Before a Magistrate Judge*. Failure to file a consent or declination will result in issuance of an Order to Show Cause. Please review the case management order that has been issued in this case. Magistrate Election Form due by 6/8/2021. (ols, Deputy Clerk) (Entered: 05/25/2021) |
| 05/25/2021 | 5 | Case Management Order. Signed by Magistrate Judge Beth P. Gesner on 5/25/2021. (ols, Deputy Clerk) (Entered: 05/25/2021) |
| 05/25/2021 | 6 | MOTION to Appear Pro Hac Vice for Robert W. Murphy (Filing fee $100, receipt number 0416-9294228.) by Yagoub M. Mohamed(Hyland, Kathleen) (Entered: 05/25/2021) |
| 05/25/2021 | 7 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of Robert William Murphy. Attorney Robert William Murphy will receive a separate email with the previously issued CM/ECF login and password. Signed by Clerk on 5/25/2021. (dm4, Deputy Clerk) (Entered: 05/25/2021) |
| 06/07/2021 | 8 | WAIVER OF SERVICE Returned Executed by Yagoub M. Mohamed. Bank of America N.A. waiver sent on 6/1/2021, answer due 8/2/2021.(Hyland, Kathleen) (Entered: 06/07/2021) |
| 06/07/2021 | 9 | -FILED IN ERROR- Consent to Magistrate Judge (Hyland, Kathleen) Modified on 6/7/2021 (ols, Deputy Clerk). (Entered: 06/07/2021) |
| 06/07/2021 | 10 | NOTICE OF DEFICIENCY re: 9 Consent/Decline to Proceed Before a US Magistrate Judge. Yagoub M. Mohamed must correct the following error(s): **Pursuant to the Magistrate Judge Pilot Project Procedures, consent/declination forms are to be filed with the event *25 Pct Mag Consent to Proceed Before a Magistrate Judge* **OR** *25 Pct Mag Decline to Proceed Before a Magistrate Judge*, both located in Other Filings >Other Documents. (ols, Deputy Clerk) (Entered: 06/07/2021) |
| 06/11/2021 | 13 | NOTICE of Appearance by Thomas M Hefferon on behalf of Bank of America N.A. (Hefferon, Thomas) (Entered: 06/11/2021) |
| 06/14/2021 | | Case Reassigned to Judge Catherine C. Blake. Magistrate Judge Beth P. Gesner no longer assigned to the case. (kns, Deputy Clerk) (Entered: 06/14/2021) |
| 07/16/2021 | 14 | MOTION to Appear Pro Hac Vice for Yvonne W. Chan (Filing fee $100, receipt number 0416-9383582.) by Bank of America N.A.(Hefferon, Thomas) (Entered: 07/16/2021) |

JA 3

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 8 of 304

| 07/16/2021 | 15 | MOTION to Appear Pro Hac Vice for James W. McGarry (Filing fee $100, receipt number 0416-9383631.) by Bank of America N.A.(Hefferon, Thomas) (Entered: 07/16/2021) |
|---|---|---|
| 07/16/2021 | 16 | PAPERLESS ORDER granting 14 Motion to Appear Pro Hac Vice on behalf of Yvonne W Chan. Directing attorney Yvonne W Chan to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 7/16/2021. (dm4, Deputy Clerk) (Entered: 07/16/2021) |
| 07/16/2021 | 17 | PAPERLESS ORDER granting 15 Motion to Appear Pro Hac Vice on behalf of James W. McGarry. Attorney James W. McGarry will receive a separate email with the previously issued CM/ECF login and password. Signed by Clerk on 7/16/2021. (dm4, Deputy Clerk) (Entered: 07/16/2021) |
| 08/02/2021 | 18 | MOTION to Dismiss *Complaint* by Bank of America N.A. (Attachments: # 1 Memorandum in Support of Bank of America, N.A.'s Motion to Dismiss, # 2 Declaration of Shane M. Daniels, # 3 Exhibit 1, # 4 Text of Proposed Order)(Hefferon, Thomas) (Entered: 08/02/2021) |
| 08/02/2021 | 19 | Local Rule 103.3 Disclosure Statement by Bank of America N.A. identifying Corporate Parent BAC North America Holding Company, Other Affiliate Bank of America Corporation, Other Affiliate Berkshire Hathaway Inc., Other Affiliate NB Holdings Corporation for Bank of America N.A..(Hefferon, Thomas) (Entered: 08/02/2021) |
| 08/06/2021 | 20 | Consent MOTION for Extension of Time to File Response/Reply as to 18 MOTION to Dismiss *Complaint* by Yagoub M. Mohamed. (Attachments: # 1 Text of Proposed Order)(Hyland, Kathleen) (Entered: 08/06/2021) |
| 08/09/2021 | 21 | ORDER granting 20 Plaintiff's Consent Motion to Set Briefing Schedule re 18 MOTION to Dismiss *Complaint*. Signed by Judge Catherine C. Blake on 8/9/2021. (ols, Deputy Clerk) (Entered: 08/09/2021) |
| 09/07/2021 | 22 | RESPONSE in Opposition re 18 MOTION to Dismiss *Complaint* filed by Yagoub M. Mohamed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Text of Proposed Order)(Hyland, Kathleen) (Entered: 09/07/2021) |
| 10/05/2021 | 23 | REPLY to Response to Motion re 18 MOTION to Dismiss *Complaint* filed by Bank of America N.A..(Hefferon, Thomas) (Entered: 10/05/2021) |
| 03/10/2022 | 24 | NOTICE of Change of Address by Thomas M Hefferon (Hefferon, Thomas) (Entered: 03/10/2022) |
| 03/10/2022 | 25 | QC NOTICE: 24 Notice of Change of Address filed by Bank of America N.A. was filed incorrectly. **Login into PACER and make address update via Manage My Account**. (ols, Deputy Clerk) (Entered: 03/10/2022) |
| 03/15/2022 | 26 | MOTION to Withdraw as Attorney by Yagoub M. Mohamed (Attachments: # 1 Text of Proposed Order)(Hyland, Kathleen) (Entered: 03/15/2022) |
| 03/16/2022 | 27 | ORDER granting 26 Motion to Withdraw as Attorney. Attorney Kathleen Hyland terminated. Signed by Judge Catherine C. Blake on 3/16/2022. (ols, Deputy Clerk) (Entered: 03/16/2022) |
| 03/29/2022 | 28 | NOTICE of Change of Address by Yvonne W. Chan (Chan, Yvonne) (Entered: 03/29/2022) |

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 9 of 304

| 03/29/2022 | 29 | QC NOTICE: 28 Notice of Change of Address filed by Bank of America N.A. was filed incorrectly. **Please make address change by Logging into PACER and make address update via Manage My Account* (ols, Deputy Clerk) (Entered: 03/29/2022) |
| 04/04/2022 | 30 | NOTICE of Appearance by Tara Keller on behalf of Yagoub M. Mohamed (Keller, Tara) (Entered: 04/04/2022) |
| 04/05/2022 | 31 | MOTION to Appear Pro Hac Vice for Leonard A. Bennett (Filing fee $100, receipt number AMDDC-9859618.) by Yagoub M. Mohamed (Attachments: # 1 Exhibit A) (Keller, Tara) (Entered: 04/05/2022) |
| 04/06/2022 | 32 | MOTION to Appear Pro Hac Vice for Craig C. Marchiando (Filing fee $100, receipt number AMDDC-9861144.) by Yagoub M. Mohamed (Attachments: # 1 Exhibit A) (Keller, Tara) (Entered: 04/06/2022) |
| 04/07/2022 | 33 | PAPERLESS ORDER granting 31 Motion to Appear Pro Hac Vice on behalf of Leonard Anthony Bennett, Craig C Marchiando. Directing attorney Leonard Anthony Bennett, Craig C Marchiando to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so; granting 32 Motion to Appear Pro Hac Vice on behalf of Leonard Anthony Bennett, Craig C Marchiando. Directing attorney Leonard Anthony Bennett, Craig C Marchiando to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. Signed by Clerk on 4/7/2022. (dm4s, Deputy Clerk) (Entered: 04/07/2022) |
| 05/25/2022 | 34 | ORDER Scheduling Oral Argument. Signed by Judge Catherine C. Blake on 5/25/2022. (ols, Deputy Clerk) (Entered: 05/25/2022) |
| 06/09/2022 | 35 | Motion Hearing held on 6/9/2022 re 18 MOTION to Dismiss *Complaint* filed by Bank of America N.A. before Judge Catherine C. Blake.(Court Reporter: Melissa Clark) (dg4s, Deputy Clerk) (Entered: 06/09/2022) |
| 07/17/2022 | 36 | NOTICE by Yagoub M. Mohamed re 18 MOTION to Dismiss *Complaint Supplemental Authority* (Attachments: # 1 Exhibit Stipulation and Consent to the Issuance of Consent Order directed to Bank of America, N.A., Consumer Financial Protection Bureau File No. 2022-CFPB-0004, entered July 14, 2022, # 2 Exhibit Consent Order directed to Bank of America N.A., Consumer Financial Protection Bureau File No. 2022-CFPB-0004, entered July 14, 2022, # 3 Exhibit Consumer Financial Protection Bureau press release dated July 14, 2022, entitled Federal Regulators Fine Bank of America $225 Million Over Botched Disbursement of State Unemployment Benefits at Height of Pandemic-, # 4 Exhibit Consent Order of United States Department of the Treasury, Office of the Comptroller of the Currency, directed to Bank of America, N.A., File No.: AA-ENF-2022-21 (#2022-023), entered July 14, 2022 (cease and desist proceedings, # 5 Exhibit Consent Order of United States Department of the Treasury, Office of the Comptroller of the Currency, directed to Bank of America, N.A., File No.: AA-ENF-2022-22 (#2022-024), entered July 14, 2022 (civil money penalty proceedings)) (Murphy, Robert) (Entered: 07/17/2022) |
| 08/11/2022 | 37 R | MEMORANDUM. Signed by Judge Catherine C. Blake on 8/11/2022. (ols, Deputy Clerk) (Entered: 08/11/2022) |
| 08/11/2022 | 38 R | ORDER granting 18 Defendant's Motion to Dismiss. Signed by Judge Catherine C. Blake on 8/11/2022. (ols, Deputy Clerk) (Entered: 08/11/2022) |
| 09/06/2022 | 39 | NOTICE OF APPEAL as to 38 R Order on Motion to Dismiss by Yagoub M. Mohamed. Filing fee $ 505, receipt number AMDDC-10138384.(Keller, Tara) (Entered: |

JA 5

| | | 09/06/2022) |
|---|---|---|
| 09/08/2022 | 40 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 39 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 09/08/2022) |
| 09/12/2022 | 41 | USCA Case Number 22-1954 for 39 Notice of Appeal filed by Yagoub M. Mohamed - Case Manager - Ashley Brownlee. (slss, Deputy Clerk) (Entered: 09/12/2022) |
| 10/12/2022 | 42 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 06-09-2022, before Judge Catherine C. Blake. Court Reporter/Transcriber Melissa L. Clark, Telephone number greencastlereporter@gmail.com. Total number of pages filed: 72. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 11/2/2022. Redacted Transcript Deadline set for 11/14/2022. Release of Transcript Restriction set for 1/10/2023.(Clark, Melissa) (Entered: 10/12/2022) |

## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## (NORTHERN DIVISION)

YAGOUB M. MOHAMED,
*Individually and on behalf of*
*all others similarly situated,*
5920 Schering Road
Baltimore, Maryland 21206

        Plaintiff,                      **CASE NO.: 1:21-cv-1283**

vs.                                **CLASS ACTION**

BANK OF AMERICA, N.A.,
100 North Tryon Street
Charlotte, North Carolina 28255

        SERVE ON:
        The Corporation Trust, Inc.
        2405 York Road, Suite 201
        Lutherville-Timonium, MD 21093

        Defendant.

_____/

## COMPLAINT FOR DAMAGES AND INCIDENTAL RELIEF

Plaintiff, Yagoub M. Mohamed, an individual ("Mr. Mohamed"), on behalf of himself and all other similarly situated persons, whose Maryland Unemployment Insurance ("UI"), Pandemic Unemployment Assistance ("PUA"), and other public benefits are or were paid through debit cards issued by Defendant, Bank of America, N.A., a national banking association ("Bank of America" or "Bank"), alleges:

## INTRODUCTION

1. This matter arises from Bank of America's breach of contractual and legal obligations to provide safe and secure debit cards to Marylanders who received unemployment insurance benefits.

2. Like thousands of other Marylanders, Plaintiff lost his job through no fault of his own during the COVID-19 pandemic. Plaintiff applied for public benefits through programs administered by the Maryland Department of Labor's Division of Unemployment Insurance ("DUI") and was found eligible by DUI to receive the benefits to which he was lawfully entitled.

3. Pursuant to a state contract between DUI and Bank of America, through which the Bank provided debit cards, Plaintiff and the Class Members received their periodic payments not from DUI directly, but through bank-issued and bank-administered prepaid debit cards. ("DUI Debit Cards" or "Cards"), which are linked to individual Bank depository accounts ("DUI Debit Card Accounts" or "Accounts"). Although the Bank was legally required to take necessary and reasonable steps to protect Plaintiff's and Class Members' DUI Debit Cards and Accounts from fraudulent access by third parties, the Bank failed to do so.

4. Bank of America used inexpensive, outdated debit card technology that did not properly secure customer information or comport to the industry standard of care. The Bank failed to secure Plaintiff's and Class Members' sensitive Card and Account information and issued them DUI Debit Cards without the fraud-preventing EMV chip technology that the Bank has used on all its other debit and credit cards since 2014. Instead, the Bank's DUI Debit Cards used outdated magnetic stripe technology, which makes them readily susceptible to cloning and other schemes that have allowed third

parties to fraudulently use and access Plaintiff's and Class Members' DUI Debit Cards and Accounts.

5. Marylanders experienced a high rate of fraudulent activity on their Bank of America DUI Debit Card Accounts. Instead of providing an effective and timely process for Plaintiff and Class Members to report unauthorized transactions and submit fraud claims, the Bank adopted a series of "customer service" practices and policies that required Plaintiff and Class Members to spend dozens of hours on telephone calls with customer service and that have frustrated and obstructed their efforts to submit their claims.

6. The Bank also has violated its statutory obligations to Plaintiff and Class Members under the federal Electronic Fund Transfer Act and other laws by not implementing adequate and reasonable systems, measures, and protections to permit prompt and effective identification of fraud, submission of fraud claims, provisional access to already approved benefits during the course of fraud investigations, prompt and accurate resolution of fraud claims, and prompt reimbursement of funds stolen from Plaintiff's and Class Members' Accounts.

7. By the acts and omissions alleged here, Bank of America has violated federal and state consumer protections; violated EFTA and its implementing Regulation E; acted negligently; breached its cardholder agreement with Plaintiff and Class Members; and breached its contract with DUI (to which Plaintiff and Class Members are intended third-party beneficiaries). These acts and omissions have caused substantial financial and other harm to Plaintiff and Class Members.

JA 9

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to: (a) 28 U.S.C. §1331 because this action arises under the Electronic Fund Transfer Act, 15 U.S.C. §§1693, *et seq*. and (b) supplemental jurisdiction under 28 U.S.C. §1367 with respect to the claims for relief arising under state law.

9. This Court has specific personal jurisdiction over Bank of America because the Bank has sufficient minimum contacts with Maryland, has purposely availed itself of the benefits and protection of Maryland law, and conducts a substantial amount of business in and with the State of Maryland (including with DUI).

10. Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial portion of the acts or omissions giving rise to the claims alleged occurred in this District, and because Bank of America is subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

11. Mr. Mohamed is a resident of Baltimore, Maryland. He was a mechanic and small business owner who found himself out of work during the COVID-19 pandemic. He then applied for and was found eligible by DUI to receive unemployment benefits. He received a Bank of America DUI Debit Card with a magnetic stripe (but no EMV chip) to access his benefits. He immediately discovered he was a victim of unauthorized transactions on his DUI Debit Card Account. Mr. Mohamed promptly reported the unauthorized transactions to Bank of America, which failed to comply with its legal obligations as alleged herein, and caused Mr. Mohamed to suffer immediate and irreparable injury. Mr. Mohamed is pursuing the claims alleged herein on his own behalf and as a representative of all Class Members.

12. Defendant Bank of America, N.A. ("Bank of America" or "Bank"), is a financial institution incorporated in the State of Delaware and headquartered in North Carolina that conducted a substantial amount of business in Maryland. At all times relevant to this dispute, the Bank had an exclusive contract with the State of Maryland DUI to administer UI and other benefit payments through DUI Debit Cards and Accounts.

## FACTUAL ALLEGATIONS

### A. Bank of America's Contract with the State of Maryland

13. DUI is an office of the Maryland State Department of Labor ("DOL"), formerly known as the Maryland Department of Labor, Licensing, and Regulation ("DLLR"), which is responsible for administering state programs that provide unemployment insurance (UI) benefits and currently administers four federal COVID-19 relief programs in Maryland: pandemic unemployment assistance (PUA) benefits, pandemic emergency unemployment compensation (PEUC) benefits to Marylanders, federal pandemic unemployment compensation (FPUC) and mixed-earner unemployment compensation program (MEUC) (collectively, "DUI benefits").

14. On January 17, 2013, DOL issued a "Request for Proposals for Electronic Payment Card Services for Department of Labor, Licensing and Regulation, Division of Unemployment Insurance, RFP #-DLLR-EPC-01172013." ("RFP") https://www.treasurer.state.md.us/media/52202/dllr_epc_01172013_rfp.pdf, (last accessed May 24, 2021.)

15. In the RFP, DUI stated it was "seeking an electronic payment solution for the disbursement of UI benefit payments in order to [...] ensure cardholders receive the UI benefits to which they are entitled, efficiently, timely, accurately, and securely." RFP, 3.01, "Objectives."

16. According to the RFP, DUI issues payments five days a week, with the exception of State holidays. RFP, 3.02, "Program Description."

17. The RFP provided detailed data on Claims Activity for 2008 through 2012. This represented the time period immediately following the Great Recession and demonstrated a high level of activity in Maryland during the economic crisis:

| UI Claims Activity | Activity for the past four (4) years 2008-2012 | Calendar year 2012 |
|---|---|---|
| Number of New Cards Issued | 510,292 | 75,620 |
| Number of Debit Card Payments | 10,703,573 | 2,357,145 |
| Average Payment Amount | $5,905,037,002 | $1,290,119,609 |
| Average Payment Amount | $324/wk | $325/wk |
| Average Weeks of Benefits Received Per Claimant | 17.8 | 18.0* |
| *12 months ending September 2012 | | |

*See, Id.*

18. For the calendar year 2012, DUI reported that there were 1,469 fraud credits issued in Maryland. These resulted in 30 deactivated accounts for identity theft. *See* "Questions and Answers," https://www.treasurer.state.md.us/media/52914/dllr_epc_01172013 questions_and_answers.pdf (last accessed May 24, 2021.)

19. On or about March 26, 2013, Bank of America accepted the Contract with DOL and the enumerated conditions and requirements of the RFP were incorporated by reference as a final exhibit to the Contract. ***See*, Exhibit 1, "Contract,"** Article I-Scope of Services.

20. Bank of America entered into an exclusive contract with DUI for the provision of Electronic Payment Card ("EPC") services, including issuance of Bank of America DUI

6

JA 12

Debit Cards through which individuals entitled to receive DUI benefits could access those benefits.

21. On or about March 26, 2013, Bank of America acknowledged and agreed to comply with the following procedures related to consumer account security:

> [...] 5. Contractor must have in place reasonable security procedures designed to protect the confidentiality of data regarding cardholder information and cardholder accounts and to limit to authorized persons access to such data. Such procedures must, at a minimum, ensure that:
> a. Access to data regarding cardholder information and cardholder accounts is restricted to only those individuals whose access is essential to the administration of the program.
> b. Individuals with access to cardholder information or cardholder accounts is under the direction and control of the Contractor.
> c. Each individual with access to cardholder information or cardholder accounts is required to maintain the confidentiality of such data, either as a condition of employment or by written agreement, before access to this information is permitted.
> d. Contractor monitors the use of the data by individuals with access to cardholder information or cardholder accounts to ensure that such information is being used only for purposes consistent with the administration of the EPC program.
> e. All information regarding cardholders and cardholder accounts is secured in a manner which will ensure its confidentiality.

*See*, RFP, "3.05, **General Requirements**."

22. Bank of America also agreed the DOL would not indemnify it for any claims or losses arising out of the performance of the Contract. Bank of America was required to agree to indemnify and hold harmless DOL for any claims arising from any negligent act or omission in connection with providing EPC services for the disbursement of UI benefit payments. *See*, RFP, 3.05, ¶¶s 15-16.

23. Bank of America further agreed, "to assume full responsibility for any and all damage to the property of the Office, both real and personal, which results from or arises in connection with, the performance of this Contract." *See* Exhibit 1, "Contract."

24. Bank of America provided DUI with detailed information regarding its "Fraud Detection and Prevention" policies and procedures. *See*, RFP, 3.06, "Specific Services, C: Fraud Detection and Prevention."

25. Bank of America provided DUI with a detailed description of the assistance cardholders would be provided in the event their individual account information was compromised. *See, Id.*, "I: Confidentiality and Security."

26. Upon information and belief, Bank of America represented to DUI that it would provide "best-in-class" fraud monitoring.

27. The Contract required Bank of America to have the capability to provide daily, detailed reports on fraudulent activity to DUI:

    a.     Fraud control activity/risk analysis (daily reports):

        1)     Number of PIN changes;
        2)     Number of reports of stolen/lost EPCs;
        3)     Dollar amount stolen/lost;
        4)     Number of reports of fraudulent activity;
        5)     Dollar amount defrauded;
        6)     Geographical location of fraudulent activity;
        7)     Detailed listing of customers who have reported stolen/lost EPCs and/or fraudulent activity and the resolution of each;
        8)     Data to measure timeliness between the date of a reported stolen/lost
        9)     EPC or other fraudulent activity and the date the reported issue is resolved;
        10)    Number of accounts deactivated due to fraud;
        11)    Number of reissued EPCs and reasons for re-issuance;
        12)    Detailed listing of confidentiality and security breaches including steps taken to contain the breach, follow-up reports, and a corrective action plan;
        13)    Detailed listing of any and all business disruptions of four (4) hours or longer

*See*, RFP, 3.05., ¶ 6.

JA 14

28. The Contract further required Bank of America to keep data on the number of frozen accounts; closed accounts; and customer service activity, including the number of account protests by type of protest. *See, Id.*

29. Following execution of the Contract, DUI began distributing DUI benefits pursuant to its contract with Bank of America, under which the default means of distributing DUI benefits payments was through Bank-issued and Bank-administered DUI Debit Cards.

30. Pursuant to the terms of the Contract, DUI and the Bank engaged in a joint undertaking to administer the DUI benefits programs and distribute DUI benefits payments to eligible claimants through DUI Debit Cards.

31. DUI Debit Cards and Accounts are an integral part of DUI's benefits distribution and administration system. Under the terms of the Contract, those Accounts can only receive deposits from the DUI and do not allow commingling of benefits payments with other funds.

32. Bank of America maintained its exclusive contract with the State of Maryland from March of 2013 through February of 2021.

33. On February 23, 2021, DOL Secretary Tiffany P. Robinson announced that "Maryland's unemployment insurance claimants will begin receiving their benefit payments through direct deposit beginning in April 2021. The transition from Bank of America debit cards to direct deposit comes as a result of a new contract with Wells Fargo." *See,* "Maryland Department of Labor Announces Direct Deposit Payments Will Be Available for Unemployment Insurance Claimants in April 2021," https://www.dllr.state.md.us/whatsnews/uidd.shtml (last accessed May 20, 2021).

## B. Bank of America's Additional Representations on Card Security to Maryland Consumers

34. In addition to the terms set forth in Bank of America's Contract with the state of Maryland, Bank of America published a separate webpage specifically tailored to Maryland UI Debit Cardholders, "Maryland UI Benefits Card," https://www.visaprepaidprocessing.com/mduidebitcard (last accessed May 20, 2021).

35. By signing up to receive UI benefits on the Bank of America Debit Card, Marylanders were subject to a Bank of America Cardholder Agreement.

36. The Bank's "Maryland Unemployment Benefits Debit Card Account Agreement," ("Cardholder Agreement,"), effective March 1, 2018, contained "Bank of America's "Zero Liability" Policy for Unauthorized Transactions." ***See* Exhibit 2, "Cardholder Agreement."** The Zero Liability Policy states,

> Federal law (described in the section below entitled "Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions ") may limit your liability for unauthorized transactions on your Account, but you may still be liable in some circumstances. Under the Bank of America "zero liability" policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions:

> [...]

> **"Reasonable" time defined.** Reasonable time will be determined in our sole discretion based on the circumstances but will not be less than the time frames specified under the Electronic Fund Transfer Act or Regulation E (see Section 10 below).

> **Your Rights under Regulation E.** If your claim does not meet the prescribed conditions for reimbursement under the above policy, you still retain any consumer rights you may have under Regulation E, as described in Sections 10 and 11 below, and we will automatically re-examine the claim in accordance with those rights.

*See*, **Exhibit 2, ¶ 6**. Emphasis in original.

**JA 16**

37. Section 10 of the Cardholder Agreement states, in relevant part:

> **Regulation E Liability Disclosure**; Your Liability in Case of Loss, Theft, or Unauthorized Transactions. Contact Us Promptly. Please contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission. Telephoning is the best way of keeping your possible losses down.

*See*, **Exhibit 2, ¶ 10**. Emphasis in original.

38. In the event of a fraud claim or compromised account, Bank of America promised to provide the following dispute resolution services:

> We will determine whether an error occurred within 10 business days after we hear from you—and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your Account.
>
> [...]
>
> We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.

*See*, **Exhibit 2, ¶ 11**. Emphasis in original.

39. On the Maryland UI Benefits Card webpage, Bank of America provided a "FAQs" tab, which stated, for " convenience and flexibility," account information and customer service is available 24 hours a day, 7 days a week. *See* https://www.visaprepaid processing.com/mduidebitcard/Program/FAQ (last accessed, May 20, 2021).

### C. Maryland Unemployment Rates and Claims Rose During the COVID-19 Pandemic

40. On March 5, 2020, in response to the COVID-19 Pandemic, Governor Larry Hogan declared a State of Emergency in Maryland.

JA 17

41. In April of 2020, Maryland reported 370,700 job losses, which was a sharp, 13.5% monthly decline from February of 2020. *See,* "Covid-19 Economic Crisis: By State," University of New Hampshire, Carsey School of Public Policy, April 16, 2021, https://carsey.unh.edu/COVID-19-Economic-Impact-By-State (last accessed, May 20, 2021).

42. Between February 2020 and April 2021, the industries in Maryland with the highest job losses were: (1) Arts, Entertainment, & Recreation; (2) Accommodation & Food Services; (3) Information; (4) Other Services (Named Plaintiff's category); and (5) Educational Services. *Id.*, (industry data from the U.S. Bureau of Labor Statistics.)

43. Between February 29th and March 31, 2021, the number of UI benefits payments processed in Maryland dramatically increased, reaching the highest point in April of 2020:

| Date | Total Payments |
|---|---|
| 2/29/2020 | 5,894 |
| 3/31/2020 | 20,634 |
| 4/30/2020 | 143,742 |
| 5/31/2020 | 48,670 |
| 6/30/2020 | 30,901 |
| 7/31/2020 | 21,346 |
| 8/31/2020 | 9,583 |
| 9/30/2020 | 5,219 |
| 10/31/2020 | 11,762 |
| 11/30/2020 | 5,667 |
| 12/31/2020 | 12,040 |
| 1/31/2021 | 14,785 |
| 2/28/2021 | 14,275 |
| 3/31/2021 | 12,215 |

*See, United States Department of Labor, Employment & Training Administration:*

*Benefits: Timeliness and Quality Reports, Report for 2/01/2020 through 3/31/2021:*

https://oui.doleta.gov/unemploy/btq/btqrpt.asp (last accessed May 24, 2021).

### D. Bank of America's Failures To Protect Maryland Cardholders' Information

44. As the number of Marylanders eligible for UI and pandemic relief increased, Bank of America repeatedly failed to secure Plaintiff's and Class Members' personally identifiable information, Card, and Account data, and other financial data and information (collectively, "Cardholder Information").

45. Bank of America failed to maintain, store, share, or transfer DUI Debit Cardholders' Cardholder Information in a reasonably secure manner consistent with the Bank's obligations to DUI and to Plaintiff and Class Members.

46. Bank of America violated obligations under the Contract and under its common law duty to take reasonable steps to protect Cardholder Information from unauthorized access, theft, or disclosure.

47. Plaintiff and many of the putative class members received DUI Debit Cards after unauthorized users had already stolen money from their DUI Accounts. Such unauthorized transactions could only have occurred if Bank of America failed to store or transfer Cardholder Information in a reasonably secure manner.

48. At all times relevant to this dispute, Bank of America used outdated "Magnetic Stripe Technology" on the Maryland DUI Debit Cards, instead of the common standard of technology, which were originally called "Europay, MasterCard, and Visa Chip Cards," and are now known as "EMV" chip cards. Magnetic stripes, which store data about the card, including the cardholder's name, the card number, and the card expiration date.,

are highly susceptible to fraud. Alternatively, chip cards are much safer because they have two-way magnetic stripes with more sophisticated encoding and embedded chips with personal identification numbers.

49. Magnetic stripe fraud vulnerability is well-established. For over a decade, a common credit card fraud known as "skimming" has allowed thieves to collect information on the magnetic stripe through a wireless transmitter. In 2013 and 2014, large retail stores such as Target and Home Depot became widespread victims of skimming scams, and repaid consumer cardholders millions of dollars in damages.

50. Since 2012, most card companies adopted chip technology as the standard for card security. Visa, Mastercard, Discover, American Express, Bank of America, Citibank, Wells Fargo, JPMorgan Chase, U.S. Bank, major retailers, and several credit unions have all migrated to chip technology. *See* "EMV," https://en.wikipedia.org/wiki/EMV, (last accessed, May 21, 2021).

51. Over seven years ago, Bank of America migrated to chip technology and publicly announced that it would include EMV chip technology on all consumer debit cards to help prevent fraud. According to Bank of America's website, EMV chip technology "has been around for over 20 years and is the credit and debit card security standard in many countries around the world. When purchases are made using the chip feature at chip-enabled terminals, the transaction is more secure because of the process used to determine if the card is authentic. This makes the card more difficult to counterfeit or copy." *See* "EMV Chip FAQs," https://www.bankofamerica.com/security-center/faq/emv-chip-card/#:~:text=Chip%20technology%20has%20been%20around,

many%20countries%20around%20the%20world.&text=Chip%20card%20technology%20provides%20an,at%20a%20chip%2Denabled%20terminal, (last accessed May 24, 2021).

52. Bank of America also assures its accountholders on its website that "whether you use the magnetic stripe or the chip to make your purchase, you can have confidence in the protection and security features we provide for all credit and debit accounts."

53. Despite the fact that Bank of America has known that chip cards are significantly more secure than magnetic stripe cards and is the "debit card security standard," the Bank chose to issue DUI Debit Cards using vulnerable magnetic stripe technology to thousands of the most financially vulnerable Marylanders.

54. Predictably, the issuance of DUI Debit Cards without chips led to rampant fraud, resulting in the ongoing loss of thousands of dollars in DUI benefits intended to assist Marylanders who lost their jobs, including during the COVID-19 pandemic.

### E. Marylanders Experienced Widespread UI Debit Card and Account Fraud

55. Since the COVID-19 Pandemic, media sources in Maryland have run stories on stolen benefits and the DUI Debit Cards. *See*, "Unemployment claimants question debit card security after benefits were stolen: UI debit cards lack chip technology," WMAR Baltimore, October 28, 2020, updated on March 17, 2021, https://www.wmar2news.com/matterformallory/unemployment-claimants-question-debit-card-security-after-benefits-were-stolen, last accessed May 20, 2021. ("WMAR Report").

56. The WMAR Report mentioned that "in July, the Maryland Department of Labor uncovered a massive and sophisticated criminal enterprise involving 47,500 fraudulent

15

**JA 21**

unemployment claims using identity theft totaling over $501 million." But clarified that "this appears to be a different kind of fraud. Claimants believe their debit cards were somehow cloned."

57. The WMAR reporters asked Bank of America whether the fraud had to do with the lack of chip technology on unemployment insurance debit cards. "A Bank of America spokeswoman advised, "We are in continual discussions with our clients about options for our Card technology, including the addition of chip. She added that Bank of America takes all reports of fraud very seriously and claimants should contact Bank of America (using the number on the back of their card) to report unauthorized or disputed transaction claims."

58. On March 2, 2021, Fox 5, Washington, DC reported that a Maryland resident, Dr. Keenan Cofield, reported that he was contacted online by someone who pretended to be an investor. Weeks later, he began receiving packages with batches of Maryland UI letters and cards inside. Fox 5 reported, "State Police and the FBI have been warning of these types of scams – where were scammers steal identities to submit fraudulent unemployment claims and then use people as "money mules," trying to funnel the stolen money through them. This could include using your bank account or having you go to a bank or ATM to process the transactions."

59. The "Unofficial Unemployment Maryland Information and Help," Facebook Group ("Maryland Facebook Group") contains complaints from dozens of Marylanders regarding fraudulent activity and locked accounts with Bank of America. To summarize:

　　　　a. On April 7, 2021, a Maryland DUI recipient wrote that the source of the fraud involved duplicated personal identification numbers and a data breach within Bank of America. According to this individual, Bank of

America knew of the security breach due to widespread issues in the state of California that occurred prior to December 25, 2020.

b. As of April 7, 2021, Bank of America had not alerted its Maryland DUI recipients about the breach, and had not taken any steps to increase security on the Maryland Debit Cards or DUI Accounts.

c. The Bank told Maryland DUI recipients with fraud complaints that DUI caused the freeze on their accounts, which "automatically" caused the Bank to close its fraud investigation.

d. Multiple Maryland DUI recipients had their accounts frozen for longer than one month.  One user reported that on April 8, 2021, her account had been frozen since November of 2020.

e. Under advisement from the Bank, these Marylanders had filed police reports in multiple counties, but the Bank did not investigate their claims.

f.  Marylanders contacted DUI representatives, who explained that the DUI office had no power to unlock the Bank's accounts.

g. One Maryland DUI recipient, who had aggressively pursued his claim and received a refund, reported that the Bank wanted everyone to reach out via e-mail so that a team could be formed to help claimants. This group member advised the group to contact someone named "Ms. Jones" or email Holly O'Neill of the Bank public relations office.

h. Other Maryland consumers have reported their claims to Bank of America and have not received any credit for their stolen funds.

60. Upon information and belief from these sources, the unauthorized transactions have taken various forms, including massive ATM withdrawals in distant states and

countries, thousand-dollar charges at luxury vendors, and repeated transactions with food delivery services. Regardless of how or where the fraud has been carried out, the Bank's DUI Debit Cards have proven highly susceptible to unauthorized use.

61. After criminals exploited the security vulnerabilities of the Bank's DUI Debit Cards and Accounts and misappropriated Card and Account information, that information can be sold on the dark web, allowing the buyer to engage in unauthorized use of funds belonging to Plaintiff and Class Members.

62. This kind of consumer account information has a market value. The RFP and Contract specifically prohibited the sale of any Marylanders' account information, over opposition from the Bank and bidders who attended the RFP Q&A Session.

63. Such rampant third-party fraud was readily foreseeable given the rapid growth of the number of new UI and PUA claims, as well as reports from early in the pandemic warning of the potential for fraud and exploitation of the UI and PUA benefits system by criminals.

64. Upon information and belief, the Bank knew or had reason to know that the DUI Debit Cards were not secure. In 2020, Major breaches occurred with state government UI Debit Cards the Bank issued in California and Nevada. Still, the Bank did nothing to protect Maryland DUI recipients.

65. Bank of America failed to take reasonable measures to prepare for, prevent, or respond to the readily foreseeable fraud as relates to its DUI Debit Cards and Accounts.

### FACTS SPECIFIC TO THE PLAINTIFF

66. Since October of 2017, Mr. Mohamed owned and operated Amanie Express, LLC, which provided automotive mechanic services in Baltimore, Maryland.

JA 24

67. By July of 2020, due to the COVID-19 Pandemic, the Maryland Stay-At-Home orders, and the declining demand for his automotive repair services, Mr. Mohamed experienced a sudden loss of income and had to close his business.

68. On or about July of 2020, Mr. Mohamed applied for and was awarded unemployment insurance benefits through the DUI.

69. Mr. Mohamed signed up to receive his benefits on a Bank of America DUI Debit Card that was to be mailed directly to his home address at 5920 Schering Road, Baltimore, Maryland 21206.

70. At all times relevant to this dispute, Mr. Mohamed has resided at 5920 Schering Road, Baltimore, Maryland 21206.

71. Between July and October of 2020, Mr. Mohamed was entitled to receive $14,644.00 in unemployment benefits.

72. Between July and October of 2020, Mr. Mohamed regularly called the DUI office. During these calls, DUI representatives advised that, due to the high number of UI applicants, Mr. Mohamed may experience a forty-five (45) to ninety (90) day delay.

73. To find new job prospects, Mr. Mohamed enrolled in a vocational training program and obtained a certification licensing in HVAC repair. For a short time, beginning on or about October 1, 2020, he stopped filing for UI benefits and worked for a home warranty company. Unfortunately, due to the COVID-19 Pandemic, the company ran out of work, and Mr. Mohamed filed for a new monthly benefit.

74. By the end of November 2020, Mr. Mohamed still had not received his DUI Debit Card. He called DUI again, and a representative advised that he should have received it by then. The representative advised that DUI did not mail out the debit cards. He advised

Mr. Mohamed to call Bank of America's Customer Service telephone line for prepaid cards at 1-855-847-2029.

75. Mr. Mohamed immediately contacted Bank of America, and a Bank representative advised that the Bank had already mailed his card to his home address. The Bank representative advised that they would re-send another debit card.

76. On or about December 5, 2020, Mr. Mohamed received the DUI Debit Card via U.S. Mail at his home address.

77. Mr. Mohamed's DUI Debit Card had a magnetic stripe and did not have an EMV chip.

78. Upon receipt, Mr. Mohamed tried to activate the card but the activation code did not work. He attempted to download the Bank of America phone application for activation, but was still not able to activate. He called the number on the back of the card, and heard from the automated system that the card had a zero dollar ($0) balance.

79. Mr. Mohamed reasonably believed that Bank of America still needed to set something up, and waited a business day to see if the funds would be deposited into his account. This belief was reasonable, given the widely publicized delays related to the administration of unemployment benefits in Maryland.

80. On or about December 7, 2020, Mr. Mohamed called the same customer service line and spoke with a female Bank representative. She advised that the funds from Mr. Mohamed's account had all been spent, and confirmed that the account balance was in fact zero dollars ($0).

81. According to the Bank representative, the full disbursement of $14,644.00 had been deposited into his Bank of America DUI Account, but all of the funds had been depleted.

82. When Mr. Mohamed explained that he had just received the DUI Debit Card for the first time on December 5, 2020 and had neither used, nor had access to any of the funds, the Bank representative transferred him to a Claims Department.

83. The Bank representative proceeded to ask Mr. Mohamed questions about whether he ever shared his personal DUI Account or Card information. He answered that he had not.

84. During the telephone call with the Claims Department, a Bank representative read each transaction aloud to Mr. Mohamed and asked him to verify whether he had made any of the charges. He responded, one-by-one, that he had not made nor authorized any of the charges.

85. The Bank representative advised Mr. Mohamed that the card was used between August 20, 2020 and October 1, 2020. During that period of time, the unauthorized user purchased merchandise and made withdrawals against the $14,644.00 cash balance.

86. During this call, Mr. Mohamed wrote down the list of the unauthorized transactions. The charges occurred in a wide range of locations throughout the United States, from as nearby as Towson, Maryland to an ATM transaction within a hotel in California, and a separate transaction in Hollywood, California.

87. Mr. Mohamed confirmed that he did not authorize any of the transactions that transpired between August 20, 2020 and October 1, 2020. He did not know who had used his DUI Debit Card.

88. The Bank representative provided Mr. Mohamed with a Claim Number, 201208301077.

89. The Bank representative advised that Mr. Mohamed must file a police report with his local authorities.

JA 27

90. On December 8, 2020, Mr. Mohamed went to the Baltimore City Police Department and filed a police report for false pretenses. (Report # 4201202126).

91. While at the Police Department on December 8, 2020, Mr. Mohamed called the Bank Claims Department and verified with the representative that he had provided all required information. The Claims representative instructed him to fax the paperwork to the Bank at 1-877-233-8011.

92. The Claims representative advised that he would receive a letter from the Bank regarding his claim within forty-five (45) days.

93. According to the police report, the officer noted, "Upon further investigation, Bank of America advised Mr. Mohamed that they will do a follow up on who received the card."

94. On December 16, 2020, Mr. Mohamed faxed the police report information with his claim number and a copy of his Maryland driver's license to 1-877-233-8011. His fax service automatically generated a cover sheet and recorded that the fax was received.

95. On or about December 23, 2020, Mr. Mohamed called Bank of America to ask about the status of his claim.

96. Between December and January, Mr. Mohamed called Bank of America every week in hopes of receiving information about his claim. The representatives regularly advised Mr. Mohamed to call back for the outcome of his claim.

97. Mr. Mohamed also began calling the DUI office every day, and each time, he received a message stating that the office was too busy to accept his call.

98. Without any financial resources, Mr. Mohamed relied on credit cards to survive. He began to max out his business and personal credit and incurred late fees. His credit score plummeted from 750 to 500. Mr. Mohamed also fell behind in his monthly payments.

99. During this time, he struggled with depression, experienced long nights of sleeplessness, and began vomiting due to stress.

100. On December 27, 2020, Mr. Mohamed suffered from a panic attack that was exacerbated by exhaustion and dehydration. He went to Patient First - Bayview Urgent Care at 5100 Eastern Avenue, Baltimore, MD 21224-2772, where he received medication and an intravenous drip for hydration.

101. On or about January 5, 2021, Mr. Mohamed received a letter from Bank of America. *See* **Exhibit 3, "Freeze Letter."** Upon information and belief, this is a form letter that Bank of America generated and sent to Maryland DUI recipients who filed fraud claims.

102. The Freeze Letter was entitled, "Important Notice About Your Prepaid Debit Card For State Unemployment Benefits Or Other Benefits/Payments." The Freeze Letter explained, "It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result, and in accordance with the card account agreement, a freeze (or hold) has been placed on your account." Id.

103. The Freeze Letter further explained that Mr. Mohamed would not be able to use the prepaid debit card or access any money in his account. It stated that "if a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines." Id.

104. In January, Mr. Mohamed logged into his DUI account and saw a new identification verification requirement had appeared. He followed the steps to make sure his identification was verified with DUI.

23

JA 29

105. On or about February 3, 2021, Mr. Mohamed received an email notification from the Bank stating that his Account had a deposit of $1,050.

106. On February 3, 2021, Plaintiff called the Bank and learned from a representative that he was to use the same DUI Debit Card to access the Account. Mr. Mohamed changed the PIN for this card in hopes that no more unauthorized charges would be made.

107. Upon receiving access to his account on February 3, 2021, Mr. Mohamed was able to see an incomplete list of prior transactions in the compromised Account records online. He observed that between October 2, 2020 and October 13, 2020, an unauthorized user had unsuccessfully tried to make ten transactions. This coincided with when Mr. Mohamed had temporarily stopped filing claims for his monthly benefits.

108. The Bank representative confirmed that she could see the older information in his account. She stated that the Bank had stopped processing his claim because DUI had frozen his account. She explained that the Bank could reopen his claim now that the DUI account was open.

109. Upon information and belief, the Bank was the only party who could freeze or unfreeze Mr. Mohamed's access to his account.

110. Upon information and belief, the Bank's representatives often provided erroneous information to Plaintiff and Class Members regarding the source of their Account freezes. Class Members have been told that the Bank has no control over the freeze, that DUI is the entity responsible for the freeze, and that only DUI has the power to unfreeze their DUI Debit Card Accounts. But when Class Members call DUI, DUI informs them that it has no control over their DUI Debit Card Accounts and that the freeze is entirely within the Bank's control.

111. During the telephone conversation on February 3, 2021, Mr. Mohamed asked if there was any other status update on his claim. The Bank representative read his file and said it did not state why the claim was denied, but the representative said that his fax from December 16, 2020 "looked blurry," which might affect the claim. She advised him to resend the information.

112. On February 17, 2021, Mr. Mohamed scanned and sent a clearer copy of the police report information with another copy of his Maryland license.

113. Mr. Mohamed called the Bank every day for an update. When he called, he regularly experienced long hold times and was transferred to different representatives.

114. When Plaintiff and Class Members did reach a customer service representative, those representatives were unable to offer any meaningful assistance, often conveying false information or contradicting one another.

115. For example, on or about February 28, 2021, a Bank representative stated that his claim was denied. Mr. Mohamed asked why, but the Bank representative could not tell him why and instead advised that he would receive a letter in the mail with the explanation. Mr. Mohamed never received this letter. Mr. Mohamed asked to speak with a supervisor, who again stated that he had to wait for the denial letter and would be able to request reconsideration.

116. On or about March 3, 2021, the Bank sent Mr. Mohamed a second letter entitled "Important Notices About Your Prepaid Debit Card For State Unemployment Benefits or Other Benefits/Payments." ***See* Exhibit 4, "Update Letter."** The Update Letter stated that while there may have been "irregular, unauthorized, or unlawful activities on your card account" that had led to a freeze, the Bank was "pleased to inform" that "they have removed the freeze and your card is now active again."

117. Upon receipt of the Update Letter, Mr. Mohamed called the Bank and asked whether this letter meant that he could file for reconsideration of his claim. Between March and April of 2021, he spoke with multiple representatives who did not consistently advise him. One Bank representative advised that Mr. Mohamed could not seek reconsideration because he had received two denials of his claim. This was contrary to prior Bank representative's statement that his first claim had merely been reopened, rather than denied.

118. Also in March, Mr. Mohamed spoke with a separate Bank representative, who advised him that he still needed to wait for the alleged denial letter before he could appeal anything. Mr. Mohamed heard from additional Bank representatives that he needed to wait for the letter and that the letter was supposedly being re-sent. When he specifically asked about the status of his claim and why it had been denied, the Bank representatives repeated that they could not give him a reason for the denial.

119. As of the date of this filing, Mr. Mohamed has not received a written or oral statement for the denial of his claim.

120. At all times relevant to this dispute, Mr. Mohamed had to use the compromised Account Number and Debit Card, and the Bank did not provide any replacement card or enhanced security options for his compromised account.

121. Mr. Mohamed has never received a either a provisional or permanent credit of his lost UI funds, totaling $14,644.

122. On or about April 12, 2021, Mr. Mohamed received a 1099-G notice from the State of Maryland requiring him to pay income taxes on the full amount of his unemployment benefits.

123. Bank of America's inadequate response to DUI Debit Cardholders' issues with fraud on their Cards and Accounts results from the Bank's failure to adequately staff its customer-service and fraud-investigation departments, and from Bank procedures that are designed to, or that the Bank knows or reasonably should know will, frustrate and obstruct Cardholders' efforts to submit their claims and obtain reimbursement under the EFTA and the Bank's "Zero Liability" policy.

124. As a result of the conduct and omissions alleged herein, and despite the Bank's "Zero Liability" policy, Plaintiff and Class Members have been deprived of UI and pandemic relief, to which they are entitled by law, causing them great, immediate, and irreparable harm.

## CLASS ACTION ALLEGATIONS

125. Plaintiff brings this lawsuit individually and as a class action pursuant to Federal Rule of Civil Procedure 23, seeking damages on behalf of a class defined as follows (the "Class"):

> All Maryland residents who were issued or who used a Bank of America debit card for the purpose of accessing DUI benefits deposited into a Bank of America account, at any time within three years prior to the filing of this Complaint through the present ("Class Period").

126. Plaintiff reserves the right under Rule 23 to amend or modify the class descriptions and/or add one or more subclasses based on information obtained after the filing of this Complaint.

127. All Class Members have suffered or were threatened with imminent injury during the Class Period, caused by Defendant's wrongful acts and omissions, as alleged herein.

128. This action has been brought and may properly be maintained as a class action against Bank of America pursuant to the following provisions of Rule 23.

129. **Numerosity (Rule 23(a)(1)):** The members of the Class are so numerous that their individual joinder is impracticable. The Bank provided thousands of DUI benefits recipients with DUI Debit Cards that used outdated magnetic stripe technology and subjected these individuals to an undue risk of being subjected to fraudulent transactions on those cards. The identities of, and contact information for, those individuals may readily be obtained through the Bank's business records or the business records of its affiliated entities. The Bank was contractually required to keep and provide this data to DUI.

130. **Commonality and Predominance (Rule 23(a)(2) and 23(b)(3))**: Many questions of law and fact are common to the Class. These questions predominate over any questions affecting only individual Class Members. These common legal and factual issues include, but are not limited to:

a. Whether the Bank had or has a policy and/or practice of denying fraud claims without investigation or explanation.

b. Whether the Bank had or has a policy and/or practice of automatically freezing the DUI Debit Card Accounts of Cardholders who report unauthorized transactions.

c. Whether the Bank had or has a policy and/or practice of failing to provide its customer service representatives with the tools or authority to assist DUI Debit Cardholders who call seeking assistance in resolving their fraud claims or unfreezing their Accounts.

d. Whether the Bank violated the EFTA and Regulation E by having a policy and/or practice of denying fraud claims without providing the DUI Debit Cardholder a written explanation of the Bank's findings.

e. Whether the Bank violated the EFTA and Regulation E by having a policy and/or practice of denying DUI Debit Cardholders' fraud claims without conducting a good-faith investigation of the alleged

fraud and without having a reasonable basis for believing that no fraud occurred.

f.   Whether the Bank violated the EFTA and Regulation E by having a policy and/or practice of not issuing provisional credit within the first ten (10) business days of a DUI Debit Cardholder reporting fraud despite having no intent of completing a good-faith investigation of the Cardholder's fraud claim within 10 business days.

g.   Whether the Bank owed a duty of care to Plaintiff and Class Members, including by nature of the fiduciary relationship between the Bank and its DUI Debit Cardholders, under the DUI-Bank Contract, under the Cardholder Agreement, or under any other contract between the Bank and Plaintiff or Class Members.

h.   Whether Plaintiff and Class Members are third-party beneficiaries of the contract between the Bank and DUI.

i.   Whether the Bank breached its duties to Plaintiff and Class Members, including by using outdated fraud-protection technology on its DUI Debit Cards, not adequately monitoring DUI Debit Cards and Accounts for suspicious activity, not conducting appropriate follow-up or investigation when fraud claims were made, failing to comply with the EFTA and its own "Zero Liability" policy, and otherwise failing to make Plaintiff and Class Members whole for unauthorized transactions.

j.   Whether the Bank should pay damages and interest or provide restitution, reimbursement, and/or other relief to Plaintiff and Class Members.

131. **Typicality (Rule 23(a)(3))**: Plaintiff's claims are typical of the claims of the members of the putative Class. Plaintiff, like all other members of the putative Class,

sustained economic and other damages as a result of the Bank's wrongful acts and omissions as alleged herein. The representative Plaintiff and all members of the putative Class were and are similarly or identically harmed by the Bank's same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct as alleged herein.

132. **Adequacy of Representation (Rule 23(a)(4))**: The representative Plaintiff will fairly and adequately represent and protect the interests of the putative Class Members and has retained competent and qualified counsel with extensive experience in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the members of the putative Class that would make class certification inappropriate. Counsel for the putative Class will vigorously prosecute the claims of all putative Class Members.

133. This action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure.

134. **Class Action Status (Rule 23(b)(1))**: Class action status is appropriate under Rule 23(b)(1)(A) because prosecution of separate actions by each of the thousands of putative Class Members would create a risk of establishing incompatible standards of conduct for the Bank and inconsistent results for Class Members.

135. Class action status is also appropriate under Rule 23(b)(1)(B) because prosecution of separate actions by putative Class Members would create a risk of adjudication with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action or would substantially impair or impede their ability to protect their interests.

136. **Declaratory Relief (Rule 23(b)(2))**: Certification under Rule 23(b)(2) is appropriate because the Bank acted or refused to act on grounds generally applicable to the putative Class, thereby making appropriate declaratory or other appropriate equitable relief with respect to the putative Class as a whole.

137. **Predominance and Superiority (Rule 23(b)(3))**: Certification under Rule 23(b)(3) is appropriate because questions of law or fact common to putative Class Members predominate over any questions affecting only individual members, and because class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

138. The Class is ascertainable, and there is a well-defined community of interest in the questions of law or fact alleged herein since the rights of each Class Member were infringed or violated in the same or similar fashion.

## CAUSES OF ACTION

### COUNT ONE
### VIOLATIONS OF THE ELECTRONIC FUND TRANSFER ACT
### (15 U.S.C. §§1693 et seq.; 12 C.F.R. §§1005.1 et seq.)

139. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

140. Plaintiff brings this cause of action pursuant to the United States Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. §§1693 et seq., and 12 C.F.R. §§1005.1–1005.20 (Regulation E of the EFTA).

141. The Plaintiff and Class Members are "consumers" as defined in 15 U.S.C. § 1693a(6) of the EFTA.

142. Plaintiff and Class Members maintained a debit card account, which is an "account" as defined by the 15 U.S.C. § 1693a(2) of the EFTA.

143. Defendant is a "financial institution" as defined in 15 U.S.C. § 1693a(9) of the EFTA.

144. Plaintiff and Class Members provided notice to Bank of America within 60 days after receiving notice of an unauthorized transaction (which is an "error" under

Regulation E), thereby triggering the error resolution requirements of 15 U.S.C. §1693f and 12 C.F.R. §1005.11.

145. Bank of America violated 15 U.S.C. §1693f and Regulation E, 12 C.F.R. §1005.11, including but not limited to through its implementation of each of the following policies and/or practices:

    a. Adopting and implementing policies and practices designed to circumvent the Bank's statutory and regulatory obligations under 15 U.S.C. §1693f and Regulation E, including by frustrating and obstructing Plaintiff's and Class Members' efforts to submit fraud claims and by denying fraud claims without investigation;

    b. Failing to provide provisional credit to Plaintiff and Class Members relating to investigation that could not be resolved within 10 business days;

    c. Not issuing provisional credit within the first 10 business days of a DUI Debit Cardholder reporting fraud despite having no intention of completing a good-faith investigation of the Cardholder's fraud claim within 10 business days, and despite not completing a good-faith investigation of the Cardholder's fraud claim within 10 business days;

    d. Failing to conduct good-faith investigations into alleged errors or unauthorized transactions that were timely reported by Plaintiff and Class Members;

    e. Failing to conduct good-faith investigations into the alleged errors or unauthorized transactions that were timely reported by Plaintiff and Class Members, within 45 days of the date that the alleged error or unauthorized transaction was reported;

    f.   Denying Plaintiff's and Class Members' claims of error without having conducted a good-faith investigation and without providing an explanation of its findings;

    g.   Denying Plaintiff's and Class Members' claims of error without having a reasonable basis for concluding that their Accounts were not in error, and where the Bank could not reasonably have drawn its conclusion that no error occurred based on the evidence available to the Bank at the time;

    h.   Failing to credit Plaintiff's and Class Members' DUI Debit Card Accounts with interest on the amounts of the fraudulent transactions for the period during which they were without access to those funds; and,

    i.   Freezing Plaintiff's and Class Members' DUI Debit Card Accounts in order to avoid the Bank's legal obligations and to prevent Plaintiff and Class Members from accessing their funds.

146. In situations where Bank of America has violated Regulation E by failing to provisionally recredit Plaintiff's and Class Members' DUI Debit Card Accounts, the Bank has neither conducted a good faith investigation nor had a reasonable basis for believing that the Account was not in error. Plaintiff and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

147. Bank of America knowingly and willfully concluded that Plaintiff's and Class Members' DUI Debit Card Accounts were not in error when such conclusion could not reasonably have been drawn from the evidence available to the Bank at the time of its investigation. Plaintiff and Class Members are therefore entitled to treble damages under 15 U.S.C. §1693f(e).

33

148. Bank of America violated EFTA and Regulation E by failing to limit Plaintiff's and Class Members' liability as required by 15 U.S.C. §1693m and 12 C.F.R. §1005.6(b).

149. Plaintiff provided notice to Bank of America less than two business days after learning of the fraudulent transactions that occurred in his DUI Debit Card Accounts.

150. Under 12 C.F.R. §1005.6(b)(1), Plaintiff's and Class Members' liability is capped at $50 in these circumstances. Bank of America has subjected Plaintiff and Class Members to far greater than $50 in liability through its wrongful conduct as alleged herein.

151. Under 12 C.F.R. §1005.6(b)(2), $500 is the maximum liability that may be imposed on an accountholder who does not provide notice to the financial institution within two business days after learning of a suspected unauthorized transaction. Bank of America has subjected Plaintiff and Class Members to far greater than $500 in liability through its wrongful conduct as alleged herein.

152. Regarding any Class Members who did not provide Bank of America with actual notice within two business days of learning of a suspected unauthorized transaction, Bank of America was on constructive notice, under 12 C.F.R. §1005.6(b)(5)(iii), of widespread unauthorized electronic fund transfers from DUI Debit Card Accounts since the beginning of the COVID-19 pandemic. Since that time, countless unauthorized fund transfers have occurred and continue to occur from those Accounts. The volume of calls from DUI Debit Cardholders to Bank of America's customer service to report unauthorized transactions has been, and continues to be, so great, and the Bank's customer service department is so understaffed, that the Bank routinely causes DUI Debit Cardholders to wait on hold for multiple hours. The widespread fraud specifically targeting DUI Debit Cardholders has been widely reported in the media and has been the subject of significant attention from Maryland officials.

153. In no event should any Class Member be liable for over $500 of damages under 12 C.F.R. §1005.6. Bank of America has violated 12 C.F.R. §1005.6 by imposing hundreds and thousands of dollars of liability on unemployed Marylanders.

154. As a direct and proximate result of Bank of America violations of Regulation E, Plaintiff and Class Members have lost money.

**COUNT TWO**
**VIOLATIONS OF THE MARYLAND PERSONAL INFORMATION PROTECTION ACT**
**Md. Code Ann., Com. Law § 14-3501, *et seq.***

155. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

156. Defendant is a "business," as defined by § 14-3501 (b)(2) of the Maryland Personal Information Protection Act ("MPIPA").

157. Plaintiff's account number and account history with Bank of America was "personal information," as defined by § 14-3501 (e)(1) of the MPIPA.

158. Bank of America directly or indirectly collected Plaintiff and Class Members' personal information, including but not limited to Plaintiff's and Class Members' first names or first initials, last names, and account numbers or debit card numbers, in combination with any required security codes, access codes, or passwords that would permit access to Plaintiff's and Class Members' financial accounts.

159. Pursuant to § 14-3503 of the MPIPA, Bank of America was required to implement and maintain reasonable security procedures and practices to protect Plaintiff's personal information from unauthorized access.

160. Upon information and belief, Bank of America collected, stored, and/or transmitted Plaintiff's and Class Members' personal information in nonencrypted and

nonredacted form or in some other way that permitted unauthorized third parties to access that information in violation of the MPIPA.

161. Bank of America violated § 14-3503 when it (1) used magnetic stripe technology; and (2) collected, stored, and transmitted information in an unsafe manner.

162. Bank of America failed to implement and maintain reasonable security measures by transferring information regarding Plaintiff's and Class Members' Debit Cards to, and storing it on, unsecured or inadequately secured data storage devices.

163. Bank of America actions enabled unauthorized third parties to breach the security system to access Plaintiff and Class Members' personal data and account information. This violated § 14-3504 of the MPIPA.

164. Pursuant to § 14-3501 of the MPIPA, a violation of the MPIPA is an unfair and deceptive trade practice within the meaning of the Maryland Consumer Protection Act.

## COUNT THREE
### VIOLATIONS OF THE MARYLAND CONSUMER PROTECTION ACT
### Md. Code Ann., Com. Law § 13-101, *et seq.*

165. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

166. The Plaintiff and Class Members are "consumers" as defined in § 13-101 (c) of the Maryland Consumer Protection Act ("MCPA").

167. Defendant is a "merchant" as defined in § 13-101 (g) of the MCPA.

168. The Defendant is subject to all of the consumer protections mandated by the MCPA which, among other things, prohibits unfair or deceptive practices in the consumer services.  MCPA, Com. Law §§ 13-303(1).

36

JA 42

169. Pursuant to § 13-301 (2)(i) of the MCPA, a business may not make a representation that a consumer service has a characteristic, use, benefit that it does not have.

170. Pursuant to § 13-301 (2)(iv) of the MCPA, a business may not make a representation that consumer services are of a particular standard, quality, grade, style, or model which they are not.

171. Defendant violated § 13-301 (2)(i) by representing that Plaintiff's and Class Members' DUI Debit Card was private and secure, when it was not.

172. Defendant violated § 13-301 (2)(iv) by failing to adhere to the standards set forth in the EFTA and the MPIPA when Plaintiff and putative Class Members notified it of the account errors.

173. Defendant violated the MCPA by failing to adhere to the terms of the Cardholder Agreement, especially the Zero Liability Policy.

174. Defendant violated the MCPA by failing to adhere to the terms of the Contract.

175. Defendant engaged in unfair or deceptive practices in violation of the MCPA by failing to use reasonable measures to protect Plaintiff's personal information.

176. Defendant also violated the MCPA by violating the MPIPA.

177. Plaintiff and Class Members relied on Defendant to protect their accounts and private financial information.

178. Plaintiff suffered actual damages as a direct result of his reliance, including emotional distress, and Plaintiff and Class Members lost their UI funds.

## COUNT FOUR
### BREACH OF CONTRACT

179. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

180. Plaintiff and the Class Members entered into a Cardholder Agreement with the Bank that requires the Bank to administer DUI benefits to them through prepaid debit cards.

181. Plaintiff and Class Members performed all or substantially all of the material requirements that their Cardholder Agreement with Bank of America imposed on them, and they fulfilled all conditions precedent to Bank of America's performance, including, among other things, by contacting or attempting to contact Bank of America to reimburse them for fraudulently appropriated funds within the time specified in the Cardholder Agreement.

182. Bank of America breached its promises to Plaintiff and Class Members in its Cardholder Agreement by, among other things: (a) failing to timely investigate and resolve their fraud claims; (b) failing to reimburse them for unauthorized transactions; (c) failing to provide them with provisional credit when the Bank's investigation into their fraud claims exceeded 10 business days; (d) failing to limit their liability for unauthorized transactions; (e) freezing their DUI Debit Card Accounts beyond the length of time necessary for a reasonable investigation; (f) freezing their DUI Debit Card Accounts for reasons other than those specified in the Cardholder Agreement; (g) failing to make funds available to them for their use on the day the Bank had been instructed by the DUI to fund their Accounts; and (h) and otherwise failing to make funds available to them in accordance with DUI's instructions.

38

183.  Plaintiff and Class Members were harmed by Bank of America's conduct and have suffered actual damages.

## COUNT FIVE
### BREACH OF CONTRACT

184.  Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

185.  Bank of America and the State of Maryland entered into the Contract, which is a valid and legally enforceable contract that requires Bank of America to administer DUI benefits to Plaintiff and Class Members through DUI Debit Cards and Accounts.

186.  As DUI benefits recipients, DUI Debit Cardholders, and DUI Debit Card Account holders, Plaintiff and Class Members are intended third-party beneficiaries of the Contract. Plaintiff and Class Members would benefit from performance of the Contract, providing that benefit was a motivating purpose of the contracting parties entering into the Contract and permitting Plaintiff and Class Members to pursue a claim for breach of the Contract seeking specific performance is consistent with the Contract's objectives and the reasonable expectations of the contracting parties at the time of contracting.

187.  Plaintiff, Class Members, and the DUI performed all or substantially all of the material conditions imposed on them by the Contract and fulfilled any and all conditions precedent to Bank of America's performance.

188.  Bank of America failed to perform as promised in the Contract by, among other things: (a) failing to take adequate steps to prevent fraud on DUI Debit Cards and Accounts, including but not limited to failing to adequately monitor for fraudulent and suspected fraudulent transactions, failing to adequately detect fraudulent and suspected fraudulent transactions, failing to deploy reasonable and adequate technologies and

human resources to monitor for and detect fraudulent and suspected fraudulent transactions, failing to promptly notify Plaintiff and Class Members of Bank-detected fraudulent or suspected fraudulent transactions, and failing to issue DUI Debit Cards that incorporate EMV chip technology; (b) failing to timely perform good-faith investigations of unauthorized transactions involving DUI Debit Cards and Accounts; (c) failing to timely resolve claims of unauthorized transactions involving DUI Debit Cards and Accounts, including failing to have a reasonable basis for its determinations that challenged transactions were in fact authorized by the relevant DUI Debit Cardholder; (d) failing to timely reimburse Plaintiff and Class Members for unauthorized transactions on their DUI Debit Cards and Accounts; (e) failing to timely provide provisional credit to Plaintiff and Class Members when the Bank's investigation of fraud claims exceeds 10 business days; (f) failing to provide DUI Debit Cardholders with the kinds, levels, amount, and quality of customer service specified in the Contract; and (g) failing to make commercially reasonable efforts in the context of the COVID-19 pandemic to provide the kinds, levels, amount, and quality of customer service to DUI Debit Cardholders that reasonably should have been provided to them in the context of the COVID-19 pandemic.

189. Plaintiff and Class Members were harmed by Bank of America's conduct in breaching Contract and have suffered actual damages.

**COUNT SIX**
**NEGLIGENCE**

190. Plaintiff repeats and incorporates by reference each and every allegation set forth above, as though fully set forth here.

191. At all times relevant hereto, Plaintiff and Class Members were "customers" of Bank of America. Md. Code Ann., Com. Law § 4-104(a)(5).

192. In Maryland, the Bank has an implied-in-fact contractual relationship with its customers.

193. Under this implied contract, the Bank owes a duty of ordinary care to its customers.

194. Defendant owed Plaintiff and Class Members a duty of ordinary care for the protection of the Plaintiff's financial records and personal information.

195. Defendant owed Plaintiff and Class Members a duty not to allow unauthorized access by non-account holders.

196. Defendant owed Plaintiff and Class Members a further duty not to allow unauthorized transfers from their personal accounts.

197. Defendant breached the contractual duty of care by allowing unauthorized access to Plaintiff's and Class Members' accounts.

198. Defendant further breached the contractual duty of care by failing to apply security measures and fraud protection that it normally affords its regular customers to Maryland DUI Accounts.

199. Defendant breached the contractual duty of care by failing to protect Plaintiff's and Class Members' information from misuse by an unauthorized user.

200. Plaintiff and Class Members incurred actual loss or damage resulting from the conduct or failure to act of the Defendant.

201. Plaintiff's and Class Members' damages resulted from the Defendant's breach of its duty.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for the following relief:

**JA 47**

a. For an order certifying the Classes as defined above, appointing Plaintiff as representative for the Classes, and appointing Plaintiff's counsel as counsel for the Classes;

b. For declaratory relief, including but not limited to ordering the Bank to take each of the following corrective actions:

1) Reopen the fraud claim of any Class Member whose claim was closed at any time prior to the Class Period and who has not been permanently credited for the amount of the reported fraud;

2) Provide an effective means, such as a secure request form on the Bank's website and an email address by which Class Members may easily initiate or reopen a fraud claim regarding unauthorized transactions in the Class Member's DUI Debit Card Account (the "Claim Submission Form");

3) Provide email, mail, and publication Notice to Class Members of the availability of the Claim Submission Form;

4) Conduct a reasonable and good-faith investigation into each reopened, pending, or new fraud claim reported by a Class Member, which shall be completed within not more than 45 days after the initiation or reopening of the fraud claim, or in the case of fraud claims pending at the time of the Court's order, within not more than 45 days of the Court's order;

5) Within one day after completing its investigation of a Class Member's fraud claim, permanently credit the Class Member's DUI Debit Card Account for the full amount of the claim, plus interest,

unless the Bank has affirmative evidence establishing there was no unauthorized transaction and provides documentation of that evidence to the Class Member;

6) For any investigation that is not completed within 10 days after initiation or reopening of the fraud claim, provisionally credit the Class Member's DUI Debit Card Account for the full claim amount pending the Bank's reasonable and good-faith investigation of the claim.

c. For an award of all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class Members, including treble damages where authorized by law, disgorgement, unjust enrichment, restitution, and all other available relief under applicable law, including but not limited to accrued interest for the periods during which Plaintiff and Class Members were deprived of funds in their DUI Debit Card Accounts due to unauthorized transactions;

d. For an award of punitive damages pursuant to applicable law;

e. For reasonable attorney's fees and costs;

f. For pre- and post-judgment interest as allowed by law; and

g. For any other relief the Court deems just.

### **DEMAND FOR JURY TRIAL**

Plaintiff, Yagoub Mohamed, an individual, on behalf of himself and all others similarly situated, pursuant to Rule 38(b), Federal Rules of Civil Procedure, demands a trial by jury of all issues so triable.

Dated: May 24, 2021.

/s/Kathleen P. Hyland
KATHLEEN P. HYLAND (Bar No. 30075)
HYLAND LAW FIRM, LLC
222 Severn Avenue, Suite 17
Annapolis, Maryland 21403
(410) 777-5396 (Tel.)
(410) 777-8237 (Fax)
kat@lawhyland.com
*Counsel for Plaintiff*

AND

ROBERT W. MURPHY
1212 S.E. 2nd Avenue
Ft. Lauderdale, FL 33316
(954) 763-8660 (Tel.)
(954) 763-8607 (Fax)
rwmurphy@lawfirmmurphy.com
*Counsel for the Plaintiff*
*To be admitted pro hac vice*

# <u>Exhibit 1</u>

## CONTRACT

**THIS CONTRACT** (the "Contract") is made as of the __ day of _____, 2013, by and between [NAME AND ADDRESS] (the "Contractor"), and the **MARYLAND STATE TREASURER'S OFFICE**, 80 Calvert Street, Annapolis, Maryland 21401 (the "Office"**),** on behalf of the **DEPARTMENT OF LABOR, LICENSING AND REGULATION, DIVISION OF UNEMPLOYMENT INSURANCE** (the "DLLR/DUI"), offices of the **STATE OF MARYLAND** (the "State").

**IN CONSIDERATION OF** the premises and the covenants herein contained, the parties agree as follows:

## ARTICLE I - SCOPE OF SERVICES

The Office hereby engages the Contractor to perform the services set forth below:

1.1.  <u>General Services</u>. The Contractor shall provide Electronic Payment Card Services as described in this Contract, which includes the following exhibits:

| | |
|---|---|
| Exhibit | The Office's Request for Proposals ("RFP") for Electronic Payment Card Services, RFP #DLLR-EPC-01172013; |
| Exhibit | Contractor's Proposal dated ____; |
| Exhibit | Contractor's  Cardholder Services Cost/Fees Worksheet dated ___; |
| Exhibit | Contractor's Presentation dated ___; |
| Exhibit | Collateral Security Agreement dated ___; |
| Exhibit | Designation of Depository dated ____; |
| Exhibit | Bid/Proposal Affidavit, Living Wage Affidavit, Contract Affidavit and Investment Activities in Iran Certification; and |
| Exhibit | Contractor's "Bank Operating Documents," dated _____. |

1.2.  If there are any inconsistencies between this Contract and the Exhibits, this Contract shall control.  If there is any conflict among the Exhibits, Exhibit A, shall control.

1.3  The Procurement Officer may, at any time, by written order, make changes in the work within the general scope of the Contract.  No other order, statement or conduct of the Procurement Officer or any other person shall be treated as a change or entitle the Contractor to an equitable adjustment under this section.  Except as otherwise provided in this Contract, if any change under this section causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work, whether or not changed by the order, an equitable adjustment in the Contract price shall be made and the Contract modified in writing accordingly.  The Contractor must assert in writing its right to an adjustment under this section within thirty (30) days of receipt of written change order and shall include a written statement setting forth the nature and cost of such claim.  No claim by the Contractor shall be allowed if asserted after final payment under this Contract.  Failure to agree to an adjustment under this section shall be a

dispute under Section 4.5., Disputes.  Nothing in this section shall excuse the Contractor from proceeding with the Contract as changed.

## ARTICLE II - TERM

2.1.    The initial term of this Contract shall be for the period beginning April 1, 2013 and ending March 21, 2016.

2.2.    In addition there shall be two additional two-year renewal options, which may be exercised at the sole discretion of the Office.

2.3.    After the end of the Contract term, should a new contract be awarded to a contractor other than the incumbent, the Contract shall be deemed to be extended, Contractor shall continue to perform Contract services, and Contractor shall continue to receive the compensation specified in the Contract for such services, until such time as the transition to the new contractor is complete.  Contractor shall also assist the Office during any transition period to a new contractor and provide all necessary information and data to any subsequent contractor.

2.4.    The provisions of Sections 4.1, 4.5, 4.21, 4.22, 4.25 and 4.26 of this Contract shall survive termination of this Contract for any reason.

## ARTICLE III - CONSIDERATION, PAYMENT
## AND PERFORMANCE

3.1.    Contractor shall charge only the cardholder services costs/fees as described on Contractor's Cardholder Services Costs/Fees Worksheet as attached hereto as Exhibit ___ and any Worksheet Supplement as attached hereto as Exhibit ___.  No other costs/fees shall apply to cardholders, the State, the Office or DLLR/DUI.  These costs/fees shall not be adjusted during the term of this Contract including any renewal option periods.

## ARTICLE IV – GENERAL CONDITIONS

4.1. Liability

The Contractor agrees to assume full responsibility for any and all damage to the property of the Office, both real and personal, which results from or arises in connection with, the performance of this Contract.

The Contractor hereby agrees to indemnify and save harmless the State against all claims, damages, costs, losses and liabilities whatsoever, for any and all injury to persons and property that may arise out of the performance of this Contract.

The Contractor agrees to maintain adequate insurance coverage in order to fulfill responsibility under this section.

4.2. Tax Exemption

The State is generally exempt from Federal Excise Taxes, Maryland Sales and Use Taxes, District of Columbia Sales Tax and Transportation Taxes. Exemption certificates shall be completed upon request.

4.3. Subcontracting; Assignment

The Contractor may not subcontract any portion of the services provided under this Contract without obtaining the prior written approval of the State, nor may the Contractor sell, transfer, or otherwise assign its obligations under this Contract, or any portion thereof, or any of its rights or obligations hereunder, without the prior written approval of the State; provided, however, that the Contractor may subcontract services under or make an assignment of this Contract to an affiliate of the Contractor that is fully capable of performing such services if the Contractor retains full responsibility for the Contract. Any such subcontract or assignment shall be subject to any terms and conditions that the Office deems necessary to protect the interest of the State. The Office shall not be responsible for the fulfillment of the Contractor's obligations to subcontractors.

4.4. Non-Hiring of Officials and Employees

No official or employee of the State of Maryland, as defined under State Government Article, §15-102, Annotated Code of Maryland, whose duties as such official or employee include matters relating to or affecting the subject matter of this Contract, shall during the pendancy and term of this Contract and while serving as an official or employee of the State become or be an employee of the Contractor or any entity that is a subcontractor on this Contract.

4.5. Disputes

This Contract shall be subject to the provisions of Title 15, Subtitle 2 of the State Finance and Procurement Article of the Annotated Code of Maryland (Dispute Resolution), and COMAR 21.10 (Administrative and Civil Remedies). Pending resolution of a claim, the Contractor shall proceed diligently with the performance of the Contract in accordance with the Procurement Officer's decision.

4.6. Maryland Law Prevails

The provisions of this Contract shall be governed by the Laws of Maryland.

4.7. Amendments

This Contract, including the exhibits hereto, constitutes the entire agreement between the parties and all other communications prior to its execution, whether written or oral, with reference to the subject matter of this Contract are superseded by this Contract. Any amendment to this Contract must first be approved in writing by the Procurement Officer,

subject to any additional approvals required by State law. No amendment to this Contract shall be binding unless so approved and unless it is in writing and signed by the party to be charged.

4.8. Nondiscrimination in Employment

The Contractor agrees: (a) not to discriminate in any manner against an employee or applicant for employment because of race, color, religion, creed, age, sex, marital status, national origin, ancestry or disability of a qualified individual with a disability; (b) to include a provision similar to that contained in subsection (a), above, in any subcontract except a subcontract for standard commercial supplies or raw materials; and (c) to post and to cause subcontractors to post in conspicuous places available to employees and applicants for employment, notices setting forth the substance of this clause.

4.9. Commercial Nondiscrimination Clause

4.9.1.   As a condition of entering into this Contract, Contractor represents and warrants that it will comply with the State's Commercial Nondiscrimination Policy, as described under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland. As part of such compliance, Contractor may not discriminate on the basis of race, color, religion, ancestry or national origin, sex, age, marital status, sexual orientation, disability or other unlawful forms of discrimination in the solicitation, selection, hiring, or commercial treatment of subcontractors, vendors, suppliers, or commercial customers, nor shall Contractor retaliate against any person for reporting instances of such discrimination. Contractor shall provide equal opportunity for subcontractors, vendors, and suppliers to participate in all of its public sector and private sector subcontracting and supply opportunities, provided that this clause does not prohibit or limit lawful efforts to remedy the effects of marketplace discrimination that have occurred or are occurring in the marketplace. Contractor understands that a material violation of this clause shall be considered a material breach of this Contract and may result in termination of this Contract, disqualification of Contractor from participating in State contracts, or other sanctions. This clause is not enforceable by or for the benefit of, and creates no obligation to, any third party.

4.9.2.   As a condition of entering into this Contract, upon the Maryland Human Relations Commission's request, and only after the filing of a complaint against Contractor under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland, as amended from time to time, Contractor agrees to provide within 60 days after the request a complete list of the names of all subcontractors, vendors, and suppliers that Contractor has used in the past 4 years on any of its contracts that were undertaken within the State of Maryland, including the total dollar amount paid by Contractor on each subcontract or supply contract. Contractor further agrees to cooperate in any investigation conducted by the State pursuant to the State's Commercial Nondiscrimination Policy as set forth under Title 19 of the State Finance and Procurement Article of the Annotated Code of Maryland, and to

provide any documents relevant to any investigation that is requested by the State. Contractor understands that violation of this clause is a material breach of this Contract and may result in Contract termination, disqualification by the State from participating in State contracts, and other sanctions.

## 4.10. Contingent Fee Prohibition

The Contractor, architect, or engineer (as applicable) warrants that it has not employed or retained any person, partnership, corporation, or other entity, other than a bona fide employee or agent working for the Contractor, architect, or engineer, to solicit or secure this Contract, and that it has not paid or agreed to pay any person, partnership, corporation, or other entity, other than a bona fide employee or agent, any fee or any other consideration contingent on the making of this Contract.

## 4.11. Living Wage Requirements

A solicitation for services under a State contract valued at $100,000 or more may be subject to Title 18, State Finance and Procurement (SFP) Article, Annotated Code of Maryland.

Contractors and Subcontractors subject to the Living Wage Law shall pay each covered employee at least $12.28 per hour, if State contract services valued at 50% or more of the total value of the contract are performed in the Tier 1 Area.  If State contract services valued at 50% or more of the total Contract value are performed in the Tier 2 Area, an Offeror shall pay each covered employee at least $9.23 per hour. The specific Living Wage rate is determined by whether a majority of services take place in a Tier 1 Area or Tier 2 Area of the State. The Tier 1 Area includes Montgomery, Prince George's, Howard, Anne Arundel, and Baltimore Counties, and Baltimore City.  The Tier 2 Area includes any county in the State not included in the Tier 1 Area. In the event employees who perform the services are not located in the State, the head of the unit responsible for a State contract pursuant to §18-102 (d) shall assign the tier based upon where the recipients of the services are located.

This Contract has been deemed to be a Tier 1 contract.

## 4.12. Multi-Year Contracts Contingent upon Appropriations

If the General Assembly fails to appropriate funds or if funds are not otherwise made available for continued performance for any fiscal period of this Contract succeeding the first fiscal period, this Contract shall be cancelled automatically as of the beginning of the fiscal year for which funds were not appropriated or otherwise made available; provided, however, that this will not affect either the State's rights or the Contractor's rights under any termination clause in this Contract.  The effect of termination of the Contract hereunder will be to discharge both the Contractor and the State from future performance of the Contract, but not from their rights and obligations existing at the time of termination.  The Contractor shall be reimbursed for the reasonable value of any non-

recurring costs incurred but not amortized in the price of the Contract. The State shall notify the Contractor as soon as it has knowledge that funds may not be available for the continuation of this Contract for each succeeding fiscal period beyond the first.

4.13. Termination for Default

If the Contractor fails to fulfill its obligation under this Contract properly and on time, or otherwise violates any provision of the Contract, the State may terminate the Contract by written notice to the Contractor. The notice shall specify the acts or omissions relied upon as cause for termination. All finished or unfinished work provided by the Contractor shall, at the State's option, become the State's property. The State shall pay the Contractors fair and equitable compensation for satisfactory performance prior to receipt of notice of termination, less the amount of damages caused by Contractor's breach. If the damages are more than the compensation payable to the Contractor, the Contractor will remain liable after termination and the State can affirmatively collect damages. Termination hereunder, including the determination of the rights and obligations of the parties, shall be governed by the provisions of COMAR 21.07.01.11B.

4.14. Termination for Convenience

The performance of work under this Contract may be terminated by the State in accordance with this clause in whole, or from time to time in part, whenever the State shall determine that such termination is in the best interest of the State. The State will pay all reasonable costs associated with this Contract that the Contractor has incurred up to the date of termination and all reasonable costs associated with termination of the Contract. However, the Contractor shall not be reimbursed for any anticipatory profits that have not been earned up to the date of termination. Termination hereunder, including the determination of the rights and obligations of the parties, shall be governed by the provisions of COMAR 21.07.01.12A(2).

4.15. Delays and Extensions of Time

The Contractor agrees to prosecute the work continuously and diligently and no charges or claims for damages shall be made by it for any delays or hindrances from any cause whatsoever during the progress of any portion of the work specified in this Contract.

Time extensions will be granted only for excusable delays that arise from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to, acts of God, acts of the public enemy, acts of the State in either its sovereign or contractual capacity, acts of another contractor in the performance of a Contract with the State, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of either the Contractor or the subcontractors or suppliers.

58

JA 57

4.16. <u>Variations in Estimated Quantities</u>

No equitable adjustment shall be permitted in favor of either the State or the Contractor in the event that the quantity of any pay item in this Contract is an estimated quantity and the actual quantity of such pay item varies from the estimated quantity stated in the Contract.

4.17. <u>Suspension of Work</u>

The Procurement Officer unilaterally may order the Contractor in writing to suspend, delay, or interrupt all or any part of its performance for such period of time as the Procurement Officer may determine to be appropriate for the convenience of the State.

4.18. <u>Pre-Existing Regulations</u>

In accordance with the provisions of §11-206 of the State Finance and Procurement Article, Annotated Code of Maryland, the regulations set forth in Title 21 of the Code of Maryland Regulations (COMAR Title 21) in effect on the date of execution of this Contract are applicable to this Contract.

4.19. <u>Financial Disclosure</u>

The Contractor shall comply with the provisions of §13-221 of the State Finance and Procurement Article of the Annotated Code of Maryland, which requires that every business that enters into contracts, leases, or other agreements with the State of Maryland or its agencies during a calendar year under which the business is to receive in the aggregate $100,000 or more, shall, within 30 days of the time when the aggregate value of these contracts, leases or other agreements reaches $100,000, file with the Secretary of State of Maryland certain specified information to include disclosure of beneficial ownership of the business.

4.20. <u>Political Contribution Disclosure</u>

The Contractor shall comply with the Election Law Article § 14-101 – 14-108, Annotated Code of Maryland, which requires that every person that enters into contracts, leases, or other agreements with the State, a county or an incorporated municipality, or their agencies, during a calendar year in which the person receives in the aggregate $100,000 or more, shall file with the State Board of Elections a statement disclosing contributions in excess of $500 made during the reporting period to a candidate for elective office in any primary or general election.  The statement shall be filed with the State Board of Elections: (1) before a purchase or execution of a lease or contract by the State, a county, an incorporated municipality, or their agencies, and shall cover the preceding two calendar years; and (2) if the contribution is made after the execution of a lease or contract, then twice a year, throughout the Contract term, on: (a) February 5, to cover the 6-month period ending January 31; and (b) August 5, to cover the 6-month period ending July 31.

4.21. Retention of Records/Audit

The Contractor shall retain and maintain all records and documents relating to this Contract for three years after final payment by the State hereunder or any applicable statute of limitations, whichever is longer, and shall make them available for inspection and audit by authorized representatives of the State, including the Procurement Officer or his designee, at all reasonable times.

4.22. Compliance with Laws

The Contractor hereby represents and warrants that:

4.22.1. It is qualified to do business in the State of Maryland and that it will take such action as, from time to time, hereafter may be necessary to remain so qualified;

4.22.2. It is not in arrears with respect to the payment of any monies due and owing the State of Maryland, or any department or unit thereof, including but not limited to the payment of taxes and employee benefits, and that it shall not become so in arrears during the term of this Contract;

4.22.3. It shall comply with all federal, State and local laws, regulations and ordinances applicable to its activities and obligations under this Contract; and

4.22.4. It shall obtain, at its expense, all licenses, permits, insurance, and governmental approvals, if any, necessary to the performance of its obligations under this Contract.

4.23. Liability for Loss of Data

In the event of loss of any data or records necessary for the performance of this Contract where such loss is due to the error or negligence of the Contractor, the Contractor shall be responsible, irrespective of cost to the Contractor, for recreating such lost data or records.

4.24. Cost and Price Certification

4.24.1. The Contractor by submitting cost or price information certifies that, to the best of its knowledge, the information submitted is accurate, complete, and current as a mutually determined specified date prior to the conclusion of any price discussions or negotiations for:

(1)     A negotiated contract, if the total contract price is expected to exceed $100,000, or a smaller amount set by the procurement officer; or

(2)     A change order or contract modification, expected to exceed $100,000, or a smaller amount set by the procurement officer.

4.24.2. The price under this Contract and any change order or modification hereunder, including profit or fee, shall be adjusted to exclude any significant price increases occurring because the Contractor furnished cost or price information which, as of the date agreed upon between the parties, was inaccurate, incomplete, or not current.

4.25. Ownership of Documents and Materials

The Contractor agrees that all documents and materials including, but not limited to, reports, drawings, studies, specifications, estimates, maps, photographs, designs, graphics, mechanical, artwork, and computations prepared by or for it under the terms of this Contract shall at anytime during the performance of the services be made available to the State upon request by the State and shall become and remain the exclusive property of the State upon termination or completion of the services.  The State shall have the right to use same without restriction or limitation and without compensation to the Contractor other than that provided by this Contract.  The State shall be the owner for purposes or copyright, patent or trademark registration.

4.26. Patents, Copyrights and Trade Secrets

4.26.1. If the Contractor furnishes any design, device, material, process or other item, which is covered by a patent, or copyright or which is proprietary to or a trade secret of another, Contractor shall obtain the necessary permission or license to use such item.

4.26.2. Contractor will defend or settle, at its own expense, any claim or suit against the State alleging that any such item furnished by Contractor infringes any patent, trademark, copyright, or trade secret.  Contractor also will pay all damages and costs that by final judgment may be assessed against the State due to such infringement and all attorney fees and litigation expenses reasonably incurred by the State to defend against such a claim or suit.  The obligations of this paragraph are in addition to those stated in paragraph 4.26.3. below.

4.26.3. If any product(s) furnished by Contractor become, or in Contractor's opinion are likely to become, the subject of a claim of infringement, Contractor will, at its option: (1) procure for the State the right to continue using the applicable item; (2) replace the product with a non-infringing product substantially complying with the item's specifications; or (3) modify the item so it becomes non-infringing and performs in a substantially similar manner to the original item.

4.27. Confidentiality

Subject to the Maryland Public Information Act and any other applicable laws, including all confidential or proprietary information and documentation relating to either party (including without limitation, any information or data stored within the Contractor's computer systems) shall be held in absolute confidence by the other party.  Each party

61

**JA 60**

shall, however, be permitted to disclose relevant confidential information to its officers, agents and employees to the extent that such disclosure is necessary for the performance of their duties under this Contract, provided the data may be collected, used, disclosed, stored and disseminated only as provided by and consistent with the law and the confidentiality provisions of the RFP. The provisions of this section shall not apply to information that (a) is lawfully in the public domain; (b) has been independently developed by the other party without violation of this Contract; (c) was already in the possession of such party; (d) was supplied to such party by a third party lawfully in possession thereof and legally permitted to further disclose the information; or (e) which such party is required to disclose by law.

## ARTICLE V - NOTICES

5.1.    All notices required to be given by one party to the other hereunder shall be in writing and shall be addressed as follows:

If to the Office:          Procurement Officer
                           Maryland State Treasurer's Office
                           Louis L. Goldstein Treasury Building
                           80 Calvert Street
                           Annapolis, Maryland 21401

If to the Department of Labor, Licensing and Regulation:
                           Jim McVicker
                           Deputy Director, Contributions Division
                           Maryland Department of Labor, Licensing and Regulation
                           Office of Unemployment Insurance
                           1100 North Eutaw Street
                           Baltimore, Maryland 21201-2201

If to the Contractor:      _____
                           _____

## ARTICLE VI - ADMINISTRATION

6.1.    The work to be accomplished under this Contract shall be performed under the direction of the Contract Officer, Deputy Director of the Contributions Division. All matters relating to the administration of this Contract shall be referred to the Procurement Officer for determination.

## ARTICLE VII - REPRESENTATIONS

7.1.    Each party to this Contract represents and warrants to the other that it has full right, power, and authority to execute this Contract.

**IN WITNESS WHEREOF,** the parties have executed this Contract as of the date hereinabove set forth.

**ATTEST:**                                                **[FIRM NAME]**

_____            By:_____

**WITNESS:**                                              **MARYLAND STATE TREASURER'S OFFICE**

_____            By:_____
                                                                       Nancy K. Kopp
                                                                       State Treasurer

**WITNESS:**

_____            By:_____
                                                                       Bernadette T. Benik
                                                                       Chief Deputy Treasurer

                                                                **ACKNOWLEDGED AND ACCEPTED:**
                                                                **DEPARTMENT OF LABOR,**
                                                                **LICENSING AND REGULATION,**
                                                                **DIVISION OF UNEMPLOYMENT**
                                                                **INSURANCE**

                                                                By: _____
                                                                       James A. McVicker
                                                                       Deputy Director, Contributions
                                                                       Division Unemployment Insurance

Approved for form and legal sufficiency
for the Maryland State Treasurer's Office:

_____
Melanie Mayo West
Assistant Attorney General

# <u>Exhibit 2</u>



**BANK OF AMERICA** <span>Maryland Unemployment Benefits Debit Card</span>

# Terms and Conditions

## Maryland Unemployment Benefits Debit Card Account Agreement

*Effective Date March 1, 2018*

By using or allowing another to use Maryland Unemployment Benefits Debit Card you agree to be bound by the terms and conditions of this Maryland Unemployment Benefits Debit Card Account Agreement ("this Agreement"). This Agreement discloses the terms and conditions of your Maryland Unemployment Benefits Debit Card and you are not entitled to any rights or benefits given to deposit account customers or debit card holders at Bank of America, N.A. unless such rights or benefits are contained in this Agreement. **Please read this Agreement and the enclosed Fee Disclosure and Other Important Disclosures ("Fee Disclosure") carefully and keep it for future reference** In this Agreement: "Account" means the account accessed by your Card; "Card" or "Government Prepaid Debit Card" means the Government Prepaid Debit Card issued by us on behalf of Maryland Department of Labor, Licensing and Regulation ("Agency" or " DLLR") to enable you to receive unemployment benefits from DLLR, "you" and "your" mean the recipient to whom we issue a Card or his or her legal representative; and "we", "us", and "our" mean Bank of America, N.A.

1 **General Information.**
**General Account Information.** Your Account is funded by the DLLR with deductions for transactions and fees as more fully described in this Agreement. No interest is paid on the balance for any period of time.
**Individual Accounts Only.** Each Account is individually owned by the recipient who receives payments from the DLLR. No joint ownership of an Account is permitted. You may have only one Card for each Account.
**Accounts are Not Transferable.** Your Account is not transferable to any other person. We reserve the right not to acknowledge or accept attempted pledges or assignments of, or purported security interests in, your Account.
**Business Days.** For purposes of this Agreement, our business days are Monday through Friday, excluding bank holidays.

2 **Deposits to Your Account and Funds Availability.**
**Funds Added to Your Account.** Deposits to your Account may only be made by the DLLR. We will add funds to your Account only (a) in accordance with instructions from the DLLR or (b) to remedy an error made by us or by someone who has accepted your Account. For information on the amounts and scheduled dates of additions to your Account, please contact the DLLR. Once funds are properly deposited, the DLLR has no rights to any funds in your Account, except as otherwise provided by law or the rules of the network used to make the deposit.
**When Funds are Available for Withdrawal.** Funds are available for your use on the day we have been instructed by the DLLR to fund your Account. Once the funds are available, you may make the transactions described below. Funds received by us may be delayed for a longer period if there is an emergency, such as failure of computer or communications. We will notify you if we delay your ability to make transactions as a result of an emergency and we will tell you when funds will be available.

Case 1:21-cv-01283-CCB   Document 1-4   Filed 05/24/21   Page 3 of 12

**Overpayments and Reversals.** If funds to which you are not entitled are deposited to your Account by mistake or otherwise, we may deduct these funds from your Account. If there are not enough funds, we may overdraw your Account. We can do this without giving you any prior notice or demand.

**"Freezing" Your Account.** If we suspect irregular, unauthorized, or unlawful activities may be involved with your Account, we may "freeze" (or place a hold on) the balance pending an investigation of such suspected activities. If we freeze your Account, we will give you a notice required by law.

3   **Transfer Types and Limitations.**

**Account Access.** You may use your Card to:

(1) Pay for purchases at places that have agreed to accept the Card as described below.

(2) Withdraw cash from your Account including by way of Emergency Cash Transfers as described below.

(3) Transfer funds from your Account to a checking or savings account owned by you in the United States whenever you request as described below.

(4) Pay bills directly [by telephone] from your Account in the amounts and on the days you request

Some of these services may not be available at all terminals.

**Purchases.** Your Card bears the Visa® symbol on the front face. Your Card may be used for purchases at merchants who accept Visa debit cards at a point-of-sale ("POS") terminal. Visa transactions may be made by presenting your Card and signing the receipt. You may also use your Card for purchases at POS terminals that require a Personal Identification Number ("PIN"). Some merchants will accept a transaction for an amount greater than the goods or services purchased and will refund the difference to you in cash.

**Use at Cirrus® or Visa Automated Teller Machines.** Your Card may be used for transactions at Cirrus or Visa Automated Teller Machines ("ATMs") to make cash withdrawals or balance inquiries requiring a PIN. See the Fee Disclosure for fees which may apply to ATM transactions. Most ATMs require that cash withdrawals be made in multiples of a dollar amount (e.g. $10 or $20). In addition, some ATM operators have maximum amounts that may be withdrawn at a machine in one transaction. Many merchants limit the amount of cash that may be obtained in connection with a purchase transaction.

**Obtaining Cash.** Offices of financial institutions that accept Visa cards, including Bank of America banking centers, will accept your Card for obtaining cash.

**Online Funds Transfer.** Your Card can be used to transfer funds online to a checking or savings account owned by you in the United States, subject to certain restrictions. This type of transfer may only be requested online via the Internet at www.bankofamerica.com/mduidebitcard. Once funds are transferred, you will not be able to have the funds returned to your Account if the routing number or account number you provide for your checking or savings account is not correct.

**Emergency Cash Transfers.** You may obtain cash at a Western Union location in the United States ("Emergency Cash Transfer"). All Emergency Cash Transfer requests must be initiated through the Bank of America Maryland Unemployment Benefits Department Debit Card Service Center (the "Service Center"). All requests for Emergency Cash Transfers are subject to the Emergency Cash Transfer Fees stated in the Fee Disclosure. All requests for Emergency Cash Transfers are subject to Western Union guidelines which could vary by state and could include certain dollar limits, identification requirements and other restrictions. If you request an Emergency Cash Transfer, you agree that we have no liability for any losses or damages that you may suffer arising out of any action, non-action or delayed action on the part of Western Union or its agents or any other third party.

**Limitations on Frequency of Transfers.** You may withdraw up to $1,000 from any ATM each 24-hour period using the Card. For security reasons, there may be limits on the amount, number or type of transactions that you can make using your Card, and we may restrict access to your Card if we notice suspicious activity.

4   **Additional Account Agreements.**

**Account Alert Service.** You may sign up online for text or email alerts (the "Account Alert Service") to the mobile device or email address provided by you. Text or email alerts are dependent upon users providing a valid and current Internet email address or valid mobile device phone number. You can set up alert messaging options online at www.bankofamerica.com/mduidebitcard. After signing up for the Account Alert Service, you must respond with an appropriate code to an alert sent to your mobile device (double opt-in) in order to begin receiving text message alerts. If you do not respond with the code provided in the alert, the Account Alert Service is not authorized. Each message references the last four digits of the Card for which the alert is sent. To change your alert messaging options or to discontinue the Service, go to www.bankofamerica.com/mduidebitcard.

If you sign up for the Account Alert Service, you agree that we may send you text alerts through your wireless service provider. We do not charge for the Account Alert Service, but you are responsible for all charges and fees associated with usage of email or text messages imposed by your Internet, wireless, or cellular service provider(s).

Depending on the timing and the delivery mechanism, your balance may not reflect your most recent transactions. We assume no responsibility for transactions that may affect your balance after daily processing.

You understand and agree that the information provided to you by email or text alert is provided "as is" without warranty of any kind, either expressed or implied, and that we assume no responsibility for the timeliness, deletion, misdelivery, errors in the content of any email or text alerts or failure to store any user communications or personalization settings. In no event shall we be liable for any special, incidental, indirect, or consequential damages of any kind, or any damages whatsoever resulting from loss of use, data or profits, whether or not advised of the possibility of damage, and on any theory of liability, arising out of or in connection with the use or provision of this information. The Account Alert Service can be terminated if we determine that your mobile device or email address does not support delivery of alerts, or if you have de-listed your mobile device or email address. In addition, we reserve the right at any time and from time-to-time to modify or discontinue, temporarily or permanently, the Account Alert Service (or any part thereof) with or without notice. **Refunds and Merchant Disputes.** You do not receive cash refunds for returns of merchandise or services purchased using your Card. When a merchant gives you a refund, it is made on a credit voucher and will appear in your next monthly Account statement or in your Account history. You must settle any disputes you have about the goods or services directly with the merchant. We are not liable for any misrepresentations that a merchant makes about the goods or services you purchase with your Card, or if a merchant for any reason refuses to accept your Card or fails to abide by the applicable network rules governing your Card.

**Legal Transactions.** You agree that you will only use your Card for transactions that are legal. For example, Internet gambling transactions may be illegal in your state. Display of a Visa or other logo by an on-line merchant does not mean that the transaction is legal where you conduct it. You agree that we may decline

transactions we believe may be illegal or in violation of the applicable network rules. You also agree that if we do not decline the transaction, we may charge your Account and we are not liable to you if you engage in an illegal transaction.

**ATM Safety.** Please refer to the safety tips for using your Card at ATMs found on the mailer that came with your Card.

5   **Your Responsibility for Authorized Card Account Use and Negative Balances.**
**Use of Your Card and PIN.** Your Card and PIN are provided for your use and protection and you will:
(a) Not disclose your PIN or record it on your Card or otherwise make it available to anyone else;
(b) Use your Card, your PIN and any ATM only as instructed;
(c) Promptly notify us of any loss or theft of your Card or PIN; and
(d) Be liable for the authorized or permitted use of your Card and PIN.

**Authorized Use of Card.** If you authorize someone else to use your Card or PIN, you will be responsible for any transactions initiated by such person(s) with your Card or PIN. Transactions will be considered unauthorized only after you notify us that the person is no longer authorized to use your Card.

**Negative Balances. The amount available on your Card will be reduced by the amount of your transactions plus applicable fees.** There is no overdraft/credit feature on your Account. However, if a negative balance does occur in your Account, you agree (a) that we may take the amount of the negative balance from subsequent additions to your Account or (b) to pay us on demand the amount of the negative balance

6   **Bank Fees.**

**Fee Disclosure.** Bank fees associated with your Card are listed in the Fee Disclosure. These fees are imposed by us and retained by us. When you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

**Payment of Fees by You.** You agree to pay all fees listed in the Fee Disclosure. Fees will be taken from the balance of your Account as they occur. The DLLR may not charge you any fees in connection with your Card or your Account.

**Foreign Transactions/Fees.** If you use your Card to purchase goods or services in a foreign currency or in US dollars with a foreign merchant or to obtain currency from an ATM or an office of a financial institution in a foreign country (a "Foreign Transaction"), we will assess an International Transaction Fee. Please note that Foreign Transactions include U.S. internet transactions made in the U.S. but with a foreign merchant. If the Foreign Transaction is made in U.S. dollars, the International Transaction Fee will be the percentage of that U.S. dollar amount as disclosed in the Fee Disclosure. If the Foreign Transaction is made in a foreign currency, Visa or Mastercard will convert the transaction into a U.S. dollar amount, and the International Transaction Fee will be the percentage of that converted U.S. dollar amount as disclosed in the Fee Disclosure. Any International Transaction Fee will be shown in the transaction section of your monthly Account statement or in your Account history. The currency conversion rate used by Visa will be either (1) a rate selected by Visa from a range of rates available in wholesale currency markets for the applicable central processing date, which rate may differ from the rate Visa receives, or (2) a government-mandated rate in

Case 1:21-cv-01283-CCB   Document 1-4   Filed 05/24/21   Page 8 of 12

effect for the central processing date. The currency conversion rate used by Mastercard will be either (1) a wholesale market rate selected by Mastercard, or (2) a government-mandated rate. The rate used by Visa or Mastercard on the processing date may differ from the rate on the date of your transaction.

7  **Right to Receive Documentation of Transactions**

**a. Terminal Receipts.** You usually can get a receipt at the time you make any transaction with your Card at an ATM, teller or POS; except that you may not get a receipt if the amount of the transaction is $15 or less. ATM receipts are not final because each transaction is subject to verification by us. If the receipt and our records conflict, our records will govern.

**b. Preauthorized Credits.** You can call us at 1.855.847.2029, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), to find out whether or not a direct deposit has been made.

**c. Delivery of Statements and Notices.** If you request to receive your monthly Account statement by mail, we will deliver it to the last address we have on our records for you. [See the Fee Disclosure for the fee for receiving monthly Account statements by mail.] You agree to notify us promptly, in writing, at the address listed in Section 11 below, of any change of address or you may change your address online at www.bankofamerica.com/mduidebitcard. If you receive your monthly Account statement by mail, you may request that rather than receiving it by mail, you may review it electronically. If you wish to do so, you may make this request online at www.bankofamerica.com/mduidebitcard or you may contact the Service Center at the address or phone number below.

**CARDHOLDERS WHO DO NOT RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL Access to Your Account Information.** You may obtain information about the amount of money you have remaining in your Account by calling 1.855.847.2029, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.). That information is also available when you make a balance inquiry at an ATM. This information, along with a 12-month history of Account transactions, is also available online at www.bankofamerica.com/mduidebitcard.

You also have the right to obtain a 24-month written history of Account transactions by calling 1.855.847.2029, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), or writing to us at: Bank of America, P.O. Box 8488 , Gray, TN 37615-8488. You will not be charged a fee for this information unless you request it more than once per month.

**Prompt Review of Account Information.** You agree to promptly review your Account information and to notify the Service Center at the address or phone number above at once if any Account information shows transactions that you did not make or authorize. Section 11 below has more specific information about disputing transactions, fees, or errors. **CARDHOLDERS WHO RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL**

**Monthly Card Account Statements.** Upon your request, we will provide you with an Account statement monthly for every month in which your Account is open. The statement will include information about the transactions you made, deposits, fees and adjustments to your Account. A fee may apply to receive a monthly paper statement. For more information see the Fee Disclosure. **Prompt Review of Statements.** You agree to promptly review your monthly Account statements and to notify the Service Center at the address or phone number above at once if any statement shows transactions that you did not make or

authorize. Section 11 below has more specific information about disputing transactions, fees, or errors shown on your monthly Account statement.

8   **Claims by Third Parties Against Your Account.**

Claims or Disputes by Third Parties Concerning Your Account. If a third party makes a claim against funds in your Account, or if we have reason to believe there is or may be a dispute over matters such as the ownership of your Account or the authority to withdraw funds, we may, in our sole discretion and in accordance with applicable state or federal law (a) continue to rely on current enrollment forms or other Account documents, (b) honor the competing claim upon receipt of evidence we deem satisfactory to justify such action, (c) freeze all or part of the funds until the dispute is resolved to our satisfaction, or (d) pay the funds into an appropriate court of law for resolution.

**Liens and Attachments.** Following receipt by us of any notice of lien, process in attachment, garnishment or other proceeding relating to you or your Account, we are authorized, without notice to you, unless otherwise required by law, to withhold transfer of so much of the balance of your Account as may be the subject of such notice or process, and to pay such amount to the court or creditor, in accordance with applicable state or federal law without responsibility to you for such withholding or payment or for refusal to honor transfers made by you.

9   **Bank of America's "Zero Liability" Policy for Unauthorized Transactions.** Federal law (described in the section below entitled "Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions ") may limit your liability for unauthorized transactions on your Account, but you may still be liable in some circumstances. Under the Bank of America "zero liability" policy, you may incur no liability for unauthorized use of your Card up to the amount of the unauthorized transaction, provided you notify us within a reasonable time of the loss or theft of your Card, Card number or PIN or its unauthorized use, subject to the following terms and conditions:

**Excluded transactions.** Our zero liability policy does not apply to any unauthorized electronic fund transfer on an account which does not involve use of a Card or Card number.

**"Unauthorized" defined.** A transaction is considered "unauthorized" if it is initiated by someone other than you (the cardholder) without your actual or apparent authority, and you receive no benefit from the transaction. A transaction is not considered "unauthorized" if 1) you furnish your Card, Card number or other identifying information to another person and expressly or implicitly give that individual authority to perform one or more transactions, and the person then exceeds that authority, or 2) for any other reason we conclude that the facts and circumstances do not reasonably support a claim of unauthorized use.

**"Reasonable" time defined.** Reasonable time will be determined in our sole discretion based on the circumstances but will not be less than the time frames specified under the Electronic Fund Transfer Act or Regulation E (see Section 10 below).

**Other considerations.** We may ask you for a written statement, affidavit or other information necessary to support your claim. If you do not provide the requested materials within the time requested or within a reasonable time if no date is stated, and we have no knowledge of the facts or other documentation to further investigate or confirm your claim, our zero liability policy may not apply.

**Limitation of our Liability.** Our liability under this policy is limited to reimbursing you for the amount of

**JA 69**

your loss up to the face amount of any unauthorized card transaction covered by this policy. We are not liable for any claims, losses or damages that arise out of your misuse of the Card. We are not liable for any claims of special, indirect or consequential damages.

**Your Rights under Regulation E.** If your claim does not meet the prescribed conditions for reimbursement under the above policy, you still retain any consumer rights you may have under Regulation E, as described in Sections 10 and 11 below, and we will automatically re-examine the claim in accordance with those rights.

10 **Regulation E Liability Disclosure; Your Liability in Case of Loss, Theft, or Unauthorized Transactions. Contact Us Promptly.** Please contact us at the numbers listed below AT ONCE if you believe your Card has been lost or stolen, or if you believe that someone may use or has used your PIN assigned to your Card without your permission. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your Account. If you tell us within two business days after you learn of the loss or theft, you can lose no more than $50 for an unauthorized transaction or a series of related unauthorized transfers should someone use your Card or PIN.

If you do NOT tell us within two business days after you learn of the loss or theft of your Card or PIN and we can prove we could have stopped someone from using your Card or PIN without your permission if you had told us, you could lose as much as $500.

Also, if your monthly Account statement or your Account history shows transfers that you did not make, including those made by your Card, Card number, PIN or other means, tell us at once. If you receive a monthly Account statement and you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had contacted us on time. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.

If you do not receive a monthly Account statement and do not tell us within 60 days after the earlier of the date you electronically access your Account if the error could be viewed in your electronic history or the date we sent the FIRST written history on which the error appeared (but in any event within 120 days after the transaction allegedly in error was credited or debited to your Account), you may not get back any money you lost after the applicable 60 or 120 day period if we can prove that we could have stopped someone from taking the money if you had contacted us on time. If a good reason (such as a long trip or hospital stay) keeps you from notifying us, we will extend the time periods.

If you believe your Card has been lost or stolen, call us at 1.855.847.2029, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.) or write to: Bank of America, P.O. Box 8488, Gray, TN 37615-8488.

NOTE: These liability rules are established by Regulation E which covers accounts that involve the use of a Card. Our zero liability policy, as described in Section 9 above, regarding unauthorized transactions may give you more protection, provided you report the transactions promptly. You should also note that when you give someone your Card or PIN, you are authorizing that person to use your Card and you are responsible for all transactions that person performs with your Card or PIN. These transactions are authorized transactions. Transactions are considered unauthorized only after you notify us that the person is no longer authorized. Remember, do not write your PIN on your Card or carry your PIN with you. This reduces the possibility of someone using your Card without your permission if it is lost or stolen.

In Case of Errors or Questions About Your Transactions:

Telephone us at: 1.855.847.2029

1.866.656.5913 TTY

423.262.1650 (Collect, when calling outside the U.S.)

Or write to:

Bank of America

P.O. Box 8488

Gray, TN 37615-8488


**CARDHOLDERS WHO RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL**


Call or write as soon as you can if you think your monthly Account statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared. You will need to tell us:

(a) Your name and Card Account number.
(b) Why you believe there is an error, and the dollar amount involved.
(c) Approximately when the error took place.

If you tell us orally, we may require that you send your complaint or question in writing within 10 business days.

**CARDHOLDERS WHO DO NOT RECEIVE MONTHLY ACCOUNT STATEMENTS BY MAIL**

Call or write as soon as you can if you think an error has occurred in your Account. We must allow you to report an error until 60 days after the earlier of the date you electronically access your Account, if the error could be viewed in your electronic history, or the date we sent the FIRST written history on which the error appeared; but in any event you must report the error no more than 120 days after the transaction allegedly in error was credited or debited to your Account. You may request a written history of your transactions at any time by calling or writing to us at the numbers and address listed above. You will need to tell us:

(1) Your name and Card Account number.
(2) Why you believe there is an error, and the dollar amount involved.
(3) Approximately when the error took place.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

**WHEN YOU WILL HEAR FROM US**

We will determine whether an error occurred within 10 business days after we hear from you—and will correct any error promptly. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we decide to do this, we will credit your Account within 10 business days for the amount you think is in error, so that you will have the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10

business days, we may not credit your Account.

For errors involving new accounts, POS, or foreign-initiated transactions, we may take up to 90 days to investigate your complaint or question. For new accounts, we may take up to 20 business days to credit your Account for the amount you think is in error.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of the documents that we used in our investigation. If you need more information about our error-resolution procedures, call or write to us using the contact information listed above.

12 **Our liability for failure to complete transactions.**

If we do not complete a transfer to or from your Account on time or in the correct amount according to this Agreement, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:

◦ If, through no fault of ours, you do not have enough available money in your Account to make the transaction;

◦ If the ATM where you are making the transaction does not have enough cash;

◦ If the ATM, terminal or system was not working properly and you knew about the breakdown when you started the transaction;

◦ If circumstances beyond our control (such as power outages, equipment failures, fire or flood) prevent the transaction, despite reasonable precautions that we have taken;

◦ If your Card or PIN has been reported to be, or suspected of being, lost or stolen, and we have taken action to prevent transactions with the Card or PIN;

◦ If your Account is subject to some legal process, right of setoff or encumbrance restricting the transaction, or if the funds in your Account are not immediately available for completing a transaction.

13 **Preauthorized Transactions.**

**Right to Stop Payment and Procedure for Doing So.** If you have told us in advance to make regular payments out of your Account, you can stop any of these payments. Here's how:

Call us at 1.855.847.2029, 1.866.656.5913 TTY, or 423.262.1650 (Collect, when calling outside the U.S.), or write us at: Bank of America, P.O. Box 8488, Gray, TN 37615-8488, in time for us to receive your request three business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

**Notice of Varying Amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. **Our Liability for Failure to Stop Payment of Preauthorized Transfers.** If you order us to stop one of these payments three business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

14 **Privacy**

As part of establishing your Account, you will receive with your Card a copy of the Prepaid Card Privacy Notice which generally addresses our policy for handling and disclosing information for your Card. You may view our Prepaid Card Privacy Notice at www.bankofamerica.com/prepaidprivacy. With respect to any information we collect from you as a result of your Card, we will only share such information related to your

Account, from time to time, subject to any applicable financial privacy laws or other laws or regulations, (a) where it is necessary for completing transactions; (b) in response to any subpoena, summons, court or administrative order, or other legal process which we believe requires our compliance; (c) in connection with collection of indebtedness or to report losses incurred by us; (d) in compliance with any agreement between us and a professional, regulatory or disciplinary body; (e) in connection with potential sales of businesses; (f) to service providers who help us meet your needs by assisting us in providing the services under this Agreement; or (g) If you give us your written permission.

15  **Recording and Monitoring Telephone Calls.**

We may record or monitor telephone calls between you and us. We need not remind you of our recording or monitoring before each call unless required to do so by law.

16  **Amendment/Termination.**

Amendments. We may, at any time, change the terms and conditions in this Agreement, including the amount of any fee. We may add new terms and conditions and we may delete or amend existing terms and conditions. We generally send you at least 21 days' advance notice of an adverse change, including increased fees to you, increased liability for you, fewer types of available electronic fund transfers, or stricter limitations on the frequency or dollar amount of transfers. If a change is not adverse to you, however, we may make the change at any time without advance notice. If you do not agree with the change, you may close your Account. However, if you continue to use your Account or keep it open, you accept and agree to the change.

**Our Closure or Suspension of Your Account.** We may close or suspend your Account at any time. Your Card remains our property. We may cancel your right to use your Card at any time. Once your Account has been closed, you agree to discontinue using your Card. If we close your Account, we may, at our option, apply the remaining balance to a new account for your benefit. If you have not spent the remaining balance prior to Account closure, you may contact the Service Center to request a check for the remaining balance, less the Paper Check Fee.

**Your Closure of Your Account.** If, at the time you close your Account, all transactions have cleared and there is no remaining balance, your Account will be closed to further use. If there is a remaining balance, you may use your Card to reduce the balance to zero before closing your Account. Alternatively, you can contact the Service Center to request a check for the remaining balance of your Account, less the Paper Check Fee, or request an Emergency Cash Transfer. You understand that you are responsible for negative balances that occur after your notice of closure to the same extent as provided in this Agreement for an open Account. You agree to destroy your Card after your Account is closed.

17  **Unclaimed Property.**

Any remaining unclaimed balance will be reported and remitted as unclaimed property to the appropriate state as required by state law after a period of time defined by that state's law. After we turn the funds over to the state, we have no further liability to you for the funds and you must apply to the appropriate state agency to reclaim your funds.

18  **Governing Law/Severability.**

This Agreement will be governed by the laws and regulations of the United States and, to the extent not so covered, by the laws and regulations of the State of North Carolina. A determination that any part of this Agreement is invalid or unenforceable will not affect the remainder of this Agreement.

19  **English Document Controlling.**

As a service that we may provide to you at your request, we may communicate certain information to you in

Spanish. Any legal clarifications which may need to be made will be based on the use and application of the English versions, including but not limited to this Agreement and the Fee Disclosure.

20 **Fee Disclosure and Other Important Disclosures.**

A copy of our Fee Disclosure and Other Important Disclosures is included with, and incorporated in, this Agreement.

# **Exhibit 3**



**PREPAID**
P.O. Box 8488
Gray, TN 37615-8488

January 5, 2021

ﺍ·ﻟ·ﺍﻟ‖ﻟ‖··ﺍ‖ﻟ·ﺍ‖···ﺏ‖·ﺍ‖·ﻟﻟﺐ‖··ﺍ·ﻟﺍﻟ‖·ﻟ‖ﺍ·
*************AUTO**ALL FOR AADC 212
YAGOUB M MOHAMED
5920 SCHERING RD
BALTIMORE, MD 21206-4046

## IMPORTANT NOTICE ABOUT YOUR PREPAID DEBIT CARD
## FOR STATE UNEMPLOYMENT BENEFITS OR OTHER BENEFITS/PAYMENTS

This notice is provided to you as the named account holder for a prepaid debit card issued by Bank of America, N.A. ("we" or "us") on behalf of your state's agency responsible for unemployment benefits or other benefits/payments.

It has been determined that there may be irregular, unauthorized, or unlawful activities involved with the prepaid debit card issued to you. As a result, and in accordance with the card account agreement, a freeze (or hold) has been placed on your account.

While your account is frozen, you will be unable to use the prepaid debit card or access the money in your account. Your card and account cannot be used for any purpose, including ATM withdrawals, making purchases, transferring funds online between your accounts, requesting emergency cash, paying bills, or requesting or using checks. In addition, while your account is frozen, your card will not be available to receive any additional benefits that may be issued to you by the state agency administering your benefit program. Although your account is frozen, we recommend that you keep your card in a safe place should your account become unfrozen.

If a conclusion is reached that there is no irregular, unauthorized, or unlawful activity on your account, your account will be unfrozen and your balance will become available in accordance with the terms of the card account agreement and state agency guidelines.

Should you require further information regarding this notice or you want to request that the account be unfrozen, you may contact our Service Center by calling 1.866.213.4074, 1.866.656.5913 TTY, or 423.262.1650 (collect, when calling outside the U.S.), or by writing to us at: Bank of America, P.O. Box 8488, Gray, TN 37615-8488. You may also contact your state's agency responsible for the benefit program.

If you have already requested that your account be unfrozen and your request is being worked on, there is no need to make another request.

BANK OF AMERICA, N.A.

# <u>Exhibit 4</u>



**PREPAID**
P.O. Box 8488
Gray, TN 37615-8488

March 3, 2021

⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕⁕AUTO⁕⁕SCH 5-DIGIT 21205
YAGOUB M MOHAMED
5920 SCHERING RD
BALTIMORE, MD 21206-4046

## IMPORTANT NOTICE ABOUT YOUR PREPAID DEBIT CARD
## FOR STATE UNEMPLOYMENT BENEFITS OR OTHER BENEFITS/PAYMENTS

This notice is provided to you as the named account holder for a prepaid debit card issued by Bank of America, N.A. ("we" or "us") on behalf of your state's agency responsible for unemployment benefits or other benefits/payments.

It was determined previously that there may have been irregular, unauthorized, or unlawful activities on your card account. As a result, and in accordance with the card account agreement, a freeze (or hold) was placed on your card account. When the freeze was in place, you were not able to use the card or access any benefits on the card.

We are pleased to inform you that we have removed the card account freeze, and your card is now active again.  As a result, your card is available to be used in accordance with the terms of the card account agreement and state agency guidelines.

[If you remain eligible for benefit payments and you want to receive future benefit payments in your card account, you may need to contact your state's agency responsible for the benefit program.]

Since your card account is no longer frozen, it is important that you safeguard your card and your PIN so that you protect any benefits that are on your card.

Should you require further information regarding this notice or the status of your account, you may contact our Service Center by calling 1.866.213.4074, 1.866.656.5913 TTY, or 423.262.1650 (collect, when calling outside the U.S.), or by writing to us at: Bank of America, P.O. Box 8488, Gray, TN 37615-8488. You may also contact your state's agency responsible for the benefit program.

BANK OF AMERICA, N.A.

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(NORTHERN DIVISION)

|  |  |
|---|---|
| YAGOUB M. MOHAMED, *individually and on behalf of all others similarly situated,*<br><br>　　　Plaintiff,<br><br>　　v.<br><br>BANK OF AMERICA, N.A.,<br><br>　　　Defendant. | Civil Action No. 1:21-cv-01283-CCB |

## BANK OF AMERICA, N.A'S MOTION TO DISMISS COMPLAINT

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Bank of America, N.A. ("BANA" or "the Bank") respectfully moves to dismiss Plaintiff Yagoub M. Mohamed's Class Action Complaint (ECF No. 1) in its entirety with prejudice.

Plaintiff asserts that BANA violated the Electronic Fund Transfer Act ("EFTA") and Regulation E ("Reg E"), the Maryland Personal Information Protection Act ("MPIPA"), and the Maryland Consumer Protection Act ("MCPA"), and further asserts breach of contract and negligence claims. Plaintiff's claims are based on the alleged theft of his debit card by an unknown third party, who proceeded to make unauthorized transactions using that card. Plaintiff alleges that he reported this theft to BANA but BANA did not reimburse him, and that BANA froze his card due to a suspicion of irregular, unauthorized, or unlawful activities and then unfroze his account after he verified his identity with the Maryland Department of Labor's Division of Unemployment Insurance ("DUI").

1

As grounds for the Motion, and as set forth more fully in the accompanying Memorandum of Law, which is incorporated herein by reference, BANA respectfully submits that the Complaint should be dismissed for the following reasons:

1.      Plaintiff's EFTA and Reg E claim (Count One) should be dismissed because Plaintiff's factual allegations do not plausibly establish that his prepaid debit card account is covered by EFTA and Reg E.  Reg E's definition of a covered "prepaid account" excludes accounts that are "directly or indirectly established through a third party and loaded only with qualified disaster relief payments."  12 C.F.R. § 1005.2(b)(3)(ii)(B).  Plaintiff alleges that his debit card account was established by BANA, Compl. ¶ 3, and the federal pandemic unemployment assistance ("PUA") benefits that Plaintiff received are "qualified disaster relief payments."

2.      Plaintiff fails to state a claim under the MPIPA (Count Two) because he has not adequately alleged that BANA failed to implement or maintain reasonable security measures, nor has he alleged facts sufficient to show that he suffered injury or loss as a result of BANA's alleged failure to comply with the statute.

3.      Plaintiff's MCPA claim (Count Three) should be dismissed because Plaintiff has failed to plead the elements of an MCPA claim with particularity as required by Fed. R. Civ. P. 9(b).  Plaintiff does not allege that BANA made false statements of fact for the purpose of defrauding him, or that he relied upon any representation by BANA.  Nor has Plaintiff adequately pled causation, as he alleges that his injuries resulted from the interception of his mail rather than any representation by BANA.  Additionally, Plaintiff cannot state a claim under the MCPA based on alleged contractual violations or violations of the MPIPA for the reasons described above.

4.      Plaintiff lacks standing to assert his breach of contract claim premised on the Account Agreement between Plaintiff and BANA (Count Four) insofar as he contends that BANA

breached the Account Agreement by failing to investigate and credit his claim, as Plaintiff has been credited in full and the Account Agreement limits BANA's liability to the amount of his loss. Additionally, Plaintiff has not adequately pled a breach of the Account Agreement based on the freezing of his account, as the Account Agreement expressly permits BANA to freeze accounts. Nor has Plaintiff plausibly alleged that BANA breached the Account Agreement by failing to make funds available as instructed by DUI, as he does not allege any facts to support this claim.

5.      Plaintiff's breach of contract claim premised on the Agreement between BANA and the Maryland Department of Labor, Licensing and Regulation's Division of Unemployment Insurance (Count Five) should also be dismissed, as Plaintiff is not a third-party beneficiary of that agreement as a matter of law.

6.      Finally, Plaintiff's negligence claim (Count Six) should be dismissed because Plaintiff does not adequately allege the required elements of negligence.  Nowhere in the Complaint does Plaintiff plausibly allege that BANA owed any tort duty of reasonable care to Plaintiff where the parties have a written contract.  Plaintiff's assertion that he has a separate, implied-in-fact contractual relationship with BANA that gives rise to additional duties must fail because quasi-contractual claims cannot be asserted when an express contract defining the rights and remedies of the parties exists.  Finally, Plaintiff has not adequately alleged that any breach of the duties purportedly owed by BANA caused his alleged harm.

BANA incorporates the accompanying Memorandum of Law and exhibits as though fully restated herein, and respectfully requests oral argument regarding this Motion.

WHEREFORE, for the reasons set forth herein and in the accompanying Memorandum of Law in Support of its Motion to Dismiss, BANA respectfully requests that the Court grant its Motion to Dismiss and dismiss the Complaint with prejudice.

JA 81

Dated:  August 2, 2021                        Respectfully submitted,

                                              /s/ Thomas M. Hefferon
                                              Thomas M. Hefferon (Bar No. 15109)
                                              *THefferon@goodwinlaw.com*
                                              **GOODWIN PROCTER LLP**
                                              1900 N Street, N.W.
                                              Washington, DC 20036
                                              Tel.: (202) 346-4029
                                              Fax: (202) 346-4444

                                              James W. McGarry (*pro hac vice*)
                                              *JMcGarry@goodwinlaw.com*
                                              Yvonne W. Chan (*pro hac vice*)
                                              *YChan@goodwinlaw.com*
                                              **GOODWIN PROCTER LLP**
                                              100 Northern Avenue
                                              Boston, MA 02210
                                              Tel.: (617) 570-1000
                                              Fax: (617) 523-1231

**JA 82**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will serve all counsel of record.

/s/ Thomas M. Hefferon
Thomas M. Hefferon (Bar No. 15109)

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| YAGOUB M. MOHAMED, *individually and on behalf of all others similarly situated,*<br><br>    Plaintiff,<br><br>    v.<br><br>BANK OF AMERICA N.A.,<br><br>    Defendant. | Civil Action No. 1:21-cv-01283-CCB<br><br>**CLASS ACTION** |

**DECLARATION OF SHANE M. DANIELS IN SUPPORT OF BANK OF AMERICA, N.A.'S MOTION TO DISMISS**

I, Shane M. Daniels, declare as follows:

1.      I am employed by Bank of America, N.A. ("BANA") as a Senior Vice President, Business Executive Operations for Claims Administration.  I make this declaration in support of BANA's Motion to Dismiss based upon personal knowledge and belief, upon BANA's records maintained in the ordinary course and scope of business, and upon information gathered from other employees of BANA.  If called to testify as to any of the matters set forth in this declaration, I could and would competently testify thereto.

2.      In my capacity as Senior Vice President, Business Executive Operations for Claims Administration, I am familiar with BANA's practices for the handling and investigating of claims made by cardholders with debit cards issued by BANA for the Maryland Department of Labor's Division of Unemployment Insurance ("DUI") unemployment program.  As part of my responsibilities, I routinely review and analyze account level files and claim records.

3.      I have reviewed BANA's records pertaining to claims submitted by Plaintiff

1

**JA 84**

Yagoub M. Mohamed.

4.      On December 8, 2020, Mr. Mohamed submitted a claim to BANA based on several allegedly unauthorized transactions on his account, totaling $14,654.00.

5.      On June 25, 2021, Mr. Mohamed was informed that BANA had completed an additional review of his claim.  As a result of BANA's research, Mr. Mohamed's account was credited $14,654.00 that day.  A true and correct copy of the June 25, 2021 letter is attached hereto as Exhibit 1.


I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of August, 2021.


By: _____

SHANE DANIELS

2

# EXHIBIT 1

**Bank of America** 

Dispute Resolution Services P.O. Box 53137 Phoenix AZ 85072-3137

June 25, 2021

YAGOUB MOHAMED

**Amount:** $14,654.00          **Claim number** ▮▮▮▮▮▮          **Account ending in:** ▮▮▮

**YAGOUB MOHAMED:**

**We've completed an additional review of your claim and are providing you with the results of our research.**

**What you need to know**

• As a result of our research, your account has been credited $14,654.00.

• This credit is final and permanent, and we now consider this dispute closed.

**We're here to help**
We appreciate the opportunity to serve you and your financial needs. If you have any questions, please call us at 855.355.5058, Monday through Friday, 8 a.m. to 8 p.m. Eastern.



DC_CLMDC 14654.00 Page1of1                    Page 1 of 1

**JA 87**

# Exhibit A

USCA4 Appeal: 22-1954   Doc: 22   Filed: 01/03/2023   Pg: 93 of 304
Case 3:21-cv-00376-VC   Document 89-1   Filed 05/17/21   Page 1 of 4
Case 1:21-cv-01283-CCB   Document 22-1   Filed 09/07/21   Page 2 of 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YICK, et al., | Case No.  21-cv-00376-VC |
| Plaintiffs, | |
| v. | **ORDER RE PRELIMINARY INJUNCTION** |
| BANK OF AMERICA, N.A., | Re: Dkt. No. 64 |
| Defendant. | |

Because of the time-sensitivity involved, this ruling assumes that the reader is familiar with the applicable legal standards, the parties' arguments, the evidence in the record, and the discussion that took place at the preliminary injunction hearing on May 13, 2021.

1. The plaintiffs have demonstrated a strong likelihood of success on their claims that Bank of America (BofA) has violated, and continues to violate, the Electronic Fund Transfers Act by failing to conduct an adequate, good faith investigation when cardholders report unauthorized charges, and often simply freezing cardholder accounts based on a faulty screening process. 15 U.S.C. § 1693f. This has resulted (and will likely continue to result) in the improper denial of cardholders' reimbursement claims for unauthorized charges, the unlawful deprivation of provisional credits for such charges, and the inability to access benefits to which cardholders are entitled. For similar reasons, the plaintiffs have demonstrated a strong likelihood of success on their claims that BofA is systematically breaching its contracts with cardholders and violating California's Unfair Competition Law.

2. Provisional certification of a class of all cardholders who call to report unauthorized charges to their accounts is warranted for purposes of a preliminary injunction. *See, e.g.*, *Zepeda*

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 94 of 304
Case 3:21-cv-00376-VC    Document 89    Filed 05/17/21    Page 2 of 4
Case 1:21-cv-01283-CCB    Document 22-1    Filed 09/07/21    Page 3 of 5

*Rivas v. Jennings*, 445 F. Supp. 3d 36, 39 (N.D. Cal. 2020); *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1201-05 (N.D. Cal. 2017), *affirmed as Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir. 2018).

3. BofA is wrong to argue that the named plaintiffs or the class are categorically barred from obtaining interim relief. There is Article III standing because many of the named plaintiffs were being injured by the conduct described in Section 1 at the time they filed their lawsuits, and some of the named plaintiffs continue to suffer injury today. *Buckeye Tree Lodge v. Expedia, Inc.*, 2020 WL 5372246, at *2 (N.D. Cal. Sept. 9, 2020); *see Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 184 (2000). And the evidence presented by BofA in response to this preliminary injunction motion does not refute the plaintiffs' strong showing that class members are likely to suffer similar violations in the future.

4. The harm being suffered by the class members is irreparable. The class is comprised of people who depend on unemployment benefits to get through the pandemic. As the plaintiffs' evidence shows, continued denial of these benefits will seriously hinder the ability of many class members to feed their families and keep a roof over their heads. Thus, although the general rule is that financial harm is not "irreparable" (because plaintiffs can generally recoup the money if they ultimately prevail), this is precisely the type of case where the exception to the general rule applies. Just as companies can establish irreparable harm by showing that losing money will likely cause them to shut down, human beings can establish irreparable harm by showing that losing wages or benefits will likely cause them to be evicted, go hungry, or be denied necessary medical care. *Cf. Carrillo v. Schneider Logistics, Inc.*, 823 F. Supp. 2d 1040, 1045 (C.D. Cal. 2011) ("Because plaintiffs are low-wage workers, and lost wages or delays in compensation threaten or impair their ability to meet basic needs, such harms are irreparable."); *see also United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting, Division of Conval-Penn, Division of Conval Corp.*, 598 F.2d 1273, 1280 (3d Cir. 1979).[1]

_____

[1] In some cases involving wages or benefits, courts have intoned the general rule about financial injury without acknowledging the exception, perhaps because the exception did not apply on

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 95 of 304
Case 3:21-cv-00376-VC    Document 89    Filed 05/17/21    Page 3 of 4
Case 1:21-cv-01283-CCB    Document 22-1    Filed 09/07/21    Page 4 of 5

5. The balance of hardships and the public interest almost certainly support some form of preliminary injunctive relief. *See, e.g.*, *Golden Gate Restaurant Association v. City & County of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) ("'Faced with . . . a conflict between financial concerns and preventable human suffering, we have little difficulty concluding that the balance of hardships tips decidedly' in favor of the latter." (quoting *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983))). But it ultimately depends on the nature of the relief sought. At the hearing, the Court suggested that the parties participate in a settlement conference with a Magistrate Judge to carefully review and discuss the plaintiffs' proposed preliminary injunction to ensure that it does not interfere with BofA's operations more than is necessary to sufficiently minimize the risk of innocent cardholders being improperly deprived of their benefits, and also to carefully review and discuss the proposed injunction to ensure that it does not unduly hinder BofA from freezing the accounts of people who are likely to have obtained their cards through fraud. Both sides accepted this invitation. Accordingly, the case is referred to Judge Sallie Kim for a settlement conference to take place on May 26 and May 27, 2021. The parties are ordered to work as much as possible before the conference, including with one another, to maximize the chances of coming out of the conference with a joint proposal. A joint proposal or competing proposals should be filed with the Court no later than May 28. As stated at the hearing, BofA's participation in this conference, which is designed primarily to ensure that any relief ordered is not overbroad, does not constitute a waiver of its right to challenge the validity any preliminary injunction that is ultimately issued.

---

those facts. *See, e.g.*, *Hale v. Wood*, 89 F.3d 840 (8th Cir. 1996) ("Hale failed to establish a threat of irreparable harm because the injuries he alleged as the basis for his claim for relief—wrongfully withheld wages, statutorily inadequate wages, and termination of his work assignment—were compensable through his section 1983 claim for money damages."); *Johnson v. City of San Francisco*, 2010 WL 3078635, at *3 (N.D. Cal. Aug. 5, 2010) ("Lost wages alone do not constitute a claim for irreparable harm as money damages would be sufficient to remedy the wrong should one ultimately be found to have been committed."); *see also Ahuruonye v. U.S. Department of Interior*, 312 F. Supp. 3d 1, 23-24 (D.D.C. 2018). But those cases should not be read to suggest that the loss of wages or benefits can never constitute irreparable harm. When a case involves the deprivation of wages or benefits to low-income people living hand to mouth, a preliminary injunction may well be warranted (depending, of course, upon the strength of the plaintiffs' claims on the merits and other factors).

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 96 of 304
Case 3:21-cv-00376-VC   Document 89   Filed 05/17/21   Page 4 of 4
Case 1:21-cv-01283-CCB   Document 22-1   Filed 09/07/21   Page 5 of 5

**IT IS SO ORDERED.**

Dated: May 17, 2021

_____

VINCE CHHABRIA
United States District Judge

# Exhibit B

USCA4 Appeal: 22-1954    Doc: 22      Filed: 01/03/2023    Pg: 98 of 304
Case 3:21-cv-00376-VC   Document 103   Filed 06/02/21   Page 1 of 5
Case 1:21-cv-01283-CCB   Document 22-2   Filed 09/07/21   Page 2 of 6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNIFER YICK, et al., | Case No. 21-cv-00376-VC |
| Plaintiffs, | |
| | **PRELIMINARY INJUNCTION** |
| v. | Re: Dkt. Nos. 64, 100 |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

With the assistance of Magistrate Judge Kim, the plaintiffs and defendants worked together to craft preliminary injunction language that is designed to protect the class members from future harm while minimizing disruption to the defendant's operations. This language is an improvement over what was presented by the plaintiffs in support of their motion. The hardship to the defendant from this injunction is outweighed by its benefits to the class members. The injunction is also in the public interest. Accordingly, in accordance with the language submitted by the parties, and for the reasons discussed in the order issued on May 17, 2021:

Bank of America, N.A. (the "Bank"), and the Bank's officers, directors, agents, employees, representatives, and all persons acting under, in concert or participation with, or for them ("Defendant") are preliminarily enjoined in the administration of prepaid debit cards for Employment Development Department ("EDD") unemployment or disability benefits issued by Defendant to members of the certified class as follows:

(1) Defendant shall be prohibited from considering the results of the Bank's initial automated claims fraud filter (Claim Fraud Filter) in investigating or resolving unauthorized transaction error claims (*see* 12 C.F.R. 1005.11) (Claims).

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 99 of 304
Case 3:21-cv-00376-VC   Document 103   Filed 09/02/21   Page 2 of 5
Case 1:21-cv-01283-CCB   Document 22-2   Filed 09/07/21   Page 3 of 6

(2) a.  Defendant shall be prohibited from denying or closing Claims or denying provisional or permanent credit to claimants' accounts without conducting and concluding an investigation into the alleged unauthorized transaction, pursuant to EFTA and Regulation E.

b.  Defendant shall be prohibited from denying or closing claims without providing the claimant a written explanation of the findings of its investigation, pursuant to EFTA and Regulation E.

(3)  Defendant shall not consider the results of the Bank's Claim Fraud Filter as a basis for freezing card accounts of any Class Member.

(4) a.  Beginning ten (10) days after the entry of this Order, Defendant shall reopen any Claim that it closed or denied based solely upon the results of its Claim Fraud Filter and that it has not previously paid or previously reopened and investigated (Previously Closed Claim). Defendant may stagger the reopening of such Claims in roughly equal amounts over thirty (30) additional days.

b.  For Previously Closed Claims filed by a class member who has not yet authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, Defendant shall, within ten (10) days of reopening, and thereafter at least weekly for five weeks, send the class member a written notice (by mail and email, if available) explaining the basis for the original denial; that the claim has been reopened; what steps they need to take to authenticate their identity (which may include presenting identification at a Bank branch or by calling the dedicated toll free number for the Fraud Call Center referred to in paragraph 9); that if they do not authenticate their identity within 45 calendar days of the original notice, the claim will be denied; and that if they authenticate their identity, the Bank will commence and complete the investigation and resolve the claim within 45 calendar days of the authentication and, if such claim has not been resolved within 10 business days of the authentication, provide provisional credit in the amount of the alleged error(s) to the account.  Persons subject to this Paragraph 4(b) are subject to Paragraph 5(a) if they authenticate.

(5)  a.  For Previously Closed Claims that were filed by a class member who has

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 100 of 304

Case 3:21-cv-00376-VC   Document 103   Filed 06/02/21   Page 3 of 5
Case 1:21-cv-01283-CCB   Document 22-2   Filed 09/07/21   Page 4 of 6

authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, Defendant shall complete the investigation and resolve the claim within 45 calendar days of the entry of this Order (or of the date the class member authenticates their identity, if later) and, if the claim has not been resolved within 10 business days of the entry of this Order (or of the date the class member authenticates their identity, if later), provide provisional credit in the amount of the alleged error(s).

b. For any Previously Closed Claims that were filed by a class member who has authenticated their identity through either EDD (in the knowledge of the Bank) or the Bank, but the Claim has never been reopened, Defendant shall reopen such Claim within ten (10) days of the entry of this Order and Defendant shall complete the investigation and resolve the claim within 45 calendar days of reopening and, if the claim has not been resolved within 10 business days of reopening, provide provisional credit in the amount of the alleged error(s).

(6)  In addition to Claims that Defendant reopens pursuant to paragraphs 4 and 5(b), Defendant shall, upon request from the affected cardholder, reopen any Claim that it closed or denied on or after January 1, 2020.

(7)  Within 10 days of the entry of this Order (by mail and email, if available) or after the date of the blocking (by mail, within three (3) business days, and email, if available, within one (1) business day), whichever is later, Defendant shall give written notice to class members whose accounts are blocked solely based upon its Claims Fraud Filter that explains that the Bank will promptly unblock their account if the class member authenticates their identity. The written notice shall explain: the basis for the previous block; what steps the class member needs to take to authenticate their identity (which may include presenting identification at a Bank branch or by calling the dedicated toll free number at the Fraud Call Center referred to in paragraph 9); that if they do not authenticate their identity, their account will remain blocked or will be closed; and that they have the right to ask EDD to issue future benefits payments by paper check instead of by the Bank Debit Card.

(8)  Defendant shall:

USCA4 Appeal: 22-1954    Doc: 23    Filed: 01/03/2023    Pg: 101 of 304
Case 3:21-cv-00376-VC   Document 103   Filed 06/02/21   Page 4 of 5
Case 1:21-cv-01283-CCB   Document 22-2   Filed 09/07/21   Page 5 of 6

a. As soon as practicable, and in no event later than twenty (20) days of the entry of this Order, establish a dedicated toll-free number to enable class members to directly reach the Claims Initiation Call Center, which shall be staffed by customer service representatives (CSRs) who are trained to handle Claims intake;

b. Within thirty (30) days of the entry of this Order, the Claims Initiation Call Center hours to receive calls shall consist of at least fourteen (14) hours on weekdays and ten (10) hours on Saturdays, which shall be expanded within forty-five days of the entry of this Order to include ten (10) hours on Sundays, and expanded within sixty days of the entry of this Order to include 24 hours per day, 7 days per week coverage; and

c. As soon as practicable after the establishment and successful testing of the dedicated toll-free number for the Claims Initiation Call Center, but in no event later than ten (10) days thereafter, and at least monthly thereafter, provide written notices (by mail and email, if available) to all class members regarding the available toll free number and providing the information in paragraphs 6, and (8)(a) and (b).

(9)  Defendant shall:

a. As soon as practicable, and in no event later than twenty (20) days after the entry of this Order, establish a dedicated toll-free number to enable class members to directly reach the Fraud Call Center, which shall be available 24 hours per day, 7 days per week, and which shall be staffed by CSRs who are trained to authenticate identity and resolve challenges to blocked accounts.

b. As soon as practicable after the establishment and successful testing of the dedicated toll-free number for the Fraud Call Center, but in no event later than ten (10) days thereafter, and thereafter at least weekly, provide written notice (by mail and email, if available) to all class members whose accounts are blocked of the availability of this dedicated toll-free number.

(10)  Defendant shall, within 20 days of the entry of this Order:

a. Staff the Claims Initiation Call Center and Fraud Call Centers, such that the average speed to answer calls from Class Members for these centers is no more than five minutes, 90% of

USCA4 Appeal: 22-1954    Doc: 22       Filed: 01/03/2023    Pg: 102 of 304
Case 3:21-cv-06376-VC   Document 103   Filed 06/02/21   Page 5 of 5
Case 1:21-cv-01283-CCB   Document 22-2   Filed 09/07/21   Page 6 of 6

the time, separately measured for the Claims Initiation and Fraud Call Centers and based on all callers to such centers (rather than just calls by Class Members).

b. Train and require CSRs in the Claims Initiation Call Center to request email contact information from a claimant at the time a claim is filed (if email is not already available for that claimant), so that the Bank may use that information to contact the claimant regarding authentication, if and to the extent this is consented to by EDD.

c. Train and require CSRs in the Fraud Call Center to immediately inform cardholders who are unable to authenticate their identity by phone that they have the option of authenticating their identity at a Bank branch.

(11) Within 10 business days of the entry of this Order, Defendants shall provide email and mail notice to all Class Members of their rights under paragraphs (1) through (7) of this Order.

(12) Paragraphs 2 and 4 of this Order shall not apply to,

a. Claims made with respect to accounts that EDD has found to be disqualified or not entitled to benefits, or has requested an account freeze; or

b. Claims made with respect to accounts that Defendant has frozen or blocked based on (i) receipt of legal process or (ii) information provided or made available by law enforcement, or (iii) the outcome of an investigation of suspicious facts and circumstances related to an individual cardholder developed independent of the Claim (if such cardholder has been sent a notice that the action has occurred and a statement of what the cardholder can do in response).

Defendant shall implement the requirement of paragraph 1 as soon as practicable but in no event more than seven (7) days from the entry of this Order.

There shall be no bond required.

**IT IS SO ORDERED.**

Dated: June 2, 2021

_____

VINCE CHHABRIA
United States District Judge

5

**JA 98**

# Exhibit C

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 104 of 304
Case 3:21-md-02992-LAB-MSB   Document 58   Filed 07/29/21   PageID.146   Page 1 of 6
Case 1:21-cv-01283-CCB   Document 22-3   Filed 09/07/21   Page 2 of 7

LAURA A. STOLL (SBN 255023)
*LStoll@goodwinlaw.com*
**GOODWIN PROCTER LLP**
601 South Figueroa Street, 41st Floor
Los Angeles, California 90017
Tel.: +1 213 426 2500
Fax: +1 213 623 1673

JAMES W. MCGARRY (admitted pro hac vice)
*JMcGarry@goodwinlaw.com*
YVONNE W. CHAN (admitted pro hac vice)
*YChan@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax: +1 617 523 1231

THOMAS M. HEFFERON (admitted pro hac vice)
*THefferon@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N St. NW
Washington, DC 20036
Tel: +1 202 346 4000
Fax: +1 202 346 4444

Attorneys for Defendant
BANK OF AMERICA, N.A.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA –

## SAN DIEGO DIVISION

| | |
|---|---|
| IN RE: BANK OF AMERICA CALIFORNIA UNEMPLOYMENT BENEFITS LITIGATION | Case No. 21-MD-02992-LAB-MSB **DEFENDANT BANK OF AMERICA, N.A.'S DISCOVERY POSITION STATEMENT** Courtroom: 14A – 14th Floor Judge: Hon. Michael S. Berg |

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 105 of 304
Case 3:21-md-02992-LAB-MSB   Document 58   Filed 07/29/21   PageID.147   Page 2 of 6
Case 1:21-cv-01283-CCB   Document 22-3   Filed 09/07/21   Page 3 of 7

1   Pursuant to the Court's July 21, 2021 Order (Dkt. No. 51), Defendant Bank

2   of America, N.A. ("BANA") submits its discovery position statement.  Simply put,

3   no discovery is needed for "urgent relief and timely payment of unemployment

4   benefits." *Id.* at 2.  That is so because virtually every cardholder is presently able to

5   access their accounts and seek payment of any unauthorized transaction "claims"

6   they have made.

7   The crux of Plaintiffs' case is the freezing or blocking of cardholder accounts

8   or unauthorized transaction claims being disallowed as a result of suspected

9   fraudulent activity.  Neither presents the type of urgent circumstance that justifies

10   the burdensome discovery Plaintiffs seek.

11   The vast majority of currently frozen accounts were frozen at EDD's request,

12   and Plaintiffs have stated many times that such freezes are not part of their case.

13   The limited number of remaining, currently frozen accounts were frozen by BANA

14   because its investigation or law enforcement information revealed ties to criminal

15   networks or other fraudulent behavior, or because of legal process (*e.g.*, seizure

16   warrants).  BANA also "blocks" accounts based on suspected fraudulent activity,

17   including concerns about identity theft or account compromise.  A cardholder

18   whose account is blocked may contact BANA (either by phone or by visiting a

19   branch) to verify their identity; once verified, the account is immediately unblocked

20   and the cardholder's use of the card is restored.

21   As for Plaintiffs' attack on BANA's handling of claims, BANA no longer

22   uses the automated claims fraud filter to close claims of allegedly unauthorized

23   transactions ("Claims").  Virtually every such Claim that was previously closed

24   based solely on the claims fraud filter has been addressed:  either already paid, or

25   reopened and investigated, or allowed reconsideration under the *Yick* preliminary

26   injunction procedures.  As of July 26, 2021, over 29,000 Claims have been

27   reconsidered and paid, and over 17,000 Claims have been reconsidered and denied.

28   Thus, discovery is not needed to achieve any "need for urgent relief" because

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 106 of 304
Case 3:21-md-02992-LAB-MSB   Document 58   Filed 07/29/216   PageID.148   Page 3 of 6
Case 1:21-cv-01283-CCB   Document 22-3   Filed 09/07/21   Page 4 of 7

1    current processes provide that relief.  Specifically, all cardholders have or can

2    restore access to their accounts unless (a) they cannot prove their identity, or

3    (b) EDD identified them as fraudulent, they have ties to criminal networks or other

4    suspicious behavior, or they are subject to legal process.  And almost all

5    cardholders with Claims that were closed or denied based on the claims fraud filter

6    are subject to the reconsideration processes in the preliminary injunction.

7         Given the lack of urgency, conducting discovery before the Court rules on

8    BANA's motion to dismiss would be particularly inefficient and unnecessarily

9    burdensome.  Plaintiffs should not be permitted to conduct discovery regarding

10   frozen or blocked cards, for example, when the cardholder agreement expressly

11   permits BANA to freeze accounts if BANA "suspect[s] irregular, unauthorized, or

12   unlawful activities."  Discovery about BANA's claims investigation practices also

13   should not be permitted until the Court has ruled on, among other things:

14   (i) whether Plaintiffs' accounts are covered by EFTA/Reg E; (ii) whether Plaintiffs

15   have adequately pled an EFTA/Reg E violation or breach of contract (where many

16   have been fully reimbursed, and others do not even allege they experienced

17   unauthorized transactions); and (iii) the scope of any remaining claim.

18        The remaining legal claims in the case (and the discovery served in *Yick*)

19   focus on three main areas:  the use of magnetic stripe versus chip cards, an alleged

20   data breach, and customer service issues.  None of this discovery is urgent and all

21   of it relates to claims that will be subject to a motion to dismiss.  There is no legal

22   support for the novel theory that the magnetic stripe cards that EDD specified in its

23   contract as a technology requirement violate the California Consumer Privacy Act

24   or any other legal duty owed by BANA; Plaintiffs have alleged no facts whatsoever

25   to support their theory that a data breach occurred; and BANA's customer service

26   obligations are rooted solely in its agreement with EDD, which Plaintiffs have no

27   right to enforce as they are not third-party beneficiaries under California law.

28        BANA looks forward to discussing these issues with the Court on August 5.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 107 of 304
Case 3:21-md-02992-LAB-MSB    Document 58    Filed 07/29/21    PageID.149    Page 4 of 6
Case 1:21-cv-01283-CCB    Document 22-3    Filed 09/07/21    Page 5 of 7

| | | |
|---|---|---|
| 1 | Dated:        July 29, 2021 | Respectfully Submitted, |
| 2 | | |
| 3 | | By: /s/ Yvonne W. Chan |
| 4 | | LAURA A. STOLL (SBN 255023) |
| | | LStoll@goodwinlaw.com |
| 5 | | **GOODWIN PROCTER LLP** |
| | | 601 South Figueroa Street |
| 6 | | 41st Floor |
| | | Los Angeles, California 90017 |
| 7 | | Tel.: +1 213 426 2500 |
| | | Fax: +1 213 623 1673 |

JAMES W. MCGARRY (pro hac vice)
*JmcGarry@goodwinlaw.com*
YVONNE W. CHAN (pro hac vice)
*YChan@goodwinlaw.com*
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: +1 617 570 1000
Fax: +1 617 523 1231

THOMAS M. HEFFERON (pro hac vice)
*THefferon@goodwinlaw.com*
**GOODWIN PROCTER LLP**
1900 N St. NW
Washington, DC 20036
Tel: +1 202 346 4000
Fax: +1 202 346 4444

JANICE P. BROWN (SBN 114433)
*jbrown@meyersnave.com*
ARLENE R. YANG (SBN 297450)
*ayang@meyersnave.com*
**MEYERS NAVE**
600 B Street, Suite 1650
San Diego, CA 92101
Tel: +1 619 330 1700
Fax: +1 619 330 1701

BARRY W. LEE (SBN 088685)
*bwlee@manatt.com*
**MANATT PHELPS & PHILLIPS LLP**
One Embarcadero Center, 30th Floor
San Francisco, CA 94111

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 108 of 304
Case 3:21-md-02992-LAB-MSB   Document 58   Filed 07/29/21   PageID.150   Page 5 of 6
Case 1:21-cv-01283-CCB   Document 22-3   Filed 09/07/21   Page 6 of 7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Tel.: +1 415 291 7450
Fax: +1 415 291 7474

*Attorneys for Defendant*
*BANK OF AMERICA, N.A.*

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 109 of 304
Case 3:21-md-02992-LAB-MSB   Document 58   Filed 07/29/21   PageID.151   Page 6 of 6
Case 1:21-cv-01283-CCB   Document 22-3   Filed 09/07/21   Page 7 of 7

## **CERTIFICATE OF SERVICE**

     I hereby certify that I electronically filed the foregoing with the clerk of the court for the United States District Court for the Southern District of California by using the CM/ECF system on July 29, 2021.  I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.  I certify under penalty of perjury that the foregoing is true and correct.

Executed:   July 29, 2021            /s/ Yvonne W. Chan

# Exhibit D

**Bank of America**

Dispute Resolution Services P.O. Box 53137 Phoenix AZ 85072-3137

June 25, 2021

YAGOUB MOHAMED
5920 SCHERING RD
BALTIMORE　MD　21206

**Amount:** $14,654.00　　　　**Claim number:** 201208301077　　　　**Account ending in:**

**YAGOUB MOHAMED:**

**We've completed an additional review of your claim and are providing you with the results of our research.**

**What you need to know**

• As a result of our research, your account has been credited $14,654.00.

• This credit is final and permanent, and we now consider this dispute closed.

**We're here to help**
We appreciate the opportunity to serve you and your financial needs. If you have any questions, please call us at 855.355.5058, Monday through Friday, 8 a.m. to 8 p.m. Eastern.



201208301077 DC_CLMDC 14654.00 Page1of1　　　　　　　　　Page 1 of 1

**JA 107**

# <u>Exhibit E</u>


**Bank of America**
Dispute Resolution Services P.O. Box 53137 Phoenix AZ 85072-3137

12/09/2020

000017
YAGOUB MOHAMED
5920 SCHERING RD
BALTIMORE, MD 21206

Amount: $14,654.00          Claim number: 201208301077          Account ending in:

YAGOUB:

The above listed claim has been closed.

**What you need to know**
Your claim has been closed because we believe the account or the claim have been the subject of fraud or suspicious activity.  Any temporary credit that was applied to your account related to this claim, including any related reimbursement of fees, has been or will be debited from your account and reflected in your available balance, if any.

**We're here to help**
If you have any questions, please call us at 855-355-5058, Monday through Friday, 8 a.m. to 8 p.m. Eastern.  If you contact us by phone or in writing, you may request that we reopen your claim for further consideration.  You will be asked to give us information, including any documents you may have, to support your claim.
You have the right to request documents, if any, that we relied on in making our determination.



# Exhibit F

**Bank of America** $\rule{0pt}{0pt}$

Dispute Resolution Services P.O. Box 53137 Phoenix AZ 85072-3137

February 11, 2021

YAGOUB MOHAMED
5920 SCHERING RD
BALTIMORE    MD    21206

**Amount:** $14,654.00          **Claim number:** 201208301077          **Account ending in:**

**YAGOUB MOHAMED:**

**We've completed an additional review of your case and concluded that our original decision was correct.**

**What you need to know**
No posting error has occurred on your account.

Based on this information, we're unable to credit your account and we now consider this dispute closed.

**We're here to help**
We appreciate the opportunity to serve you and your financial needs. If you have any questions, or would like to request copies of the documents we relied on to reach this decision, please call us at 855.355.5058 Monday through Friday, 8 a.m. to 8 p.m. Eastern.



201208301077 DC_CLMDC 14654.00 Page1of1          Page 1 of 1

**JA 111**

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | |
|---|---|
| YAGOUB M. MOHAMED, *individually and on behalf of all others similarly situated,*<br><br>    Plaintiff,<br><br><br>    v.<br><br>BANK OF AMERICA, N.A.,<br><br>    Defendant. | Civil Action No.: 1:21-cv-01283-CCB |

## <u>NOTICE OF SUPPLEMENTAL AUTHORITY</u>

Plaintiff, Yagoub M. Mohamed ("Mohamed"), on behalf of himself and all others similarly situated, by and through his undersigned attorney, hereby provides notice of filing supplemental authority with respect to the issues raised in Bank of America's Motion to Dismiss [DE 18]:

1.    Stipulation and Consent to the Issuance of Consent Order directed to Bank of America, N.A., Consumer Financial Protection Bureau File No. 2022-CFPB-0004, entered July 14, 2022- attached as Exhibit "A".

2.    Consent Order directed to Bank of America N.A., Consumer Financial Protection Bureau File No. 2022-CFPB-0004, entered July 14, 2022-- attached as Exhibit "B."

3.     Consumer Financial Protection Bureau press release dated July 14, 2022, entitled "*Federal Regulators Fine Bank of America $225 Million Over Botched Disbursement of State Unemployment Benefits at Height of Pandemic*"- attached as Exhibit "C".

4.     Consent Order of United States Department of the Treasury, Office of the Comptroller of the Currency, directed to Bank of America, N.A., File No.: AA-ENF-2022-21 (#2022-023), entered July 14, 2022 (cease and desist proceedings) - attached as Exhibit "D."

5.     Consent Order of United States Department of the Treasury, Office of the Comptroller of the Currency, directed to Bank of America, N.A., File No.: AA-ENF-2022-22 (#2022-024), entered July 14, 2022 (civil money penalty proceedings) - attached as Exhibit "E."

Dated: July 17, 2022          Respectfully submitted,

/s/ Robert W. Murphy
ROBERT W. MURPHY
440 Premier Circle, Suite 240
Charlottesville, VA 22901
(434) 328-3100 (Tel.)
(434) 328-3101 (Fax)
rwmurphy@lawfirmmurphy.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all parties entitled

to service when filing electronically through the CM/ECF system.

*/s/ Kathleen P. Hyland*
Kathleen P. Hyland

# EXHIBIT "A"

# UNITED STATES OF AMERICA
# CONSUMER FINANCIAL PROTECTION BUREAU

**File No. 2022-CFPB-0004**

|                          | **STIPULATION AND CONSENT TO THE ISSUANCE OF A CONSENT ORDER** |
|--------------------------|---|
| **In the matter of:**    |   |
| **BANK OF AMERICA, N.A.** |   |

The Consumer Financial Protection Bureau (Bureau) intends to initiate an administrative proceeding against Bank of America, N.A. (Respondent), under 12 U.S.C. §§ 5563 and 5565, for its administration of unemployment insurance benefit prepaid debit cards and accounts in violation of the Consumer Financial Protection Act of 2010's (CFPA) prohibition on unfair, deceptive, or abusive acts or practices, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B), Sections 908 and 909 of the Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

Respondent, in the interest of compliance and resolution of the matter, and without admitting or denying any wrongdoing, consents to the issuance of a

Consent Order substantially in the form of the one to which this Stipulation and

Consent to the Issuance of a Consent Order is attached (Consent Order), and which

is incorporated by reference.

In consideration of the above premises, Respondent agrees to the following:

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under Sections 1053 and 1055

of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§

5563, 5565.

## Consent

2.    Respondent agrees to the issuance of the Consent Order, without admitting

or denying any of the findings of fact or conclusions of law, except that

Respondent admits the facts necessary to establish the Bureau's jurisdiction

over Respondent and the subject matter of this action.

3.    Respondent agrees that the Consent Order will be deemed an "order issued

with the consent of the person concerned" under 12 U.S.C. § 5563(b)(4) and

agrees that the Consent Order will become a final order, effective upon its

entry on the administrative docket, and will be fully enforceable by the

Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565.

4.    Respondent voluntarily enters into this Stipulation and Consent to the

Issuance of a Consent Order (Stipulation).

5.      The Consent Order resolves only Respondent's potential liability for law violations that the Bureau asserted or might have asserted based on the practices described in Section IV of the Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. Respondent acknowledges that no promise or representation has been made by the Bureau or any employee, agent, or representative of the Bureau, about any liability outside of this action that may have arisen or may arise from the facts underlying this action or immunity from any such liability.

6.      Respondent agrees that the facts described in Section IV of the Consent Order will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding before the Bureau to enforce the Consent Order, or in any subsequent civil litigation by the Bureau to enforce the Consent Order or its rights to any payment or monetary judgment under the Consent Order.

7.      The terms and provisions of this Stipulation and the Consent Order will be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.

8.      Respondent agrees that the Bureau may present the Consent Order to the Bureau Director for signature and entry without further notice.

**Waivers**

9.      Respondent, by consenting to this Stipulation, waives:

a.      Any right to service of the Consent Order, and agrees that entry of the

Consent Order on the administrative docket will constitute notice to

Respondent of its terms and conditions;

b.      Any objection to the jurisdiction of the Bureau, including, without

limitation, under section 1053 of the CFPA, 12 U.S.C. § 5563;

c.      The rights to all hearings under the statutory provisions under which

the proceeding is to be or has been instituted; the filing of proposed

findings of fact and conclusions of law; proceedings before, and a

recommended decision by, a hearing officer; all post-hearing

procedures; and any other procedural right available under section

1053 of the CFPA, 12 U.S.C. § 5563, or 12 CFR Part 1081;

d.      The right to seek any administrative or judicial review of the Consent

Order;

e.      Any claim for fees, costs or expenses against the Bureau, or any of its

agents or employees, and any other governmental entity, related in

any way to this enforcement matter or the Consent Order, whether

arising under common law or under the terms of any statute,

including, but not limited to the Equal Access to Justice Act and the

Small Business Regulatory Enforcement Fairness Act of 1996; for these purposes, Respondent agrees that Respondent is not the prevailing party in this action because the parties have reached a good faith settlement;

f.    Any other right to challenge or contest the validity of the Consent Order;

g.    Such provisions of the Bureau's rules or other requirements of law as may be construed to prevent any Bureau employee from participating in the preparation of, or advising the Director as to, any order, opinion, finding of fact, or conclusion of law to be entered in connection with this Stipulation or the Consent Order; and

h.    Any right to claim bias or prejudgment by the Director based on the consideration of or discussions concerning settlement of all or any part of the proceeding.

BANK OF AMERICA, N.A. BY:


_____        July 13, 2022
                                            _____
Thomas M. Scrivener                         Date
Chief Operations Executive, Bank of America, N.A.

# EXHIBIT "B"

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING
File No. 2022-CFPB-0004

|  |  |
|---|---|
| In the Matter of: | **CONSENT ORDER** |
| **BANK OF AMERICA, N.A.** |  |

The Consumer Financial Protection Bureau (Bureau) has reviewed the

administration of unemployment insurance benefit prepaid debit cards by Bank of

America, N.A. (Respondent, as defined below) and has identified the following

law violations in connection with Respondent's treatment of unemployment

insurance benefit recipients who filed notices of error concerning alleged

unauthorized electronic fund transfers (EFTs): (1) Respondent engaged in unfair

acts or practices by determining no error had occurred and freezing cardholder

accounts based solely on the results of Respondent's automated Fraud Filter, in

violation of Sections 1031 and 1036 of the Consumer Financial Protection Act of

2010 (CFPA), 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B); (2) Respondent failed

to conduct reasonable investigations of unemployment insurance benefit prepaid

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 127 of 304

Case 1:21-cv-01283-CCB   Document 36-2   Filed 07/17/22   Page 2 of 48
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 2 of 49

debit cardholders' notices of error, in violation of Sections 908 and 909 of the

Electronic Fund Transfer Act (EFTA), 15 U.S.C. §§ 1693f and 1693g, and Section

1005.11 of Regulation E; and (3) Respondent engaged in abusive acts or practices

by retroactively applying its automated Fraud Filter to reverse permanent credits

for unemployment insurance benefit prepaid debit cardholders whose notices of

error Respondent had previously investigated and paid, in violation of Sections

1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (d)(2)(B), 5536(a)(1)(B).

The Bureau has also identified that: (4) Respondent engaged in unfair acts or

practices by impeding unemployment insurance benefit prepaid debit cardholders'

efforts to file notices of error and seek liability protection from unauthorized EFTs,

in violation of Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531(a) and (c),

5536(a)(1)(B); and (5) Respondent failed to timely investigate and resolve

unemployment insurance benefit prepaid debit cardholders' notices of error

concerning alleged unauthorized EFTs, in violation of EFTA, 15 U.S.C. §

1693f(a), (c), and Section 1005.11(c)(2)-(3) of Regulation E. Under Sections 1053

and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§

5563, 5565, the Bureau issues this Consent Order (Consent Order).

## I.

## Jurisdiction

1.    The Bureau has jurisdiction over this matter under Sections 1053 and 1055
      of the CFPA, 12 U.S.C. §§ 5563 and 5565, and Section 918(a)(5) of EFTA,
      15 U.S.C. § 1693o(a)(5).

## II.

### Stipulation

2.    Respondent has executed a "Stipulation and Consent to the Issuance of a
      Consent Order," dated July 13, 2022 (Stipulation), which is incorporated by
      reference and is accepted by the Bureau. By this Stipulation, Respondent has
      consented to the issuance of this Consent Order by the Bureau under
      Sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without
      admitting or denying any of the findings of fact or conclusions of law, except
      that Respondent admits the facts necessary to establish the Bureau's
      jurisdiction over Respondent and the subject matter of this action.

## III.

### Definitions

3.    The following definitions apply to this Consent Order:

      a.   "Affected Consumers" means a consumer who during the Relevant
           Period: (1) qualified for and received government unemployment
           insurance benefit payments electronically through prepaid debit cards
           issued by Respondent; (2) filed a notice of error concerning alleged

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 129 of 304

Case 1:21-cr-01283-CCB   Document 36-2   Filed 07/17/22   Page 5 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 2 of 48

unauthorized EFTs with Respondent; and (3) for whom Respondent incorrectly determined, based solely on the results of Respondent's Fraud Filter, that no error occurred, and, as a result, Respondent (i) denied the consumer's error claim or reversed permanent credits previously granted to the consumer and (ii) froze or, after March 17, 2021, blocked the consumer's unemployment insurance benefit prepaid debit card account.

b. "Board" means Respondent's duly-elected and acting Board of Directors or a committee thereof.

c. "Consequential Harm" means the financial harm Affected Consumers incurred due to the time their unemployment insurance benefit prepaid debit card account remained frozen or blocked after Respondent incorrectly determined that no error occurred on the consumer's unemployment insurance benefit prepaid debit card account, based solely on the results of Respondent's Fraud Filter.

d. "EDD" means the California Employment Development Department.

e. "EDD Cardholder" means a consumer who received an EDD Prepaid Debit Card.

f. "EDD Prepaid Debit Cards" means Respondent-issued and Respondent-administered unemployment insurance benefit prepaid debit cards linked to individual EDD Prepaid Debit Card Accounts.

g. "EDD Prepaid Debit Card Accounts" means depository accounts maintained by Respondent for the Prepaid Card Unemployment Insurance Benefits Program and holding unemployment insurance and other public benefits from EDD for consumers.

h. "Effective Date" means the date on which the Consent Order is entered on the administrative docket.

i. "Electronic Fund Transfer" or "EFT" means "any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, or computer or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account." 15 U.S.C. § 1693a(7).

j. "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his or her delegate.

k. "Error Resolution Investigation" means the procedures and duties required of financial institutions as described in 12 C.F.R. § 1005.11.

l. "Fraud Filter" means the automated fraud detection process that Respondent used to investigate unemployment insurance benefit prepaid card notices of error between September 28, 2020 and June 8, 2021.

m. "OCC Consent Order" means the Consent Order issued by the Office of the Comptroller of the Currency against Respondent on July 14, 2022.

n. "Prepaid Card Unemployment Insurance Benefits Program" means the program through which Respondent issued and administered prepaid debit cards and associated accounts containing unemployment insurance benefits granted to consumers in certain states.

o. "Regional Director" means the Regional Director for the Southeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his or her delegate.

p. "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section IV of this Consent Order.

q. "Relevant Period" means March 1, 2020 to June 8, 2021.

r. "Respondent" means Bank of America, N.A. and its successors and assigns.

### IV.

### Bureau Findings and Conclusions

The Bureau finds the following:

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 132 of 304

Case 1:21-cv-01283-CCB   Document 36-2   Filed 07/17/22   Page 8 of 48
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 7 of 49

4.      Respondent is a national bank headquartered in Charlotte, North Carolina

with branches and ATMs located in 38 states and the District of Columbia.

As of December 31, 2021, Respondent had $2.5 trillion in consolidated

assets, which makes it an insured depository institution with assets greater

than $10,000,000,000 within the meaning of 12 U.S.C. § 5515(a).

5.      Respondent is a "covered person" under 12 U.S.C. § 5481(6) because it

"engages in offering or providing a consumer financial product or service,"

including by engaging in deposit-taking activities, transmitting or

exchanging funds, or otherwise acting as a custodian of funds or any

financial instrument for use by consumers primarily for personal, family, or

household purposes. 12 U.S.C. § 5481(15)(A)(iv).

6.      Respondent is a "financial institution" under EFTA and Regulation E

because it is a national bank holding consumer deposit accounts. 15 U.S.C. §

1693a(9).

7.      During the Relevant Period, Respondent had contracts with 12 states,

including California, to deliver unemployment insurance and other

government benefit payments to consumers through prepaid debit cards and

accounts.

8.      For each consumer deemed eligible by the relevant state unemployment

agency who elected to receive their benefit payments through a prepaid debit

card during the Relevant Period, the state notified Respondent, funded a

prepaid debit card account with Respondent, and Respondent issued a

prepaid debit card to the consumer.

9.    In each of those states, Respondent was responsible for loading

unemployment and other government benefit payments onto prepaid debit

cards and for servicing consumers' prepaid debit card accounts.

10.    The onset of the COVID-19 pandemic in March 2020 led to a surge in

consumers seeking unemployment insurance benefits. These programs

provide a temporary partial wage or income replacement for consumers who,

through no fault of their own, have lost their jobs. Payments are made

directly to unemployed consumers, so that consumers can continue to pay

for the necessities of life while they search for work. The national

unemployment rate in April 2020 was 14.7%, and it remained at

significantly elevated levels through 2020. Millions of consumers were

newly unemployed. They sought the benefits to which they were legally

entitled via Respondent's prepaid debit cards.

**Respondent's Strategy for Prepaid Debit Cardholders Filing Notices of Error
and Seeking Liability Protection**

11.    When notified by a consumer of an error such as an unauthorized EFT on

their account, a financial institution must investigate the alleged error,

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 134 of 304

Case 1:21-cv-01283-CCB    Document 36-2    Filed 07/17/22    Page 10 of 49
2022-CFPB-0004    Document 1    Filed 07/14/2022    Page 9 of 49

determine whether an error has occurred, and report the results of its investigation and determination to the consumer pursuant to the requirements in Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

12. From January 2020 until late-September 2020, upon receiving a notice of error from an unemployment insurance benefit prepaid debit cardholder concerning alleged unauthorized EFTs, Respondent would conduct an investigation that could include, among other steps: comparing the location of the transaction with the consumer's residence or habitual transactions; accessing ATM camera footage (if the alleged unauthorized activity occurred at a Respondent ATM); and contacting the cardholder for further information.

13. Following a surge in notices of error filed by unemployment insurance benefit prepaid debit cardholders nationwide throughout the summer of 2020, Respondent changed its practices for investigating unemployment insurance benefit prepaid debit cardholder notices of error.

14. Under its new strategy, which Respondent implemented on September 28, 2020 for all of its state unemployment insurance benefit prepaid programs, Respondent only ran cardholders' notices of error concerning alleged unauthorized EFTs through its newly developed automated Fraud Filter, and

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 135 of 304

Case 1:21-cv-01288-CCB   Document 36-2   Filed 07/17/22   Page 11 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2021   Page 136 of 48

for notices of error that met any indicator used by the Fraud Filter ceased

taking the steps described in Paragraph 12, above, as part of its investigation.

15.    Beginning on September 28, 2020, for notices of error submitted by

unemployment insurance benefit prepaid debit cardholders concerning

alleged unauthorized EFTs that met any of the three indicators used by

Respondent's new Fraud Filter, Respondent automatically determined that

no error had occurred.

16.    Between September 28, 2020 and June 8, 2021, for notices of error

submitted by unemployment insurance benefit prepaid debit cardholders

concerning alleged unauthorized EFTs that met any of the three indicators

used by Respondent's Fraud Filter, along with determining no error had

occurred, Respondent froze or, after March 17, 2021, blocked the

consumer's prepaid debit card account.

17.    The only exception was from October 4, 2020 through December 2, 2020,

when unemployment insurance benefit prepaid debit card accounts flagged

by Respondent's new Fraud Filter were not frozen as Respondent had

intended. After Respondent discovered the issue, it froze those flagged

unemployment insurance benefit prepaid debit card accounts on or about

December 17, 2020, excluding accounts where a reconsideration request

from a consumer was pending or where Respondent had reversed its initial

determination that no error had occurred.

18. A consumer whose unemployment insurance benefit prepaid debit card

account is frozen cannot access the government benefits in their account.

19. Respondent also will not accept new benefits payments for deposit into a

frozen unemployment insurance benefit prepaid debit card account.

20. When Respondent blocks an unemployment insurance benefit prepaid debit

card, no transactions are permitted. But unlike an account freeze,

Respondent permits cardholders with blocks on their unemployment

insurance benefit prepaid debit card to verify their identity directly with

Respondent. Upon verification, Respondent releases the block, and the

unemployment insurance benefit prepaid debit card becomes usable again.

21. Before implementing the Fraud Filter on September 28, 2020, Respondent

knew, or should have known, that the Fraud Filter would, in certain cases,

incorrectly determine that no error had occurred.

22. Likewise, before implementing the Fraud Filter, Respondent knew, or

should have known, that not all unemployment insurance benefit prepaid

accounts meeting its Fraud Filter indicators would be fraudulent and

therefore should be frozen. Indeed, in an internal September 2020

presentation, Respondent acknowledged, "Fraudulent determinations would

require a detailed review of specific accounts, which given the volume, is unmanageable."

23. For notices of error meeting any of its Fraud Filter indicators, Respondent continued with its nationwide strategy of automatically determining no error occurred and freezing the cardholder's unemployment insurance benefit prepaid debit card account based solely on the Fraud Filter from September 28, 2020 to March 17, 2021.

24. Consumers whose unemployment insurance benefit prepaid debit card accounts Respondent froze through its Fraud Filter went weeks, and in some cases months, without access to their unemployment insurance benefits.

25. Some consumers whose prepaid debit card accounts Respondent froze incurred late fees and interest charges on their other accounts, and also missed phone and utility bill payments. Some consumers with frozen prepaid debit card accounts also faced other financial impacts, including foreclosure, eviction, and car repossession.

26. Beginning on March 18, 2021, for notices of error for which it determined no error had occurred based solely on the results of its Fraud Filter, Respondent blocked the cardholder's unemployment insurance benefit prepaid debit card, rather than freezing the cardholder's account.

27.    For notices of error submitted by over 100,000 unemployment insurance

benefit prepaid debit cardholders concerning alleged unauthorized EFTs that

met one or more of the Fraud Filter indicators, Respondent continued to rely

solely on the results of its Fraud Filter to determine no error had occurred

until June 8, 2021.

**Respondent's Strategy as Applied to EDD Cardholders**

28.    Eligible California consumers may receive their EDD unemployment

insurance benefit payments through a check mailed by EDD or through EDD

Prepaid Debit Cards and EDD Prepaid Debit Card Accounts.

29.    During the Relevant Period, most eligible California consumers received

their EDD unemployment insurance benefit payments through EDD Prepaid

Debit Cards and Accounts.

30.    From September 28, 2020 to March 17, 2021, for EDD Cardholders whose

notices of error Respondent determined no error occurred through its Fraud

Filter, Respondent sent denial notices reflecting Respondent's determination

that the EDD Cardholder's Account or notice of error had been the subject

of fraudulent or suspicious activity. Respondent's denial notices failed to

mention that Respondent had also frozen the consumer's EDD Prepaid Debit

Card Account.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 139 of 304

Case 1:21-cv-01852-CCB   Document 36-2   Filed 07/17/22   Page 15 of 48
2022-CFPB-0004   Document 1   Filed 07/19/2021   Page 15 of 49

31.  Beginning in December 2020 and continuing to March 17, 2021,
     Respondent sent an additional letter notifying affected EDD Cardholders of
     their account freeze several days after the EDD Prepaid Debit Card Account
     freeze had gone into effect. In some cases, Respondent failed to notify
     affected EDD Cardholders that their EDD Prepaid Debit Card Accounts had
     been frozen at all.

32.  EDD Cardholders seeking to file a notice of error with Respondent to seek
     liability protection spent hours a day on the phone attempting to notify
     Respondent that their EDD Prepaid Debit Card Account had been subject to
     unauthorized EFTs.

33.  EDD Cardholders whose EDD Prepaid Debit Card Accounts Respondent
     froze based solely on its Fraud Filter spent hours a day on the phone with
     Respondent attempting to seek information regarding how to regain access
     to their frozen Account. Along with long hold times, Cardholders with EDD
     Prepaid Debit Card Accounts frozen as a result of the Fraud Filter were
     subject to disconnections, transfers, and inaccurate information from
     Respondent and its vendor agents, including that their Accounts had been
     frozen at the direction of EDD rather than by Respondent.

34.  From September 28, 2020 to March 17, 2021, Respondent generally required
     EDD Cardholders with frozen EDD Prepaid Debit Card Accounts to reverify

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 140 of 304

Case 1:21-cv-01883-CCB   Document 36-2   Filed 07/17/22   Page 16 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2021   Page 136 of 46

their identity through EDD (rather than with Respondent) to regain access to their Account.

35.    Respondent knew, or should have known, that EDD would not be able to handle the burden of quickly reverifying eligible EDD Cardholders whose EDD Prepaid Debit Card Accounts Respondent had frozen through its new strategy beginning on September 28, 2020.

36.    During the summer of 2020, Respondent met with EDD dozens of times, often weekly, and was in telephone or email contact even more often.

37.    In July 2020, EDD had approximately 1,400 staff to handle an average of 6.7 million consumer calls per week. In August 2020, EDD was answering and resolving only 1% of incoming calls.

38.    Respondent did not inform EDD that it would be using a Fraud Filter and freezing unemployment insurance benefit prepaid debit card accounts before implementing that strategy on September 28, 2020.

39.    Until March 18, 2021, the only exception to Respondent's requirement that EDD Cardholders reverify their identity through EDD to regain access to their frozen EDD Prepaid Debit Card Account was limited to Cardholders who filed a complaint asserting a particular hardship with Respondent through a state or congressional representative, a legal aid group or private attorney, or the media that reached the attention of Respondent's executives.

**Findings and Conclusions as to Respondent's Strategy in California (Unfair Practice)**

40.    Sections 1031 and 1036 of the CFPA prohibit a "covered person" from

    engaging in any "unfair, deceptive, or abusive act or practice" in connection

    with any transaction with a consumer for a consumer financial product or

    service, or the offering of a consumer financial product or service. 12 U.S.C.

    §§ 5531(a), 5536(a)(1)(B).

41.    An act or practice is unfair if it causes or is likely to cause substantial injury

    to consumers, which is not reasonably avoidable by consumers, and such

    substantial injury is not outweighed by countervailing benefits to consumers

    or to competition. 12 U.S.C. § 5531(c).

42.    From September 28, 2020 to March 17, 2021, Respondent automatically

    determined, without any further investigation, that no error had occurred for

    any EDD Cardholder notice of error concerning alleged unauthorized EFTs

    that met any of the three indicators in Respondent's Fraud Filter. During

    most of this period, when Respondent determined no error had occurred

    through its Fraud Filter, Respondent also froze the cardholder's EDD

    Prepaid Debit Card Account.

43.    This caused substantial injury to consumers. Not only did Respondent,

    through its Fraud Filter, incorrectly and automatically determine no error

    had occurred for tens of thousands of EDD Cardholders who had filed

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 142 of 304

Case 1:21-cv-01282-CCB   Document 36-2   Filed 07/17/22   Page 18 of 49
2022-CFPB-0004   Document 1   Filed 07/19/2021   Page 119 of 48

notices of error, but Respondent also froze those cardholders' EDD Prepaid Debit Card Accounts (except as stated in Paragraph 17), meaning those EDD Cardholders could not receive or access the unemployment insurance benefit funds in their Accounts.

44.  This substantial injury was not reasonably avoidable by EDD Cardholders. During this period, Respondent generally required EDD Cardholders whose Accounts were frozen through its strategy to reverify their identity through EDD to regain access to their Accounts.

45.  EDD Cardholders received conflicting and delayed information from Respondent regarding the reasons for their EDD Prepaid Debit Card Account freeze, and the steps they needed to take to unfreeze their Account.

46.  This substantial injury was not outweighed by any countervailing benefits to consumers or to competition.

47.  As a result, Respondent engaged in unfair acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (c), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Retroactive Application of Its Fraud Filter (Abusive Practice)**

48.  An act or practice is abusive if it, among other things, takes unreasonable advantage of the inability of a consumer to protect their interests in selecting or using a consumer financial product or service. 12 U.S.C. § 5531(d)(2)(B).

49.    In late September 2020 or early October 2020, Respondent also applied its Fraud Filter to more than 11,000 notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders between April 1, 2020 and September 27, 2020 for which Respondent had previously provided the EDD Cardholder a permanent credit.

50.    For those more than 11,000 notices of error, Respondent retroactively determined that no error had occurred based on the results of its Fraud Filter, and reversed those EDD Cardholders' permanent credits.

51.    Affected EDD Cardholders were unable to protect their interests because they could not control how and when Respondent would investigate and resolve their notices of error.

52.    Until at least December 2021, Respondent did not correct its reversals of these more than 11,000 previously-investigated-and-paid notices of error without an EDD Cardholder's request for reconsideration.

53.    By reversing the permanent credits for EDD Cardholders who had already received notice from Respondent that their error claim had been investigated and paid, Respondent took unreasonable advantage of EDD Cardholders' inability to protect their interests.

54.  As a result, Respondent engaged in abusive acts or practices, in violation of Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (d)(2)(B), 5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Failure to Conduct Reasonable Error Resolution Investigations (EFTA and Regulation E)**

55.  Under EFTA, upon receiving notices of error, financial institutions may not determine no error had occurred without conducting a "good faith investigation of the alleged error" and without "a reasonable basis for believing that the consumer's account was not in error." 15 U.S.C. § 1693f(e).

56.  Further, under Regulation E, when conducting an Error Resolution Investigation, a financial institution must conduct, at minimum, a "review of its own records regarding [the] alleged error." 12 C.F.R. § 1005.11(c)(4), and the Error Resolution Investigation "must be reasonable," 71 Fed. Reg. 1638, 1654 (Jan. 10, 2006).

57.  From September 28, 2020 to June 8, 2021, Respondent used its Fraud Filter to determine no error had occurred for approximately 188,000 notices of error submitted by Affected Consumers nationwide concerning alleged unauthorized EFTs, without any further investigation or considering any other information relevant to Affected Consumers' notices.

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 145 of 304

Case 1:21-cv-01882-CCB   Document 36-2   Filed 07/17/22   Page 21 of 49
2022-CFPB-0004   Document 1   Filed 07/19/2021   Page 208 of 48

58.   As a result, Respondent violated the requirement to conduct a reasonable
      Error Resolution Investigation under Sections 908 and 909 of EFTA, 15
      U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E.

**Findings and Conclusions as to Respondent Impeding EDD Cardholders from Filing Notices of Error and Seeking Liability Protection from Unauthorized EFTs (Unfair Practices)**

59.   Throughout the Relevant Period, Respondent and EDD both directed EDD
      Cardholders to contact Respondent to file a telephonic notice of error.

60.   Throughout the Relevant Period, EDD Cardholders could not file notices of
      error with Respondent online, through Respondent's other (non-prepaid)
      customer service divisions, or in person at Respondent's branches.

61.   EDD Cardholders who called for assistance after their EDD Prepaid Debit
      Card Account was subject to unauthorized EFTs were required to navigate
      Respondent's prepaid call center divisions staffed by vendor agents.

62.   Throughout the Relevant Period, Respondent represented on its EDD Debit
      Card FAQ webpage that it would provide EDD Cardholders with "dedicated
      customer service representatives" who are "available 24 hours a day, 7 days
      a week" to help EDD Cardholders "investigate transactions."

63.   Respondent further advised consumers in its EDD Cardholder Agreement,
      which Respondent mailed to all new EDD Cardholders, that "Telephoning is
      the best way of keeping your possible losses down."

64.     Under Respondent's "Zero Liability" guarantee, which Respondent also
        includes in its EDD Cardholder Agreement, Respondent represents that
        EDD Cardholders will incur no liability for unauthorized use of their EDD
        Prepaid Debit Card up to the amount of the unauthorized transactions,
        provided they notify Respondent within a reasonable amount of time.

65.     For much of 2020, EDD Cardholders faced long hold times when attempting
        to file a notice of error with Respondent over the phone and take advantage
        of Respondent's "Zero Liability" guarantee for unauthorized use of
        cardholders' EDD Prepaid Debit Cards.

66.     Throughout the Relevant Period, EDD Cardholders were required to first
        speak with an agent in Respondent's main prepaid call center before being
        transferred to Respondent's prepaid claims initiation division, which was the
        only division authorized to accept EDD Cardholders' notices of error over
        the phone.

67.     From May 1, 2020 to July 1, 2020, prepaid debit cardholders nationwide had
        to wait on average nearly two hours to speak with an agent in Respondent's
        prepaid claims initiation division.

68.     From September 1 to December 1, 2020, prepaid debit cardholders
        nationwide had to wait on average over an hour to speak with an agent in
        Respondent's prepaid claims initiation division.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 147 of 304

Case 1:21-cv-01962-CCB   Document 36-2   Filed 07/17/22   Page 23 of 49
2022-CFPB-0004   Document 1   Filed 07/19/2021   Page 23 of 48

69. Unlike Respondent's main prepaid call center, throughout the Relevant Period Respondent's prepaid claims initiation division was not available 24 hours a day, 7 days a week, but instead kept the following business hours: Monday to Friday, 5am PT to 7pm PT; Saturday, 6:30am PT to 5pm PT; and closed on Sundays.

70. Through September 2020, Respondent's prepaid claims initiation division was still staffed by fewer than 300 vendor agents to assist unemployment insurance benefit prepaid debit cardholders nationwide with filing their notices of error.

71. Throughout 2020, certain EDD Cardholders remained on hold with Respondent's prepaid call center divisions for hours daily, over the course of weeks, in attempts to file notices of error.

72. EDD Cardholders were also subject to transfers, dropped calls, and misinformation from Respondent's prepaid call center agents, all of which further impeded their ability to successfully file notices of error with Respondent.

73. EDD Cardholders could not reasonably avoid the harm caused by extensive hold times, dropped calls, and misinformation from Respondent's prepaid call center agents because, among other reasons, Respondent directed EDD Cardholders to file notices of error by contacting Respondent by phone.

74.    This substantial injury to EDD Cardholders was not outweighed by any

countervailing benefits to consumers or to competition.

75.    As a result, Respondent engaged in unfair acts or practices, in violation of

Sections 1031 and 1036 of the CFPA. 12 U.S.C. §§ 5531(a) and (c),

5536(a)(1)(B).

**Findings and Conclusions as to Respondent's Failure to Timely Investigate
EDD Cardholders' Notices of Error Concerning Alleged Unauthorized EFTs
(EFTA and Regulation E)**

76.    For timely-submitted consumer notices of error, EFTA requires financial

institutions to "investigate the alleged error, determine whether an error has

occurred, and report or mail the results of such investigation and

determination to the consumer within ten business days." 15 U.S.C. §

1693f(a).

77.    A financial institution may extend that 10-business-day investigation

deadline to 45 calendar days if it provisionally credits the consumer's

account in the amount of the alleged error within 10 business days of

receiving the error notice. 15 U.S.C. § 1693f(c); 12 C.F.R. § 1005.11(c)(2).

78.    This 45-day investigation deadline may be extended to 90 calendar days if a

notice of error involves an EFT that was not initiated within a state; resulted

from a point-of-sale debit card transaction; or occurred within 30 days of the

first deposit to the account. 12 C.F.R. § 1005.11(c)(3)(ii).

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 149 of 304

Case 1:21-cv-01852-CCB    Document 36-2    Filed 07/17/22    Page 25 of 48
2022-CFPB-0004    Document 1    Filed 07/14/2022    Page 24 of 49

79. This extended 90-day investigation deadline does not apply to transactions at an ATM, including ATMs located at merchant locations. Official Interpretation Comment 11(c)(3)-1, 12 C.F.R. Pt. 1005, Supp. I.

80. In certain instances, for notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders during the Relevant Period, Respondent failed to complete its investigation within 10 business days and Respondent did not issue a provisional credit (or issued a provisional credit after 10 business days).

81. In certain instances, for notices of error concerning alleged unauthorized EFTs relating to ATM transactions submitted by EDD Cardholders during the Relevant Period, Respondent failed to complete its investigation within 45 calendar days.

82. In certain instances, for notices of error concerning alleged unauthorized EFTs submitted by EDD Cardholders during the Relevant Period, Respondent failed to complete its investigation within 90 calendar days.

83. As a result, Respondent violated EFTA and Regulation E by failing to timely investigate EDD Cardholders' notices of error concerning alleged unauthorized EFTs. 15 U.S.C. § 1693f(a), (c); 12 C.F.R. § 1005.11(c)(2)-(3).

## CONDUCT PROVISIONS

## V.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 150 of 304

Case 1:21-cv-01282-CCB    Document 36-2    Filed 07/17/22    Page 26 of 48
2022-CFPB-0004    Document 1    Filed 07/14/2022    Page 26 of 49

**IT IS ORDERED**, under Sections 1053 and 1055 of the CFPA, that:

84.   Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate Sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531 and 5536, Sections 908 and 909 of EFTA, 15 U.S.C. §§ 1693f and 1693g, and Section 1005.11 of Regulation E, in connection with administering unemployment insurance benefit prepaid debit cards and accounts, including in connection with receiving, investigating, and resolving notices of error submitted by unemployment insurance benefit prepaid debit cardholders concerning alleged unauthorized EFTs.

85.   Respondent and its officers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, in connection with administering unemployment insurance benefit prepaid debit cards and accounts, must take the following affirmative actions:

   a.  Respondent must not determine no error occurred solely based on the results of an automated fraud filter for notices of error submitted by unemployment insurance benefit prepaid debit cardholders;

USCA4 Appeal: 22-1954   Doc: 22   Filed: 01/03/2023   Pg: 151 of 304

Case 1:21-cv-01281-CCB   Document 36-2   Filed 07/17/22   Page 27 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 208 of 46

b.  Respondent must not freeze an unemployment insurance benefit prepaid debit card account solely based on the results of an automated fraud filter;

c.  Respondent must, during the course of an Error Resolution Investigation, reasonably consider all information relevant to the unemployment insurance benefit prepaid debit cardholder's notice of error, including, but not limited to, information within Respondent's own records;

d.  Respondent must not condition access to an open EDD Prepaid Debit Card Account for an existing EDD Cardholder on reverifying their identity through EDD, and must allow EDD Cardholders to attempt to verify their identity directly with Respondent, except in the cases where (i) EDD disqualified the EDD Cardholder or requested that the EDD Prepaid Debit Card Account be frozen, or (ii) reverification through EDD is requested by EDD or is required by law;

e.  Respondent must allow EDD Cardholders to attempt to reverify their identity in order to unblock their EDD Prepaid Debit Card Account in person at Respondent's financial center branches. Respondent's financial center branches must have processes and procedures in place to facilitate telephonic submission of notices of error by EDD Cardholders; and

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 152 of 304

Case 1:21-cv-01882-CCB   Document 36-2   Filed 07/17/22   Page 28 of 48
2022-CFPB-0004   Document 1   Filed 07/14/2021   Page 29 of 49

    f.   Respondent must conduct a risk assessment of its Prepaid Card

        Unemployment Insurance Benefits Program, including an assessment of

        risks associated with increased volumes of unemployment insurance

        benefit prepaid debit cardholders in the future. This requirement may be

        performed as part of the Program Risk Assessment required of

        Respondent by Article V of the OCC Consent Order.

86.   Respondent must provide the appropriate staffing and resources necessary

     to comply with Paragraphs 87–89.

## VI.

## Compliance Plan

**IT IS FURTHER ORDERED** that:

87.   Within 60 days of the Effective Date, Respondent must submit to the

     Regional Director for review and determination of non-objection a

     comprehensive compliance plan designed to ensure that Respondent's

     administration of unemployment insurance benefit prepaid debit cards and

     accounts complies with all applicable laws that the Bureau enforces,

     including Federal consumer financial laws, and the terms of this Consent

     Order (Compliance Plan). The Compliance Plan must include, at a

     minimum:

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 153 of 304

Case 1:21-cv-01282-CCB   Document 36-2   Filed 07/17/22   Page 29 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 28 of 48

a.  detailed steps for addressing each action required by this Consent Order as set forth in Paragraphs 84–85; and

b.  specific timeframes and deadlines for implementation of the steps described above.

88.  The Regional Director will have the discretion to make a determination of non-objection to the Compliance Plan or direct Respondent to revise it. If the Regional Director directs Respondent to revise the Compliance Plan, Respondent must revise and resubmit the Compliance Plan to the Regional Director within 30 days.

89.  After receiving notification that the Regional Director has made a determination of non-objection to the Compliance Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Compliance Plan.

## VII.

## Role of the Board

**IT IS FURTHER ORDERED** that:

90.  The Board, or a committee thereof, must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 154 of 304

Case 1:21-cv-01281-CCB   Document 36-2   Filed 07/17/22   Page 30 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 29 of 48

91.  Although this Consent Order requires Respondent to submit certain documents for review or non-objection by the Regional Director or Enforcement Director, the Board, or a committee thereof, will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with the laws that the Bureau enforces, including Federal consumer financial laws and this Consent Order.

92.  In each instance that this Consent Order requires the Board to ensure adherence to, or perform certain obligations of Respondent, the Board, or a committee thereof, must:

a.  Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

b.  Require timely reporting by management to the Board on the status of compliance obligations; and

c.  Require timely and appropriate corrective action to remedy any material non-compliance with Board directives related to this Section.

## MONETARY PROVISIONS

## VIII.

## Order to Pay Redress

**IT IS FURTHER ORDERED** that:

**JA 150**

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 155 of 304

Case 1:21-cv-01352-CCB    Document 36-2    Filed 07/17/22    Page 306 of 49
2022-CFPB-0004    Document 1    Filed 07/14/2022    Page 30 of 48

93.    Respondent shall provide redress to Affected Consumers, which shall
include (i) compensation for the value of unauthorized EFTs alleged by
Affected Consumers in notices of error that Respondent incorrectly denied
through its Fraud Filter; (ii) compensation to Affected Consumers for
related Consequential Harm, as required by this Section; and (iii)
compensation to Affected Consumers through an individualized review
process, as required by this Section. Respondent will not be required to
pay redress to consumers meeting the definition of Affected Consumers as
of the Effective Date for whom (i) the state benefit granting agency has
determined or later determines should have been initially disqualified for
unemployment insurance benefit payments, or (ii) whose unemployment
insurance benefit prepaid debit card account is or becomes frozen,
blocked, or closed by Respondent at the request of the state benefit
granting agency, or due to suspected fraud, anti-money laundering, or
financial crimes inquiries or determinations made in conjunction with law
enforcement, or due to an independent legal requirement such as receipt of
legal process or orders.

94.    Within 90 days of the Effective Date, Respondent must submit to the
Enforcement Director for review and non-objection a comprehensive
written plan for providing redress consistent with this Consent Order

(Redress Plan). The Enforcement Director will have the discretion to make a determination of non-objection to the Redress Plan or direct Respondent to revise it. If the Enforcement Director directs Respondent to revise the Redress Plan, Respondent must revise and resubmit the Redress Plan to the Enforcement Director within 30 days. After receiving notification that the Enforcement Director has made a determination of non-objection to the Redress Plan, Respondent must implement and adhere to the steps, recommendations, deadlines, and timeframes outlined in the Redress Plan.

95.  The Redress Plan must include:

  a. A description of the methodology Respondent will use to identify Affected Consumers, including Affected Consumers who no longer have active unemployment insurance benefit prepaid debit card accounts with Respondent;

  b. A description of the procedures and process Respondent will use to remediate each Affected Consumer, which shall include: (i) calculating the value of unauthorized EFTs alleged by Affected Consumers in notices of error that Respondent incorrectly denied through its Fraud Filter; (ii) calculating the lump sum Consequential Harm payment; and (iii) an individualized review process administrated by an independent third-party payment administrator that allows Affected Consumers to

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 157 of 304

Case 1:21-cv-01832-CCB   Document 36-2   Filed 07/17/22   Page 33 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 329 of 48

seek additional redress compensation by submitting evidence of financial harm exceeding Consequential Harm-related payments;

c.  A description of the methodology Respondent will use to calculate the amount of remediation to be paid as Consequential Harm for each Affected Consumer;

d.  A description of the methodology Respondent will use to identify compensable financial impacts to Affected Consumers for the purpose of additional redress compensation exceeding Consequential Harm-related payments in connection with the individualized review process;

e.  A description of the type of supporting documentation that will be required for Affected Consumers seeking additional financial redress compensation exceeding Consequential Harm-related payments in connection with the individualized review process;

f.  A description of the procedures for issuing and tracking redress payments to Affected Consumers;

g.  A description of the plan for developing communications that will be sent to notify Affected Consumers of their redress under the Redress Plan (Redress Notification). The Redress Notification must include a statement that the redress is being paid in accordance with terms of this Consent Order;

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 158 of 304

Case 1:21-cv-01852-CCB    Document 36-2    Filed 07/17/22    Page 34 of 49
2022-CFPB-0004    Document 1    Filed 07/14/2021    Page 396 of 48

h. A description of the processes for handling any redress funds for Affected Consumers that remain unclaimed; and

i. The procedures, deadlines, and timeframes for completing each step of the Redress Plan, consistent with the terms of this Consent Order.

96. Following the implementation of the Redress Plan, Respondent must submit a report that:

a. Identifies each Affected Consumer evaluated as part of the Redress Plan;

b. States the amount of redress Respondent provided to each Affected Consumer for (i) notices of error that Respondent incorrectly denied; (ii) Consequential Harm; and (iii) pursuant to the individualized review process (if applicable);

97. Respondent must make reasonable attempts to obtain a current physical address for any Affected Consumer (i) before sending any redress payment required under this Section VIII and (ii) for a period of 360 days from the date the redress was initially sent to the Affected Consumer upon receipt of returned mail or failure to negotiate a check that is issued to the consumer.

98. Respondent may not condition the payment of any redress to any Affected Consumer under this Consent Order on that Affected Consumer waiving any right.

# IX.

## Order to Pay Civil Money Penalty

**IT IS FURTHER ORDERED** that:

99.   Under § 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section IV of this Consent Order, Respondent must pay a civil money penalty of $100 million to the Bureau.

100.  Within 10 business days of the Effective Date, Respondent must pay the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions.

101.  The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by § 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

102.  Respondent, for all purposes, must treat the civil money penalty paid under this Consent Order as a penalty paid to the government. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a.  Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b.  Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 160 of 304

Case 1:21-cv-01281-CCB   Document 36-2   Filed 07/17/22   Page 36 of 49
2022-CFPB-0004   Document 1   Filed 07/19/2021   Page 359 of 46

insurance policy, with regard to any civil money penalty paid under this Consent Order.

103. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any payment that the Bureau makes from the Civil Penalty Fund. If the court in any Related Consumer Action offsets or otherwise reduces the amount of compensatory monetary remedies imposed against Respondent based on the civil money penalty paid in this action or based on any payment that the Bureau makes from the Civil Penalty Fund, Respondent must, within 30 days after entry of a final order granting such offset or reduction, notify the Bureau, and pay the amount of the offset or reduction to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X.

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

104. In the event of any default on Respondent's obligations to make payment under this Consent Order, interest—computed under 28 U.S.C. § 1961, as amended—will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

105. Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

106. Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer-identification numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

107. Within 30 days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Enforcement Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to consumers and describe the consumers or classes of consumers to whom that redress has been or will be paid.

## COMPLIANCE PROVISIONS

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 162 of 304

Case 1:21-cv-01323-CCB   Document 36-2   Filed 07/17/22   Page 38 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 37 of 48

# XI.

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

108. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least 30 days before the development, but in any case no later than 14 days after the development.

109. Within 7 days of the Effective Date, Respondent must designate at least one telephone number and email, physical, and postal addresses as points of contact that the Bureau may use to communicate with Respondent.

110. Respondent must report any change in the information required to be submitted under Paragraph 109 at least 30 days before the change or as soon as practicable after the learning about the change, whichever is sooner.

111. Within 90 days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an accurate written compliance progress report (Compliance Report) that has been approved by the Board or a committee thereof, sworn to under penalty of perjury, which, at a minimum:

   a. Lists each applicable paragraph and subparagraph of the Order and describes in detail the manner and form in which Respondent has complied with each such paragraph and subparagraph of the Consent Order;

   b. Describes in detail the manner and form in which Respondent has complied with the Redress Plan and Compliance Plan; and

   c. Attaches a copy of each Order Acknowledgment obtained under Section XII, unless previously submitted to the Bureau.

## XII.

### Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that:

112. Within 7 days of the Effective Date, Respondent must submit to the Enforcement Director an acknowledgment of receipt of this Consent Order, sworn under penalty of perjury.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 164 of 304

Case 1:21-cv-01863-CCB   Document 36-2   Filed 07/17/22   Page 40 of 48
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 39 of 49

113. Within 30 days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its Board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

114. For 5 years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future Board members and executive officers, as well as to any managers, employees, service providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

115. Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic signatures comply with the requirements of the E-Sign Act, 15 U.S.C. § 7001 et seq., within 30 days of delivery, from all persons receiving a copy of this Consent Order under this Section.

116. Within 90 days of the Effective Date, Respondent must provide the Bureau with a list of all persons and their titles to whom this Consent Order was delivered through that date under Paragraphs 112–114 and a copy of all

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 165 of 304

Case 1:21-cv-01282-CCB    Document 36-2    Filed 07/17/22    Page 41 of 49
2022-CFPB-0004    Document 1    Filed 07/19/2022    Page 40 of 48

signed and dated statements acknowledging receipt of this Consent Order

under Paragraph 115.

## XIII.

## Recordkeeping

**IT IS FURTHER ORDERED** that:

117.  Respondent must create and retain the following business records:

a.  All documents and records necessary to demonstrate full compliance with

each provision of this Consent Order, including all submissions to the

Bureau;

b.  All documents and records pertaining to the Redress Plan, described in

Section VIII above;

c.  All documents and records pertaining to the Compliance Plan, described

in Section VI above;

d.  For each individual Affected Consumer:

i.  the consumer's name, address, and, if available to Respondent,

phone number, and email address;

ii.  the date(s) the consumer submitted a notice of error concerning

alleged unauthorized EFTs that Respondent wrongly

determined no error occurred based solely on the results of

Respondent's Fraud Filter;

    iii.  the value of alleged unauthorized EFTs in the consumer's

notice(s) of error that Respondent wrongly determined no error

occurred based solely on the results of Respondent's Fraud

Filter; and

    iv.  the length of time that Respondent froze or blocked the

consumer's unemployment insurance benefit prepaid debit card

account due to Respondent's determination that no error

occurred based solely on the results of Respondent's Fraud

Filter.

e.  All consumer complaints and refund requests (whether received directly

or indirectly, such as through a third party) regarding Respondent's

administration of unemployment insurance benefit prepaid debit cards

and accounts relating to government benefit payments, and any responses

to those complaints or requests.

f.  Records showing, for each Respondent employee or agent providing

material services related to Respondent's unemployment insurance

benefit prepaid debit card programs, that person's name, telephone

number, email, physical, and postal address, job title or position, dates of

service, and, if applicable, the reason for termination.

g.  Records showing, for each service provider providing services related to

USCA4 Appeal: 22-1954     Doc: 22     Filed: 01/03/2023     Pg: 167 of 304

Case 1:21-cv-01283-CCB   Document 36-2   Filed 07/17/22   Page 43 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 42 of 48

Respondent's administration of unemployment insurance benefit prepaid

debit cards and accounts, the name of a point of contact, and that

person's telephone number, email, physical, and postal address, job title

or position, dates of service, and, if applicable, the reason for termination.

118.  Respondent must make the documents identified in Paragraph 117

available to the Bureau upon the Bureau's request.

## XIV.

## Notices

**IT IS FURTHER ORDERED** that:

119.  Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re* Bank

of America, N.A., File No. 2022-CFPB-0004," and send them by

overnight courier or first-class mail to the below addresses and

contemporaneously by email to Enforcement_Compliance@cfpb.gov and

Southeastregion@cfpb.gov:

> Regional Director, Bureau Southeast Region
> Peachtree Summit Building
> 401 W. Peachtree Street
> Atlanta, GA 30308
>
> Assistant Director for Enforcement
> Consumer Financial Protection Bureau
> ATTENTION: Office of Enforcement

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 168 of 304

Case 1:21-cv-01298-CCB   Document 36-2   Filed 07/17/22   Page 44 of 49
2022-CFPB-0004   Document 1   Filed 07/19/2021   Page 43 of 48

1700 G Street, N.W.
Washington D.C. 20552

## XV.

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

120.  Respondent must cooperate fully to help the Bureau determine the identity

and location of, and the amount of injury sustained by, each Affected

Consumer. Respondent must provide such information in its or its agents'

possession or control within 14 days of receiving a written request from

the Bureau.

## XVI.

## Compliance Monitoring

**IT IS FURTHER ORDERED** that:

121.  Within 14 days of receipt of a written request from the Bureau,

Respondent must submit additional Compliance Reports or other requested

information, which must be made under penalty of perjury; provide sworn

testimony; or produce documents.

122.  Respondent must permit Bureau representatives to interview any employee

or other person affiliated with Respondent who has agreed to such an

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 169 of 304

Case 1:21-cv-01282-CCB   Document 36-2   Filed 07/17/22   Page 45 of 48
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 45 of 49

interview regarding: (a) this matter; (b) anything related to or associated

with the conduct described in Section IV; or (c) compliance with the

Consent Order. The person interviewed may have counsel present.

123.    Nothing in this Consent Order will limit the Bureau's lawful use of civil

investigative demands under 12 C.F.R. § 1080.6 or other compulsory

process.

## XVII.

## Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

124.    Respondent may seek a modification to non-material requirements of this

Consent Order (*e.g.*, reasonable extensions of time and changes to

reporting requirements) by submitting a written request to the Enforcement

Director.

125.    The Enforcement Director may, in his or her discretion, modify any non-

material requirements of this Consent Order (*e.g.*, reasonable extensions of

time and changes to reporting requirements) if he or she determines good

cause justifies the modification. Any such modification by the

Enforcement Director must be in writing.

## ADMINISTRATIVE PROVISIONS

## XVIII.

USCA4 Appeal: 22-1954   Doc: 22   Filed: 01/03/2023   Pg: 170 of 304

Case 1:21-cv-01 2832-CCB Document 36-2 Filed 07/17/22 Page 46 of 49
2022-CFPB-0004 Document 1 Filed 07/19/2022 Page 46 of 49

**IT IS FURTHER ORDERED** that:

126.   The provisions of this Consent Order do not bar, estop, or otherwise
prevent the Bureau from taking any other action against Respondent,
except as described in Paragraph 127 below. Further, for the avoidance of
doubt, the provisions of this Consent Order do not bar, estop, or otherwise
prevent any other person or governmental agency from taking any action
against Respondent.

127.   The Bureau releases and discharges Respondent from all potential liability
for law violations that the Bureau has or might have asserted based on the
practices described in Section IV of this Consent Order, to the extent such
practices occurred before the Effective Date and the Bureau knows about
them as of the Effective Date. The Bureau may use the practices described
in this Consent Order in future enforcement actions against Respondent
and its affiliates, including, without limitation, to establish a pattern or
practice of violations or the continuation of a pattern or practice of
violations or to calculate the amount of any penalty. This release does not
preclude or affect any right of the Bureau to determine and ensure
compliance with the Consent Order, or to seek penalties for any violations
of the Consent Order.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 171 of 304

Case 1:21-cv-01332-CCB   Document 36-2   Filed 07/17/22   Page 47 of 49
2022-CFPB-0004   Document 1   Filed 07/14/2022   Page 48 of 48

128. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under § 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

129. This Consent Order will terminate on the later of 5 years from the Effective Date or 5 years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent, if such action is initiated within 5 years of the Effective Date. If such action is dismissed or the relevant adjudicative body rules that Respondent did not violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

130. Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

131. Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 172 of 304

Case 1:21-cv-01282-CCB    Document 36-2    Filed 07/17/22    Page 48 of 49
2022-CFPB-0004    Document 1    Filed 07/14/2022    Page 48 of 48

sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

132. The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under Section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

133. This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

134. Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

USCA4 Appeal: 22-1954    Doc: 22    Filed: 01/03/2023    Pg: 173 of 304
Case 2:21-cv-03814-CCB Document 84-2 Filed 07/17/17 Page 48 of 49
Case 1:21-cv-03814-CCB Document 44 Filed 08/09/21 Page 49 of 49

**IT IS SO ORDERED**, this 14th day of July, 2022.

_Rohit Chopra_
_____
Rohit Chopra
Director
Consumer Financial Protection Bureau

# EXHIBIT "C"

 (cfpb.gov/)

# Federal Regulators Fine Bank of America $225 Million Over Botched Disbursement of State Unemployment Benefits at Height of Pandemic

Bank Left Struggling Americans in the Lurch by Wrongfully Freezing Accounts

**JUL 14, 2022**

**WASHINGTON, D.C.** – Today, the Consumer Financial Protection Bureau (CFPB) fined Bank of America $100 million for botching the disbursement of state unemployment benefits at the height of the pandemic. Bank of America automatically and unlawfully froze people's accounts with a faulty fraud detection program, and then gave them little recourse when there was, in fact, no fraud. Today's order requires Bank of America to undertake a process that is estimated to result in hundreds of millions of dollars in redress to consumers. In a separate order, the Office of the Comptroller of the Currency (OCC) is also fining the bank $125 million.

"Taxpayers relied on banks to distribute needed funds to families and small businesses to rescue the economy from collapse when the pandemic hit," said CFPB Director Rohit Chopra. "Bank of America failed to live up to its legal obligations. And when it got overwhelmed, instead of stepping up, it stepped back."

Bank of America (NYSE: BAC) is a national bank headquartered in Charlotte, North Carolina, with approximately 4,100 branches. It has been designated as a global systemically important bank by the Financial Stability Board, and as of December 31, 2021, the company had $2.5 trillion in consolidated assets, which makes it the second largest bank in the United States. The bank has previously been sanctioned by the CFPB. In 2014, the CFPB ordered (https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-bank-of-america-to-pay-727-million-in-consumer-relief-for-illegal-credit-card-practices/) Bank of America to pay $727 million in redress to its victims for illegal credit card practices. And in May of this year, the CFPB ordered (https://www.consumerfinance.gov/about-us/newsroom/cfpb-orders-bank-of-america-to-pay-10-million-penalty-for-illegal-garnishments/) Bank of America to pay a $10 million civil penalty over unlawful garnishments.

**JA 171**

Bank of America has contracts with various state agencies to deliver unemployment and other benefit payments to consumers electronically through prepaid debit cards and accounts. For example, since 2011, Bank of America has had an exclusive contract with the State of California to deliver unemployment and other benefit payments to California consumers electronically through prepaid debit cards and accounts. Under the Electronic Fund Transfer Act, consumers are protected when they use electronic methods to transfer money; this includes prepaid cards. Protections include that after a consumer contacts the financial institution that there has been an error, the financial institution must conduct a prompt, reasonable, and timely investigation.

When the COVID-19 pandemic hit in early 2020, the unemployment rate surged. Millions of consumers sought unemployment insurance benefits. The surge included a great deal of fraud. There was a significant amount of identity theft that affected eligible cardholders with legitimate prepaid debit card accounts but there were also a significant number of criminals who applied for and began receiving unemployment insurance benefits who filed false error claims to access additional funds.

In its investigation, the CFPB found that Bank of America engaged in unfair and abusive acts and practices that resulted in Californians not getting their unemployment benefits at the height of the pandemic, when many people needed the money the most. Specific findings include that the bank:

- **Replaced reasonable investigations with a faulty fraud filter:** In the fall of 2020, and continuing through mid-2021, Bank of America changed its practices for investigating prepaid debit card fraud on the unemployment insurance benefit accounts. Instead of conducting reasonable investigations, it implemented a fraud filter with a simple set of flags that automatically triggered an account freeze. This set a low bar to freeze the unemployment insurance benefits of many people, harming thousands of legitimate cardholders needing the money. The bank also retroactively applied its fraud filter to deny some notices of error submitted by prepaid debit cardholders that the bank had previously investigated and paid.

- **Left distressed consumers in the lurch:** Bank of America made it very difficult for people to unfreeze their prepaid debit cards or for people to report fraudulent use of their cards. People with unemployment insurance benefit prepaid debit cards could not make reports online, or in person at bank branches. People were on hold for hours every day for weeks trying to talk to someone at the bank. Furthermore, the bank told customers they had agents available 24 hours a day, seven days a week, when, in fact, it operated a more limited schedule for its claim call center. Because Bank of America was the strongly preferred provider for California unemployment benefits, consumers were caught without any choice to switch providers.

- **Passed the buck to an overwhelmed state agency:** When consumers sought assistance, the bank often sent them back to the California state unemployment department for verification in order to regain access to their benefits. But the bank knew the department was stretched and unable to provide services; the bank met with the department dozens of times in the summer of 2020 and should have known it was essentially redirecting people into a black hole.

## Enforcement Action

Under the Consumer Financial Protection Act, the CFPB has the authority to take action against institutions violating consumer financial laws, including engaging in unfair, deceptive, or abusive acts or practices. Bank of America will be required to:

- **Provide redress to consumers:** Bank of America must pay back the money that they wrongly denied to consumers across the country because of the faulty fraud filter. The bank must also provide each affected consumer with a lump sum consequential harm payment, to be determined through a methodology of financial harm consumers suffered due to the time their accounts remained frozen or blocked. Finally, affected consumers will have the opportunity to receive additional redress through an individualized review process.

- **Pay a $100 million fine:** Bank of America must pay a $100 million dollar penalty to the CFPB, which will be deposited into the victims relief fund. The penalty reflects the severity and scope of the consumer harm caused by the bank's practices. The OCC is separately fining the bank $125 million to be remitted to the Treasury.

Read today's order (cfpb.gov/enforcement/actions/bank-of-america-na-2/).

Consumers can submit complaints about financial products or services by visiting the CFPB's website (https://www.consumerfinance.gov/complaint/) or by calling (855) 411-CFPB (2372).

*###*

*The Consumer Financial Protection Bureau is a 21st century agency that implements and enforces Federal consumer financial law and ensures that markets for consumer financial products are fair, transparent, and competitive. For more information, visit consumerfinance.gov (cfpb.gov/).*

**PRESS INFORMATION**

If you want to republish the article or have questions about the content, please contact the press office.

Go to press resources page (cfpb.gov/about-us/newsroom/press-resources/)

An official website of the United States government

# EXHIBIT "D"

**#2022-023**

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**OFFICE OF THE COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:**　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | |
| Bank of America, N.A.　　　　　　　　　　) | AA-ENF-2022-21 |
| Charlotte, North Carolina　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　　　) | |

**CONSENT ORDER**

**WHEREAS**, the Office of the Comptroller of the Currency ("OCC") has supervisory

authority over Bank of America, N.A., Charlotte, North Carolina ("Bank");

**WHEREAS**, the OCC intends to initiate cease and desist proceedings against the Bank

pursuant to 12 U.S.C. § 1818(b), through the issuance of a Notice of Charges, related to: (1) the

administration of the Bank's prepaid cards for unemployment benefits, specifically engagement

in (i) unsafe or unsound practice(s), including deficiencies in its risk management, operational

processes and controls, internal audit, and investigation and resolution of consumer claims of

unauthorized transactions; and (ii) unfair and deceptive practices in violation(s) of Section 5 of

the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a)(1); and (2) engaging in

unsafe or unsound practices related to deficiencies in its enterprise-wide complaints risk

management framework;

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with

administrative and judicial proceedings with respect to the above matter, the Bank, by and

through its duly elected and acting Board of Directors ("Board"), consents to the issuance of this

Consent Order ("Order"), by the OCC through the duly authorized representative of the

Comptroller of the Currency ("Comptroller"); and

**NOW, THEREFORE**, pursuant to the authority vested in the OCC by Section 8(b) of

the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818(b), the OCC hereby orders

that:

## ARTICLE I

## JURISDICTION

(1)    The Bank is an "insured depository institution" as that term is defined in

12 U.S.C. § 1813(c)(2).

(2)    The Bank is a national banking association within the meaning of 12 U.S.C.

§ 1813(q)(1)(A), and is chartered and examined by the OCC. *See* 12 U.S.C. § 1 *et seq.*

(3)    The OCC is the "appropriate Federal banking agency" as that term is defined in

12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain this cease and desist

action against the Bank pursuant to 12 U.S.C. § 1818(b).

## ARTICLE II

## COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)    For several years, the Bank issued and administered prepaid debit cards to

distribute unemployment insurance benefits ("UI Prepaid Cards") to consumers that were

loaded with benefit funds issued by certain states, hereinafter referred to as the Unemployment

Benefits Prepaid Card Program ("Program").

(2)    In March 2020, millions became unemployed and Congress enacted the

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which created the new

Pandemic Unemployment Assistance ("PUA") benefit. The CARES Act and PUA expanded

unemployment benefits eligibility and provided greater benefit amounts than previously

available. As a result, the size of the Program increased substantially (from under one million

2

unique cards loaded in January 2020 to over six million in July 2020), as did the volume of benefits issued by the states and loaded onto UI Prepaid Cards (from approximately $1 billion in January 2020 to over $27 billion in July 2020). Along with the increases in Program participants and benefits, the Program experienced an increase in fraud, including with respect to unauthorized transaction claims.

(3)     The Bank failed to establish effective risk management over the Program, and, beginning in 2020, denied or delayed many consumers' access to unemployment benefits when consumers filed or attempted to file UI Prepaid Card unauthorized transaction claims. Specifically, the Bank:

(a)     applied an automated fraud filter between September 28, 2020 and June 8, 2021 to decision UI Prepaid Card error claims that met certain criteria ("Fraud Filter") without conducting a sufficient investigation to: (i) deny many consumers' claims of unauthorized transactions on their UI Prepaid Cards, and (ii) "freeze" or "block" the UI Prepaid Card accounts associated with the claims. Consumers with frozen or blocked accounts could not access the unemployment benefits in their UI Prepaid Card accounts until the Bank removed the freeze or block.

(b)     failed to provide timely and full provisional or final credit to many consumers entitled to such credits who reported unauthorized transactions on their UI Prepaid Card accounts.

(c)     retroactively applied the Fraud Filter to many consumers' claims of unauthorized transactions on their UI Prepaid Card accounts without conducting further investigation and providing advance notice, which

incorrectly resulted in the reversal of provisional and final credits that the Bank previously provided to those consumers.

(d)    impeded many consumers' ability to regain access to their unemployment benefits through the UI Prepaid Cards and to request reconsideration of their unauthorized transaction claims as a result of operational deficiencies.

(e)    provided consumers deceptive disclosures and notices with respect to liability for unauthorized transactions, processing of unauthorized transaction claims, and account freezes and blocks.

(4)    Overall, the Bank has the following deficiencies in its administration of the Program:

(a)    inadequate risk management practices in both the front-line units and independent risk management, including ineffective oversight, risk assessment, monitoring, and reporting;

(b)    inadequate internal controls, including those relating to contract management;

(c)    inadequate oversight, risk management, and monitoring of UI Prepaid Card unemployment benefits vendors ("Program Vendors"); and

(d)    inadequate oversight and coverage by the Bank's independent audit function.

(5)    In addition, the Bank failed to establish an effective enterprise-wide complaints risk management framework that is commensurate with the Bank's size, complexity, and risk profile. Specifically, the complaint risk management framework lacks an effective:

4

    (a)    process to identify, measure, manage, and report complaints;

    (b)    complaint resolution process; and

    (c)    quality assurance process.

(6)    By reason of the deficiencies and conduct described in Paragraphs (2) through (5) of this Article, the Bank engaged in unsafe or unsound practices and engaged in unfair and deceptive practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a). These violations and practices support actions against the Bank under 12 US.C. § 1818(b) and (i)(2)(B).

(7)    The Bank has begun taking corrective actions and has committed to taking necessary and appropriate steps to remedy the deficiencies identified by the OCC and to assist and remediate harmed consumers.

## ARTICLE III

## COMPLIANCE COMMITTEE

(1)    Within thirty (30) days of the date of this Order, the Board shall maintain a Compliance Committee of at least three (3) members of which a majority shall be directors who are not employees or officers of the Bank or any of its subsidiaries or affiliates. The Board shall submit in writing to the Examiner-in-Charge the names of the members of the Compliance Committee within ten (10) days of their appointment. In the event of a change of the membership, the Board shall submit in writing to the Examiner-in-Charge within ten (10) days the name of any new or resigning committee member. The Compliance Committee shall monitor and oversee the Bank's compliance with the provisions of this Order. The Compliance Committee shall meet at least quarterly and maintain minutes of its meetings at which compliance with this Order is discussed.

(2)    Within sixty (60) days after the effective date of this Order, and thereafter within forty-five (45) days after the end of each subsequent quarter, the Bank shall prepare and submit to the Compliance Committee a written progress report setting forth in detail:

    (a)    a description of the corrective actions needed to achieve compliance with each Article of this Order,

    (b)    the specific corrective actions undertaken to comply with each Article of this Order,

    (c)    the results and status of the corrective actions, and

    (d)    the person(s) responsible for the completion of outstanding corrective actions.

(3)    The Compliance Committee shall forward a copy of the report, with any additional comments by the Committee, to the Board.

(4)    The Compliance Committee shall forward a copy of the report, with any additional comments by the Committee or Board, to the Examiner-in-Charge within fifteen (15) days of the first Compliance Committee meeting following the Committee's receipt of such report.

**ARTICLE IV**

**ACTION PLAN**

(1)    Pursuant to the timeframe for completion and other requirements set forth in Article V of this Order, the Bank shall develop a UI Prepaid Card Oversight and Risk Management Program ("ORMP") containing a complete description of the actions necessary to achieve compliance with Article V of this Order. Separately, the Bank shall develop a Consent Order Action Plan ("COAP") containing a complete description of the actions necessary to

6

achieve compliance with Articles VI through X of this Order. The components of the COAP shall be completed within the timeframes set forth in Articles VI through X of this Order, if specified. Collectively, the ORMP and COAP are referred to collectively in this Order as the "Plans." At the time the Bank is required to submit the ORMP pursuant to Article V, Paragraph (4), the Bank shall submit the Board-approved COAP to the Examiner-in-Charge for review and prior written determination of no supervisory objection.

(2)    The Plans shall also specify the:

(a)    reasonable and well-supported timelines for completion of the corrective actions required by this Order, and

(b)    the person(s) responsible for completion of the corrective actions required by this Order.

(3)    The timelines contained in the Plans shall be consistent with any deadlines set forth in this Order, including any modifications to the Order made pursuant to Article XIV, Paragraph (5).

(4)    In the event the Examiner-in-Charge requires changes to the Plans, the Bank shall incorporate the required changes into the Plan(s) and submit the revised Plan(s) to the Examiner-in-Charge for review and prior written determination of no supervisory objection.

(5)    Within thirty (30) days following receipt of the Examiner-in-Charge's written determination of no supervisory objection to the Plans, the Board shall adopt the Plans and thereafter ensure that Bank management implements and adheres to the Plans, including timelines set forth within the Plans.

(6)    The Bank shall not take any action that will cause a significant deviation from, or

material change to, the Plans. Where the Bank makes a determination to modify the Plans, the Bank shall submit the revised Plan(s) containing the proposed modifications to the Examiner-in-Charge for prior written determination of no supervisory objection. Upon receipt of a written determination of no supervisory objection from the Examiner-in-Charge, the Board shall timely adopt the revised Plan(s) and thereafter ensure that Bank management implements and adheres to the revised Plan(s), including the timelines set forth within the revised Plan(s).

### ARTICLE V

### UI PREPAID CARD OVERSIGHT AND RISK MANAGEMENT PROGRAM

(1)     Within sixty (60) days of the date of this Order, the Bank shall perform and submit to the Examiner-in-Charge for review and prior written determination of no supervisory objection, the Program Risk Assessment and Program Risk Assessment Report as defined in and required by Paragraph (2) of this Article and the Program Gap Analysis Report as defined in and required by Paragraph (3) of this Article. Within five (5) business days of receipt of the Examiner-in-Charge's written determination of no supervisory objection to each of the Program Risk Assessment, the Program Risk Assessment Report, and the Program Gap Analysis Report, the Bank shall submit the respective item to the Compliance Committee.

(2)     The Bank shall perform a comprehensive and holistic risk assessment of the Program  ("Program Risk Assessment") that shall address all significant risks to include at a minimum transaction and card volumes and trends; operational risks, including capacity limitations or obstacles with product service or delivery; requisite staffing skills and expertise; compliance with applicable consumer protection and information security laws and regulations; and fraud risk volume, fraud sources, and types of fraud. The Bank shall also prepare a report of

8

**JA 183**

the Program Risk Assessment ("Program Risk Assessment Report") that summarizes the findings from the Program Risk Assessment.

(3)     The Bank shall conduct an analysis of its current controls and risk management processes over the Program to identify gaps ("Program Gap Analysis"). At a minimum, the Program Gap Analysis shall address the adequacy of operational controls, fraud investigations, fraud rules and/or strategies, claims intake and processing, accounting practices, complaints management, claims and complaints quality assurance processes, systems and data management, and Program Vendor risk management. The Bank shall also prepare a report of the Program Gap Analysis ("Program Gap Analysis Report") that summarizes the findings from the Program Gap Analysis.

(4)     Within thirty (30) days following receipt of the Examiner-in-Charge's written determination of no supervisory objection to the Program Risk Assessment, the Program Risk Assessment Report, and the Gap Analysis Report, the Bank shall submit to the Examiner-in-Charge for review and prior written determination of no supervisory objection, an acceptable Board-approved UI Prepaid Card ORMP that at a minimum shall include:

(a)     policies, procedures, systems, and controls to effectively identify, measure, monitor, and control risks associated with the Bank's administration of the Program, including those risks identified in the Program Risk Assessment required by Paragraph (2) of this Article.

(b)     corrective actions to address the gaps identified in the Program Gap Analysis required by Paragraph (3) of this Article.

(c)     an effective oversight and risk management framework that establishes the roles and responsibility for respective front-line units and independent risk

9

management for Program operations consistent with the Bank's

Enterprise-Wide Risk Framework.

(d)    policies and procedures to ensure effective and timely execution of

training to Bank employees and employees of Program Vendors and

comprehensive measures for assessing the effectiveness of such training.

(e)    measures to ensure Program Vendors adhere to the Bank's established

Enterprise-Wide Vendor Risk Management Policy and comply with all

applicable consumer protection laws and regulations and that at a

minimum shall:

(i)    ensure comprehensive and timely quality assurance activities and

monitoring activities to identify, measure, monitor, and control

risks identified by the Program Risk Assessment required by

Paragraph (1) of this Article.

(ii)    ensure business level Program Vendor scorecards and enterprise-

wide and business level reporting clearly escalate performance

issues, control lapses, or non-compliance with all applicable

consumer protection laws and regulations and Bank policies and

procedures.

(f)    standard reporting for the Program, which, at a minimum, shall include

performance metrics, risk indicators, and complaints trends.

(g)    effective independent risk management for the Program that adheres to the

Bank's Enterprise-Wide Risk Management Framework and includes, at a

minimum:

10

**JA 185**

(i)     periodic comprehensive and holistic risk assessments of the

Program, to occur at least annually, that identify the risks specified

in Paragraph (1) of this Article and specify the actions taken to

identify, measure, monitor, and control the risks; and

(ii)    independent coverage plans and testing sufficient to detect,

mitigate, and manage operational control lapses and non-

compliance with all applicable consumer protection laws and

regulations and Bank policies and procedures.

(5)     Within thirty (30) days following receipt of the Examiner-in-Charge's written

determination of no supervisory objection to the ORMP, the Board shall adopt, and Bank

management, subject to Board oversight consistent with Article XI, shall immediately implement

and thereafter ensure adherence to the ORMP. Any amendment to the ORMP must be submitted

to the Examiner-in-Charge for review and prior written determination of no supervisory

objection.

**ARTICLE VI**

**ENTERPRISE-WIDE COMPLAINTS RISK MANAGEMENT FRAMEWORK**

(1)     Within sixty (60) days of the date of this Order, the Bank shall submit to the

Examiner-in-Charge for review and prior written determination of no supervisory objection a

Board-approved enterprise-wide complaints risk management framework ("Complaints

Framework").

(2)     The Complaints Framework shall at a minimum include an effective

enterprise complaints policy, inclusive of an expanded complaints definition, and the

identification and description of effective procedures for adequately and timely identifying,

11

tracking, documenting, analyzing, managing, monitoring, escalating, reporting, and resolving consumer customer complaints. This Complaints Framework shall also include quality assurance measures to ensure Bank adherence to the Complaints Framework.

(3)    Within sixty (60) days following receipt of the Examiner-in-Charge's written determination of no supervisory objection to the Complaints Framework or to any subsequent amendment to the Complaints Framework, the Board shall adopt the Complaints Framework and shall ensure that Bank management, subject to Board oversight consistent with Article XI, shall implement and thereafter ensure adherence to the Complaints Framework. Any amendment to the Complaints Framework must be submitted to the Examiner-in-Charge for review and prior written determination of no supervisory objection.

## ARTICLE VII

## CONTRACT APPROVAL AND REVIEW PROCESS

(1)    Within thirty (30) days of the date of this Order, the Bank shall develop the criteria it will use to determine if a contract, including nonstandard contracts, pursuant to which the Bank is providing significant services and acting as a vendor of such services, poses significant risks to the Bank in various scenarios, including adverse conditions.

(2)    Within thirty (30) days of the date of this Order, the Bank shall create an inventory of existing contracts and newly signed contracts executed more than thirty (30) days prior to the date of submission of the inventory that meet the criteria developed pursuant to Paragraph (1) of this Article and submit this inventory to the Examiner-in-Charge.

(3)    The Bank shall update the inventory required by Paragraph (2) of this Article on an annual basis and submit the updated inventory to the Examiner-in-Charge.

(4)     Within one hundred fifty (150) days of the date of this Order, the Bank shall conduct risk assessments of all existing contracts listed in the inventory required by Paragraph (2) of this Article.

(5)     Within one hundred fifty (150) days of the date of this Order, the Bank shall review and revise, as appropriate, its enterprise-wide framework for contract review and approval for contracts where the Bank is providing significant services and acting as a vendor of such services, including nonstandard contracts, to ensure at a minimum that its contract approval and review process includes:

(a)     policies and procedures for assessing the risks of new contracts that meet the criteria required by Paragraph (1) of this Article, which assessment shall occur prior to entering the contract;

(b)     policies and procedures for conducting periodic assessments of the risks, of all existing contracts listed in the inventory required by Paragraph (2) of this Article, which assessments should occur at least annually; and

(c)     policies and procedures for developing and implementing plans that adequately measure, monitor, and provide for controls that adapt commensurate with changing risk levels for the risks identified pursuant to the assessments required by Paragraphs (4), (5)(a) and (5)(b) of this Article.

(6)     Upon adoption of the revised enterprise-wide framework for contract approval and review as described in Paragraph (5) of this Article, Bank management, subject to Board oversight consistent with Article XI, shall implement and thereafter ensure adherence to the revised enterprise-wide framework for contract review and approval and any amendments

13

**JA 188**

thereto. The Board shall ensure that the Bank conducts the assessments, develops, implements, and adheres to the requirements of this Article.

## ARTICLE VIII

### INTERNAL AUDIT

(1)     Within sixty (60) days of the date of this Order, Internal Audit shall revise the audit plan to ensure comprehensive end-to-end coverage of the Program's operations and risk management processes and that at a minimum includes the testing of controls over the Program's operations, claims and reconsiderations, and adherence to all applicable consumer protection laws and regulations and Bank policies and procedures.

(2)     Consistent with the Bank's established Internal Audit policies and procedures, Internal Audit shall report all Program control deficiencies; UI Prepaid Card claims-related and other operational errors; Program internal misconduct; and Program violations of applicable laws, including consumer protection laws and regulations, and of Bank policies and procedures to the Board and management in a timeframe consistent with the Bank's established Internal Audit policies and procedures.

## ARTICLE IX

### REMEDIATION

(1)     Within ninety (90) of days of the date of this Order, the Bank shall submit to the Examiner-in-Charge for review and prior written determination of no supervisory objection a Board-approved acceptable remediation plan ("Remediation Plan").

(2)     At a minimum, the Remediation Plan shall include:

(a)     a description of a well-supported methodology to be used to identify harmed consumers as a result of the practices described in Article II,

14

Paragraph (3), and a calculation of the time necessary to compile a list of potential harmed consumers.

(b)     a description of the procedures and process used to remediate each harmed consumer meeting the methodology referred to in Paragraph 2(a) of this Article, including for claim amounts wrongfully withheld or denied, benefit amounts frozen or blocked, and any consequential financial harm. At a minimum, these procedures shall include:

(i)     a lump sum consequential harm payment to harmed consumers, that is calculated pursuant to the methodology required by Paragraph (2)(c) of this Article;

(ii)     an individualized review process administered by an independent third-party payment administrator that allows harmed consumers to request an individualized review to establish consequential harm not satisfied by the lump sum payment described in Paragraph 2(b)(i) of this Article ("Individualized Review Process"); and

(iii)     a description of the plan for developing effective disclosures and communications used to inform harmed consumers of Individualized Review Process and the type of supporting information that will be required, as well as the circumstances under which such supporting information will be required.

(c)     a description of the methodology used to calculate the amount of remediation to be paid to each harmed consumer. This methodology shall include compensation for the financial harm suffered due to loss of access

15

to unemployment funds, including but not limited to, the wrongly denied unauthorized transaction claim amounts and the loss of access to the UI Prepaid Card balances that were frozen or blocked as described in Article II Paragraph 3(a).

(d)  a description of the procedures for the issuance and tracking of remediation and the disclosures and communications required by Paragraph (2)(b)(iii) of this Article.

(e)  a description of the procedure for monitoring compliance with the Remediation Plan.

(3)  The Bank shall remediate financial injury and make restitution to each harmed consumer in accordance with the Remediation Plan required by Paragraph (1) of this Article. No amount paid under the Remediation Plan is paid to reimburse the OCC or any other government or governmental entity for investigation or litigation costs, or in lieu of a fine or penalty.

(4)  Within thirty (30) days following receipt of the Examiner-in-Charge's written determination of no supervisory objection to the Remediation Plan or to any subsequent amendment to the Remediation Plan, the Board shall adopt and Bank management, subject to Board oversight consistent with Article XI, shall immediately implement and thereafter ensure adherence to the Remediation Plan. Any amendment to the Remediation Plan must be submitted to the Examiner-in-Charge for review and prior written determination of no supervisory objection.

## ARTICLE X

## ASSESSMENT OF REMEDIATION

(1)     There shall be a periodic independent review and assessment of compliance with the terms of the Remediation Plan ("Remediation Review") in accordance with Paragraph (2) of this Article, which Review shall include an assessment of:

(a)     the application of the methodology used to determine the population of harmed consumers,

(b)     the Claims Process and the adherence to procedures specified for the Claims Process,

(c)     the application of the methodology used to determine the amount of remediation for each harmed consumer,

(d)     the sufficiency of the disclosures and communications required by Paragraph (2)(b)(iii) of Article IX,

(e)     the effectiveness of the process used to issue and track remediation payments to harmed consumers and the disclosures and communications required by Paragraph (1)(b)(iii) of Article IX, and

(f)     the process used for monitoring compliance with the Remediation Plan.

(2)     The Remediation Reviews shall occur at least every six months, beginning from the date of this Order, during the development and execution of the Remediation Plan and the findings shall be memorialized in writing. Within thirty (30) days of completing the Remediation Review, the Bank shall provide the written findings of the Remediation Review to the Compliance Committee and the Examiner-in-Charge.

17

**JA 192**

(3)     Any communications, workpapers, or work product related to the Remediation

Reviews shall be made available to the OCC immediately upon request of the Examiner-in-

Charge.

## ARTICLE XI

## **GENERAL BOARD RESPONSIBILITIES**

(1)     The Board shall ensure that the Bank has timely adopted and implemented all

corrective actions required by this Order, and shall verify that the Bank adheres to the corrective

actions and that the corrective actions are effective in addressing the Bank's deficiencies that

resulted in this Order.

(2)     In each instance in which this Order imposes responsibilities upon the Board, it is

intended to mean that the Board shall:

(a)     authorize, direct, and adopt corrective actions on behalf of the Bank as

may be necessary to perform the obligations and undertakings imposed on

the Board by this Order;

(b)     ensure the Bank has sufficient processes, management, personnel, control

systems, and corporate and risk governance to implement and adhere to all

provisions of this Order;

(c)     require that Bank management and personnel have sufficient training and

authority to execute their duties and responsibilities pertaining to or

resulting from the Order;

(d)     hold Bank management and personnel accountable for executing their

duties and responsibilities pertaining to or resulting from this Order;

18

(e)    require appropriate, adequate, and timely reporting to the Board by Bank management of corrective actions directed by the Board to be taken under the terms of this Order; and

(f)    address any noncompliance with corrective actions in a timely and appropriate manner.

## ARTICLE XII

## <u>WAIVERS</u>

(1)    The Bank, by executing and consenting to this Order, waives:

(a)    any and all rights to the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818;

(b)    any and all procedural rights available in connection with the issuance of this Order;

(c)    any and all rights to a hearing and a final agency decision pursuant to 12 U.S.C. § 1818 and 12 C.F.R. Part 19;

(d)    any and all rights to seek any type of administrative or judicial review of this Order;

(e)    any and all claims for fees, costs, or expenses against the OCC, or any of its officers, employees, or agents related in any way to this enforcement matter or this Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

(f)    any and all rights to assert these proceedings, the consent to and/or the issuance of this Order, as the basis for a claim of double jeopardy in any

19

pending or future proceedings brought by the United States Department of Justice or any other governmental entity; and

(g)  any and all rights to challenge or contest the validity of this Order.

## ARTICLE XIII

## OTHER PROVISIONS

(1)  As a result of this Order, the Bank is not:

(a)  precluded from being treated as an "eligible bank" for the purposes of 12 C.F.R. Part 5, unless the Bank fails to meet any of the requirements contained in subparagraphs (1) – (4) of 12 C.F.R. § 5.3, Definitions, Eligible bank or eligible savings association, or is otherwise informed in writing by the OCC;

(b)  subject to the restrictions in 12 C.F.R. § 5.51 requiring prior notice to the OCC of changes in directors and senior executive officers or the limitations on golden parachute payments set forth in 12 C.F.R. Part 359, unless the Bank is otherwise subject to such requirements pursuant to 12 C.F.R. § 5.51(c)(7)(i) and (iii); and

(c)  precluded from being treated as an "eligible bank" for the purposes of 12 C.F.R. Part 24, unless the Bank fails to meet any of the requirements contained in 12 C.F.R. § 24.2(e)(1)-(3) or is otherwise informed in writing by the OCC.

(2)  This Order supersedes all prior OCC communications issued pursuant to 12 C.F.R. §§ 5.3, 5.51(c)(7)(ii), and 24.2(e)(4).

**ARTICLE XIV**

**CLOSING**

(1)      This Order is a settlement of the cease and desist proceedings against the Bank contemplated by the OCC, based on the unsafe or unsound practices and/or violations of law described in the Comptroller's Findings set forth in Article II of this Order. The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the practices and/or violations described in Article II of this Order, to the extent known to the OCC as of the effective date of this Order. Nothing in this Order, however, shall prevent the OCC from:

(a)      instituting enforcement actions other than a cease and desist order against the Bank based on the Comptroller's Findings set forth in Article II of this Order;

(b)      instituting enforcement actions against the Bank based on any other findings;

(c)      instituting enforcement actions against institution-affiliated parties (as defined by 12 U.S.C. § 1813(u)) based on the Comptroller's Findings set forth in Article II of this Order, or any other findings; or

(d)      utilizing the Comptroller's Findings set forth in Article II of this Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

(2)      Nothing in this Order is a release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affects any actions that may be or have been brought

21

**JA 196**

by any other representative of the United States or an agency thereof, including, without

limitation, the United States Department of Justice.

    (3)    This Order is:

        (a)    a "cease-and-desist order issued upon consent" within the meaning of

            12 U.S.C. § 1818(b);

        (b)    a "cease-and-desist order which has become final" within the meaning of

            12 U.S.C. § 1818(e);

        (c)    an "order issued with the consent of the depository institution" within the

            meaning of 12 U.S.C. § 1818(h)(2);

        (d)    an "effective and outstanding . . . order" within the meaning of 12 U.S.C.

            § 1818(i)(1); and

        (e)    a "final order" within the meaning of 12 U.S.C. § 1818(i)(2) and (u).

    (4)    This Order is effective upon its issuance by the OCC, through the Comptroller's

duly authorized representative. Except as otherwise expressly provided herein, all references to

"days" in this Order shall mean calendar days and the computation of any period of time

imposed by this Order shall not include the date of the act or event that commences the period of

time.

    (5)    The provisions of this Order shall remain effective except to the extent that, and

until such time as, such provisions are amended, suspended, waived, or terminated in writing by

the OCC, through the Comptroller's duly authorized representative. If the Bank seeks an

extension, amendment, suspension, waiver, or termination of any provision of this Order, the

Board or a Board-designee shall submit a written request to the Deputy Comptroller asking for

the desired relief. Any request submitted pursuant to this paragraph shall include a statement

setting forth in detail the circumstances that warrant the desired relief or prevent the Bank from complying with the relevant provision(s) of the Order, and shall be accompanied by relevant supporting documentation. The OCC's decision concerning a request submitted pursuant to this paragraph, which will be communicated to the Board in writing, is final and not subject to further review.

(6)    The Bank will not be deemed to be in compliance with this Order until it has adopted, implemented, and adhered to all of the corrective actions set forth in each Article of this Order; the corrective actions are effective in addressing the Bank's deficiencies; and the OCC has verified and validated the corrective actions. An assessment of the effectiveness of the corrective actions requires sufficient passage of time for the Bank to demonstrate the sustained effectiveness of the corrective actions.

(7)    This Order is not a contract binding on the United States, the United States Treasury Department, the OCC, or any officer, employee, or agent of the OCC and neither the Bank nor the OCC intends this Order to be a contract.

(8)    Each citation, issuance, or guidance referenced in this Order includes any subsequent citation, issuance, or guidance that replaces, supersedes, amends, or revises the referenced cited citation, issuance, or guidance.

(9)    This Order applies to the Bank and all its subsidiaries.

(10)    No separate promise or inducement of any kind has been made by the OCC, or by its officers, employees, or agents, to cause or induce the Bank to consent to the issuance of this Order.

(11)    All reports, plans, or programs submitted to the OCC pursuant to this Order shall

be forwarded, by overnight mail or via email, to the following:

Robert Barnes
Examiner-in-Charge
National Bank Examiners
Bank of America, N.A.
201 N. Tryon Street, NC1-022-19-01
Charlotte, NC 28255

or other such individuals or addresses as directed by the OCC.

(12)    The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his duly authorized representative, has hereunto set her signature on behalf of the Comptroller.

//s//  Digitally Signed, Dated: 2022.07.14

_____
Tanya K. Smith
Deputy Comptroller
Large Bank Supervision

**JA 199**

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of the Bank of America, N.A., Charlotte, North Carolina have hereunto set their signatures on behalf of the Bank.

| /s/ | 07/12/2022 |
|---|---|
| Brian T. Moynihan | Date |
| /s/ | 13 Jul, 2022 |
| Sharon L. Allen | Date |
| /s/ | 13 Jul, 2022 |
| Frank P. Bramble, Sr. | Date |
| /s/ | 13 Jul, 2022 |
| Pierre J.P. de Weck | Date |
| /s/ | 07/13/2022 |
| Arnold W. Donald | Date |
| /s/ | 13 Jul, 2022 |
| Linda P. Hudson | Date |
| /s/ | 12 Jul, 2022 |
| Monica C. Lozano | Date |
| /s/ | 12 Jul, 2022 |
| Lionel L. Nowell, III | Date |
| /s/ | 12 Jul, 2022 |
| Denise L. Ramos | Date |
| /s/ | 13 Jul, 2022 |
| Clayton S. Rose | Date |

25

**JA 200**

/s/                                              12 Jul, 2022
_____                  _____
Michael D. White                                 Date

/s/                                              13 Jul, 2022
_____                  _____
Thomas D. Woods                                  Date

/s/                                              12 Jul, 2022
_____                  _____
R. David Yost                                    Date

/s/                                              07/13/2022
_____                  _____
Maria T. Zuber                                   Date

26

**JA 201**

# EXHIBIT "E"

#2022-024

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
OFFICE OF THE COMPTROLLER OF THE CURRENCY

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | |
| Bank of America, N.A. ) | AA-ENF-2022-22 |
| Charlotte, North Carolina ) | |
| ) | |

**CONSENT ORDER**

**WHEREAS**, the Office of the Comptroller of the Currency ("OCC") has supervisory

authority over Bank of America, N.A., Charlotte, North Carolina ("Bank");

**WHEREAS**, the OCC intends to initiate civil money penalty proceedings against the

Bank pursuant to 12 U.S.C. § 1818(i), through the issuance of a Notice of Assessment of a Civil

Money Penalty, related to: (1) the administration of the Bank's prepaid cards for unemployment

benefits, specifically engagement in (i) unsafe or unsound practice(s), including deficiencies in

its risk management, operational processes and controls, internal audit, and investigation and

resolution of consumer claims of unauthorized transactions; and (ii) unfair and deceptive

practices in violation(s) of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15

U.S.C. § 45(a)(1); and (2) engaging in unsafe or unsound practices related to deficiencies in its

enterprise-wide complaints risk management framework;

**WHEREAS**, in the interest of cooperation and to avoid additional costs associated with

administrative and judicial proceedings with respect to the above matter, the Bank, by and

through its duly elected and acting Board of Directors ("Board"), consents to the issuance of this

Consent Order ("Order"), by the OCC through the duly authorized representative of the

Comptroller of the Currency ("Comptroller"); and

**NOW, THEREFORE**, pursuant to the authority vested in the OCC by Section 8(i) of the

Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818(i), the OCC hereby orders that:

## ARTICLE I

### JURISDICTION

(1)    The Bank is an "insured depository institution" as that term is defined in

12 U.S.C. § 1813(c)(2).

(2)    The Bank is a national banking association within the meaning of 12 U.S.C.

§ 1813(q)(1)(A), and is chartered and examined by the OCC. *See* 12 U.S.C. § 1 *et seq.*

(3)    The OCC is the "appropriate Federal banking agency" as that term is defined in

12 U.S.C. § 1813(q) and is therefore authorized to initiate and maintain this civil money penalty

action against the Bank pursuant to 12 U.S.C. § 1818(i).

## ARTICLE II

### COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)    For several years, the Bank issued and administered prepaid debit cards to

distribute unemployment insurance benefits ("UI Prepaid Cards") to consumers that were loaded

with benefit funds issued by certain states, hereinafter referred to as the Unemployment Benefits

Prepaid Card Program ("Program").

(2)    In March 2020, millions became unemployed and Congress enacted the

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which created the new

Pandemic Unemployment Assistance ("PUA") benefit.  The CARES Act and PUA expanded

unemployment benefits eligibility and provided greater benefit amounts than previously

available. As a result, the size of the Program increased substantially (from under one million

unique cards loaded in January 2020 to over six million in July 2020), as did the volume of

benefits issued by the states and loaded onto UI Prepaid Cards (from approximately $1 billion in January 2020 to over $27 billion in July 2020). Along with the increases in Program participants and benefits, the Program experienced an increase in fraud, including with respect to unauthorized transaction claims.

(3)    The Bank failed to establish effective risk management over the Program, and, beginning in 2020, denied or delayed many consumers' access to unemployment benefits when consumers filed or attempted to file UI Prepaid Card unauthorized transaction claims. Specifically, the Bank:

(a)    applied an automated fraud filter between September 28, 2020 and June 8, 2021 to decision UI Prepaid Card error claims that met certain criteria ("Fraud Filter") without conducting a sufficient investigation to: (i) deny many consumers' claims of unauthorized transactions on their UI Prepaid Cards, and (ii) "freeze" or "block" the UI Prepaid Card accounts associated with the claims. Consumers with frozen or blocked accounts could not access the unemployment benefits in their UI Prepaid Card accounts until the Bank removed the freeze or block.

(b)    failed to provide timely and full provisional or final credit to many consumers entitled to such credits who reported unauthorized transactions on their UI Prepaid Card accounts.

(c)    retroactively applied the Fraud Filter to many consumers' claims of unauthorized transactions on their UI Prepaid Card accounts without conducting further investigation and providing advance notice, which incorrectly resulted in the reversal of provisional and final credits that the

3

Bank previously provided to those consumers.

(d)     impeded many consumers' ability to regain access to their unemployment benefits through the UI Prepaid Cards and to request reconsideration of their unauthorized transaction claims as a result of operational deficiencies.

(e)     provided consumers deceptive disclosures and notices with respect to liability for unauthorized transactions, processing of unauthorized transaction claims, and account freezes and blocks.

(4)     Overall, the Bank has the following deficiencies in its administration of the Program:

(a)     inadequate risk management practices in both the front-line units and independent risk management, including ineffective oversight, risk assessment, monitoring, and reporting;

(b)     inadequate internal controls, including those relating to contract management;

(c)     inadequate oversight, risk management, and monitoring of UI Prepaid Card unemployment benefits vendors ("Program Vendors"); and

(d)     inadequate oversight and coverage by the Bank's independent audit function.

(5)     In addition, the Bank failed to establish an effective enterprise-wide complaints risk management framework that is commensurate with the Bank's size, complexity, and risk profile. Specifically, the complaint risk management framework lacks an effective:

(a)     process to identify, measure, manage, and report complaints;

4

(b)    complaint resolution process; and

(c)    quality assurance process.

(6)    By reason of the deficiencies and conduct described in Paragraphs (2) through (5) of this Article, the Bank engaged in unsafe or unsound practices and engaged in unfair and deceptive practices in Section 5 of the FTC Act, 15 U.S.C. §45(a). These violations and practices support actions against the Bank under 12 U.S.C. § 1818(b) and (i)(2)(B).

(7)    The Bank has begun taking corrective actions and has committed to taking necessary and appropriate steps to remedy the deficiencies identified by the OCC and to assist and remediate harmed consumers.

## ARTICLE III

## ORDER FOR A CIVIL MONEY PENALTY

(1)    The Bank shall make payment of a civil money penalty in the total amount of one hundred twenty-five million ($125,000,000) which shall be paid upon the execution of this Order.

(2)    Such payment shall be made by a wire transfer sent in accordance with instructions provided by the OCC and the docket number of this case (AA-ENF-2022-22) shall be entered on the wire confirmation. A photocopy of the wire confirmation shall be sent immediately, by overnight delivery, to the Director of Enforcement and Compliance, Office of the Comptroller of the Currency, 400 7th Street, S.W., Washington, D.C. 20219.

## ARTICLE IV

## WAIVERS

(1)    The Bank, by executing and consenting to this Order, waives:

5

(a)    any and all rights to the issuance of a Notice of Charges pursuant to

12 U.S.C. § 1818;

(b)    any and all procedural rights available in connection with the issuance of

this Order;

(c)    any and all rights to a hearing and a final agency decision pursuant to

12 U.S.C. § 1818 and 12 C.F.R. Part 19;

(d)    any and all rights to seek any type of administrative or judicial review of

this Order;

(e)    any and all claims for fees, costs, or expenses against the OCC, or any of

its officers, employees, or agents related in any way to this enforcement

matter or this Order, whether arising under common law or under the

terms of any statute, including, but not limited to, the Equal Access to

Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412;

(f)    any and all rights to assert these proceedings, the consent to and/or the

issuance of this Order, as the basis for a claim of double jeopardy in any

pending or future proceedings brought by the United States Department of

Justice or any other governmental entity; and

(g)    any and all rights to challenge or contest the validity of this Order.

**ARTICLE V**

**CLOSING**

(1)    This Order is a settlement of the civil money penalty proceedings against the

Bank contemplated by the OCC, based on the unsafe or unsound practices and violations of law

described in the Comptroller's Findings set forth in Article II of this Order. The OCC releases

6

and discharges the Bank from all potential liability for a civil money penalty order that has been or might have been asserted by the OCC based on the practices and/or violations described in Article II of this Order, to the extent known to the OCC as of the effective date of this Order. Nothing in this Order, however, shall prevent the OCC from:

(a) instituting enforcement actions other than a civil money penalty order against the Bank based on the Comptroller's Findings set forth in Article II of this Order;

(b) instituting enforcement actions against the Bank based on any other findings;

(c) instituting enforcement actions against institution-affiliated parties (as defined by 12 U.S.C. § 1813(u)) based on the Comptroller's Findings set forth in Article II of this Order, or any other findings; or

(d) utilizing the Comptroller's Findings set forth in Article II of this Order in future enforcement actions against the Bank or its institution-affiliated parties to establish a pattern or the continuation of a pattern.

(2) Nothing in this Order is a release, discharge, compromise, settlement, dismissal, or resolution of any actions, or in any way affects any actions that may be or have been brought by any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice.

(3) This Order is:

(a) an "order issued with the consent of the depository institution" within the meaning of 12 U.S.C. § 1818(h)(2);

7

**JA 209**

> (b)    an "effective and outstanding . . . order" within the meaning of 12 U.S.C.
>
> § 1818(i)(1); and
>
> (c)    a "final order" within the meaning of 12 U.S.C. § 1818(i)(2) and (u).

(4)    This Order is effective upon its issuance by the OCC, through the Comptroller's duly authorized representative.

(5)    This Order is not a contract binding on the United States, the United States Treasury Department, the OCC, or any officer, employee, or agent of the OCC and neither the Bank nor the OCC intends this Order to be a contract.

(6)    No separate promise or inducement of any kind has been made by the OCC, or by its officers, employees, or agents, to cause or induce the Bank to consent to the issuance of this Order.

(7)    The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his duly authorized representative, has hereunto set her signature on behalf of the Comptroller.

//s// Digitally Signed, Dated: 2022.07.14

_____

Tanya K. Smith
Deputy Comptroller
Large Bank Supervision

8

**JA 210**

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of Directors of the Bank of America, N.A., Charlotte, North Carolina have hereunto set their signatures on behalf of the Bank.

| /s/ | 07/12/22 |
|---|---|
| Brian T. Moynihan | Date |
| /s/ | 13 Jul, 2022 |
| Sharon L. Allen | Date |
| /s/ | 13 Jul, 2022 |
| Frank P. Bramble, Sr. | Date |
| /s/ | 13 Jul, 2022 |
| Pierre J.P. de Weck | Date |
| /s/ | 07/13/2022 |
| Arnold W. Donald | Date |
| /s/ | 13 Jul, 2022 |
| Linda P. Hudson | Date |
| /s/ | 12 Jul, 2022 |
| Monica C. Lozano | Date |
| /s/ | 12 Jul, 2022 |
| Lionel L. Nowell, III | Date |
| /s/ | 12 Jul, 2022 |
| Denise L. Ramos | Date |
| /s/ | 13 Jul, 2022 |
| Clayton S. Rose | Date |

9

**JA 211**

| | |
|---|---|
| /s/ | 12 Jul, 2022 |
| Michael D. White | Date |
| /s/ | 13 Jul, 2022 |
| Thomas D. Woods | Date |
| /s/ | 12 Jul, 2022 |
| R. David Yost | Date |
| /s/ | 07/13/2022 |
| Maria T. Zuber | Date |

10

**JA 212**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| YAGOUB M. MOHAMED, *Individually and on behalf of all others similarly situated* | Civil Action No. CCB-21-1283 |
| v. |  |
| BANK OF AMERICA, N.A., *et al.* |  |

### MEMORANDUM

Yagoub M. Mohamed was eligible for unemployment benefits during the COVID-19 pandemic, but he lost access to nearly $15,000 in those benefits when an unauthorized user fraudulently used the Bank of America prepaid debit card that was meant to deliver his funds. He brought claims (ECF 1) against the Bank for violation of the federal Electronic Fund Transfer Act, violations of state privacy and consumer protection laws, and common-law breach of contract and negligence. He brought those claims individually and on behalf of a putative class of Maryland residents who were issued Bank of America prepaid debit cards for unemployment benefits. Bank of America filed a motion to dismiss (ECF 18), which Mohamed opposed (ECF 22) and Bank of America supported in its reply (ECF 23). The issues have been briefed, and oral argument was held June 9, 2022. For the following reasons, the motion to dismiss will be granted as to Count One, for violation of the Electronic Fund Transfer Act. The court will decline to exercise supplemental jurisdiction over the remaining state law claims, which will therefore be dismissed without prejudice.

1

**JA 213**

## BACKGROUND

In ruling on a motion to dismiss, this court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikipedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)).

**Mohamed's Experience**

Yagoub M. Mohamed was a mechanic and small business owner who suddenly lost his business (and significant income) in July 2020 due to the COVID-19 pandemic. That month, he applied for unemployment benefits. While self-employed individuals might not normally have been eligible for state unemployment insurance, federal supplemental programs like Pandemic Unemployment Assistance (PUA) benefits also were administered by the Maryland state Division of Unemployment Insurance (DUI), an office of the state Department of Labor.[1]

Though Mohamed had the option to receive his disbursements via paper check, he signed up to receive his benefits on a Bank of America DUI Debit Card[2] that was to be mailed to his Baltimore home address. The Complaint is silent as to Mohamed's decision calculus at the time.

Between July and October 2020, Mohamed was entitled to receive $14,644 in benefits, but he had still not received his DUI Debit Card by the end of November 2020. He had called the DUI office regularly during those months, but DUI representatives advised him that he might experience a 45- or 90-day delay due to the high applicant volume. When he called in late November 2020, the representative advised that Mohamed should have already received the card,

---

[1] Mohamed stated in his response brief that he "believes he received UI benefits [as opposed to PUTA benefits], but awaits proof from the Division of Unemployment Insurance ('DUI')." (ECF 22, Opp. at 6). He has offered no proof of this assertion.

[2] As discussed below, the state DUI contracted with Bank of America, North America (BANA, or the Bank) to administer prepaid debit cards for its benefit recipients.

2

**JA 214**

which would have been mailed by Bank of America, North America (BANA). He then called

BANA, whose representative told him that the Bank had already mailed his card and that BANA

would mail a new card.

Around December 5, 2020, Mohamed received the DUI Debit Card. But when he tried to

activate the card, the activation code did not work. He called the customer service line and

learned the card had a $0 balance. He waited a few days to give the Bank an opportunity to finish

setup, and he called back on December 7, 2020; the Bank's representative told him that although

the account had received the full $14,644 disbursement, the funds from his account had already

been spent. A Claims Department representative read aloud each transaction to Mohamed, who

confirmed that he had not made or authorized any of them. Between August 20 and October 1 of

that year, an unauthorized user had bought goods and made withdrawals in a wide range of

locations, from Towson, Maryland, to Hollywood, California. None of the transactions were

familiar, nor did Mohamed know who had made them.

After receiving a claim number from the Bank, Mohamed filed a police report and

provided that information to BANA's Claims Department as requested. The Claims Department

told him he would receive a letter from BANA within 45 days. From late December into January,

Mohamed called the Bank weekly and then daily to inquire about his claim; representatives told

him to call back, or he received messages stating the office was too busy to accept his call.

Without any financial resources, Mohamed maxed out his business and personal credit

cards. He incurred late fees, sending his credit score from 750 to 500, and he fell behind on his

monthly payments. He struggled with depression, sleeplessness, and stress-induced vomiting. On

December 27, he experienced a panic attack exacerbated by exhaustion and dehydration,

requiring an urgent care visit.

Around January 5, 2021, Mohamed received a Freeze Letter (ECF 1-5, Exhibit 3) from BANA, a letter BANA sent to Maryland DUI recipients who had filed fraud claims. The letter observed that BANA had determined there might be unauthorized activities involved with his card, so his account had been frozen. When he logged into his account, he saw a new identification verification requirement, which he satisfied. About a month later, on February 3, the Bank emailed him to notify him of a $1,050 deposit into his account. While his account been frozen, the Bank had stopped processing his fraud claim. Mohamed and other similarly affected unemployment insurance claimants who experienced fraud received confusing, conflicting messaging from the Bank and DUI about who was responsible for account freezes. Continued calls to the Bank through the rest of February yielded little meaningful assistance.

On March 3, he received an Update Letter (ECF 1-6, Exhibit 4) stating that the freeze had been lifted and his card was active once again. Again, he received mixed messages about his fraud claim and whether it remained active or was eligible for reconsideration.

When Mohamed filed this lawsuit in late May of 2021, BANA had not given him either a provisional or permanent credit for his $14,644 in lost unemployment funds, though he had received notice from the State requiring him to pay taxes on the full amount. On June 25, 2021, the Bank informed Mohamed that it would credit him the full amount. (ECF 18-2, Daniels Decl. ¶ 5). The Bank filed its motion to dismiss on August 2, 2021.

### Bank of America and the Maryland Division of Unemployment Insurance

Well before the pandemic, Bank of America contracted with DUI to administer prepaid debit cards for electronic payment of unemployment insurance benefits. The 2013 Request for Proposal stated that it sought a disbursement solution to "ensure cardholders receive the UI benefits to which they are entitled, efficiently, timely, accurately, and securely." (ECF 1 ¶ 15).

4

The RFP[3] required the contractor to have in place reasonable security procedures and to make sure information about cardholders and their accounts is secured to ensure its confidentiality. It also included provisions that DOL would not indemnify the Contractor (eventually, the Bank) for any claims or losses arising out of the Contract and requiring that the Contractor indemnify and hold harmless DOL. In 2013, Bank of America accepted the contract with DUI, and Mohamed incorporates that state contract into the complaint by reference. (ECF 1 ¶ 19; ECF 1-3, Exhibit 1, Contract). The RFP and Contract also required information about fraud detection and prevention services.

Bank of America also published a separate webpage tailored to Maryland UI debit cardholders. Cardholders were subject to a Bank of America Cardholder Agreement ("Account Agreement") that contained several relevant provisions. (ECF 1-4, Ex. 2, Cardholder Agreement).

First, it contained BANA's "Zero Liability" Policy for Unauthorized Transactions, a policy that limits a cardholder's liability for unauthorized transactions to the amount of the transaction, so long as the cardholder notifies BANA within a reasonable time. The policy specifies that even if the claim does not meet the Zero Liability conditions, the cardholder still retains their consumer rights under federal law:

> **Your Rights under Regulation E.** If your claim does not meet the prescribed conditions for reimbursement under the above policy, you still retain any consumer rights you may have under Regulation E, as described in Sections 10 and 11 below, and we will automatically re-examine the claim in accordance with those rights.

(ECF 1-4, Ex. 2, Cardholder Agreement at 8).

---

[3] Request for Proposals for Electronic Payment Card Services for Department of Labor, Licensing and Regulation, Division of Unemployment Insurance, RFP #-DLLR-EPC-01172013." ("RFP") at 13 ¶ 3.05.5, https://www.treasurer.state.md.us/media/52202/dllr_epc_01172013_rfp.pdf, (last accessed Aug. 1, 2022) ("Contractor must have in place reasonable security procedures . . .").

**JA 217**

That federal law is the subject of the second relevant provision. The Zero Liability policy refers to Regulation E, a federal regulation that implements the Electronic Fund Transfer Act and is administered by the Consumer Finance Protection Bureau. This law and its regulation concern dispute resolution for certain accounts. The Account Agreement outlined Bank of America's dispute resolution services: BANA would determine whether there was an error within 10 days and correct it promptly. If they need more time, however, they could take up to 45 days to investigate, in which case they would provisionally credit the disputed amount within 10 days so the Cardholder would have the money during the investigation. BANA would reveal the results within three days of completing the investigation.

The DUI announced in 2021 that it would move away from Bank of America prepaid debit cards in favor of a new contract for direct deposit through Wells Fargo.

**Card Technologies**

The nature of the Bank of America debit cards is particularly noteworthy here. Mohamed's card — like all other UI debit cardholders' but unlike the Bank's non-UI debit cardholders' — featured a magnetic stripe and no EMV chip. EMV chips are an anti-fraud technology that have become more common over time as the industry standard for card security. Magnetic stripes encode user information, like the cardholder's name, card number, and card expiration date, but magnetic stripes are highly susceptible to fraud. While EMV chip cards also have a magnetic stripe, their stripes are two-way and are encoded in a more sophisticated fashion. Bank of America's website assures cardholders of their cards' security.

**The Class Action**

Mohamed was not the only Maryland unemployment claimant to experience fraud. In July 2020, the DOL uncovered a criminal enterprise involving 47,500 fraudulent employment

6

**JA 218**

claims using identity theft totaling over $501 million, where many claimants believe their debit

cards were cloned. He brings his suit individually and as a proposed class action, seeking

damages on behalf of a class defined as follows:

> All Maryland Residents who were issued or who used a Bank of America debit
> card for the purpose of accessing DUI benefits deposited into a Bank of America
> account, at any time within three years prior to the filing of this complaint
> through the present ("Class Period").

## LEGAL STANDARD

To survive a motion to dismiss, the factual allegations of a complaint "must be enough to

raise a right to relief above the speculative level on the assumption that all the allegations in the

complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

(2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast'

evidence sufficient to prove the elements of the claim. However, the complaint must allege

sufficient facts to establish those elements." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir.

2012) (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint

that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the

line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Additionally,

although courts "must view the facts alleged in the light most favorable to the plaintiff," they

"will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable

conclusions, or arguments'" in deciding whether a case should survive a motion to dismiss. *U.S.*

*ex rel. Nathan v. Takeda Pharm. North Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)

(quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

## ANALYSIS

### I. Violations of EFTA (Count I)

Mohamed alleges that the Bank violated the Electric Fund Transfer Act, and this claim is

the only federal claim in his lawsuit. The Electronic Fund Transfer Act (EFTA) is a consumer

protection statute that regulates the terms of certain transactions. 15 U.S.C. § 1693 *et. seq.* The

purpose of the EFTA is to establish "individual consumer rights" in the context of electronic

fund transfer (EFT) transactions. *Id.* § 1693(b). Accordingly, the EFTA is a remedial consumer

protection standard that courts read "liberally" to achieve the goal of protecting consumers.

*Curtis v. Propel Property Tax Funding, LLC*, 915 F.3d 234, 239 (4th Cir. 2019) (citations

omitted). Regulation E implements the EFTA. 12 C.F.R. §§ 1005.1–1005.20.

BANA concedes that if Regulation E applies to this case, then Mohamed has a claim at

least for statutory penalties, but according to BANA, Regulation E does not apply, primarily

because Mohamed received pandemic unemployment assistance rather than traditional

unemployment insurance. BANA argues that the EFTA's and Regulation E's definition of a

covered "account" excludes various types of prepaid accounts, including those established by a

bank and loaded with government disaster funds. BANA offers the following analysis:

1. For the EFTA to apply, Mohamed's account must qualify as an account under the
   EFTA's definition of "account," which refers to the regulations of the Consumer
   Financial Protection Bureau. EFTA, 15 U.S.C. § 1693a(2).

2. The relevant CFPB regulations defines "account" to include a prepaid account. 12 C.F.R.
   1005.2(b)(3). But for the purposes of paragraphs (b)(3)(i)(C) and (D) of the regulation,
   the term "prepaid account" excludes any "account that is directly or indirectly established

8

through a third party and loaded only with qualified disaster relief payments[.]" 12 C.F.R. § 1005.2(b)(3)(ii)(B).

3. As the CFPB officially interprets the regulation, "[f]or purposes of § 1005.2(b)(3)(ii)(B), 'qualified disaster relief funds' means funds made available through a qualified disaster relief program as defined in 26 U.S.C. 139(b)." Official Interpretation of Paragraph 2(b)(3)(ii) at ¶ 2, *Interactive Bureau Regulations / 12 CFR Part 1005 (Regulation E) / § 1005.2 Definitions, Consumer Financial Protection Bureau*, available at https://www.consumerfinance.gov/rules-policy/regulations/1005/2/ (last accessed July 29, 2022).

4. The Internal Revenue Code, 26 U.S.C. § 139(b), defines a qualified disaster relief payment as "any amount paid to or for the benefit of an individual . . . if such amount is paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection with a qualified disaster in order to promote the general welfare[.]" 26 U.S.C. § 139(b)(4).

5. The Internal Revenue Code goes on to define "qualified disaster" as "a federally declared disaster (as defined in section 165(i)(5)(A))." 26 U.S.C. § 139(c)(2).

6. Under § 165, a federally qualified disaster means "any disaster subsequently determined by the President of the United States to warrant assistance by the Federal Government under the Robert T. Stafford Disaster Relief and Emergency Assistance Act." 26 U.S.C. § 165(i)(5)(A).

7. President Trump declared on March 13, 2020, that the COVID-19 pandemic was a disaster warranting federal assistance. *Letter from Pres. Donald J. Trump on Emergency Determination Under the Stafford Act* (Mar. 13, 2020),

https://trumpwhitehouse.archives.gov/briefings-statements/letter-president-donald-j-

trump-emergency-determination-stafford-act/ (last accessed Mar. 11, 2022).

8. Congress created Pandemic Unemployment Assistance in the CARES Act in late March

2020. PUA provided federally financed unemployment benefits to non-employees

(including business owners, gig workers, etc.) like Mohamed.

9. Mohamed's card was established through a third party (BANA) and loaded with only

qualified disaster relief payments (PUA and no regular state unemployment insurance,

because Mohamed did not qualify for regular Maryland UI). Therefore, his account is

excluded from the definition of "prepaid account."

BANA's argument hinges on step two, which excludes certain accounts from the

definition of "prepaid account" under 12 C.F.R. § 1005.2(b)(3)(ii)(B) — specifically, accounts

both established through a third party and loaded only with qualified disaster relief payments.

The parties debate whether Mohamed's PUA account is a "prepaid account" covered

under EFTA or whether it is carved out of the definition of "prepaid account" according to step

two — that is, Regulation E's exclusion of any "account that is directly or indirectly established

through a third party and loaded only with qualified disaster relief payments." 12 C.F.R. §

1005.2(b)(3)(ii)(B). If the PUA payments are qualified disaster relief payments, then Mohamed's

account is carved out of the definition of "prepaid account" under EFTA, and he cannot bring his

federal EFTA claim.

Mohamed argues that, while the pandemic was in March 2020 declared by President

Trump a disaster warranting federal assistance under the Stafford Act, PUA payments were

actually authorized by Congress in the CARES Act for the "COVID-19 public health

emergency" rather than a disaster. Specifically, it was tied initially to the public health

10

**JA 222**

emergency declared by the Secretary of Health and Human Services in January 2020 rather than

the March 2020 disaster declaration by President Trump. 15 U.S.C. §§ 9021(a)(2) (defining

"COVID-19 public health emergency" in terms of the January 2020 HHS declaration), (c)(1)(A)

(making PUA available beginning the same date as the January 2020 HHS declaration rather

than the March 2020 presidential declaration).[4] According to Mohamed, the CARES Act showed

a Democratic House and Senate explicitly acting separately from President Trump and not tying

their measures to his prospective declaration.

The Internal Revenue Code, however, favors BANA's argument. A qualified disaster

relief payment is "any amount paid to or for the benefit of an individual . . . if such amount is

paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection

with a *qualified disaster* in order to promote the general welfare[.]" 26 U.S.C. § 139(b)(4)

(emphasis added). A "qualified disaster" is a "federally declared disaster," 26 U.S.C. § 139(c)(2),

which is "any disaster *subsequently determined* by the President of the United States to warrant

assistance by the Federal Government under the Robert T. Stafford Disaster Relief and

Emergency Assistance Act." 26 U.S.C. § 165(i)(5)(A) (emphasis added). Even if the CARES Act

was tied initially to the January 2020 HHS declaration, the CARES Act nonetheless referred to

the pandemic itself, which was subsequently declared a disaster warranting Stafford Act

assistance.

The pandemic is therefore a "federally qualified disaster" under 26 U.S.C. § 165(i)(5)(A)

and a "qualified disaster" under IRC § 139(c)(2), meaning PUA payments were "qualified

---

[4]  Mohamed also points to 15 U.S.C. § 9021(h), which specifies that 20 C.F.R. § 625's Stafford disaster
unemployment assistance regulations should apply to § 9021 PUA as if "COVID-19 public health emergency"
and "pandemic" were substituted for "major disaster" and "disaster" in the regulation. Mohamed urges a reading
of this provision that Congress specifically chose pandemic language rather than Stafford disaster language in the
CARES Act, but it may also be read to show the interchangeability of the two.

11

**JA 223**

disaster relief payments" under IRC § 139(b)(4). The payments therefore satisfy the CFPB's official interpretation of Regulation E § 1005.2(b)(3)(ii)(B) and are excluded from the definition of "prepaid account," therefore falling outside of EFTA's definition of covered "accounts," 15 U.S.C. § 1693a(2). Count I must therefore be dismissed.

### II. State Law Claims

To the extent Mohamed alleges BANA has violated state law in counts II–VI, the court declines to exercise supplemental jurisdiction and will dismiss the state claims without prejudice.[5] *See* 28 U.S.C. § 1367(c)(3) (district court may decline to exercise supplemental jurisdiction over state law claims when "the district court has dismissed all claims over which it has original jurisdiction."); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

### CONCLUSION

For the reasons discussed herein, Bank of America, N.A.'s motion to dismiss will be granted. A separate Order follows.

_____8/11/22_____
Date

_____*CCB*_____
Catherine C. Blake
United States District Judge

---

[5] Mohamed therefore may present his claims in the appropriate state forum.

12

**JA 224**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| YAGOUB M. MOHAMED, *Individually and on behalf of all others similarly situated* | Civil Action No. CCB-21-1283 |
| v. | |
| BANK OF AMERICA, N.A., *et al.* | |

### ORDER

For the reasons stated in the accompanying memo, it is hereby **Ordered** that Bank of

America, N.A.'s motion to dismiss (ECF 18-1) is granted as follows:

1. The motion is **Granted** as to count I, which is **Dismissed**;

2. Counts II, III, IV, V, and VI are **Dismissed** without prejudice because the court declines

   to exercise supplemental jurisdiction;

3. The Clerk shall **Send** a copy of this Order and the accompanying Memorandum to

   counsel of record; and

4. The Clerk shall **Close** this case.


_8/11/22_
Date

_CCB_
Catherine C. Blake
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**YAGOUB M. MOHAMED,** *individually and on behalf of others similarly situated,*

    **Plaintiff,**

**v.**                                    **CIVIL ACTION NO.  1:21-cv-01283-CCB**

**BANK OF AMERICA, N.A.,**

    **Defendant.**

## NOTICE OF APPEAL

Notice is hereby given that YOGOUB B. MOHAMED, *on behalf of himself and all others similarly situated*, hereby appeals to the United States Court of Appeals for the Fourth Circuit from the Order entered in this action on August 11, 2022. (ECF No. 38.)

              Respectfully Submitted,

              **YAGOUB M. MOHAMED,** *individually and on behalf of others similarly situated,*

    By:  */s/ Tara B. Keller*
              Tara B. Keller
              Bar No. 22303
              **CONSUMER LITIGATION ASSOCIATES, PC**
              763 J Clyde Morris Blvd Ste 1A
              Newport News, VA 23601
              703-273-7770
              Email: tara@clalegal.com

              Leonard A. Bennett (VSB # 37523)
              Craig C. Marchiando (VSB # 89736)
              **CONSUMER LITIGATION ASSOCIATES, PC**
              763 J. Clyde Morris Boulevard, Suite 1-A
              Newport News, Virginia 23601
              Telephone: (757) 930-3660

Facsimile: (757) 930-3662
E-mail: lenbennett@clalegal.com
E-mail: craig@clalegal.com

Robert William Murphy
Law Office of Robert W. Murphy
440 Premier Circle
Suite 240
CHARLOTTESVILLE, VA 22901
434-328-3100
Fax: 434-328-3101
Email: rwmurphy@lawfirmmurphy.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 6, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

James W. McGarry
Goodwin Procter LLP
100 Northern Avenue
Boston, MA 02210
Email: Jmcgarry@goodwinprocter.com

Thomas M Hefferon
Goodwin Procter LLP
1900 N St. NW
Washington, DC 20036
Email: thefferon@goodwinlaw.com

Yvonne W. Chan
Jones Day - Boston
100 High Street
Ste 21st Floor
Boston, MA 02110-1781
Email: ychan@jonesday.com

*/s/Tara B. Keller*
Counsel for Plaintiff

**JA 227**

```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3    YAGOUB M. MOHAMED,           )
              Plaintiff,           )
 4            vs.                   )   CRIMINAL CASE NO.
                                   )   CCB-21-01283
 5    BANK OF AMERICA, N.A.,       )
              Defendant.           )
 6    _____)

 7                     TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE CATHERINE C. BLAKE
 8                  UNITED STATES DISTRICT JUDGE
                       THURSDAY, JUNE 9, 2022
 9                      BALTIMORE, MARYLAND

10

11

12         For the Plaintiff:

13           Robert Murphy, Esq.

14           Tara Keller, Esq.

15

16         For the Defendant:

17           Thomas Hefferon, Esq.

18           Virginia Selden McCorkle, Esq.

19

20

21    _____

22                       Reported by:

23                   Melissa L. Clark, RPR
                 Federal Official Court Reporter
24               101 W. Lombard Street, 4th Floor
                    Baltimore, Maryland  21201
25
```

```
 1                    P R O C E E D I N G S.
 2          (2:21 p.m.)
 3              THE COURT:  Good afternoon.  You can all be seated.
 4     Do you want to call the case?
 5              THE CLERK:  The matter pending before in court is
 6     Civil Number CCB-21-01283, Mohamed vs. Bank of America, N.A.
 7          The matter now comes before this Court for the purpose of
 8     a motions hearing.
 9          Counsel for the record starting with the Plaintiff.
10              MR. MURPHY:  Good afternoon, Your Honor.  Attorney
11     Robert Murphy on behalf of the Plaintiff.
12              MS. KELLER:  Tara Keller on behalf of the Plaintiff.
13              MR. HEFFERON:  Your Honor, Thomas Hefferon on behalf
14     of the Defendant.
15              MS. McCORKLE:  Your Honor, Virginia Selden McCorkle
16     on behalf of the Defendant.
17              THE COURT:  Okay.  All right.  And let me just
18     indicate our current COVID protocol.  If you are fully
19     vaccinated and you are speaking and you would like to remove
20     your mask, you may, which I'm about to do.
21          You don't have to if you are not fully vaccinated or not
22     speaking.  While you're not speaking, please leave your mask
23     on.  And thank you all for being here.  I do appreciate, sort
24     of, in-person chance to talk to you all about the issues.  I
25     am -- I regret, I gather, Mr. Murphy had some difficulties.
```

 1            **MR. MURPHY:**  Your Honor, it's fine.  I actually got

 2    here with two minutes to spare.

 3            **THE COURT:**  Well, I hope you were not breaking any

 4    speed laws.

 5            **MR. MURPHY:**  I wasn't.  It's hard to do that around

 6    D.C.

 7            **THE COURT:**  Yeah.  Yeah.  Well, anyway, thank you

 8    all for being here.  There are a number of issues.  I'll have

 9    some questions as we go along, but I thought it also would be

10    -- I would benefit from a chance from hearing you present your

11    cases.

12        Obviously, I'll start on the defense side.  Let me

13    preliminarily just ask a question, obviously, one of the

14    things that I've been provided at some point, some rulings in

15    the Yick case in California, and I believe there is an -- I

16    gather an MDL pending.  And I'm curious as to what's going on

17    with any California cases.  Are the issues similar, identical?

18    Well, obviously, California law might be different from

19    Maryland, but just what's the status of that case as a

20    preliminary matter if you want to tell me your information,

21    Mr. Hefferon?

22            **MR. HEFFERON:**  Of course, Your Honor.  Thomas

23    Hefferon for the Defendant.  The California case when -- first

24    started with Yick being a case up in the Northern District.

25    The preliminary injunction that was issued was before the

1    matter then became an MDL.  I think if memory serves it was a

2    pending petition, but in any event the case has now been MDL'd

3    and it's down in the Southern District down in front of Judge

4    Burns.

5         THE COURT:  Right.

6         MR. HEFFERON:  And the parties have briefed a motion

7    to dismiss and we had argument that was then cancelled at the

8    last minute and it hasn't been reset.  So that's where we are.

9         THE COURT:  Okay.  I was wondering.  I saw that it

10   hadn't been ruled on.  Of course, I hadn't ruled on mine

11   either, but it's just pending.  There is nothing, sort of,

12   else going on at the moment.

13        MR. HEFFERON:  That's correct, Your Honor.  And it's

14   California only.

15        THE COURT:  Okay.

16        MR. HEFFERON:  And my client was the prepaid debit

17   provider for 12 states.  And so that is -- there are a number

18   of constituent cases that are -- and their individual cases

19   that have continued to be added, again, in the MDL in

20   California.

21        THE COURT:  But they're all California.  It's an MDL

22   but it's all California MDL.

23        MR. HEFFERON:  That's correct.  That's correct.

24   There are some cases pending like this one in some different

25   jurisdictions, but there is only the single MDL that's

 1    California.

 2           **THE COURT:**  And do you know -- and we'll hear more

 3    about this in this case, whether those are just the pandemic

 4    relief unemployment or are they general unemployment insurance

 5    benefits.

 6           **MR. HEFFERON:**  That's all forms of unemployment.

 7           **THE COURT:**  All forms.

 8           **MR. HEFFERON:**  Yes, Your Honor.  And also includes

 9    disability benefits, which in California, and it was -- each

10    state is different, in California disability benefits were

11    loaded on the same cards as unemployment.

12           **THE COURT:**  I see.  Okay.  All right.  Thank you.

13      Before I hear further from you, let me just see if there

14    is anything that Plaintiff's counsel would -- do you have any

15    additional information?

16           **MR. MURPHY:**  No, Your Honor.  The review of the

17    docket this morning confirmed what counsel said.  It was taken

18    off the oral argument calendar in January and it's been

19    sitting there gathering dust, weeds.  And I think the only

20    other thing was that they did go to mediation, that's correct.

21    We did mediate it.

22           **THE COURT:**  That was at the preliminary injunction

23    stage, right?

24           **MR. HEFFERON:**  No, Your Honor.  Actually, in the

25    Southern District of California, they have an early mutual

```
 1      evaluation process.
 2              THE COURT:  I see.
 3              MR. HEFFERON:  So we had a discussion pursuant to
 4      that process.  You have it with the magistrate with no
 5      involvement of the district judge.
 6              THE COURT:  Okay.  All right.
 7          Well, thank you all.  Then I'll go ahead and start.  We
 8      have our case here, our Maryland case and I'll be happy to
 9      hear from you on your motion to dismiss.
10              MR. HEFFERON:  Yes, Your Honor.  I thought it might
11      be helpful just to give a little context to make sure that --
12      to avoid any confusion.
13              THE COURT:  Sure.
14              MR. HEFFERON:  But just about how the program
15      worked.  And at some levels some of these details don't matter
16      legally, but I think it's a little helpful to put in some
17      context, and to the extent they are, they are based on what
18      was alleged.
19              THE COURT:  And I'm just going to ask you to keep
20      your voice up.  The end of the sentence is --
21              MR. HEFFERON:  That's usually not a problem for me.
22              THE COURT:  Oh, that's better.  Okay.  Thank you.
23              MR. HEFFERON:  So I'll have no trouble complying
24      with that request, Your Honor.
25              THE COURT:  All right.  Thank you.
```

```
 1            MR. HEFFERON:  So the Maryland Department of Labor,
 2    Division of Unemployment Insurance obviously assesses citizens
 3    for unemployment insurance.  And at this time, at the time
 4    these events occurred, it had two methods to distribute those
 5    benefits.  One was through paper check, and the other one was
 6    to load the money on a Bank of America debit card.
 7            The debit card was what Mr. Mohamed chose and when one
 8    chose the debit card, then Bank of America would mail the
 9    debit card to that individual.  Prior to the choice by the
10    individual recipient, the bank would have no contact with the
11    recipient, that was all done through the DUI.  DUI arranged
12    for the benefits and said, how would you like to get it?
13    Would you like to get a check, or would you like to get a
14    debit card, and Mr. Mohamed selected a debit card and those
15    who did then the bank would mail a package with the card to
16    the recipient.
17            THE COURT:  So DUI had the initial communication
18    with Mr. Mohamed, do you want a check or do you want a debit
19    card?
20            MR. HEFFERON:  That's correct.
21            THE COURT:  And if the answer came back debit card,
22    it gets referred to the bank.
23            MR. HEFFERON:  Yeah, actually, the way it works is
24    the DUI just provides a data file over to Bank of America, and
25    said, here's today's list of people who have selected a debit
```

1    card who don't already have an account, therefore, don't

2    already have a card.

3       As sometimes you already have a card, Mr. Mohamed is an

4    example, sometimes during this period you're unemployed and

5    then you get a new job and then you lose the job again.  So

6    only for people who have not received unemployment if they

7    select a debit card, then they're mailed a debit card by Bank

8    of America.

9       The debit card comes with an account agreement just

10   like, you know, all of us have account agreements with our

11   credit card companies or debit card companies, so the debit

12   card comes along with the account agreement.  The account

13   agreement is attached to the complaint, that's the correct

14   version of the account agreement.

15          **THE COURT:**  Okay.

16          **MR. HEFFERON:**  And that governs the terms and

17   conditions under which the bank and the debit cardholder have

18   their contractural relation.

19       Separately, of course, as you would expect, Bank of

20   America has a contract with DUI, with the State of Maryland

21   for the -- you know, providing debit cards to people who are

22   referred to it by DUI.  The form of contract is attached to

23   the complaint, but it's blank and unsigned, but it does

24   reflect on the front that the contract actually isn't just

25   that document, it includes the RFP and the RFP response which,

9

1    Your Honor -- I mean, that's not an uncommon way that

2    government contracts are done, so that the government doesn't

3    spend a lot of time rewriting all of the terms in order to get

4    the contract, they'll attach the RFP and the RFP response.

5         And so that contract is separate from -- it's between the

6    bank and the state, and it's separate from the contract, the

7    account agreement between the bank and the debit cardholder.

8              THE COURT:  Now, the RFP here was initially entered

9    into in 2013?

10             MR. HEFFERON:  Yes, Your Honor.

11             THE COURT:  And has it changed?  Does it get

12   updated?  Does it get -- what happens to it?

13             MR. HEFFERON:  The original term of the contract, I

14   believe was until 2017, and it was subject to two two-year

15   renewals, which were exercised, and the contract has now

16   concluded.

17        The last that -- Maryland has now gone to provide an

18   option for paper checks or direct deposit.  No more debit

19   cards.

20             THE COURT:  Yeah, and I think that might not have

21   actually happened as of the time of the briefing, but that's

22   done now?

23             MR. HEFFERON:  It's done, yes, Your Honor.  I

24   checked the website yesterday just to confirm, but I also had

25   talked to my client.  And the last loading of the debit card

1    was May of 2021, and the debit cards themselves were

2    deactivated in February of this year.

3                **THE COURT:**  Okay.  And going back to the two-year

4    renewals, I mean, I guess one of the things that you've raised

5    is that the contract between the bank and the state did not

6    require the chip technology?

7         In the course of the renewals, in the course of the state

8    looking at this contract that had been formed by accepting the

9    RFP, I guess, were there any changes that you can think of

10   that are significant to this, or is it simply the same

11   identical contract that was renewed every couple of years?

12               **MR. HEFFERON:**  Your Honor, I --

13               **THE COURT:**  If you know.

14               **MR. HEFFERON:**  Yeah, I don't have complete knowledge

15   of that, but I do know that when the extensions were put in

16   place, they are a single amendment that just says, the parties

17   hereby agree to go forward with the extension.

18               **THE COURT:**  Okay.

19               **MR. HEFFERON:**  And, of course, the existing

20   agreement that is in effect, you know, at the time of the

21   events in question would be, you know, the original form that

22   was attached to the complaint, the RFP, the RFP responses and

23   the amendments.

24               **THE COURT:**  Okay.

25               **MR. HEFFERON:**  So --

```
 1              THE COURT:  Which are the exercise of the renewals?
 2              MR. HEFFERON:  Yes, plus whatever, if there were
 3      other amendments, I'm not aware of any, but...
 4              THE COURT:  Okay.  All right.
 5          Probably therefore not relevant at all but just a
 6      question.
 7              MR. HEFFERON:  Yeah, and I was trying to give
 8      context.  I was -- recognized -- I know when I got involved in
 9      this in similar matters, it was a learning curve about how the
10      process works like most things as Your Honor deals with in
11      cases, it's helpful to understand the background.
12           Two other items of context.  One is the account
13      agreement contains several terms that relate, as they're
14      discussed in the brief, relate to the possibility that someone
15      who has been issued a debit card will experience an
16      unauthorized transaction.  Similar to the kind of protection
17      that, again, probably we all have on our credit cards or debit
18      card.
19          This particular debit card, the bank agreed to a zero
20      liability policy, which meant that if a cardholder experienced
21      an unauthorized transaction, that the bank would make the
22      cardholder whole, which is actually better than federal law if
23      it applied, which has the $50 liability limit.
24          The bank zero liability policy actually makes the person
25      whole, but it does limit consequential damages.  The second
```

1  item of context is, there is discussion, obviously, in the

2  briefs and the complaint about Regulation E.

3      Regulation E is the general provision of federal law.

4  It is the regulation that enacts the Electronic Funds Transfer

5  Act, and administered at this point by the Consumer Financial

6  Protection Bureau.  And it provides the rules of the road for

7  Electronic Funds Transfers.  And now since amendments added

8  this several years ago, prepaid cards.

9      And so it provides, among other things, certain rules

10 about how you make a claim about an unauthorized transaction,

11 so there is a parallel there between the contract and the

12 Regulation E, in any event.

13     So those are the other two items of context if Your Honor

14 doesn't have any other questions or background.

15          **THE COURT:**  No, that's fine.

16          **MR. HEFFERON:**  Your Honor, our perspective as

17 reflected in the briefs is that, you know, the main claim in

18 this case is the claim that Mr. Mohamed made in Count 4 that

19 there was a breach of the account agreement.  That he had a

20 debit card, that there were 14-plus thousand dollars worth of

21 unauthorized transactions, that he had asked the bank to

22 reimburse those transactions, and the bank had not done so and

23 so he brought the lawsuit included among the claims, a claim

24 that he should have been paid that $14,000.

25     As we show in our briefs, and we do include a

1    declaration which is uncontested, after the lawsuit was filed,

2    the -- Mr. Mohamed was made good on that amount, the 14,500,

3    whatever the number was.  And so we argue that his contract

4    claim, his contracts count for breach of the account agreement

5    is moot.  And so there -- that's really the -- it's not the

6    only piece of the contract claim admittedly, but that's what

7    we saw as a central issue in the case.

8         Now, the Plaintiffs do express a worry at the time that,

9    perhaps, well, perhaps something else would happen that was

10   bad or there was a threat of recurrence.  And whatever the

11   legitimacy of that, I'm not going to contest the legitimacy of

12   it, nothing else did happen and the cards are now deactivated.

13   And so that is not a basis for avoiding the mootness.

14        There is another related claim in contract, which was

15   the contention that, well, the bank also breached the contract

16   because it froze his cards.  Under the account agreement, the

17   bank has the contractual right to freeze a card if it

18   suspects, you know, not to say the language, but if it

19   suspects fraudulent activity is occurring in the card.  The

20   language is irregular, unauthorized, or unlawful activities

21   may be involved.  And as the facts -- and we don't believe

22   there is a breach there, because as the facts are laid out by

23   Mr. Mohamed himself, the card was frozen, he was informed of

24   the freeze.  He communicated with the DUI and reauthenticated

25   his identity, confirmed, in fact, he was the right person, and

```
 1      the card was unfrozen.

 2           And so, you know, the -- and there is no contention other

 3      than -- based on any facts anyway that the freeze, you know,

 4      was out of line with what the contract permitted the bank to

 5      do.

 6           And then the last issue that the contract issue and this

 7      is the account agreement contract issue, the last issue that

 8      was raised was funds availability.  The bank receives money

 9      from the state and makes those funds available.  And the

10      contention is that the bank had not made the funds available

11      because it froze the account.  I'm not quite sure that's an

12      account agreement claim, as opposed to a third-party

13      beneficiary claim.  But in any event, you know, in their

14      opposition, the Plaintiff said that they just don't know

15      whether what the bank did breached the funds availability

16      factually and they wanted discovery.  And we, again, don't

17      think that's the proper role of discovery.

18           THE COURT:  Let me go back for a second to the

19      aspect of the contract claim focus on the fact that the

20      account was frozen.  So the breach of contract requires you

21      got to show the contract, you got to show the breach.

22      Hypothetically, if there were some breach on that aspect of

23      it, that the account was wrongfully frozen in some way or in

24      violation of the contract, what, if any damages do you

25      understand to be at issue or what position would you take
```

1    regarding damages?

2    **MR. HEFFERON:**  At a minimum, the damages would have

3    to be those made damages traceable to the freeze, which would

4    require the Plaintiff to allege for that one-month window what

5    consequences arose due solely to the freeze and having been

6    deprived of access to whatever funds were on that account at

7    that time.

8    If there were no funds on that account at that time or a

9    small amount, obviously, that would be quite different than if

10   there were a large amount on the account, presumably.

11   But if the breach froze an account that Mr. Mohamed

12   wasn't using or that had a zero balance, then our position

13   would be there would be no damages and therefore no cause of

14   action.  And the allegations certainly are not specific enough

15   to be that precise, and onto damages and even though

16   Mr. Mohamed, as he alleges, knows the exact window in time

17   that we're talking about.

18   **THE COURT:**  Okay.

19   **MR. HEFFERON:**  So, Your Honor, that's how -- that,

20   sort of, again what we saw as the central claim, and related

21   to that is, of course, Regulation E, which is the Count 1,

22   because there is a lot of overlap.  The allegation in both,

23   that animates both accounts is that you didn't properly assess

24   my claim and pay the $14,000.  And we admit that if Regulation

25   E applies, and if he proves that the bank did not properly

1    assess and pay the claim timely, then there would be, at

2    least, a statutory penalty violation in play for EFTA.  That

3    is for Regulation E.  That is mootness of having ultimately

4    paid cures the contract claim, but if Regulation E applies, we

5    can see it doesn't cure the statutory claim, assuming all of

6    the elements are met, because there is a statutory damage

7    provision there, right.

8         But as we walk the Court through in the complaint, that's

9    going to be in the motion, we believe Regulation E does not

10   apply to the unique -- or the unusual circumstances we have

11   here.  And the circumstances primarily came up because

12   Mr. Mohamed, we believe, and the Plaintiffs don't contest, was

13   a recipient of pandemic unemployment assistance, which was, as

14   Your Honor is probably familiar, a unique program that

15   Congress put in by the CARES Act of late March of 2020, which

16   for the first time provided federal federally-financed

17   unemployment benefits to someone who was not an employee,

18   included an owner of a business like Mr. Mohamed, gig workers,

19   people who were independent contractors, Uber drivers and the

20   like.

21              **THE COURT:**  Let me ask you, and obviously we'll hear

22   from Plaintiff's counsel, but there was a suggestion in the

23   Plaintiff's opposition that Mr. Mohamed might have received

24   regular unemployment benefits, but he was trying to verify

25   that or something with the Department of Labor.

1          Have you, Mr. Hefferon, heard anything to show that these

2     were regular unemployment -- I'm just saying regular, but

3     regular unemployment benefits.

4          **MR. HEFFERON:**  That's actually what people call it,

5     Your Honor, so...

6          **THE COURT:**  Okay.

7          **MR. HEFFERON:**  No, we don't have any indication that

8     he did.  And from his factual allegations, as we pointed out

9     under the Maryland statute, he would, in fact, not be

10    eligible.

11         **THE COURT:**  If they were regular unemployment

12    benefits in that case, you would think that EFTA Regulation E

13    does apply.

14         **MR. HEFFERON:**  I would have to go back and correct

15    the books probably a little bit, Your Honor, on that, but I

16    think that -- I believe the answer and I'll -- subject to

17    check, I guesses, I believe the answer is, yes.  But because

18    the CARES Act was a disaster relief payment, and it was loaded

19    onto a card for Mr. Mohamed, it falls within the exception to

20    the definition of what is a covered account for purposes of

21    Regulation E.

22         **THE COURT:**  Right.  And your position is it does not

23    qualify as a government benefit account?

24         **MR. HEFFERON:**  Yes, Your Honor because the account

25    was not established by the government.  In the definition of

1    government benefits for the account, which is contained in

2    Regulation E, 12 CFR §1005.15 a2 says, a government benefit

3    account means an account, quote, established by a government

4    agency.  And the account was not established by a government

5    agency.

6              **THE COURT:**  Okay.

7              **MR. HEFFERON:**  And, I mean, at one level, Your

8    Honor, it's sort of one of the things that are the Plaintiffs

9    pointed out I wanted to respond to, sort of, generally to.

10   They point out that there was another program that FEMA ran

11   for disaster unemployment.

12        They point out that, you know, disasters are typically

13   short-term events.  And the only observation, I think, that's

14   very important to keep in mind is Congress, when it decided to

15   enact the CARES Act and decided to create this new program,

16   did not decide to append it to the FEMA run pandemic, it's

17   going to be disaster unemployment program, they just created a

18   new program.

19        And so therefore, you know, the congressional choice to

20   do that separately, you know, doesn't -- you know, it means

21   that whatever you can say about the disaster unemployment

22   assistance program that previously existed, that that's

23   irrelevant in our view.  Furthermore, it's irrelevant that

24   many, most in some ways gladly disasters are short-term

25   events.  This one happened to be long, but it must say that in

1   March of 2020 when PUA was invented, there were, most of us,

2   all of us, hoping it was going to be quite a short event.

3   Benefit of hindsight, it obviously was not, is not.  But, you

4   know, again, there is no distinction there between long-term

5   short-term, it's a straightforward application of a

6   definition.  And again, we walked the Court through it and

7   believed that that's why PUA, loaded by itself onto a debit

8   card in this circumstance is not covered by Regulation E

9       Now, again, many of the protections of Regulation E are

10  provided through the account agreement.  And so in a sense,

11  the two claims are, sort of, parallel as I indicated.  And

12  Mr. Mohamed has been made whole and received his $14,400.  So

13  in that sense, you know, although Regulation E does not apply,

14  he received, you know, many of the benefits, at least, that he

15  is claiming under Regulation E.

16      **THE COURT:**  What about the argument, again,

17  Plaintiffs wanting to distinguish this from qualified disaster

18  payments, that it appears to have been treated similarly to

19  regular unemployment benefits, at least in the sense of being

20  subject to taxation by the internal revenue service.

21      **MR. HEFFERON:**  Again, the decision as to whether

22  to -- whether to tax these benefits or not is different from

23  what matters under the definition of account.  Under the

24  definition of account, the question is whether it's a

25  qualified disaster payment, and it was a qualified disaster

1    payment.  And whether Congress, you know, deliberately or in

2    the rush didn't think about what to do about taxability of

3    these particular benefits.  The question here is whether they

4    fall within the within this regulatory definition, and they

5    clearly are disaster benefits.  The president declared the

6    disaster on March 10th.  He declared the disaster for Maryland

7    on March 25th of 2020, and so the payments made under the

8    CARES Act qualify and whether they're taxable and not taxable,

9    we, again, think is not relevant because it's not a

10   distinguishing factor under the regulation.

11        And it would not be, you know, surprising that it was

12   thought of and determined that PUA was going to be quite a

13   significant benefit and was, in many instances, going to

14   people who, you know, owned their own businesses or, you know,

15   were independent contractors and perhaps their -- the thought

16   was that taxability was important to preserve.  It's hard to

17   know.  There is, of course, nothing in the congressional

18   records to tell you those kinds of things.

19            **THE COURT:**  Okay.

20            **MR. HEFFERON:**  So, Your Honor, the -- I think the

21   two claims that, beyond those, that I wanted to focus on, at

22   least briefly, was the third-party beneficiary claim, and the

23   tort claim.

24            **THE COURT:**  Okay.  I think there is a Maryland

25   public information section.

1      **MR. HEFFERON:**  There is.  There is.  I do want to

2   mention that as well as the Maryland Consumer Protection Act

3   claim.  But let me turn to the third-party beneficiary claim.

4   And that's a claim as Your Honor knows, that asserts that

5   Mr. Mohamed can bring a lawsuit as a third-party beneficiary

6   as a contract with the state.

7      And the -- again, first, I would point out and we --

8   that the Court does not have that contract before it.  And so

9   therefore, to the extent Plaintiff even would have some

10  standing to bring such a claim, they haven't stated it because

11  they can't point to the terms of the contract.  They don't,

12  you know, have it and haven't given it to the Court.  But we

13  think the Count 5 -- we think Count 5 dies before we get to

14  that point because there is no plausible theory we believe in

15  which an intent can be found that the state of Maryland and

16  Bank of America intended that every unemployment recipient who

17  received a debit card, would have the right to enforce that

18  state contract.

19     It's a very exacting standard, and the -- essentially as

20  the case is, we cite a number of them, Jaffee, William

21  Burnett.  But the idea is, that in order to support

22  third-party beneficiary status for purposes of bringing a

23  case, the Plaintiff has to show an intent that the promises

24  being made in that contract were actually being made to the

25  third party and both parties agreed the third party could --

 1    intended that the third party could sue to enforce them.  You

 2    need to show both, and we contend neither had shown.

 3        There is nothing here that they pointed to that shows an

 4    intent to make any promises to the third party.

 5        **THE COURT:**  Let me just back up a little bit because

 6    I might have misunderstood some -- let me see.

 7        You said the contract is not in front of the Court, the

 8    contract being the bank --

 9        **MR. HEFFERON:**  Yes, Your Honor.  The account

10    agreement which is the contract is exhibit -- the second

11    exhibit to the complaint, but the state bank contract is not

12    before the Court.

13        **THE COURT:**  So Exhibit 1 contract?

14        **MR. HEFFERON:**  Exhibit 1, that's correct, Your

15    Honor.

16        Exhibit 1 is the form of contract.  You'll notice it's

17    blank, not signed.  The form of contract was included in the

18    RFP when the RFP was issued.  And the -- as you see from the

19    Article 1.1, Article 1, Section 1.1.  It states that the

20    contract shall be this form, plus the RFP, plus the RFP

21    responses, plus ancillary agreements.  And, of course, we also

22    talked about plus amendments.

23        And what the Plaintiff has submitted is the blank form

24    of the base contract.  Has not submitted the RFP, though the

25    Plaintiff has talked about it in the opposition, and has not

1  submitted the RFP response.  And so if the Plaintiff had the

2  ability to sue as a third-party beneficiary of the contract,

3  then in orders to show a breach, the Plaintiff would have to

4  explain what the term of the contract is, but would have to

5  show the Court, and hasn't at this point, because it only put

6  before the Court the blank form of the base contract.

7          **THE COURT:**  Let's assume that they had those other

8  documents, you still are making your argument?

9          **MR. HEFFERON:**  Absolutely, Your Honor.  There is no

10  basis for third-party beneficiary.  Again, the standard

11  requires the Plaintiff to show that Bank of America and the

12  state of Maryland intended that promises in that contract were

13  being made to him or to beneficiaries, cardholders.  And that

14  they intended that cardholders could sue to enforce that state

15  contract.

16      The purpose of the state contract, of course, was to

17  enable the State of Maryland to deliver benefits, to use this

18  as a mechanism.  It wasn't to determine how benefits were

19  awarded, and it wasn't to determine the contractual agreement

20  with -- once the card was issued that, of course, the latter

21  was governed by the account agreement, which is attached.

22      The last point, again, I think it's important to keep in

23  mind is that the cases say this, the third party who is trying

24  to sue as a third-party beneficiary, has to be the primary

25  party in interest.  And we think that's impossible to meet in

1    the case of a government contract.

2         Courts are extremely reluctant as well, to ensure a

3    third-party beneficiary when you're talking about a government

4    contract.  Government contracts are inherently, there is some

5    kind of public policy there, whether it be a zoning board that

6    needs to enforce its own laws for the public good, or in this

7    case, the state of Maryland, which needs to make sure that

8    their distribution of benefits works so that the state, you

9    know -- the state generally benefits and public welfare

10   generally benefits by a free flow of unemployment benefits

11   being paid.

12        The last -- the other point I'd make is what the

13   Plaintiffs are arguing their opposition is that there were

14   provisions in the contract, the state contract which benefited

15   them, and they point to a couple.

16        One provision that talked about security, card security,

17   information security.  Another was customer service, number of

18   hours, you know, when you're open, things like that.  That's

19   not the test for third-party beneficiary, because if that was

20   the test, then anybody who wanted to bring a third-party

21   beneficiary claim would be able to say, well, this

22   subparagraph benefits me, so therefore, I can bring it.

23        The test is whether the parties to the original contract

24   thought the whole contract constituted a promise to the third

25   party, and that's not the case here.

```
 1          The separate point I wanted to make about negligence is
 2    something that, again, is sort of those relatively well
 3    spelled out in the case law.  The assertion is made that the
 4    bank owed a tort duty to Mr. Mohamed to, among other things,
 5    protect his financial records and not allow unauthorized
 6    transactions.
 7          As Your Honor knows, and I saw the Ensor versus Wells
 8    Fargo case that Your Honor had in February of this year,
 9    courts have been, I think the phrasing is, exceedingly
10    reluctant to add tort claims in a contract.  In the Jacques
11    case, spelled out, J-a-c-q-u-e-s, spelled out the standard
12    which is, there needs to be both a contract and something
13    more.  Some sort of additional circumstances showing an intent
14    of the parties to do more, have a different relationship than
15    just the contract.  The only other allegation here of what the
16    something more is, is that the Plaintiff, Mr. Mohamed and
17    others, who received debit cards, were necessitous.  And
18    surely that's the case, we're not contesting that.  Obviously,
19    it's an unemployment program, but that doesn't provide
20    something more, some special circumstances.
21          Again, if that were the case, then Ensor and lots of
22    other mortgage modification cases would come out different,
23    too.  Because those mortgage -- modification cases, and there
24    is a number of them here in this district that show no tort
25    duty to be inferred, are situations where the person is
```

 1    necessitous.

 2         So we don't think there is really any support for the

 3    idea that there is a negligent claim, because all that's being

 4    alleged is that there is a contractual relationship.

 5         Furthermore, there is no plausible theory that even if

 6    there was a claim, a tort duty to protect financial records or

 7    protect the debit cardholder, there is no causation alleged.

 8    The allegation here, Your Honor, is that Mr. Mohamed applied

 9    for the card -- excuse me, applied for benefits, chose the

10    card, and Bank of America mailed the card to him, to his

11    residential address, and it didn't arrive or apparently was

12    stolen, either from the box or from somebody who had access to

13    the mail because somebody used it.  It was used during that

14    period of time.  And Mr. Mohamed says it wasn't him, and as

15    soon as Mr. Mohamed called Bank of America, they shut that

16    card down and sent him a new one to that address and sure

17    enough it got there.  They overnighted it actually and it got

18    there the next day.

19         So to the extent that Mr. Mohamed suffered damages, it

20    was like those cases where the allegation of negligence

21    suffers from a break in the chain that they --

22              THE COURT:  Well, doesn't it come to -- you want to

23    talk more about your understanding of the difference between

24    the chip technology and the magnetic stripe technology?  I

25    mean, I think we don't exactly know what happened to the card.

1    It is certainly a reasonable inference that it may have been

2    taken from the mail.  Somebody got their hands on the card.

3    There were transactions, as I recall, from Maryland to

4    California.  Is it not correct that the magnetic stripe card

5    was more susceptible to that sort of misuse than the chip card

6    would have been, or are you saying it doesn't matter what was

7    in the mail, either card, whether it's the magnetic stripe or

8    the chip, could just as easily have been misused?

9            MR. HEFFERON:  It's the latter, Your Honor.  And I

10   think -- I mean, there is the burden of proof -- a burden of

11   pleading issue here as well, let's start there.

12       The Plaintiff alleges that a magnetic stripe card is

13   inadequate as compared to a chip card because a magnetic

14   stripe card can be skimmed.  And so that if you use it, for

15   example, in the ATM, somebody can pick up the PIN you're

16   entering and, therefore, you know, then create a new card with

17   the same account number, and having skimmed your PIN, go off

18   and, you know, sort of use this cloned card.

19        There is no allegation that the magnetic stripe card is

20   less secure than a chip card when you're talking about someone

21   who intercepts the mail and is an imposter at that point.  The

22   information -- excuse me, the card is delivered to a location

23   and the person grabs it, and to everyone in the world, other

24   than Mr. Mohamed, they think Mr. Mohamed has the card.

25       You know, he's -- you know, he goes and he uses it and

1    it's accepted.  And, you know, Mr. Mohamed hasn't established

2    a PIN, because Mr. Mohamed never got the card.  And so the

3    risk of skimming, that's the only allegation that's made as to

4    what is problematic about these cards, the risk of skimming

5    wouldn't arise.

6         Now, if Mr. Mohamed wants to allege facts, why it was

7    inadequate for the bank to send a magnetic stripe card because

8    if it gets lost in the -- you know, lost in the mailbox, that

9    that was less secure then he could attempt to allege that --

10   he hasn't alleged that.  His concern about chips really has to

11   do with situations where the individual in this case,

12   Mr. Mohamed it would be, but it's not the facts where the

13   individual obtains the card and uses the card in the ATM, then

14   it gets skimmed.  That would be the only factual situation

15   that would put him in a place where he could argue if there

16   was a tort duty, or he could argue that there was causation.

17        And so in our primary argument on this count, which is

18   Count 6, I guess.

19              **THE COURT:**  Uh-huh.

20        **MR. HEFFERON:**  Our primary argument is that there is

21   no duty, and we think that is very compelling in light of the

22   cases.  But the causation argument, we just point out as well.

23        I'll touch on the Consumer Protection Act claim and then

24   talk about the Privacy claim if, Your Honor, would indulge me

25   to do it that way?

```
 1              THE COURT:  Sure.
 2              MR. HEFFERON:  The Consumer Protection Act claim is
 3    Count 3.  And there is an overlap with security, but their
 4    first claim is that there were misrepresentations made about
 5    the product, which I assume was just the card.  And in the
 6    complaint, their allegation is that Bank of America made a
 7    misrepresentation that the card was private and secure, and it
 8    wasn't because it had no chip.
 9         There is no allegation made that Bank of America
10    actually said anything to Mr. Mohamed about that, and that
11    makes sense, of course, because DUI is talking to Mr. Mohamed,
12    not Bank of America, about the card.
13         So there is no allegation of that affirmative
14    misrepresentation.  And so there is a discussion about
15    affirmative misrepresentations in the opposition that arises
16    out of the contact between Mr. Mohamed and Bank of America in
17    connection with the claim, the back and forth about the
18    various letters as Your Honor knows and recalls.
19              THE COURT:  Yes.
20              MR. HEFFERON:  That's not in the complaint.  That's
21    not an allegation in which the CPA claims rests.  And it's not
22    surprising, of course, because that is a consumer class
23    action, and that would never be certifiable.  But in any
24    event, that's not in the complaint.  And so we have some
25    responses to the assertion, but regarding whether those things
```

1    were misrepresentations, but it's beyond the scope of the

2    complaint which really talked about affirmative

3    representations.

4         Also beyond the scope of the complaint is the assertion

5    made in the opposition that there was an omission.  The bank

6    omitted to tell Mr. Mohamed that the card was unsafe and

7    insecure.

8         Again, not pled in the complaint.  And in any event,

9    there is no causation that was alleged in the complaint that

10   would support a claim for an omission, because there is no

11   contact alleged between Bank of America and Mr. Mohamed until

12   after he already chose the card and has the card.

13        So if the bank -- in order to show causation for an

14   omission, one has to show, as Your Honor knows, that it's

15   likely the person would have made a different choice had they

16   known the information omitted.

17        Again, outside of the scope of the complaint because the

18   omission is not alleged, but there is no allegation that the

19   Plaintiff would have done something differently because by the

20   time he did talk to Bank of America, he already had signed up

21   for the debit card.

22        And he -- and so -- and of course, it is also the issue

23   that we raised in our MPA discussion.  There are no damages

24   that are caused by, again, the omission of insecurity because

25   the card was stolen, not misused.  And then, of course, there

 1    is an aspect of the CPA claim that overlaps the Personal

 2    Information Protection Act claim.

 3         And partly because factually they are arguing the same

 4    thing.  One is an unfair deceptive practice and one is a

 5    violation of PIPA.  And also a violation of PIPA is

 6    enforceable as an unfair practice.

 7              **THE COURT:**  Right.

 8              **MR. HEFFERON:**  Under the MCPA.  That's going to be

 9    under the CPA.  The allegation -- there are two claims under

10    the PIPA count, which is Count 2, factual claims.  One has to

11    do with the use of magnetic stripes and not EMV chips.  The

12    second is the bank violated the act by collecting, storing,

13    and transmitting information in an insecure manner.  I'll talk

14    about that one first.

15         As we noted, that's an allegation made on information and

16    belief.  There is no assertion of fact that would support the

17    claim.  The best they do is the quotation paragraph 59A of an

18    unnamed Facebook post, a post by an unnamed person.  And so

19    there is really no basis for any recovery under the PIPA for

20    collecting, storing, and transmitting information, the general

21    comment.

22         So really, what it comes down to is the allegation that

23    the bank violated the PIPA by using magnetic stripes on the

24    cards and not EMV chips.

25              And again, I mean, this is essentially a, per se

1    allegation.  A per se using magnetic strips is a violation of

2    the act, because it is insecure.  And there is no -- there is

3    no support for that, there is no regulatory or other, you know

4    statute or any kind of order requirement that cards be used

5    with chips only, and not magnetic strips.

6        The timing the Plaintiffs allege while the bank uses

7    chips in other cards, but they date that to a period after the

8    Maryland contract already started.  And Maryland did not

9    specify that chips be included with the cards.  And in any

10   event, even if the PIPA claim could survive based upon

11   potential risk, again, there is no causation.

12       In order to have a PIPA claim, because it's enforceable

13   through the Consumer Protection Act, Mr. Mohamed would have to

14   show that the use of a magnetic stripe card, rather than a

15   chip card caused him injury.  And if the card was stolen, and

16   all he alleges is skimming is the risk that was introduced, he

17   can't show that the use of the card -- excuse me, the issuance

18   of the card with that technology was an actionable violation.

19           **THE COURT:**  Okay.

20           **MR. HEFFERON:**  Okay.  If there is nothing else, Your

21   Honor, I think I'll step back.

22           **THE COURT:**  That's absolutely fine for now.

23   Obviously, I'll hear from Mr. Murphy and let me just say we're

24   fine.  I may have to interrupt for a brief conference call at

25   4 o'clock if you're still talking.

1          **MR. MURPHY:**  Yes, Your Honor.

2          **THE COURT:**  But that's fine, I'm happy to hear from

3    --

4          **MR. MURPHY:**  May it please the Court, Judge, may I

5    sit down because I've got my laptop here?

6          **THE COURT:**  You may.  That's absolutely fine.

7          **MR. MURPHY:**  Again, I appreciate the Court's

8    understanding of my travel.  I didn't get a ticket, though.

9       Judge, Mr. Hefferon's account of -- he gave a very

10   detailed account, I guess, a backdrop of everything.  And I

11   don't really have an issue of much of what he said, but there

12   are some things that probably need to be brought to the

13   forefront.  And I wrote down that he discussed that the

14   benefits, there was a choice, between a paper check and the

15   Bank of America debit card.  Not really a choice for the

16   unbanked.

17      The unbanked being people like my client who don't

18   otherwise have access to banking facilities and the government

19   decided to partner up and contract with Bank of America with

20   the purpose of distributing public funds, and it's important

21   because for people who, of lower income folks, they don't have

22   access to banks.  So the choice was not one that my client

23   Mr. Mohamed and other people may have had a choice and it

24   wasn't really a choice.  I think the facts later on may

25   develop that we'll learn more about the choices that were

1    presented to Mr. Mohamed and other people similarly situated.

2    That was my only real comment about that.

3         There was another comment, and I wrote it down because I

4    don't want it to be glossed over.

5              THE COURT:  Let me just interrupt for a second then.

6    If he didn't have a choice, how does that interact with

7    your --

8              MR. MURPHY:  Contract claim?

9              THE COURT:  -- reliance on --

10             MR. MURPHY:  Oh, Judge, it's present there and I

11   know it.  And this is one of these cases that I think one of

12   the reasons why the Court in California and perhaps, Your

13   Honor, I don't want to put myself into your position, is

14   struggling with this is that there is a sense that there is a

15   harm to both Mr. Mohamed and the other people similarly

16   situated by the facts that are presented in the complaint.

17   And in this case, and I value an opportunity to have oral

18   argument in any case in Federal Court, because it's an

19   opportunity for me to look at the Court and tell the Court

20   what our views are.  And also counsel, they did an excellent

21   job in the brief.  When I read the brief, I felt like I was --

22   I felt like myself and my co-counsel, Kat Highland just really

23   missed the boat, and -- but we didn't.  And I'll explain why,

24   because everything hinges on the Electronic Funds Transfer

25   Act.  But I got interrupted -- Judge you --

 1              **THE COURT:**  You had another point.

 2              **MR. MURPHY:**  It was a great point and the great

 3     point was this, is that several years ago the banks got

 4     together and they realized that they wanted to limit exposure

 5     for unauthorized electronic funds transfers.  And, you know,

 6     counsel uses the EMV.  The EMV liability shift occurred

 7     several years ago, so that any merchant taking a card that

 8     just has a mag strip is liable if it's unauthorized use.  And

 9     this is not just the mag strip, it's the information that's

10     contained if you've got the -- if you got a chip.  And it's

11     also verification, validation, calling in to activate it, the

12     PIN number, all of this goes into protecting the person whose

13     money is in that stored value card.

14          And, you know, I've done other unauthorized Electronic

15     Funds Transfer Act cases, one in particular involving public

16     funds for veterans, specifically Vietnam veterans that got

17     money that didn't get money on their cards.

18              So this is important.  And so Judge, I want to get right

19     to the thing that is bringing us to this Court, and we weren't

20     here under CAFA for the Class Action Fairness Act.  We're here

21     because we had a federal claim and the federal claim is under

22     Electronic Funds Transfer Act.  And I can summarize my

23     client's view on this is that, the argument of Bank of America

24     conflates the executive power to declare it of urgency, and

25     the right of Congress to enact rights to benefits because of

1    an emergency.

2        And I'm going to track the statute.  I'm going to track

3    the regs.  I'm going to track the staff interpretation, which

4    we're going to have Chevron deference to.  And the inevitable

5    conclusion is the CARES Act benefits are separate from

6    anything that the president at that time, President Trump

7    declared.  They're related both temporarily, that is at the

8    same time, we all remember that time period.  And it's related

9    also in the fact that there was a definite need to get

10    benefits to people and rapidly.

11        And counsel said something to the effect, and I'm going

12    to paraphrase Mr. Hefferon.  I believe what he said was that

13    they've rushed to do the Act, and they didn't address the tax

14    consequences.

15        We don't have -- the Court doesn't have the role of

16    making interpretations, except what the statute says, and the

17    statute is clear we don't go beyond that.  And I think the

18    statute when we go through it together, we're going to see

19    that the statute supports Electronic Funds Transfer Act claim.

20    And Judge, I'm going to sit down now.

21            **THE COURT:**  Sure.

22            **MR. MURPHY:**  So we start off with the definitions

23    that are contained in the regs.  That's 12 CFR §1005.2.  And I

24    apologize to the court reporter that I sometimes get excited

25    and I speak quickly.  I'm going to ask my co-counsel to kick

```
 1    me if I go too quickly.
 2         So there is a carve-out, and this is something that
 3    we're here today on this.  Is this carve-out for disaster --
 4    qualified disaster relief payments, kick Mr. Mohamed and the
 5    class out of the federal claim?
 6         The definition is an account that is directly or
 7    indirectly established through a third party and loaded with
 8    qualified disaster relief payments.  And everything in -- has
 9    a definition and an interpretation.
10         The official interpretations or Reg E, and we'll get a
11    Chevron deference to this, is that -- and it's under
12    Paragraph 2b3ii.
13              THE COURT:  Okay.  I hate to be lost already, but
14    where -- I've got the Reg 105.6 and -- no, wait a minute.
15    Okay.  1005.2, are we still there?
16              MR. MURPHY:  Yes, ma'am.  We're under 2B account and
17    it's --
18              THE COURT:  Okay.  Fine.
19              MR. MURPHY:  And it's giving us guidance on the
20    definition of the count.
21              THE COURT:  All right.
22              MR. MURPHY:  And it says under subsection --
23    paragraph 2B3ii2.  Excluded disaster relief funds for purposes
24    of Section 1005.2, Subsection B3iiB.
25         Quotation, qualified disaster relief funds means funds
```

1    made available through a qualified disaster relief program as

2    defined under 29 U.S.C. §139 Subsection B.  And in our brief,

3    we talked about the Internal Revenue Code, and all good things

4    come out of the Internal Revenue Code, apparently.

5         We go to the Internal Revenue Code to Section 139 and the

6    subsection is B.  And this is in their brief, in our brief,

7    too, but it wasn't nearly, you know -- when you go look at

8    qualified disaster relief payment defined, it has to be a

9    qualified disaster.  And I just lost my place -- it says, a

10   qualified disaster relief payment defined for purposes of the

11   section, the term qualified disaster relief payment means, and

12   then any payments to the various people below.

13        However, you have to get a definition of qualified

14   disaster relief payment, and it needs to go to qualified

15   disaster and it has to be defined, and that's under Subsection

16   C.  Qualified disaster relief defined.  And under Subsection

17   C2, it's defined -- the term qualified disaster means, under

18   Subsection 2, a federally declared disaster as defined by

19   Section 165i5A.  And that leads us to the definition under

20   26 U.S.C. §165, that's losses.  And it says, a federally

21   declared disaster for purposes of the subsection means, the

22   federally declared disaster means any disaster subsequently

23   determined by the president of the United States to warrant

24   assistance by the federal government under Robert T. Stafford

25   Disaster Relief and Emergency Assistance Act.

1           So I think we're all in agreement that these are the

2      things that control the definition and the exceptions, the

3      carve-outs.  However, if you look at the CARES Act, the

4      enactment of the CARES Act is not connected to the declaration

5      of the federally declared disaster by President Trump.  The

6      words "federally declared disaster" are wholly missing from

7      the CARES Act.  Nowhere is there a definition that -- or even

8      those words.  And this was, in my view, purposeful.  And I

9      don't even need to -- I'll address what I think the purpose is

10     at the end of my argument.  Instead, Congress chose to use the

11     words COVID Public Health Emergency, and that's under

12     subsection -- I pulled it out of the CARES Act.  And it

13     defines what the thing is that we're talking about, why there

14     is money being -- flowing to people like Mr. Mohamed and other

15     similarly situated is because of a COVID-19 public health

16     emergency, and it's defined as the term COVID-19 public health

17     emergency means a public health emergency declared by the

18     secretary of health and human services on January 27, 2022,

19     with respect to the 2019 novel Coronavirus, that is not --

20     that is not the declaration by the president.  It is not

21     connected to it in any way.  And I can go through the balance

22     of this.  My client is a covered person under the CARES Act.

23          There was some discussion in the briefs about whether or

24     not Mr. Mohamed is to be treated the same as an employed

25     person.  He's a self-employed person, and under the Act, a

1    self-employed person is treated as an employed individual.

2        The other thing in the CARES Act that shows that it

3    doesn't have to do anything with declaration is that the PUA

4    period of assistance is not tethered to the declaration.  The

5    dec -- and this was purposeful, I believe, on the part of

6    Congress.  And, again, I think, they just looked at the

7    statute itself.  But the purpose for the CARES Act not being

8    connected to President Trump's declaration is probably very

9    political.  And being that, the determination of when the PUA

10   period of assistance, it's set forth under C and it says --

11   its sentence provided for in Paragraph 2, the assistance

12   authorizes subsection B shall be available to a covered

13   individual, and it gives the time periods from beginning on or

14   after January 27, 2020.  Ending on or before September 6,

15   2021.

16       And below that it says, the limitation, duration

17   assistance.  And they have a termination date unconnected with

18   whatever the declaration that President Trump or whatever

19   president was in office could have made a determination there

20   is no more COVID problem.  And from a -- Congress knew this,

21   and they knew this because they purposely clarified that they

22   meant to separate the CARES Act with anything the president

23   did, and that's shown in Subsection H, which is in relation

24   between pandemic unemployment assistance and disaster

25   employment assistance, and they purposely substituted words,

1   and they substituted COVID public health emergency for major

2   disaster, pandemic for disaster.

3       And this is why the Electronic Funds Transfer Act

4   carve-out that is proffered as being the thing that destroys

5   this federal claim on behalf of Mr. Mohamed and everyone

6   similarly situated, doesn't work.

7        It is very good drafting of an argument, but the

8   argument when you look at it carefully, and we must look at

9   the statute the way it's drafted. And if Congress meant to

10  tie the benefits to that declaration, it would have done so.

11  It did not. And I believe that the -- we have to read the

12  statute as it's written, and also give deference to the

13  interpretation of Reg E, and it really is not much to it.

14      On my review of the case law, there is nothing out there.

15  And I'm not even sure that this is a position being argued

16  that strenuously in the other cases. Counsel can inform the

17  Court as to it.

18      So our view on this is that Electronic Funds Transfer Act

19  applies on its very face, and that we have stated a cause of

20  action for Count 1 not subject to the carve-out. Your Honor,

21  I don't have any further argument with respect to Count 1.

22          **THE COURT:** Oh, well, all right. Let me clarify. I

23  understand or I'm beginning to understand you have a statutory

24  argument. You are not relying on an argument that this is a

25  government benefit card, or are you -- a government benefit

 1    account?

 2              MR. MURPHY:  It is a government benefit account,

 3    but, you know, it's Bank of America's view that they are the

 4    ones that established it.  It's -- I don't think it makes as

 5    much a difference in determination whether the EFTA applies.

 6    And, you know, look if -- I'm going to hammer this in one more

 7    time.  If Congress meant to do that, they would have had the

 8    word "declaration" in the statute, and they didn't.

 9         They made -- Congress made its own determination about an

10    emergency.  There was an emergency, everyone in this room

11    knows there was an emergency, but we have to follow what the

12    -- the statute.  And there were strong political forces as to

13    why they weren't going to tie it to a declaration by the

14    president.

15         And I can't get behind -- judge the legislative history,

16    I can tell you this, it was a mess.  But it wasn't enough

17    where I could bring it to the Court's attention arguing

18    anything because it didn't make -- it wouldn't add anything to

19    this.

20              THE COURT:  Okay.  Go ahead, Count 1.

21              MR. MURPHY:  That's the extent of my argument on

22    Count 1.  Judge, there was so much stuff that was presented by

23    counsel, does it -- both sides, but the EFTA thing is

24    important.  I don't want anything to be lost in the rebuttal.

25    Would the Court consider having the rebuttal now in my

 1     argument so we can move onto the other claims?

 2     If Mr. Hefferon wants to respond to anything at this

 3     particular moment, he may.  Otherwise, we'll...

 4          **MR. HEFFERON:**  Your Honor, maybe -- and I don't have

 5     any problem with what counsel would suggest, but maybe it

 6     actually is good for me to do it on this one in real time

 7     because we're talking about sub sub subsections of various

 8     provisions.

 9          And so our response, and I think we address this in the

10     reply, is that what the Plaintiff's position misses, is that a

11     definition of account, that's what we're talking about is --

12     triggers on whether it is -- there are funds that are quote,

13     loaded exclusively with qualified disaster relief payments.

14          Okay.  So the question -- and it points you to the same

15     section, obviously, that my brother cited, Section 139 of the

16     Internal Revenue Code which defines, qualified disaster relief

17     payments.  And it's defined, and we point this out.  It means,

18     any amount paid to or for the benefit of an individual, and it

19     has four possibilities.  And the fourth one is, if such amount

20     is paid by a federal, state, or local government or agency or

21     instrumentality thereof in connection with a qualified

22     disaster in order to promote the general welfare.

23          So the question is then -- well, the amounts, the PUA

24     amounts, amounts that were paid by a federal or state

25     government, yes.  Were they paid in connection with a

1    qualified disaster?  Yes.  And we'll come back to what's the

2    definition of that.  And were they to promote the general

3    welfare?  Clearly, yes.

4        To go back to the qualified disaster, which is the third

5    element of this is, well, jeez, is qualified disaster defined?

6    Yes, indeed it is, immediately below, Section 139C a qualified

7    disaster is defined to mean, among other things, a Federally

8    declared disaster as defined by Section 165, which runs you to

9    a Section 165, which tells you that among the things that

10   qualified as a disaster is any disaster subsequently

11   determined by the president to warrant assistance by the

12   federal government under the Stafford Disaster Relief Act.

13       So we think that it, therefore, means that since these

14   funds were paid by a federal government in connection with a

15   qualified disaster to promote the general welfare, and

16   therefore, it qualifies as a qualified disaster relief payment

17   and that triggers the exception of the statute.

18           **THE COURT:**  I think I hear Mr. Murphy saying that

19   this is not a disaster determined by the president, that it's

20   independently a public health emergency determined -- as

21   determined by Congress.

22           **MR. MURPHY:**  Yes, Your Honor.

23           **MR. HEFFERON:**  Yes, Your Honor.  The problem with

24   that, Your Honor, is that definition of qualified disaster,

25   which is in the code, refers you to the presidential

1    declaration.  And so that's the problem with the argument.

2    And there is no question that this was a presidential

3    declaration, a disaster as determined by the president and,

4    therefore, is a qualified disaster.  And no question that

5    there was money appropriated and paid onto cards to promote

6    the general welfare in connection with that disaster.

7         So I see at some level, perhaps, the theoretical issue

8    that's being raised here.  But the problem is, the definition

9    do, in fact, trigger off the presidential declaration.  And so

10   the -- whether the CARES Act said, we're appropriating this

11   money because of the presidential declaration or because of

12   the DHS declaration or some other declaration, the health

13   emergency declaration, the fact of the matter is that the

14   definition that tells us whether Reg E applies says, as long

15   as it's tied to a presidential declaration, that triggers the

16   exception.

17        And as long as it's money, it doesn't say money

18   appropriated to -- you know, because of that iteration.  It

19   just says it's any money paid by a federal agency or state

20   agency in connection with the disaster to promote the general

21   welfare.

22             **THE COURT:**  But isn't theoretically the argument

23   then, if it doesn't trigger the exclusion, because it doesn't

24   meet this definition, then it is a prepaid account then it's

25   not excluded, and it's covered under Regulation E?

 1          **MR. HEFFERON:**  Which is -- and our argument is it

 2    does, because as you walk through each of these it triggers

 3    back to ultimately to the Stafford Act declaration by the

 4    president.

 5          And so therefore it is within the definition of -- within

 6    the exclusion, because clearly the money is paid by the

 7    government for the general welfare.  And it's in connection

 8    with a qualified disaster and it was declared by the

 9    president.

10          **THE COURT:**  What does the -- I'm very glad we're

11    having this discussion because I'm not -- so the CARES Act,

12    what does the CARES Act rely on as its authority?

13          What did Congress say we're relying on to make these

14    benefits available?

15          **MR. HEFFERON:**  They created a new provision of the

16    CARES Act -- I mean, of the statutes, the United States

17    statute that says that, you know, we are going to appropriate,

18    you know, $300 million to pay people --

19          **THE COURT:**  Right.

20          **MR. HEFFERON:**  -- unemployment even though they, you

21    know, are self-employed or a gig worker and the like.  So, I

22    mean they're exercising their authority as the legislature to

23    appropriate money, and then they are directing it to -- you

24    know, to the Department of Labor, Federal Department of Labor

25    to distribute it to the states which then did.

```
 1              MR. MURPHY:  May I offer just a surrebuttal on that
 2     just a tiny bit?
 3              THE COURT:  Yes.
 4              MR. MURPHY:  And it was in our brief and my
 5     co-counsel gave me a note, and I agree with her view on this.
 6     And just as an aside, I'm a Floridian, originally, moved to
 7     Charlottesville, and we always got emergency relief after
 8     every hurricane and tornado.
 9          That pot of money is separate and discrete from the money
10     that was established by Congress from its role as the guardian
11     of the purse of this country, a totally different fund, and
12     Congress did not mention anything about the declaration, this
13     goes back to my comment about the politics.
14           It is beyond the compelling force of reason to assume
15     that Congress wanted to, basically, spend what we spent
16     tightening World War II, times five, based on a declaration by
17     the president.  It's beyond force of reason.  And Congress
18     meant to restrict this to what they determined to be the
19     emergency, and the views of Congress as the Court should
20     recall from just being in America at this time, is that there
21     was a view that there wasn't a problem from the executive
22     branch, a different view from the legislative branch, and the
23     extent and duration of that was determined by Congress and its
24     wisdom and its view and the duration of the CARES Act isn't
25     determined on how long the president of the United States
```

1    determined that the COVID problems was going to exist, it

2    would go away by the end of the spring, it did not.

3         And so that's why Congress didn't connect it in any way,

4    shape, or form to the president's declaration.  Now, I'm being

5    emphatic about this as much as counsel is, and I appreciate

6    his argument, but it's not what the statute says.

7         **THE COURT:**  Okay.  All right.  So that's your

8    Count 1 argument, and I guess we're somewhat in agreement in

9    the sense that if EFTA does apply, if the regulation does

10   apply, then there is, at least, the possibility of a statutory

11   remedy for what you're mostly complaining about in Count 1,

12   which is this whole good faith investigation, reasonable

13   basis.

14        **MR. MURPHY:**  Yes, Your Honor.  And not rendered moot

15   by the tender of money after the filing of a lawsuit, the

16   tender of money did not make my client whole to create

17   mootness.

18        He has claims under the EFTA as well as the other class

19   members with statutory claims.  And additionally, the money

20   tendered wasn't the amount of money that would compensate him

21   on a terribly -- for his loss, the financial loss.

22        Count 2, violation of Maryland Personal Information

23   Protection Act.  This Court has had lots of cases under that

24   statute, because the Maryland statute is unique.  Well, it was

25   unique when it was enacted, not so much anymore.  And like I

1    mentioned, this is, I guess, a case for modernity.  We're

2    dealing with issues related to electronic funds transfer,

3    security of information, and public benefits being distributed

4    by private companies, which was not a thing when I got out of

5    law school.

6        Judge, we allege that personal information was lost and

7    given to third parties in that card magnetic strip.  And we

8    believe it included the account number, Mr. Mohamed's name,

9    his Social Security information, the amount of his benefits,

10   and possibly other things that are coming out with that

11   magnetic stripe -- strip.  And that is, under the Maryland

12   Act, what personal information is.

13       They cannot say that this was the equivalent of a cash

14   or -- you know, it's not like it's a $10 bill that was mailed,

15   although in practice it ended up being that way because of the

16   way they didn't protect it, and protect the ability for people

17   to access it, it was just like cash.  And I think that's what

18   I heard.  But the loss of information gives the client, my

19   client, and other similarly situated a claim.  And the recent

20   case, In Re:  Marriott International supports that.  We

21   gave -- we posed the clarity that they used non-secure

22   magnetic stripe, and the technology was unfair and deceptive,

23   and there was a -- and based on the EMV shift liability policy

24   adopted by Bank of America against its own merchants, I think

25   that their position really is hollow.

1          We have stated a cause of action, and the case is out

2     there, and there is a -- the Maryland case cited in our

3     materials In Re:  Rutter's case, Rutter's Incorporated data

4     security breach case, it touched upon the use of magnetic

5     stripes.  So this is a little bit more than that, and perhaps

6     we should go back and replead this.  I view this as being

7     sufficiently pled that their -- the way they handled the data

8     caused a breach of the act.  You know, I --

9          **THE COURT:**  If you could elaborate on that a little

10    bit more because --

11         **MR. MURPHY:**  Well, I started thinking about it,

12    Judge, from preparation for both the briefing and today,

13    potentially we could have added that they didn't have

14    protections that now banks do that protect people from having

15    people pick up something from the mail.  And by the way, I

16    need to bring this point out.  There is -- we don't know what

17    happened to     Mr. Mohamed's card.  We don't know if it was

18    stolen.  We don't know if someone at Bank of America took it,

19    or some vendor that they employed to send it out took it, or

20    they just took the data.

21         All we know is that he and others were harmed by it, and,

22    perhaps, we could replead it, add additional facts with

23    respect to what we believe and contend lead to the problem,

24    and that includes the theft of the verification system.  I

25    mean, how would someone -- is this the equivalent of having a

1   $20 bill mailed to someone in the mail, that's what it sounds

2   like.

3           THE COURT:  Well, and what's the difference between

4   the magnetic stripe and the chip in that regard --

5           MR. MURPHY:  In that regard --

6           THE COURT:  -- what I'm hearing is you can take

7   either one of them into --

8           MR. MURPHY:  That's correct.

9           THE COURT:  -- your bank or your sale place, your

10  store, wherever and use it?

11          MR. MURPHY:  Your Honor, that's true.  But in both

12  instances, there would had to have been verification.  Like

13  you get a credit card in the mail now from Bank of America.  I

14  have one in my wallet, I pull it out.  It's got the chip in

15  it, but in order for me to use it, I got to verify who I am.

16  And this goes back to the unbanked people, how do they verify

17  who they are with Bank of America?

18          THE COURT:  They call up.  I mean, there is a number

19  on the card.

20          MR. MURPHY:  Right.  And they have to have the data

21  to match it.  They have to have the data to match it that my

22  client is Mr. Mohamed, what is your Social Security Number,

23  where do you live?  What's your date of birth?

24      Do you call in?  There is no real relationship between

25  these people.  This is why this is important.

52

1          **THE COURT:**  Well, again, we're getting way outside

2     of anything that's pled in the complaint, I suppose.  But I

3     get a credit card in the mail, it has a number for me to call,

4     I call.  They say, you're authorized.  That's great.  I mean,

5     I don't remember being asked for my Social Security Number.

6          **MR. MURPHY:**  Your Honor, that's true.  They

7     typically will pair that with your phone.  They typically will

8     pair with your cell phone or your landline, whatever they

9     associate with you, they can identify who you are by this, and

10    that's why in instances of people who are unbanked, and they

11    also use throwaway phones.  I'm very familiar with the

12    problems of the people in the lower income groups, and that's

13    why they expose Mr. Mohamed and others to harm by having this

14    data go out.  And the data also included what my client is

15    owed, his money.  That money is data.  The amount that he is

16    -- the money on that credit card is data.  And if they had

17    done the things that they needed to do to protect it, we would

18    not be here today.

19         And so our view is that we pled, and, perhaps, I need to

20    add additional facts to it, Judge, I'm not perfect.  Judge,

21    with respect to Count 3, which is the American Consumer

22    Protection Act --

23          **THE COURT:**  Yes.

24          **MR. MURPHY:**  -- what happened here to Mr. Mohamed

25    and others similarly situated is something that our friends

1    CAFA novel in terms of being unable to actually get an answer

2    to the question about, where is my money.  And then when they

3    get the answer, oh, it's not fraudulent, but they don't get

4    their money, and there is no way for them to get their money.

5    And it took a lawsuit, I think we're all in agreement, to get

6    the money.  That is the basis of our claim under the Maryland

7    Consumer Protection Act.

8            THE COURT:  Where is that alleged in the complaint?

9            MR. MURPHY:  Oh, Judge, it's --

10           THE COURT:  I mean, I've got Count 3.  I read that

11   as essentially coming back to a representation that the card

12   was private and secure when it was not.

13           MR. MURPHY:  Judge, in all candor, when we were

14   working on the response to, we considered filing an amended

15   complaint, and we did not.  Our view is that we needed to

16   address the federal claim and get it done with, because we

17   would not be in this federal court without that federal claim.

18       Judge, it may be necessary for us to replead it, if we

19   can and --

20           THE COURT:  Okay.

21           MR. MURPHY:  Judge, the breach of contract claims,

22   counsel provided a very good argument with respect to Count 4,

23   the two counts that are separate.  One is direct contract

24   under the cardholder agreement, and the second is under the

25   contract with the state.  Our view is that under a breach of

54

 1    contract claim, I think, most of the argument is that our
 2    claim is moot because they gave us some money.
 3        To the extent that that is their argument, our view is
 4    that it is not moot because they didn't pay the full amount of
 5    what he's owed, they tendered what they considered to be what
 6    he is owed.  And secondly, we're connecting, obviously, the
 7    Electronic Funds Transfer Act claim, by virtue of the fact
 8    that the contract talked about that they were going to comply
 9    with the reg, and they did not.
10        And with respect to the breach of contract claim --
11            THE COURT:  Before you leave Count 4, what is the
12    source of your argument that he would be entitled to more than
13    the full amount of benefits that was on the card?
14            MR. MURPHY:  Well, Judge, in all candor, it relates
15    to the consequential damages and the view that he's entitled
16    to money for not having the ability to pay his rent, to pay
17    things like his car payment, to pay for his children's food.
18    And I am -- I see your face, Judge, and I -- I don't want to
19    be the spear catcher in this one, but in all candor if their
20    argument that those are consequential damages don't flow from
21    breach of contract claim, they have a valid point, perhaps.
22        I don't want to use my currency on claims I don't feel
23    that strongly about, Judge.
24            THE COURT:  Okay.
25            MR. MURPHY:  I think from the hearing yesterday, I

1    try to be as transparent as glass.  Our view of this case, is

2    it's going to be, if it goes forward as a class action, it's

3    going to go forward on the statutory claims, perhaps under the

4    negligence claim, Judge.  And the negligence claim is that

5    there is a duty to protect people's loss of money.  And at the

6    pleading stage, I think we stated a cause of action on behalf

7    of the class members.

8        I did want to just go back to the third-party

9    beneficiary.  I jumped ahead there.  And I wrote down what

10   counsel said, that there are no cases that deal with the

11   ability for a person receiving public benefits or benefits

12   from the government, to rely upon the contract between the

13   government entity and the business.  And there is not much

14   there, and the reason is, is that this entry of businesses

15   into handing out money and holding money and distributing

16   money into as recent as the last two decades, and they

17   outsource it to businesses, and these businesses, in this

18   case, Bank of America, didn't do a very good job on it.

19       And our view is that we -- our client, and those like

20   him, were the beneficiaries of this contract because they did

21   talk about what they were to be expecting in terms of the

22   guaranteed multilingual toll free customer services from their

23   own contract.  And the account freeze practices.

24       Counsel made an issue that we don't have the contract

25   attached to the complaint, well, that's true, that was the

1   best we could get.  But my view is that the public was

2   supposed to be the beneficiary of the contract, and they

3   didn't get the benefit of the contract.

4        Judge, I don't really have a lot more argument.  The

5   common law claims, in all candor, are there because there will

6   not be relief to the class.  There won't be relief to

7   Mr. Mohamed to make him whole, if his Electronic Funds

8   Transfer Act fails.  And there has to be a remedy.  The courts

9   were made to give remedies to persons like Mr. Mohamed and

10  others similarly situated.  And our view is that that's under

11  the statutory claims, and this -- these additional claims are

12  to, kind of, emphasize how the common law didn't protect

13  people.

14       And Judge, that's the extent of my argument.  And counsel

15  did an excellent job with presenting the bank's case, but I

16  think that the EFTA claim is strong and should survive this

17  motion.

18            **THE COURT:**  Okay.  I appreciate it, I certainly

19  agree that it seems, kind of, fundamental the first thing to

20  decide is this EFTA and whether the Regulation E applies or

21  does not.  And then we may or may not get to an issue of

22  pleading, repleading and some counts surviving and some counts

23  not, but the statutory interpretation in Count 1 certainly

24  seems fundamental.

25       Mr. Hefferon?

```
 1              MR. HEFFERON:  Your Honor, if I may.  We certainly
 2     agree that's an important claim, and all of them are
 3     important.  I would make one observation -- two observations.
 4     The first is, as indicated, the contract does not -- you know,
 5     the contract is, sort of, in parallel with Regulation E.  It
 6     says, it will do these things that are, in fact, consistent
 7     with Regulation E.  That, of course, doesn't mean you could
 8     sue under Regulation E for breach of the contract, but that
 9     also means that it's not -- you know, we would definitely take
10     issue with the concept that, you know, people will not get a
11     remedy if the statutory claim does not survive because of that
12     parallel between the contract and the --
13              THE COURT:  It's just a more limited remedy in
14     Mr. Murphy's case?
15              MR. HEFFERON:  It's a more limited remedy, that's
16     true.  I mean, undeniably, I know consequential damages is an
17     element of that and not the only element.
18          Given the fact that I responded on that count, I won't
19     say anything more.  And generally, I would just -- in response
20     to my brother's comments, I just make one observation and
21     that's really -- I think you've heard plenty today and the
22     briefs, I think, on both sides are pretty well done.
23          The idea, though, I can't let go about negligence that
24     the assertion somehow is that the negligence claim might
25     survive because the bank has a duty to protect people's money.
```

1    And, you know, I understand -- you know, I understand that,
2    you know, reaction or that hope, but that would, obviously, do
3    quite a lot of violence to the precedence, as well as to the
4    contractual relationship between banks and depositors, or
5    banks and those who they work with in the debit card or credit
6    card relationship or whatever.
7        The contract is -- the account agreement is pretty long
8    actually, and it says what the bank will and won't do.  It
9    provides certain restrictions, some of which are undeniably
10   for the protection of people like Mr. Mohamed.  Like the
11   ability to freeze cards.  And we all experience, and this
12   happens with debit cards as well that, you know, there is a
13   suspicious transaction, and your card gets blocked, and you
14   call up and say, okay, I just want to make sure it's you,
15   because you don't normally, you know, spend this kind of money
16   at Home Depot or, you know, in Newport News, because you --
17   every other expenditure has been within ten miles of where you
18   live.
19       So, you know, there is a lot of protection that the bank
20   has agreed to and that, you know, does benefit consumers.  But
21   we would strongly urge the Court, I don't even think those are
22   the allegations, but strongly urge the Court not to find the
23   bank has some kind of generalized duty to protect money on --
24   in deposit accounts or, obviously, in this case on a debit
25   card.

 1          Thank you.

 2              THE COURT:  Thank you.  I guess one last question,

 3      and this is down the road, if at all.

 4          In terms of the class that you see your client

 5      representing, are you talking about folks that got the

 6      pandemic unemployment benefits?

 7          Are you talking about anybody that got an unemployment --

 8      including regular unemployment -- debit card from the Bank of

 9      America through the state of Maryland wanting to give them

10      unemployment?

11              MR. MURPHY:  Your Honor, --

12              THE COURT:  You don't have to answer that if you're

13      not ready to --

14              MR. MURPHY:  -- I actually have thought about that,

15      because my view is that once you get over this -- the

16      carve-out, the pandemic carve-out, the disaster carve-out was

17      something that we saw when they presented it to us.  The way

18      we define the class is basically anyone who has had their

19      benefits taken.  And I think that's the definition in the

20      complaint, and they chose to challenge it based on the

21      carve-out.

22          And this is going to be a fairly -- Judge, if the court

23      denies the motion as to the EFTA claim, this is going to be a

24      very straightforward case, not a lot of moving parts in my

25      view and experience on it.  And my view is that we'll probably

```
 1   get a fairly good size class of people who have had their
 2   stored value cards, prepaid cards, whatever you want to call
 3   it, taken and impaired.
 4       I know I'm not very ambitious in my cases, Judge.  I try
 5   to view these things for what they are, and this is one where
 6   I feel very strongly about the harm to the class.  So I think
 7   the definition in what we have in the complaint is what we're
 8   going to go on now, I don't anticipate changing it, although I
 9   do have new co-counsel who has stronger views on things.
10       Judge, I apologize, we were supposed to have my other
11   co-counsels here, too, they were also unable to attend, and I
12   was the closest with a car, so...
13           THE COURT:  All right.  Excuse me, well, thank you,
14   again, just in case Mr. Hefferon was wondering.  You referred
15   to a hearing yesterday, that one was a conference call by
16   phone in an unrelated consumer case.
17           MR. HEFFERON:  That didn't worry me, Your Honor.
18           THE COURT:  No, no, no, just as a matter of
19   interest, so two arguments, so to speak, in two days.
20           MR. MURPHY:  I have not had two hearings with the
21   same federal judge in two days in quite some time.
22           THE COURT:  Well, thank you all.  I really do
23   appreciate the time and the effort to come here and to be here
24   in person, and do let me know if the Court in California
25   decides anything in the next couple of weeks.  I won't wait
```

1    for them.

2              **MR. MURPHY:**  Thank you, Your Honor.

3              **MR. HEFFERON:**  Thank you, Your Honor.

4              **THE COURT:**  Thank you.

5              **THE CLERK:**  All rise.  Court stands adjourned.

6         (At 3:53 p.m., the hearing concluded.)

## $

**$10** [1] - 49:14
**$14,000** [2] - 12:24, 15:24
**$14,400** [1] - 19:12
**$20** [1] - 51:1
**$300** [1] - 46:18
**$50** [1] - 11:23

## 1

**1** [12] - 15:21, 22:13, 22:14, 22:16, 22:19, 41:20, 41:21, 42:20, 42:22, 48:8, 48:11, 56:23
**1.1** [2] - 22:19
**1005.2** [2] - 37:15, 37:24
**101** [1] - 1:23
**105.6** [1] - 37:14
**10th** [1] - 20:6
**12** [3] - 4:17, 18:2, 36:23
**139** [2] - 38:5, 43:15
**139C** [1] - 44:6
**14,500** [1] - 13:2
**14-plus** [1] - 12:20
**165** [2] - 44:8, 44:9
**165i5A** [1] - 38:19

## 2

**2** [4] - 31:10, 38:18, 40:11, 48:22
**2013** [1] - 9:9
**2017** [1] - 9:14
**2019** [1] - 39:19
**2020** [4] - 16:15, 19:1, 20:7, 40:14
**2021** [2] - 10:1, 40:15
**2022** [2] - 1:8, 39:18
**21201** [1] - 1:24
**25th** [1] - 20:7
**26** [1] - 38:20
**27** [2] - 39:18, 40:14
**29** [1] - 38:2
**2:21** [1] - 2:2
**2B** [1] - 37:16
**2b3ii** [1] - 37:12
**2B3ii2** [1] - 37:23

## 3

**3** [3] - 29:3, 52:21, 53:10
**3:53** [1] - 61:6

## 4

**4** [4] - 12:18, 32:25, 53:22, 54:11
**4th** [1] - 1:23

## 5

**5** [2] - 21:13
**59A** [1] - 31:17

## 6

**6** [2] - 28:18, 40:14

## 9

**9** [1] - 1:8

## A

**a2** [1] - 18:2
**ability** [5] - 23:2, 49:16, 54:16, 55:11, 58:11
**able** [1] - 24:21
**absolutely** [3] - 23:9, 32:22, 33:6
**accepted** [1] - 28:1
**accepting** [1] - 10:8
**access** [5] - 15:6, 26:12, 33:18, 33:22, 49:17
**account** [44] - 8:1, 8:9, 8:10, 8:12, 8:14, 9:7, 11:12, 12:19, 13:4, 13:16, 14:7, 14:11, 14:12, 14:20, 14:23, 15:6, 15:8, 15:10, 15:11, 17:20, 17:23, 17:24, 18:1, 18:3, 18:4, 19:10, 19:23, 19:24, 22:9, 23:21, 27:17, 33:9, 33:10, 37:6, 37:16, 42:1, 42:2, 43:11, 45:24, 49:8, 55:23, 58:7
**accounts** [2] - 15:23, 58:24
**Act** [42] - 12:5, 16:15, 17:18, 18:15, 20:8, 21:2, 28:23, 29:2, 31:2, 32:13, 34:25, 36:5, 36:13, 36:19, 38:25, 39:3, 39:4, 39:7, 39:12, 39:22, 39:25, 40:2, 40:7, 40:22, 41:3, 41:18, 44:12, 45:10, 46:3,
46:11, 46:12, 46:16, 47:24, 48:23, 49:12, 52:22, 53:7, 54:7, 56:8
**act** [3] - 31:12, 32:2, 50:8
**Action** [1] - 35:20
**action** [6] - 15:14, 29:23, 41:20, 50:1, 55:2, 55:6
**actionable** [1] - 32:18
**activate** [1] - 35:11
**activities** [1] - 13:20
**activity** [1] - 13:19
**add** [4] - 25:10, 42:18, 50:22, 52:20
**added** [3] - 4:19, 12:7, 50:13
**additional** [5] - 5:15, 25:13, 50:22, 52:20, 56:11
**additionally** [1] - 48:19
**address** [6] - 26:11, 26:16, 36:13, 39:9, 43:9, 53:16
**adjourned** [1] - 61:5
**administered** [1] - 12:5
**admit** [1] - 15:24
**admittedly** [1] - 13:6
**adopted** [1] - 49:24
**afternoon** [2] - 2:3, 2:10
**agency** [5] - 18:4, 18:5, 43:20, 45:19, 45:20
**ago** [3] - 12:8, 35:3, 35:7
**agree** [4] - 10:17, 47:5, 56:19, 57:2
**agreed** [2] - 11:19, 21:25, 58:20
**agreement** [21] - 8:9, 8:12, 8:13, 8:14, 9:7, 10:20, 11:13, 12:19, 13:4, 13:16, 14:7, 14:12, 19:10, 22:10, 23:19, 23:21, 39:1, 48:8, 53:5, 53:24, 58:7
**agreements** [2] - 8:10, 22:11
**ahead** [3] - 6:7, 42:20, 55:9
**allegation** [15] - 15:22, 25:15, 26:8, 26:20, 27:19, 28:3, 29:6, 29:9, 29:13, 29:21, 30:18, 31:9, 31:15,
31:22, 32:1
**allegations** [3] - 15:14, 17:8, 58:22
**allege** [5] - 15:4, 28:6, 28:9, 32:6, 49:6
**alleged** [8] - 6:18, 26:4, 26:7, 28:10, 30:9, 30:11, 30:18, 53:8
**alleges** [3] - 15:16, 27:12, 32:16
**allow** [1] - 25:5
**ambitious** [1] - 60:4
**amended** [1] - 53:14
**amendment** [1] - 10:16
**amendments** [4] - 10:23, 11:3, 12:7, 22:22
**AMERICA** [1] - 1:5
**America** [26] - 2:6, 7:6, 7:8, 7:24, 8:8, 8:20, 21:16, 23:11, 26:10, 26:15, 29:6, 29:9, 29:12, 29:16, 30:11, 30:20, 33:15, 33:19, 35:23, 47:20, 49:24, 50:18, 51:13, 51:17, 55:18, 59:9
**America's** [1] - 42:3
**American** [1] - 52:21
**amount** [10] - 13:2, 15:9, 15:10, 43:18, 43:19, 48:20, 49:9, 52:15, 54:4, 54:13
**amounts** [3] - 43:23, 43:24
**ancillary** [1] - 22:21
**animates** [1] - 15:23
**answer** [6] - 7:21, 17:16, 17:17, 53:1, 53:3, 59:12
**anticipate** [1] - 60:8
**anyway** [2] - 3:7, 14:3
**apologize** [2] - 36:24, 60:10
**append** [1] - 18:16
**application** [1] - 19:5
**applied** [3] - 11:23, 26:8, 26:9
**applies** [6] - 15:25, 16:4, 41:19, 42:5, 45:14, 56:20
**apply** [5] - 16:10, 17:13, 19:13, 48:9, 48:10
**appreciate** [5] - 2:23, 33:7, 48:5, 56:18, 60:23
**appropriate** [2] -
46:17, 46:23
**appropriated** [2] - 45:5, 45:18
**appropriating** [1] - 45:10
**argue** [3] - 13:3, 28:15, 28:16
**argued** [1] - 41:15
**arguing** [3] - 24:13, 31:3, 42:17
**argument** [29] - 4:7, 5:18, 19:16, 23:8, 28:17, 28:20, 28:22, 34:18, 35:23, 39:10, 41:7, 41:8, 41:21, 41:24, 42:21, 43:1, 45:1, 45:22, 46:1, 48:6, 48:8, 53:22, 54:1, 54:3, 54:12, 54:20, 56:4, 56:14
**arguments** [1] - 60:19
**arise** [1] - 28:5
**arises** [1] - 29:15
**arose** [1] - 15:5
**arranged** [1] - 7:11
**arrive** [1] - 26:11
**Article** [2] - 22:19
**aside** [1] - 47:6
**aspect** [3] - 14:19, 14:22, 31:1
**assertion** [5] - 25:3, 29:25, 30:4, 31:16, 57:24
**asserts** [1] - 21:4
**assess** [2] - 15:23, 16:1
**assesses** [1] - 7:2
**Assistance** [1] - 38:25
**assistance** [10] - 16:13, 18:22, 38:24, 40:4, 40:10, 40:11, 40:17, 40:24, 40:25, 44:11
**associate** [1] - 52:9
**assume** [3] - 23:7, 29:5, 47:14
**assuming** [1] - 16:5
**ATM** [2] - 27:15, 28:13
**attach** [1] - 9:4
**attached** [5] - 8:13, 8:22, 10:22, 23:21, 55:25
**attempt** [1] - 28:9
**attend** [1] - 60:11
**attention** [1] - 42:17
**attorney** [1] - 2:10
**authority** [2] - 46:12, 46:22
**authorized** [1] - 52:4
**authorizes** [1] - 40:12

**availability** [2] - 14:8, 14:15
**available** [5] - 14:9, 14:10, 38:1, 40:12, 46:14
**avoid** [1] - 6:12
**avoiding** [1] - 13:13
**awarded** [1] - 23:19
**aware** [1] - 11:3

**B**

**B3iiB** [1] - 37:24
**backdrop** [1] - 33:10
**background** [2] - 11:11, 12:14
**bad** [1] - 13:10
**balance** [2] - 15:12, 39:21
**BALTIMORE** [1] - 1:9
**Baltimore** [1] - 1:24
**Bank** [26] - 2:6, 7:6, 7:8, 7:24, 8:7, 8:19, 21:16, 23:11, 26:10, 26:15, 29:6, 29:9, 29:12, 29:16, 30:11, 30:20, 33:15, 33:19, 35:23, 42:3, 49:24, 50:18, 51:13, 51:17, 55:18, 59:8
**BANK** [1] - 1:5
**bank** [33] - 7:10, 7:15, 7:22, 8:17, 9:6, 9:7, 10:5, 11:19, 11:21, 11:24, 12:21, 12:22, 13:15, 13:17, 14:4, 14:8, 14:10, 14:15, 15:25, 22:8, 22:11, 25:4, 28:7, 30:5, 30:13, 31:12, 31:23, 32:6, 51:9, 57:25, 58:8, 58:19, 58:23
**bank's** [1] - 56:15
**banking** [1] - 33:18
**banks** [5] - 33:22, 35:3, 50:14, 58:4, 58:5
**base** [2] - 22:24, 23:6
**based** [6] - 6:17, 14:3, 32:10, 47:16, 49:23, 59:20
**basis** [5] - 13:13, 23:10, 31:19, 48:13, 53:6
**became** [1] - 4:1
**BEFORE** [1] - 1:7
**beginning** [2] - 40:13, 41:23
**behalf** [6] - 2:11, 2:12, 2:13, 2:16, 41:5,

55:6
**behind** [1] - 42:15
**belief** [1] - 31:16
**below** [3] - 38:12, 40:16, 44:6
**beneficiaries** [2] - 23:13, 55:20
**beneficiary** [13] - 14:13, 20:22, 21:3, 21:5, 21:22, 23:2, 23:10, 23:24, 24:3, 24:19, 24:21, 55:9, 56:2
**benefit** [11] - 3:10, 17:23, 18:2, 19:3, 20:13, 41:25, 42:2, 43:18, 56:3, 58:20
**benefited** [1] - 24:14
**benefits** [36] - 5:5, 5:9, 5:10, 7:5, 7:12, 16:17, 16:24, 17:3, 17:12, 18:1, 19:14, 19:19, 19:22, 20:3, 20:5, 23:17, 23:18, 24:8, 24:9, 24:10, 24:22, 26:9, 33:14, 35:25, 36:5, 36:10, 41:10, 46:14, 49:3, 49:9, 54:13, 55:11, 59:6, 59:19
**best** [2] - 31:17, 56:1
**better** [2] - 6:22, 11:22
**between** [15] - 9:5, 9:7, 10:5, 12:11, 19:4, 26:23, 29:16, 30:11, 33:14, 40:24, 51:3, 51:24, 55:12, 57:12, 58:4
**beyond** [6] - 20:21, 30:1, 30:4, 36:17, 47:14, 47:17
**bill** [2] - 49:14, 51:1
**birth** [1] - 51:23
**bit** [5] - 17:15, 22:5, 47:2, 50:5, 50:10
**BLAKE** [1] - 1:7
**blank** [4] - 8:23, 22:17, 22:23, 23:6
**blocked** [1] - 58:13
**board** [1] - 24:5
**boat** [1] - 34:23
**books** [1] - 17:15
**box** [1] - 26:12
**branch** [1] - 47:22
**breach** [15] - 12:19, 13:4, 13:22, 14:20, 14:21, 14:22, 15:11, 23:3, 50:4, 50:8, 53:21, 53:25, 54:10, 54:21, 57:8

**breached** [2] - 13:15, 14:15
**break** [1] - 26:21
**breaking** [1] - 3:3
**brief** [8] - 11:14, 32:24, 34:21, 38:2, 38:6, 47:4
**briefed** [1] - 4:6
**briefing** [1] - 9:21, 50:12
**briefly** [1] - 20:22
**briefs** [5] - 12:2, 12:17, 12:25, 39:23, 57:22
**bring** [6] - 21:5, 21:10, 24:20, 24:22, 42:17, 50:16
**bringing** [2] - 21:22, 35:19
**brother** [1] - 43:15
**brother's** [1] - 57:20
**brought** [2] - 12:23, 33:12
**burden** [2] - 27:10
**Bureau** [1] - 12:6
**Burnett** [1] - 21:21
**Burns** [1] - 4:4
**business** [2] - 16:18, 55:13
**businesses** [4] - 20:14, 55:14, 55:17
**but..** [1] - 11:3

**C**

**C2** [1] - 38:17
**CAFA** [2] - 35:20, 53:1
**calendar** [1] - 5:18
**California** [15] - 3:15, 3:17, 3:18, 3:23, 4:14, 4:20, 4:21, 4:22, 5:1, 5:9, 5:10, 5:25, 27:4, 34:12, 60:24
**cancelled** [1] - 4:7
**candor** [4] - 53:13, 54:14, 54:19, 56:5
**cannot** [1] - 49:13
**car** [2] - 54:17, 60:12
**card** [84] - 7:6, 7:7, 7:8, 7:9, 7:14, 7:15, 7:19, 7:21, 8:1, 8:2, 8:3, 8:7, 8:9, 8:11, 8:12, 9:25, 11:15, 11:18, 11:19, 12:20, 13:17, 13:19, 13:23, 14:1, 17:19, 19:8, 21:17, 23:20, 24:16, 26:9, 26:10, 26:16, 26:25, 27:2, 27:4,

27:5, 27:7, 27:12, 27:13, 27:14, 27:16, 27:18, 27:19, 27:20, 27:22, 27:24, 28:2, 28:7, 28:13, 29:5, 29:7, 29:12, 30:6, 30:12, 30:21, 30:25, 32:14, 32:15, 32:17, 32:18, 33:15, 35:7, 35:13, 41:25, 49:7, 50:17, 51:13, 51:19, 52:3, 52:16, 53:11, 54:13, 58:5, 58:6, 58:13, 58:25, 59:8
**cardholder** [6] - 8:17, 9:7, 11:20, 11:22, 26:7, 53:24
**cardholders** [2] - 23:13, 23:14
**cards** [20] - 5:11, 8:21, 9:19, 10:1, 11:17, 12:8, 13:12, 13:16, 25:17, 28:4, 31:24, 32:4, 32:7, 32:9, 35:17, 45:5, 58:11, 58:12, 60:2
**carefully** [1] - 41:8
**CARES** [18] - 16:15, 17:18, 18:15, 20:8, 36:5, 39:3, 39:4, 39:7, 39:12, 39:22, 40:2, 40:7, 40:22, 45:10, 46:11, 46:12, 46:16, 47:24
**carve** [9] - 37:2, 37:3, 39:3, 41:4, 41:20, 59:16, 59:21
**carve-out** [8] - 37:2, 37:3, 41:4, 41:20, 59:16, 59:21
**carve-outs** [1] - 39:3
**case** [40] - 2:4, 3:15, 3:19, 3:23, 3:24, 4:2, 5:3, 6:8, 12:18, 13:7, 17:12, 21:20, 21:23, 24:1, 24:7, 24:25, 25:3, 25:8, 25:11, 25:18, 25:21, 28:11, 34:17, 34:18, 41:14, 49:1, 49:20, 50:1, 50:2, 50:3, 50:4, 55:1, 55:18, 56:15, 57:14, 58:24, 59:24, 60:14, 60:16
**CASE** [1] - 1:4
**cases** [17] - 3:11, 3:17, 4:18, 4:24, 11:11, 23:23, 25:22, 25:23, 26:20, 28:22, 34:11, 35:15, 41:16, 48:23,

55:10, 60:4
**cash** [2] - 49:13, 49:17
**catcher** [1] - 54:19
**CATHERINE** [1] - 1:7
**causation** [6] - 26:7, 28:16, 28:22, 30:9, 30:13, 32:11
**caused** [3] - 30:24, 32:15, 50:8
**CCB-21-01283** [2] - 1:4, 2:6
**cell** [1] - 52:8
**central** [2] - 13:7, 15:20
**certain** [2] - 12:9, 58:9
**certainly** [5] - 15:14, 27:1, 56:18, 56:23, 57:1
**certifiable** [1] - 29:23
**CFR** [2] - 18:2, 36:23
**chain** [1] - 26:21
**challenge** [1] - 59:20
**chance** [2] - 2:24, 3:10
**changed** [1] - 9:11
**changes** [1] - 10:9
**changing** [1] - 60:8
**Charlottesville** [1] - 47:7
**check** [5] - 7:5, 7:13, 7:18, 17:17, 33:14
**checked** [1] - 9:24
**checks** [1] - 9:18
**Chevron** [2] - 36:4, 37:11
**children's** [1] - 54:17
**chip** [11] - 10:6, 26:24, 27:5, 27:8, 27:13, 27:20, 29:8, 32:15, 35:10, 51:4, 51:14
**chips** [6] - 28:10, 31:11, 31:24, 32:5, 32:7, 32:9
**choice** [9] - 7:9, 18:19, 30:15, 33:14, 33:15, 33:22, 33:23, 33:24, 34:6
**choices** [1] - 33:25
**chose** [6] - 7:7, 7:8, 26:9, 30:12, 39:10, 59:20
**circumstance** [1] - 19:8
**circumstances** [4] - 16:10, 16:11, 25:13, 25:20
**cite** [1] - 21:20
**cited** [2] - 43:15, 50:2
**citizens** [1] - 7:2
**Civil** [1] - 2:6
**claim** [57] - 12:10,

12:17, 12:18, 12:23, 13:4, 13:6, 13:14, 14:12, 14:13, 14:19, 15:20, 15:24, 16:1, 16:4, 16:5, 20:22, 20:23, 21:3, 21:4, 21:10, 24:21, 26:3, 26:6, 28:23, 28:24, 29:2, 29:4, 29:17, 30:10, 31:1, 31:2, 31:17, 32:10, 32:12, 34:8, 35:21, 36:19, 37:5, 41:5, 49:19, 53:6, 53:16, 53:17, 54:1, 54:2, 54:7, 54:10, 54:21, 55:4, 56:16, 57:2, 57:11, 57:24, 59:23
**claiming** [1] - 19:15
**claims** [16] - 12:23, 19:11, 20:21, 25:10, 29:21, 31:9, 31:10, 43:1, 48:18, 48:19, 53:21, 54:22, 55:3, 56:5, 56:11
**clarified** [1] - 40:21
**clarify** [1] - 41:22
**clarity** [1] - 49:21
**Clark** [1] - 1:22
**class** [10] - 29:22, 37:5, 48:18, 55:2, 55:7, 56:6, 59:4, 59:18, 60:1, 60:6
**Class** [1] - 35:20
**clear** [1] - 36:17
**clearly** [3] - 20:5, 44:3, 46:6
**CLERK** [2] - 2:5, 61:5
**client** [12] - 4:16, 9:25, 33:17, 33:22, 39:22, 48:16, 49:18, 49:19, 51:22, 52:14, 55:19, 59:4
**client's** [1] - 35:23
**cloned** [1] - 27:18
**closest** [1] - 60:12
**co** [5] - 34:22, 36:25, 47:5, 60:9, 60:11
**co-counsel** [4] - 34:22, 36:25, 47:5, 60:9
**co-counsels** [1] - 60:11
**Code** [4] - 38:3, 38:4, 38:5, 43:16
**code** [1] - 44:25
**collecting** [2] - 31:12, 31:20
**coming** [2] - 49:10, 53:11

**comment** [4] - 31:21, 34:2, 34:3, 47:13
**comments** [1] - 57:20
**common** [2] - 56:5, 56:12
**communicated** [1] - 13:24
**communication** [1] - 7:17
**companies** [3] - 8:11, 49:4
**compared** [1] - 27:13
**compelling** [2] - 28:21, 47:14
**compensate** [1] - 48:20
**complaining** [1] - 48:11
**complaint** [21] - 8:13, 8:23, 10:22, 12:2, 16:8, 22:11, 29:6, 29:20, 29:24, 30:2, 30:4, 30:8, 30:9, 30:17, 34:16, 52:2, 53:8, 53:15, 55:25, 59:20, 60:7
**complete** [1] - 10:14
**comply** [1] - 54:8
**complying** [1] - 6:23
**concept** [1] - 57:10
**concern** [1] - 28:10
**concluded** [2] - 9:16, 61:6
**conclusion** [1] - 36:5
**conditions** [1] - 8:17
**conference** [2] - 32:24, 60:15
**confirm** [1] - 9:24
**confirmed** [2] - 5:17, 13:25
**conflates** [1] - 35:24
**confusion** [1] - 6:12
**Congress** [10] - 16:15, 18:14, 20:1, 35:25, 39:10, 40:6, 40:20, 41:9, 42:7, 42:9, 44:21, 46:13, 47:10, 47:12, 47:15, 47:17, 47:19, 47:23, 48:3
**congressional** [2] - 18:19, 20:17
**connect** [1] - 48:3
**connected** [3] - 39:4, 39:21, 40:8
**connecting** [1] - 54:6
**connection** [7] - 29:17, 43:21, 43:25, 44:14, 45:6, 45:20, 46:7
**consequences** [2] -

15:5, 36:14
**consequential** [4] - 11:25, 54:15, 54:20, 57:16
**consider** [1] - 42:25
**considered** [2] - 53:14, 54:5
**consistent** [1] - 57:6
**constituent** [1] - 4:18
**constituted** [1] - 24:24
**Consumer** [7] - 12:5, 21:2, 28:23, 29:2, 32:13, 52:21, 53:7
**consumer** [2] - 29:22, 60:16
**consumers** [1] - 58:20
**contact** [3] - 7:10, 29:16, 30:11
**contained** [3] - 18:1, 35:10, 36:23
**contains** [1] - 11:13
**contend** [2] - 22:2, 50:23
**contention** [3] - 13:15, 14:2, 14:10
**contest** [2] - 13:11, 16:12
**contesting** [1] - 25:18
**context** [6] - 6:11, 6:17, 11:8, 11:12, 12:1, 12:13
**continued** [1] - 4:19
**contract** [74] - 8:20, 8:22, 8:24, 9:4, 9:5, 9:6, 9:13, 9:15, 10:5, 10:8, 10:11, 12:11, 13:3, 13:6, 13:14, 13:15, 14:4, 14:6, 14:7, 14:19, 14:20, 14:21, 14:24, 16:4, 21:6, 21:8, 21:11, 21:18, 21:24, 22:7, 22:8, 22:10, 22:11, 22:13, 22:16, 22:17, 22:20, 22:24, 23:2, 23:4, 23:6, 23:12, 23:15, 23:16, 24:1, 24:4, 24:14, 24:23, 24:24, 25:10, 25:12, 25:15, 32:8, 33:19, 34:8, 53:21, 53:23, 53:25, 54:1, 54:8, 54:10, 54:21, 55:12, 55:20, 55:23, 55:24, 56:2, 56:3, 57:4, 57:5, 57:8, 57:12, 58:7
**contractors** [2] - 16:19, 20:15
**contracts** [3] - 9:2,

13:4, 24:4
**contractual** [4] - 13:17, 23:19, 26:4, 58:4
**contractural** [1] - 8:18
**control** [1] - 39:2
**Coronavirus** [1] - 39:19
**correct** [10] - 4:13, 4:23, 5:20, 7:20, 8:13, 17:14, 22:14, 27:4, 51:8
**Counsel** [1] - 55:24
**counsel** [18] - 2:9, 5:14, 5:17, 16:22, 34:20, 34:22, 35:6, 36:11, 36:25, 41:16, 42:23, 43:5, 47:5, 48:5, 53:22, 55:10, 56:14, 60:9
**counsels** [1] - 60:11
**Count** [19] - 12:18, 15:21, 21:13, 28:18, 29:3, 31:10, 41:20, 41:21, 42:20, 42:22, 48:8, 48:11, 48:22, 52:21, 53:10, 53:22, 54:11, 56:23
**count** [5] - 13:4, 28:17, 31:10, 37:20, 57:18
**country** [1] - 47:11
**counts** [3] - 53:23, 56:22
**couple** [3] - 10:11, 24:15, 60:25
**course** [16] - 3:22, 4:10, 8:19, 10:7, 10:19, 15:21, 20:17, 22:21, 23:16, 23:20, 29:11, 29:22, 30:22, 30:25, 57:7
**COURT** [89] - 1:1, 2:3, 2:17, 3:3, 3:7, 4:5, 4:9, 4:15, 4:21, 5:2, 5:7, 5:12, 5:22, 6:2, 6:6, 6:13, 6:19, 6:22, 6:25, 7:17, 7:21, 8:15, 9:8, 9:11, 9:20, 10:3, 10:13, 10:18, 10:24, 11:1, 11:4, 12:15, 14:18, 15:18, 16:21, 17:6, 17:11, 17:22, 18:6, 19:16, 20:19, 20:24, 22:5, 22:13, 23:7, 26:22, 28:19, 29:1, 29:19, 31:7, 32:19, 32:22, 33:2, 33:6, 34:5, 34:9, 35:1, 36:21,

37:13, 37:18, 37:21, 41:22, 42:20, 44:18, 45:22, 46:10, 46:19, 47:3, 48:7, 50:9, 51:3, 51:6, 51:9, 51:18, 52:1, 52:23, 53:8, 53:10, 53:20, 54:11, 54:24, 56:18, 57:13, 59:2, 59:12, 60:13, 60:18, 60:22, 61:4
**court** [4] - 2:5, 36:24, 53:17, 59:22
**Court** [25] - 1:23, 2:7, 16:8, 19:6, 21:8, 21:12, 22:7, 22:12, 23:5, 23:6, 33:4, 34:12, 34:18, 34:19, 35:19, 36:15, 41:17, 42:25, 47:19, 48:23, 58:21, 58:22, 60:24, 61:5
**Court's** [2] - 33:7, 42:17
**courts** [3] - 24:2, 25:9, 56:8
**covered** [5] - 17:20, 19:8, 39:22, 40:12, 45:25
**COVID** [5] - 2:18, 39:11, 40:20, 41:1, 48:1
**COVID-19** [2] - 39:15, 39:16
**CPA** [3] - 29:21, 31:1, 31:9
**create** [3] - 18:15, 27:16, 48:16
**created** [2] - 18:17, 46:15
**credit** [6] - 8:11, 11:17, 51:13, 52:3, 52:16, 58:5
**CRIMINAL** [1] - 1:4
**cure** [1] - 16:5
**cures** [1] - 16:4
**curious** [1] - 3:16
**currency** [1] - 54:22
**current** [1] - 2:18
**curve** [1] - 11:9
**customer** [2] - 24:17, 55:22

# D

**D.C** [1] - 3:6
**damage** [1] - 16:6
**damages** [12] - 11:25, 14:24, 15:1, 15:2, 15:3, 15:13, 15:15,

65

26:19, 30:23, 54:15, 54:20, 57:16
**data** [10] - 7:24, 50:3, 50:7, 50:20, 51:20, 51:21, 52:14, 52:15, 52:16
**date** [3] - 32:7, 40:17, 51:23
**days** [2] - 60:19, 60:21
**deactivated** [2] - 10:2, 13:12
**deal** [1] - 55:10
**dealing** [1] - 49:2
**deals** [1] - 11:10
**debit** [35] - 4:16, 7:6, 7:7, 7:8, 7:9, 7:14, 7:18, 7:21, 7:25, 8:7, 8:9, 8:11, 8:17, 8:21, 9:7, 9:18, 9:25, 10:1, 11:15, 11:17, 11:19, 12:20, 19:7, 21:17, 25:17, 26:7, 30:21, 33:15, 58:5, 58:12, 58:24, 59:8
**dec** [1] - 40:5
**decades** [1] - 55:16
**deceptive** [2] - 31:4, 49:22
**decide** [2] - 18:16, 56:20
**decided** [3] - 18:14, 18:15, 33:19
**decides** [1] - 60:25
**decision** [1] - 19:21
**declaration** [22] - 13:1, 39:4, 39:20, 40:3, 40:4, 40:8, 40:18, 41:10, 42:8, 42:13, 45:1, 45:3, 45:9, 45:11, 45:12, 45:13, 45:15, 46:3, 47:12, 47:16, 48:4
**declare** [1] - 35:24
**declared** [11] - 20:5, 20:6, 36:7, 38:18, 38:21, 38:22, 39:5, 39:6, 39:17, 44:8, 46:8
**Defendant** [5] - 1:5, 1:15, 2:14, 2:16, 3:23
**defense** [1] - 3:12
**deference** [3] - 36:4, 37:11, 41:12
**define** [1] - 59:18
**defined** [12] - 38:2, 38:8, 38:10, 38:15, 38:16, 38:17, 38:18, 39:16, 43:17, 44:5, 44:7, 44:8

**defines** [2] - 39:13, 43:16
**definite** [1] - 36:9
**definitely** [1] - 57:9
**definition** [22] - 17:20, 17:25, 19:6, 19:23, 19:24, 20:4, 37:6, 37:9, 37:20, 38:13, 38:19, 39:2, 39:7, 43:11, 44:2, 44:24, 45:8, 45:14, 45:24, 46:5, 59:19, 60:7
**definitions** [1] - 36:22
**deliberately** [1] - 20:1
**deliver** [1] - 23:17
**delivered** [1] - 27:22
**denies** [1] - 59:23
**Department** [4] - 7:1, 16:25, 46:24
**deposit** [2] - 9:18, 58:24
**depositors** [1] - 58:4
**Depot** [1] - 58:16
**deprived** [1] - 15:6
**destroys** [1] - 41:4
**detailed** [1] - 33:10
**details** [1] - 6:15
**determination** [4] - 40:9, 40:19, 42:5, 42:9
**determine** [2] - 23:18, 23:19
**determined** [11] - 20:12, 38:23, 44:11, 44:19, 44:20, 44:21, 45:3, 47:18, 47:23, 47:25, 48:1
**develop** [1] - 33:25
**DHS** [1] - 45:12
**dies** [1] - 21:13
**difference** [3] - 26:23, 42:5, 51:3
**different** [10] - 3:18, 4:24, 5:10, 15:9, 19:22, 25:14, 25:22, 30:15, 47:11, 47:22
**differently** [1] - 30:19
**difficulties** [1] - 2:25
**direct** [2] - 9:18, 53:23
**directing** [1] - 46:23
**directly** [1] - 37:6
**disability** [2] - 5:9, 5:10
**disaster** [53] - 17:18, 18:11, 18:17, 18:21, 19:17, 19:25, 20:5, 20:6, 37:3, 37:4, 37:8, 37:23, 37:25, 38:1, 38:8, 38:9, 38:10, 38:11, 38:14,

38:15, 38:16, 38:17, 38:18, 38:21, 38:22, 39:5, 39:6, 40:24, 41:2, 43:13, 43:16, 43:22, 44:1, 44:4, 44:5, 44:7, 44:8, 44:10, 44:15, 44:16, 44:19, 44:24, 45:3, 45:4, 45:6, 45:20, 46:8, 59:16
**Disaster** [2] - 38:25, 44:12
**disasters** [2] - 18:12, 18:24
**discovery** [2] - 14:16, 14:17
**discrete** [1] - 47:9
**discussed** [2] - 11:14, 33:13
**discussion** [6] - 6:3, 12:1, 29:14, 30:23, 39:23, 46:11
**dismiss** [2] - 4:7, 6:9
**distinction** [1] - 19:4
**distinguish** [1] - 19:17
**distinguishing** [1] - 20:10
**distribute** [2] - 7:4, 46:25
**distributed** [1] - 49:3
**distributing** [2] - 33:20, 55:15
**distribution** [1] - 24:8
**district** [2] - 6:5, 25:24
**DISTRICT** [3] - 1:1, 1:1, 1:8
**District** [3] - 3:24, 4:3, 3:25
**Division** [1] - 7:2
**DIVISION** [1] - 1:2
**docket** [1] - 5:17
**document** [1] - 8:25
**documents** [1] - 23:8
**dollars** [1] - 12:20
**done** [11] - 7:11, 9:2, 9:22, 9:23, 12:22, 30:19, 35:14, 41:10, 52:17, 53:16, 57:22
**down** [10] - 4:3, 26:16, 31:22, 33:5, 33:13, 34:3, 36:20, 55:9, 59:3
**drafted** [1] - 41:9
**drafting** [1] - 41:7
**drivers** [1] - 16:19
**due** [1] - 15:5
**DUI** [8] - 7:11, 7:17, 7:24, 8:20, 8:22, 13:24, 29:11
**duration** [3] - 40:16,

47:23, 47:24
**during** [2] - 8:4, 26:13
**dust** [1] - 5:19
**duty** [8] - 25:4, 25:25, 26:6, 28:16, 28:21, 55:5, 57:25, 58:23

## E

**early** [1] - 5:25
**easily** [1] - 27:8
**effect** [2] - 10:20, 36:11
**effort** [1] - 60:23
**EFTA** [9] - 16:2, 17:12, 42:5, 42:23, 48:9, 48:18, 56:16, 56:20, 59:23
**either** [4] - 4:11, 26:12, 27:7, 51:7
**elaborate** [1] - 50:9
**Electronic** [10] - 12:4, 12:7, 34:24, 35:14, 35:22, 36:19, 41:3, 41:18, 54:7, 56:7
**electronic** [2] - 35:5, 49:2
**element** [3] - 44:5, 57:17
**elements** [1] - 16:6
**eligible** [1] - 17:10
**Emergency** [2] - 38:25, 39:11
**emergency** [12] - 36:1, 39:16, 39:17, 41:1, 42:10, 42:11, 44:20, 45:13, 47:7, 47:19
**emphasize** [1] - 56:12
**emphatic** [1] - 48:5
**employed** [6] - 39:24, 39:25, 40:1, 46:21, 50:19
**employee** [1] - 16:17
**employment** [1] - 40:25
**EMV** [5] - 31:11, 31:24, 35:6, 49:23
**enable** [1] - 23:17
**enact** [2] - 18:15, 35:25
**enacted** [1] - 48:25
**enactment** [1] - 39:4
**enacts** [1] - 12:4
**end** [3] - 6:20, 39:10, 48:2
**ended** [1] - 49:15
**ending** [1] - 40:14
**enforce** [4] - 21:17, 22:1, 23:14, 24:6
**enforceable** [2] - 31:6,

32:12
**Ensor** [2] - 25:7, 25:21
**ensure** [1] - 24:2
**entered** [1] - 9:8
**entering** [1] - 27:16
**entitled** [2] - 54:12, 54:15
**entity** [1] - 55:13
**entry** [1] - 55:14
**equivalent** [2] - 49:13, 50:25
**Esq** [4] - 1:12, 1:13, 1:16, 1:17
**essentially** [3] - 21:19, 31:25, 53:11
**established** [7] - 17:25, 18:3, 18:4, 28:1, 37:7, 42:4, 47:10
**evaluation** [1] - 6:1
**event** [7] - 4:2, 12:12, 14:13, 19:2, 29:24, 30:8, 32:10
**events** [4] - 7:4, 10:21, 18:13, 18:25
**exact** [1] - 15:16
**exacting** [1] - 21:19
**exactly** [1] - 26:25
**example** [2] - 8:4, 27:15
**exceedingly** [1] - 25:9
**excellent** [2] - 34:20, 56:15
**except** [1] - 36:16
**exception** [3] - 17:19, 44:17, 45:16
**exceptions** [1] - 39:2
**excited** [1] - 36:24
**excluded** [2] - 37:23, 45:25
**exclusion** [2] - 45:23, 46:6
**exclusively** [1] - 43:13
**excuse** [4] - 26:9, 27:22, 32:17, 60:13
**executive** [2] - 35:24, 47:21
**exercise** [1] - 11:1
**exercised** [1] - 9:15
**exercising** [1] - 46:22
**exhibit** [2] - 22:10, 22:11
**Exhibit** [3] - 22:13, 22:14, 22:16
**exist** [1] - 48:1
**existed** [1] - 18:22
**existing** [1] - 10:19
**expect** [1] - 8:19
**expecting** [1] - 55:21
**expenditure** [1] -

58:17
**experience** [3] - 11:15, 58:11, 59:25
**experienced** [1] - 11:20
**explain** [2] - 23:4, 34:23
**expose** [1] - 52:13
**exposure** [1] - 35:4
**express** [1] - 13:8
**extension** [1] - 10:17
**extensions** [1] - 10:15
**extent** [7] - 6:17, 21:9, 26:19, 42:21, 47:23, 54:3, 56:14
**extremely** [1] - 24:2

## F

**face** [2] - 41:19, 54:18
**Facebook** [1] - 31:18
**facilities** [1] - 33:18
**fact** [10] - 13:25, 14:19, 17:9, 31:16, 36:9, 45:9, 45:13, 54:7, 57:6, 57:18
**factor** [1] - 20:10
**facts** [9] - 13:21, 13:22, 14:3, 28:6, 28:12, 33:24, 34:16, 50:22, 52:20
**factual** [3] - 17:8, 28:14, 31:10
**factually** [2] - 14:16, 31:3
**fails** [1] - 56:8
**fairly** [2] - 59:22, 60:1
**Fairness** [1] - 35:20
**faith** [1] - 48:12
**fall** [1] - 20:4
**falls** [1] - 17:19
**familiar** [2] - 16:14, 52:11
**Fargo** [1] - 25:8
**February** [2] - 10:2, 25:8
**Federal** [3] - 1:23, 34:18, 46:24
**federal** [17] - 11:22, 12:3, 16:16, 35:21, 37:5, 38:24, 41:5, 43:20, 43:24, 44:12, 44:14, 45:19, 53:16, 53:17, 60:21
**Federally** [1] - 44:7
**federally** [6] - 16:16, 38:18, 38:20, 38:22, 39:5, 39:6
**federally-financed** [1] - 16:16

**felt** [2] - 34:21, 34:22
**FEMA** [2] - 18:10, 18:16
**file** [1] - 7:24
**filed** [1] - 13:1
**filing** [2] - 48:15, 53:14
**financed** [1] - 16:16
**financial** [3] - 25:5, 26:6, 48:21
**Financial** [1] - 12:5
**fine** [7] - 3:1, 12:15, 32:22, 32:24, 33:2, 33:6, 37:18
**first** [7] - 3:23, 16:16, 21:7, 29:4, 31:14, 56:19, 57:4
**five** [1] - 47:16
**Floor** [1] - 1:23
**Floridian** [1] - 47:6
**flow** [2] - 24:10, 54:20
**flowing** [1] - 39:14
**focus** [2] - 14:19, 20:21
**folks** [2] - 33:21, 59:5
**follow** [1] - 42:11
**food** [1] - 54:17
**FOR** [1] - 1:1
**force** [2] - 47:14, 47:17
**forces** [1] - 42:12
**forefront** [1] - 33:13
**form** [8] - 8:22, 10:21, 22:16, 22:17, 22:20, 22:23, 23:6, 48:4
**formed** [1] - 10:8
**forms** [2] - 5:6, 5:7
**forth** [2] - 29:17, 40:10
**forward** [3] - 10:17, 55:2, 55:3
**four** [1] - 43:19
**fourth** [1] - 43:19
**fraudulent** [2] - 13:19, 53:3
**free** [2] - 24:10, 55:22
**freeze** [7] - 13:17, 13:24, 14:3, 15:3, 15:5, 55:23, 58:11
**friends** [1] - 52:25
**front** [3] - 4:3, 8:24, 22:7
**froze** [3] - 13:16, 14:11, 15:11
**frozen** [3] - 13:23, 14:20, 14:23
**full** [2] - 54:4, 54:13
**fully** [2] - 2:18, 2:21
**fund** [1] - 47:11
**fundamental** [2] -

56:19, 56:24
**Funds** [10] - 12:4, 12:7, 34:24, 35:15, 35:22, 36:19, 41:3, 41:18, 54:7, 56:7
**funds** [15] - 14:8, 14:9, 14:10, 14:15, 15:6, 15:8, 33:20, 35:5, 35:16, 37:23, 37:25, 43:12, 44:14, 49:2
**furthermore** [2] - 18:23, 26:5

## G

**gather** [2] - 2:25, 3:16
**gathering** [1] - 5:19
**general** [5] - 5:4, 12:3, 31:20, 43:22, 44:2, 44:15, 45:6, 45:20, 46:7
**generalized** [1] - 58:23
**generally** [4] - 18:9, 24:9, 24:10, 57:19
**gig** [2] - 16:18, 46:21
**given** [3] - 21:12, 49:7, 57:18
**glad** [1] - 46:10
**gladly** [1] - 18:24
**glass** [1] - 55:1
**glossed** [1] - 34:4
**governed** [1] - 23:21
**government** [23] - 9:2, 17:23, 17:25, 18:1, 18:2, 18:3, 18:4, 24:1, 24:3, 24:4, 33:18, 38:24, 41:25, 42:2, 43:20, 43:25, 44:12, 44:14, 46:7, 55:12, 55:13
**governs** [1] - 8:16
**grabs** [1] - 27:23
**great** [3] - 35:2, 52:4
**groups** [1] - 52:12
**guaranteed** [1] - 55:22
**guardian** [1] - 47:10
**guess** [7] - 10:4, 10:9, 28:18, 33:10, 48:8, 49:1, 59:2
**guesses** [1] - 17:17
**guidance** [1] - 37:19

## H

**hammer** [1] - 42:6
**handing** [1] - 55:15
**handled** [1] - 50:7
**hands** [1] - 27:2
**happy** [2] - 6:8, 33:2

**hard** [2] - 3:5, 20:16
**harm** [3] - 34:15, 52:13, 60:6
**harmed** [1] - 50:21
**hate** [1] - 37:13
**Health** [1] - 39:11
**health** [7] - 39:15, 39:16, 39:17, 39:18, 41:1, 44:20, 45:12
**hear** [7] - 5:2, 5:13, 6:9, 16:21, 32:23, 33:2, 44:18
**heard** [3] - 17:1, 49:18, 57:21
**hearing** [6] - 2:8, 3:10, 51:6, 54:25, 60:15, 61:6
**hearings** [1] - 60:20
**HEFFERON** [56] - 2:13, 3:22, 4:6, 4:13, 4:16, 4:23, 5:6, 5:8, 5:24, 6:3, 6:10, 6:14, 6:21, 6:23, 7:1, 7:20, 7:23, 8:16, 9:10, 9:13, 9:23, 10:12, 10:14, 10:19, 10:25, 11:2, 11:7, 12:16, 15:2, 15:19, 17:4, 17:7, 17:14, 17:24, 18:7, 19:21, 20:20, 21:1, 22:9, 22:14, 23:9, 27:9, 28:20, 29:2, 29:20, 31:8, 32:20, 43:4, 44:23, 46:1, 46:15, 46:20, 57:1, 57:15, 60:17, 61:3
**Hefferon** [9] - 1:16, 2:13, 3:21, 3:23, 17:1, 36:12, 43:2, 56:25, 60:14
**Hefferon's** [1] - 33:9
**helpful** [2] - 6:11, 6:16, 11:11
**hereby** [1] - 10:17
**Highland** [1] - 34:22
**himself** [1] - 13:23
**hindsight** [1] - 19:3
**hinges** [1] - 34:24
**history** [1] - 42:15
**holding** [1] - 55:15
**hollow** [1] - 49:25
**Home** [1] - 58:16
**Honor** [52] - 2:10, 2:13, 2:15, 3:1, 3:22, 4:13, 5:8, 5:16, 5:24, 6:10, 6:24, 9:1, 9:10, 9:23, 10:12, 11:10, 12:13, 12:16, 15:19, 16:14, 17:5, 17:15,

17:24, 18:8, 20:20, 21:4, 22:9, 22:15, 23:9, 25:7, 25:8, 26:8, 27:9, 28:24, 29:18, 30:14, 32:21, 33:1, 34:13, 41:20, 43:4, 44:22, 44:23, 44:24, 48:14, 51:11, 52:6, 57:1, 59:11, 60:17, 61:2, 61:3
**HONORABLE** [1] - 1:7
**hope** [3] - 3:3, 58:2
**hoping** [1] - 19:2
**hours** [1] - 24:18
**human** [1] - 39:18
**hurricane** [1] - 47:8
**hypothetically** [1] - 14:22

## I

**idea** [3] - 21:21, 26:3, 57:23
**identical** [2] - 3:17, 10:11
**identify** [1] - 52:9
**identity** [1] - 13:25
**II** [1] - 47:16
**immediately** [1] - 44:6
**impaired** [1] - 60:3
**important** [9] - 18:14, 20:16, 23:22, 33:20, 35:18, 42:24, 51:25, 57:2, 57:3
**impossible** [1] - 23:25
**imposter** [1] - 27:21
**IN** [1] - 1:1
**in-person** [1] - 2:24
**inadequate** [2] - 27:13, 28:7
**include** [1] - 12:25
**included** [6] - 12:23, 16:18, 22:17, 32:9, 49:8, 52:14
**includes** [3] - 5:8, 8:25, 50:24
**including** [1] - 59:8
**income** [2] - 33:21, 52:12
**Incorporated** [1] - 50:3
**indeed** [1] - 44:6
**independent** [2] - 16:19, 20:15
**independently** [1] - 44:20
**indicate** [1] - 2:18
**indicated** [2] - 19:11, 57:4
**indication** [1] - 17:7

**indirectly** [1] - 37:7
**individual** [8] - 4:18, 7:9, 7:10, 28:11, 28:13, 40:1, 40:13, 43:18
**indulge** [1] - 28:24
**inevitable** [1] - 36:4
**inference** [1] - 27:1
**inferred** [1] - 25:25
**inform** [1] - 41:16
**information** [15] - 3:20, 5:15, 20:25, 24:17, 27:22, 30:16, 31:13, 31:15, 31:20, 35:9, 49:3, 49:6, 49:9, 49:12, 49:18
**Information** [2] - 31:2, 48:22
**informed** [1] - 13:23
**inherently** [1] - 24:4
**initial** [1] - 7:17
**injunction** [2] - 3:25, 5:22
**injury** [1] - 32:15
**insecure** [3] - 30:7, 31:13, 32:2
**insecurity** [1] - 30:24
**instances** [3] - 20:13, 51:12, 52:10
**instead** [1] - 39:10
**instrumentality** [1] - 43:21
**insurance** [2] - 5:4, 7:3
**Insurance** [1] - 7:2
**intended** [4] - 21:16, 22:1, 23:12, 23:14
**intent** [4] - 21:15, 21:23, 22:4, 25:13
**interact** [1] - 34:6
**intercepts** [1] - 27:21
**interest** [2] - 23:25, 60:19
**internal** [1] - 19:20
**Internal** [4] - 38:3, 38:4, 38:5, 43:16
**International** [1] - 49:20
**interpretation** [4] - 36:3, 37:9, 41:13, 56:23
**interpretations** [2] - 36:16, 37:10
**interrupt** [2] - 32:24, 34:5
**interrupted** [1] - 34:25
**introduced** [1] - 32:16
**invented** [1] - 19:1
**investigation** [1] - 48:12

**involved** [2] - 11:8, 13:21
**involvement** [1] - 6:5
**involving** [1] - 35:15
**irregular** [1] - 13:20
**irrelevant** [2] - 18:23
**issuance** [1] - 32:17
**issue** [13] - 13:7, 14:6, 14:7, 14:25, 27:11, 30:22, 33:11, 45:7, 55:24, 56:21, 57:10
**issued** [4] - 3:25, 11:15, 22:18, 23:20
**issues** [4] - 2:24, 3:8, 3:17, 49:2
**item** [1] - 12:1
**items** [2] - 11:12, 12:13
**iteration** [1] - 45:18
**itself** [2] - 19:7, 40:7

**J**

**Jacques** [1] - 25:10
**JACQUES** [1] - 25:11
**Jaffee** [1] - 21:20
**January** [3] - 5:18, 39:18, 40:14
**jeez** [1] - 44:5
**job** [5] - 8:5, 34:21, 55:18, 56:15
**JUDGE** [1] - 1:8
**Judge** [17] - 4:3, 33:4, 34:10, 34:25, 35:18, 36:20, 50:12, 52:20, 53:9, 53:13, 54:14, 54:18, 54:23, 55:4, 56:14, 59:22, 60:4
**judge** [11] - 6:5, 33:9, 42:15, 42:22, 49:6, 52:20, 53:18, 53:21, 56:4, 60:10, 60:21
**jumped** [1] - 55:9
**JUNE** [1] - 1:8
**jurisdictions** [1] - 4:25

**K**

**Kat** [1] - 34:22
**keep** [3] - 6:19, 18:14, 23:22
**Keller** [2] - 1:13, 2:12
**KELLER** [1] - 2:12
**kick** [2] - 36:25, 37:4
**kind** [7] - 11:16, 24:5, 32:4, 56:12, 56:19, 58:15, 58:23
**kinds** [1] - 20:18
**knowledge** [1] - 10:14
**known** [1] - 30:16

**knows** [6] - 15:16, 21:4, 25:7, 29:18, 30:14, 42:11

**L**

**Labor** [4] - 7:1, 16:25, 46:24
**laid** [1] - 13:22
**landline** [1] - 52:8
**language** [2] - 13:18, 13:20
**laptop** [1] - 33:5
**large** [1] - 15:10
**last** [9] - 4:8, 9:17, 9:25, 14:6, 14:7, 23:22, 24:12, 55:16, 59:2
**late** [1] - 16:15
**latter** [2] - 23:20, 27:9
**law** [8] - 3:18, 11:22, 12:3, 25:3, 41:14, 49:5, 56:5, 56:12
**laws** [2] - 3:4, 24:6
**lawsuit** [5] - 12:23, 13:1, 21:5, 48:15, 53:5
**lead** [1] - 50:23
**leads** [1] - 38:19
**learn** [1] - 33:25
**learning** [1] - 11:9
**least** [5] - 16:2, 19:14, 19:19, 20:22, 48:10
**leave** [2] - 2:22, 54:11
**legally** [1] - 6:16
**legislative** [2] - 42:15, 47:22
**legislature** [1] - 46:22
**legitimacy** [2] - 13:11
**less** [2] - 27:20, 28:9
**letters** [1] - 29:18
**level** [2] - 18:7, 45:7
**levels** [1] - 6:15
**liability** [5] - 11:20, 11:23, 11:24, 35:6, 43:13
**liable** [1] - 35:8
**light** [1] - 28:21
**likely** [1] - 30:15
**limit** [3] - 11:23, 11:25, 35:4
**limitation** [1] - 40:16
**limited** [2] - 57:13, 57:15
**line** [1] - 14:4
**list** [1] - 7:25
**live** [2] - 51:23, 58:18
**load** [1] - 7:6
**loaded** [5] - 5:11, 17:18, 19:7, 37:7,

43:13
**loading** [1] - 9:25
**local** [1] - 43:20
**location** [1] - 27:22
**Lombard** [1] - 1:23
**long-term** [1] - 19:4
**look** [5] - 34:19, 38:7, 39:3, 41:8, 42:6
**looked** [1] - 40:6
**looking** [1] - 10:8
**lose** [1] - 8:5
**loss** [4] - 48:21, 49:18, 55:5
**losses** [1] - 38:20
**lost** [2] - 28:8, 37:13, 38:9, 42:24, 49:6
**lower** [1] - 33:21, 52:12

**M**

**ma'am** [1] - 37:16
**mag** [2] - 35:8, 35:9
**magistrate** [1] - 6:4
**magnetic** [17] - 26:24, 27:4, 27:7, 27:12, 27:13, 27:19, 28:7, 31:11, 31:23, 32:1, 32:5, 32:14, 49:7, 49:11, 49:22, 50:4, 51:4
**mail** [10] - 7:8, 7:15, 26:13, 27:2, 27:7, 27:21, 50:15, 51:1, 51:13, 52:3
**mailbox** [1] - 28:8
**mailed** [4] - 8:7, 26:10, 49:14, 51:1
**main** [1] - 12:17
**major** [1] - 41:1
**manner** [1] - 31:13
**March** [4] - 16:15, 19:1, 20:6, 20:7
**Marriott** [1] - 49:20
**MARYLAND** [2] - 1:1, 1:9
**Maryland** [23] - 1:24, 3:19, 6:8, 7:1, 8:20, 9:17, 17:9, 20:6, 20:24, 21:2, 21:15, 23:12, 23:17, 24:7, 27:3, 32:8, 48:22, 48:24, 49:11, 50:2, 53:6, 59:9
**mask** [2] - 2:20, 2:22
**match** [2] - 51:21
**materials** [1] - 50:3
**matter** [8] - 2:5, 2:7, 3:20, 4:1, 6:15, 27:6, 45:13, 60:18

**matters** [2] - 11:9, 19:23
**McCorkle** [2] - 1:17, 2:15
**mcCORKLE** [1] - 2:15
**MCPA** [1] - 31:8
**MDL** [6] - 3:16, 4:1, 4:19, 4:21, 4:22, 4:25
**MDL'd** [1] - 4:2
**mean** [15] - 9:1, 10:4, 18:7, 26:25, 27:10, 31:25, 44:7, 46:16, 46:22, 50:25, 51:18, 52:4, 53:10, 57:7, 57:16
**means** [1] - 18:3, 18:20, 37:25, 38:11, 38:17, 38:21, 38:22, 39:17, 43:17, 44:13, 57:9
**meant** [5] - 11:20, 40:22, 41:9, 42:7, 47:18
**mechanism** [1] - 23:18
**mediate** [1] - 5:21
**mediation** [1] - 5:20
**meet** [2] - 23:25, 45:24
**melissa** [1] - 1:22
**members** [2] - 48:19, 55:7
**memory** [1] - 4:1
**mention** [2] - 21:2, 47:12
**mentioned** [1] - 49:1
**merchant** [1] - 35:7
**merchants** [1] - 49:24
**mess** [1] - 42:16
**met** [1] - 16:6
**methods** [1] - 7:4
**might** [6] - 3:18, 6:10, 9:20, 16:23, 22:6, 57:24
**miles** [1] - 58:17
**million** [1] - 46:18
**mind** [2] - 18:14, 23:23
**mine** [1] - 4:10
**minimum** [1] - 15:2
**minute** [2] - 4:8, 37:14
**minutes** [1] - 3:2
**misrepresentation** [2] - 29:7, 29:14
**misrepresentations** [3] - 29:4, 29:15, 30:1
**missed** [1] - 34:23
**misses** [1] - 43:10
**missing** [1] - 39:6
**misunderstood** [1] -

22:6
**misuse** [1] - 27:5
**misused** [2] - 27:8, 30:25
**modernity** [1] - 49:1
**modification** [2] - 25:22, 25:23
**Mohamed** [47] - 2:6, 7:7, 7:14, 7:18, 8:3, 12:18, 13:2, 13:23, 15:11, 15:16, 16:12, 16:18, 16:23, 17:19, 19:12, 21:5, 25:4, 25:16, 26:8, 26:14, 26:15, 26:19, 27:24, 28:1, 28:2, 28:6, 28:12, 29:10, 29:11, 29:16, 30:6, 30:11, 32:13, 33:23, 34:1, 34:15, 37:4, 39:14, 39:24, 41:5, 51:22, 52:13, 52:24, 56:7, 56:9, 58:10
**MOHAMED** [1] - 1:3
**Mohamed's** [2] - 49:8, 50:17
**moment** [2] - 4:12, 43:3
**money** [35] - 7:6, 14:8, 35:13, 35:17, 39:14, 45:5, 45:11, 45:17, 45:19, 46:6, 46:23, 47:9, 48:15, 48:16, 48:19, 48:20, 52:15, 52:16, 53:2, 53:4, 53:6, 54:2, 54:16, 55:5, 55:15, 55:16, 57:25, 58:15, 58:23
**month** [1] - 15:4
**moot** [4] - 13:5, 48:14, 54:2, 54:4
**mootness** [3] - 13:13, 16:3, 48:17
**morning** [1] - 5:17
**mortgage** [2] - 25:22, 25:23
**most** [4] - 11:10, 18:24, 19:1, 54:1
**mostly** [1] - 48:11
**motion** [5] - 4:6, 6:9, 16:9, 56:17, 59:23
**motions** [1] - 2:8
**move** [1] - 43:1
**moved** [1] - 47:6
**moving** [1] - 59:24
**MPA** [1] - 30:23
**MR** [91] - 2:10, 2:13, 3:1, 3:5, 3:22, 4:6, 4:13, 4:16, 4:23, 5:6, 5:8, 5:16, 5:24, 6:3,

6:10, 6:14, 6:21, 6:23, 7:1, 7:20, 7:23, 8:16, 9:10, 9:13, 9:23, 10:12, 10:14, 10:19, 10:25, 11:2, 11:7, 12:16, 15:2, 15:19, 17:4, 17:7, 17:14, 17:24, 18:7, 19:21, 20:20, 21:1, 22:9, 22:14, 23:9, 27:9, 28:20, 29:2, 29:20, 31:8, 32:20, 33:1, 33:4, 33:7, 34:8, 34:10, 35:2, 36:22, 37:16, 37:19, 37:22, 42:2, 42:21, 43:4, 44:22, 44:23, 46:1, 46:15, 46:20, 47:1, 47:4, 48:14, 50:11, 51:5, 51:8, 51:11, 51:20, 52:6, 52:24, 53:9, 53:13, 53:21, 54:14, 54:25, 57:1, 57:15, 59:14, 60:17, 60:20, 61:2, 61:3
**MS** [2] - 2:12, 2:15
**multilingual** [1] - 55:22
**Murphy** [5] - 1:12, 2:11, 2:25, 32:23, 44:18
**MURPHY** [36] - 2:10, 3:1, 3:5, 5:16, 33:1, 33:4, 33:7, 34:8, 34:10, 35:2, 36:22, 37:16, 37:19, 37:22, 42:2, 42:21, 44:22, 47:1, 47:4, 48:14, 50:11, 51:5, 51:8, 51:11, 51:20, 52:6, 52:24, 53:9, 53:13, 53:21, 54:14, 54:25, 59:11, 59:14, 60:20, 61:2
**Murphy's** [1] - 57:14
**must** [2] - 18:25, 41:8
**mutual** [1] - 5:25

# N

**N.A** [1] - 2:6
**name** [1] - 49:8
**nearly** [1] - 38:7
**necessary** [1] - 53:18
**necessitous** [2] - 25:17, 26:1
**need** [6] - 22:2, 33:12, 36:9, 39:9, 50:16, 52:19

**needed** [2] - 52:17, 53:15
**needs** [4] - 24:6, 24:7, 25:12, 38:14
**negligence** [6] - 25:1, 26:20, 55:4, 57:23, 57:24
**negligent** [1] - 26:3
**never** [2] - 28:2, 29:23
**new** [7] - 8:5, 18:15, 18:18, 26:16, 27:16, 46:15, 60:9
**Newport** [1] - 58:16
**News** [1] - 58:16
**next** [2] - 26:18, 60:25
**NO** [1] - 1:4
**non** [1] - 49:21
**non-secure** [1] - 49:21
**normally** [1] - 58:15
**Northern** [1] - 3:24
**NORTHERN** [1] - 1:2
**note** [1] - 47:5
**noted** [1] - 31:15
**nothing** [6] - 4:11, 13:12, 20:17, 22:3, 32:20, 41:14
**notice** [1] - 22:16
**novel** [2] - 39:19, 53:1
**nowhere** [1] - 39:7
**Number** [3] - 2:6, 51:22, 52:5
**number** [11] - 3:8, 4:17, 13:3, 21:20, 24:17, 25:24, 27:17, 35:12, 49:8, 51:18, 52:3

# O

**o'clock** [1] - 32:25
**observation** [3] - 18:13, 57:3, 57:20
**observations** [1] - 57:3
**obtains** [1] - 28:13
**obviously** [14] - 3:12, 3:13, 3:18, 7:2, 12:1, 15:9, 16:21, 19:3, 25:18, 32:23, 43:15, 54:6, 58:2, 58:24
**occurred** [2] - 7:4, 35:6
**occurring** [1] - 13:19
**OF** [3] - 1:1, 1:5, 1:7
**offer** [1] - 47:1
**office** [1] - 40:19
**official** [1] - 37:10
**Official** [1] - 1:23
**omission** [5] - 30:5, 30:10, 30:14, 30:18,

30:24
**omitted** [2] - 30:6, 30:16
**once** [2] - 23:20, 59:15
**one** [34] - 3:13, 4:24, 7:5, 7:7, 10:4, 11:12, 15:4, 18:7, 18:8, 18:25, 24:16, 26:16, 30:14, 31:4, 31:10, 31:14, 33:22, 34:11, 35:15, 42:6, 43:6, 43:19, 51:7, 51:14, 53:23, 54:19, 57:3, 57:20, 59:2, 60:5, 60:15
**one-month** [1] - 15:4
**ones** [1] - 42:4
**open** [1] - 24:18
**opportunity** [2] - 34:17, 34:19
**opposed** [1] - 14:12
**opposition** [6] - 14:14, 16:23, 22:25, 24:13, 29:15, 30:5
**option** [1] - 9:18
**oral** [2] - 5:18, 34:17
**order** [7] - 9:3, 21:21, 30:13, 32:4, 32:12, 43:22, 51:15
**orders** [1] - 23:3
**original** [3] - 9:13, 10:21, 24:23
**originally** [1] - 47:6
**otherwise** [2] - 33:18, 43:3
**outs** [1] - 39:3
**outside** [2] - 30:17, 52:1
**outsource** [1] - 55:17
**overlap** [2] - 15:22, 29:3
**overlaps** [1] - 31:1
**overnighted** [1] - 26:17
**owed** [4] - 25:4, 52:15, 54:5, 54:6
**own** [5] - 20:14, 24:6, 42:9, 49:24, 55:23
**owned** [1] - 20:14
**owner** [1] - 16:18

# P

**p.m** [2] - 2:2, 61:6
**package** [1] - 7:15
**paid** [12] - 12:24, 16:4, 24:11, 43:18, 43:20, 43:24, 43:25, 44:14, 45:5, 45:19, 46:6
**pair** [2] - 52:7, 52:8

**pandemic** [7] - 5:3, 16:13, 18:16, 40:24, 41:2, 59:6, 59:16
**paper** [3] - 7:5, 9:18, 33:14
**paragraph** [2] - 31:17, 37:23
**Paragraph** [2] - 37:12, 40:11
**parallel** [4] - 12:11, 19:11, 57:5, 57:12
**paraphrase** [1] - 36:12
**part** [1] - 40:5
**particular** [4] - 11:19, 20:3, 35:15, 43:3
**parties** [4] - 4:6, 10:16, 21:25, 24:23, 25:14, 49:7
**partly** [1] - 31:3
**partner** [1] - 33:19
**parts** [1] - 59:24
**party** [20] - 14:12, 20:22, 21:3, 21:5, 21:22, 21:25, 22:1, 22:4, 23:2, 23:10, 23:23, 23:24, 23:25, 24:3, 24:19, 24:20, 24:25, 37:7, 55:8
**pay** [7] - 15:24, 16:1, 46:18, 54:4, 54:16, 54:17
**payment** [9] - 17:18, 19:25, 20:1, 38:8, 38:10, 38:11, 38:14, 44:16, 54:17
**payments** [7] - 19:18, 20:7, 37:4, 37:8, 38:12, 43:13, 43:17
**penalty** [1] - 16:2
**pending** [5] - 2:5, 3:16, 4:2, 4:11, 4:24
**people** [26] - 7:25, 8:6, 8:21, 16:19, 17:4, 20:14, 33:17, 33:21, 33:23, 34:1, 34:15, 36:10, 38:12, 39:14, 46:18, 49:16, 50:14, 50:15, 51:16, 51:25, 52:10, 52:12, 56:13, 57:10, 58:10, 60:1
**people's** [2] - 55:5, 57:25
**per** [2] - 31:25, 32:1
**perfect** [1] - 52:20
**perhaps** [10] - 13:9, 20:15, 34:12, 45:7, 50:5, 50:22, 52:19, 54:21, 55:3
**period** [6] - 8:4, 26:14, 32:7, 36:8, 40:4,

40:10
**periods** [1] - 40:13
**permitted** [1] - 14:4
**person** [14] - 2:24, 11:24, 13:25, 25:25, 27:23, 30:15, 31:18, 35:12, 39:22, 39:25, 40:1, 55:11, 60:24
**Personal** [2] - 31:1, 48:22
**personal** [2] - 49:6, 49:12
**persons** [1] - 56:9
**perspective** [1] - 12:16
**petition** [1] - 4:2
**phone** [3] - 52:7, 52:8, 60:16
**phones** [1] - 52:11
**phrasing** [1] - 25:9
**pick** [2] - 27:15, 50:15
**piece** [1] - 13:6
**PIN** [4] - 27:15, 27:17, 28:2, 35:12
**PIPA** [7] - 31:5, 31:10, 31:19, 31:23, 32:10, 32:12
**place** [4] - 10:16, 28:15, 38:9, 51:9
**Plaintiff** [17] - 1:3, 1:11, 2:9, 2:11, 2:12, 14:14, 15:4, 21:9, 21:23, 22:23, 22:25, 23:1, 23:3, 23:11, 25:16, 27:12, 30:19
**Plaintiff's** [4] - 5:14, 16:22, 16:23, 43:10
**Plaintiffs** [6] - 13:8, 16:12, 18:8, 19:17, 24:13, 32:6
**plausible** [2] - 21:14, 26:5
**play** [1] - 16:2
**pleading** [3] - 27:11, 55:6, 56:22
**pled** [4] - 30:8, 50:7, 52:2, 52:19
**plenty** [1] - 57:21
**plus** [5] - 11:2, 22:20, 22:21, 22:22
**point** [20] - 3:14, 12:5, 18:10, 18:12, 21:7, 21:11, 21:14, 23:5, 23:22, 24:12, 24:15, 25:1, 27:21, 28:22, 35:1, 35:2, 35:3, 43:17, 50:16, 54:21
**pointed** [3] - 17:8, 18:9, 22:3
**points** [1] - 43:14

policy [4] - 11:20, 11:24, 24:5, 49:23
**political** [2] - 40:9, 42:12
**politics** [1] - 47:13
**posed** [1] - 49:21
**position** [7] - 14:25, 15:12, 17:22, 34:13, 41:15, 43:10, 49:25
**possibilities** [1] - 43:19
**possibility** [2] - 11:14, 48:10
**possibly** [1] - 49:10
**post** [2] - 31:18
**pot** [1] - 47:9
**potential** [1] - 32:11
**potentially** [1] - 50:13
**power** [1] - 35:24
**practice** [3] - 31:4, 31:6, 49:15
**practices** [1] - 55:23
**precedence** [1] - 58:3
**precise** [1] - 15:15
**preliminarily** [1] - 3:13
**preliminary** [3] - 3:20, 3:25, 5:22
**prepaid** [4] - 4:16, 12:8, 45:24, 60:2
**preparation** [1] - 50:12
**present** [2] - 3:10, 34:10
**presented** [4] - 34:1, 34:16, 42:22, 59:17
**presenting** [1] - 56:15
**preserve** [1] - 20:16
**President** [4] - 36:6, 39:5, 40:8, 40:18
**president** [14] - 20:5, 36:6, 38:23, 39:20, 40:19, 40:22, 42:14, 44:11, 44:19, 45:3, 46:4, 46:9, 47:17, 47:25
**president's** [1] - 48:4
**presidential** [5] - 44:25, 45:2, 45:9, 45:11, 45:15
**presumably** [1] - 15:10
**pretty** [2] - 57:22, 58:7
**previously** [1] - 18:22
**primarily** [1] - 16:11
**primary** [3] - 23:24, 28:17, 28:20
**Privacy** [1] - 28:24
**private** [3] - 29:7, 49:4, 53:12
**problem** [8] - 6:21,

40:20, 43:5, 44:23, 45:1, 45:8, 47:21, 50:23
**problematic** [1] - 28:4
**problems** [2] - 48:1, 52:12
**PROCEEDINGS** [1] - 1:7
**process** [3] - 6:1, 6:4, 11:10
**product** [1] - 29:5
**proffered** [1] - 41:4
**program** [9] - 6:14, 16:14, 18:10, 18:15, 18:17, 18:18, 18:22, 25:19, 38:1
**promise** [1] - 24:24
**promises** [3] - 21:23, 22:4, 23:12
**promote** [5] - 43:22, 44:2, 44:15, 45:5, 45:20
**proof** [1] - 27:10
**proper** [1] - 14:17
**properly** [2] - 15:23, 15:25
**protect** [11] - 25:5, 26:6, 26:7, 49:16, 50:14, 52:17, 55:5, 56:12, 57:25, 58:23
**protecting** [1] - 35:12
**protection** [3] - 11:16, 58:10, 58:19
**Protection** [9] - 12:6, 21:2, 28:23, 29:2, 31:2, 32:13, 48:23, 52:22, 53:7
**protections** [2] - 19:9, 50:14
**protocol** [1] - 2:18
**proves** [1] - 15:25
**provide** [2] - 9:17, 25:19
**provided** [5] - 3:14, 16:16, 19:10, 40:11, 53:22
**provider** [1] - 4:17
**provides** [4] - 7:24, 12:6, 12:9, 58:9
**providing** [1] - 8:21
**provision** [4] - 12:3, 16:7, 24:16, 46:15
**provisions** [2] - 24:14, 43:8
**PUA** [6] - 19:1, 19:7, 20:12, 40:3, 40:9, 43:23
**public** [14] - 20:25, 24:5, 24:6, 24:9, 33:20, 35:15, 39:15,

39:16, 39:17, 41:1, 44:20, 49:3, 55:11, 56:1
**Public** [1] - 39:11
**pull** [1] - 51:14
**pulled** [1] - 39:12
**purpose** [5] - 2:7, 23:16, 33:20, 39:9, 40:7
**purposeful** [2] - 39:8, 40:5
**purposely** [2] - 40:21, 40:25
**purposes** [5] - 17:20, 21:22, 37:23, 38:10, 38:21
**purse** [1] - 47:11
**pursuant** [1] - 6:3
**put** [6] - 6:16, 10:15, 16:15, 23:5, 28:15, 34:13

## Q

**qualified** [28] - 19:17, 19:25, 37:4, 37:8, 37:25, 38:1, 38:8, 38:9, 38:10, 38:11, 38:13, 38:14, 38:16, 38:17, 43:13, 43:16, 43:21, 44:1, 44:4, 44:5, 44:6, 44:10, 44:15, 44:16, 44:24, 45:4, 46:8
**qualifies** [1] - 44:16
**qualify** [2] - 17:23, 20:8
**questions** [2] - 3:9, 12:14
**quickly** [2] - 36:25, 37:1
**quite** [6] - 14:11, 15:9, 19:2, 20:12, 58:3, 60:21
**quotation** [2] - 31:17, 37:25
**quote** [2] - 18:3, 43:12

## R

**raised** [4] - 10:4, 14:8, 30:23, 45:8
**ran** [1] - 18:10
**rapidly** [1] - 36:10
**rather** [1] - 32:14
**Re** [2] - 49:20, 50:3
**reaction** [1] - 58:2
**read** [3] - 34:21, 41:11, 53:10
**ready** [1] - 59:13

real [3] - 34:2, 43:6, 51:24
**realized** [1] - 35:4
**really** [15] - 13:5, 26:2, 28:10, 30:2, 31:19, 31:22, 33:11, 33:15, 33:24, 34:22, 41:13, 49:25, 56:4, 57:21, 60:22
**reason** [3] - 47:14, 47:17, 55:14
**reasonable** [2] - 27:1, 48:12
**reasons** [1] - 34:12
**reauthenticated** [1] - 13:24
**rebuttal** [2] - 42:24, 42:25
**received** [6] - 8:6, 16:23, 19:12, 19:14, 21:17, 25:17
**receives** [1] - 14:8
**receiving** [1] - 55:11
**recent** [2] - 49:19, 55:16
**recipient** [5] - 7:10, 7:11, 7:16, 16:13, 21:16
**recognized** [1] - 11:8
**record** [1] - 2:9
**records** [2] - 20:18, 25:5, 26:6
**recovery** [1] - 31:19
**recurrence** [1] - 13:10
**referred** [3] - 7:22, 8:22, 60:14
**refers** [1] - 44:25
**reflect** [1] - 8:24
**reflected** [1] - 12:17
**Reg** [4] - 37:10, 37:14, 41:13, 45:14
**reg** [1] - 54:9
**regard** [2] - 51:4, 51:5
**regarding** [2] - 15:1, 29:25
**regret** [1] - 2:25
**regs** [2] - 36:3, 36:23
**regular** [7] - 16:24, 17:2, 17:3, 17:11, 19:19, 59:8
**Regulation** [20] - 12:2, 12:3, 12:12, 15:21, 15:24, 16:3, 16:4, 16:9, 17:12, 17:21, 18:2, 19:8, 19:9, 19:13, 19:15, 45:25, 56:20, 57:5, 57:7, 57:8
**regulation** [3] - 12:4, 20:10, 48:9

**regulatory** [2] - 20:4, 32:3
**reimburse** [1] - 12:22
**relate** [2] - 11:13, 11:14
**related** [5] - 13:14, 15:20, 36:7, 36:8, 49:2
**relates** [1] - 54:14
**relation** [2] - 8:18, 40:23
**relationship** [5] - 25:14, 26:4, 51:24, 58:4, 58:6
**relatively** [1] - 25:2
**relevant** [2] - 11:5, 20:9
**reliance** [1] - 34:9
**relief** [18] - 5:4, 17:18, 37:4, 37:8, 37:23, 37:25, 38:1, 38:8, 38:10, 38:11, 38:14, 38:16, 43:13, 43:16, 44:16, 47:7, 56:6
**Relief** [2] - 38:25, 44:12
**reluctant** [2] - 24:2, 25:10
**rely** [2] - 46:12, 55:12
**relying** [2] - 41:24, 46:13
**remedies** [1] - 56:9
**remedy** [5] - 48:11, 56:8, 57:11, 57:13, 57:15
**remember** [2] - 36:8, 52:5
**remove** [1] - 2:19
**rendered** [1] - 48:14
**renewals** [4] - 9:15, 10:4, 10:7, 11:1
**renewed** [1] - 10:11
**rent** [1] - 54:16
**replead** [3] - 50:6, 50:22, 53:18
**repleading** [1] - 56:22
**reply** [1] - 43:10
**Reported** [1] - 1:21
**reporter** [1] - 36:24
**Reporter** [1] - 1:23
**representation** [1] - 53:11
**representations** [1] - 30:3
**representing** [1] - 59:5
**request** [1] - 6:24
**require** [2] - 10:6, 15:4
**requirement** [1] - 32:4
**requires** [2] - 14:20,

23:11
**reset** [1] - 4:8
**residential** [1] - 26:11
**respect** [6] - 39:19, 41:21, 50:23, 52:21, 53:22, 54:10
**respond** [2] - 18:9, 43:2
**responded** [1] - 57:18
**response** [6] - 8:25, 9:4, 23:1, 43:9, 53:14, 57:19
**responses** [3] - 10:22, 22:21, 29:25
**restrict** [1] - 47:18
**restrictions** [1] - 58:9
**rests** [1] - 29:21
**Revenue** [4] - 38:3, 38:4, 38:5, 43:16
**revenue** [1] - 19:20
**review** [2] - 5:16, 41:14
**rewriting** [1] - 9:3
**RFP** [14] - 8:25, 9:4, 9:8, 10:9, 10:22, 22:18, 22:20, 22:24, 23:1
**rights** [1] - 35:25
**rise** [1] - 61:5
**risk** [4] - 28:3, 28:4, 32:11, 32:16
**road** [2] - 12:6, 59:3
**Robert** [3] - 1:12, 2:11, 38:24
**role** [3] - 14:17, 36:15, 47:10
**room** [1] - 42:10
**RPR** [1] - 1:22
**ruled** [1] - 4:10
**rules** [2] - 12:6, 12:9
**rulings** [1] - 3:14
**run** [1] - 18:16
**runs** [1] - 44:8
**rush** [1] - 20:2
**rushed** [1] - 36:13
**Rutter's** [2] - 50:3

**S**

**sale** [1] - 51:9
**saw** [5] - 4:9, 13:7, 15:20, 25:7, 59:17
**school** [1] - 49:5
**scope** [3] - 30:1, 30:4, 30:17
**se** [2] - 31:25, 32:1
**seated** [1] - 2:3
**second** [6] - 11:25, 14:18, 22:10, 31:12, 34:5, 53:24

**secondly** [1] - 54:6
**secretary** [1] - 39:18
**section** [3] - 20:25, 38:11, 43:15
**Section** [8] - 22:19, 37:24, 38:5, 38:19, 43:15, 44:6, 44:8, 44:9
**secure** [5] - 27:20, 28:9, 29:7, 49:21, 53:12
**Security** [3] - 49:9, 51:22, 52:5
**security** [6] - 24:16, 24:17, 29:3, 49:3, 50:4
**see** [10] - 5:12, 5:13, 6:2, 16:5, 22:6, 22:18, 36:18, 45:7, 54:18, 59:4
**Selden** [2] - 1:17, 2:15
**select** [1] - 8:7
**selected** [2] - 7:14, 7:25
**self** [3] - 39:25, 40:1, 46:21
**self-employed** [3] - 39:25, 40:1, 46:21
**send** [2] - 28:7, 50:19
**sense** [6] - 19:10, 19:13, 19:19, 29:11, 34:14, 48:9
**sent** [1] - 26:16
**sentence** [2] - 6:20, 40:11
**separate** [7] - 9:5, 9:6, 25:1, 36:5, 40:22, 47:9, 53:23
**separately** [2] - 8:19, 18:20
**September** [1] - 40:14
**serves** [1] - 4:1
**service** [2] - 19:20, 24:17
**services** [2] - 39:18, 55:22
**set** [1] - 40:10
**several** [4] - 11:13, 12:8, 35:3, 35:7
**shall** [2] - 22:20, 40:12
**shape** [1] - 48:4
**shift** [2] - 35:6, 49:23
**short** [4] - 18:13, 18:24, 19:2, 19:5
**short-term** [3] - 18:13, 18:24, 19:5
**show** [14] - 12:25, 14:21, 17:1, 21:23, 22:2, 23:3, 23:5, 23:11, 25:24, 30:13,

30:14, 32:14, 32:17
**showing** [1] - 25:13
**shown** [2] - 22:2, 40:23
**shows** [2] - 22:3, 40:2
**shut** [1] - 26:15
**side** [1] - 3:12
**sides** [2] - 42:23, 57:22
**signed** [2] - 22:17, 30:20
**significant** [2] - 10:10, 20:13
**similar** [3] - 3:17, 11:9, 11:16
**similarly** [8] - 19:18, 34:1, 34:15, 39:15, 41:6, 49:19, 52:25, 56:10
**simply** [1] - 10:10
**single** [2] - 4:25, 10:16
**sit** [2] - 33:5, 36:20
**sitting** [1] - 5:19
**situated** [7] - 34:1, 34:16, 39:15, 41:6, 49:19, 52:25, 56:10
**situation** [1] - 28:14
**situations** [2] - 25:25, 28:11
**size** [1] - 60:1
**skimmed** [3] - 27:14, 27:17, 28:14
**skimming** [3] - 28:3, 28:4, 32:16
**small** [1] - 15:9
**so..** [2] - 17:5, 60:12
**Social** [3] - 49:9, 51:22, 52:5
**solely** [1] - 15:5
**someone** [6] - 11:14, 16:17, 27:20, 50:18, 50:25, 51:1
**sometimes** [3] - 8:3, 8:4, 36:24
**somewhat** [1] - 48:8
**soon** [1] - 26:15
**sort** [11] - 2:23, 4:11, 15:20, 18:8, 18:9, 19:11, 25:2, 25:13, 27:5, 27:18, 57:5
**sounds** [1] - 51:1
**source** [1] - 54:12
**Southern** [2] - 4:3, 5:25
**spare** [1] - 3:2
**speaking** [2] - 2:19, 2:22
**spear** [1] - 54:19
**special** [1] - 25:20
**specific** [1] - 15:14

**specifically** [1] - 35:16
**specify** [1] - 32:9
**speed** [1] - 3:4
**spelled** [3] - 25:3, 25:11
**spend** [3] - 9:3, 47:15, 58:15
**spent** [1] - 47:15
**spring** [1] - 48:2
**staff** [1] - 36:3
**stafford** [1] - 38:24
**Stafford** [2] - 44:12, 46:3
**stage** [2] - 5:23, 55:6
**standard** [3] - 21:19, 23:10, 25:11
**standing** [1] - 21:10
**stands** [1] - 61:5
**start** [4] - 3:12, 6:7, 27:11, 36:22
**started** [3] - 3:24, 32:8, 50:11
**starting** [1] - 2:9
**State** [2] - 8:20, 23:17
**state** [21] - 5:10, 9:6, 10:5, 10:7, 14:9, 21:6, 21:15, 21:18, 22:11, 23:12, 23:14, 23:16, 24:7, 24:8, 24:9, 24:14, 43:20, 43:24, 45:19, 53:25, 59:9
**States** [3] - 38:23, 46:16, 47:25
**states** [3] - 4:17, 22:19, 46:25
**STATES** [2] - 1:1, 1:8
**status** [2] - 3:19, 21:22
**statute** [17] - 17:9, 32:4, 36:2, 36:16, 36:17, 36:18, 36:19, 40:7, 41:9, 41:12, 42:8, 42:12, 44:17, 46:17, 48:6, 48:24
**statutes** [1] - 46:16
**statutory** [10] - 16:2, 16:5, 16:6, 41:23, 48:10, 48:19, 55:3, 56:11, 56:23, 57:11
**step** [1] - 32:21
**still** [3] - 23:8, 32:25, 37:15
**stolen** [4] - 26:12, 30:25, 32:15, 50:18
**store** [1] - 51:10
**stored** [2] - 35:13, 60:2
**storing** [2] - 31:12, 31:20

**straightforward** [2] - 19:5, 59:24
**Street** [1] - 1:23
**strenuously** [1] - 41:16
**strip** [4] - 35:8, 35:9, 49:7, 49:11
**stripe** [11] - 26:24, 27:4, 27:7, 27:12, 27:14, 27:19, 28:7, 32:14, 49:11, 49:22, 51:4
**stripes** [3] - 31:11, 31:23, 50:5
**strips** [2] - 32:1, 32:5
**strong** [2] - 42:12, 56:16
**stronger** [1] - 60:9
**strongly** [4] - 54:23, 58:21, 58:22, 60:6
**struggling** [1] - 34:14
**stuff** [1] - 42:22
**sub** [2] - 43:7
**subject** [4] - 9:14, 17:16, 19:20, 41:20
**submitted** [3] - 22:23, 22:24, 23:1
**subparagraph** [1] - 24:22
**subsection** [5] - 37:22, 38:6, 38:21, 39:12, 40:12
**Subsection** [6] - 37:24, 38:2, 38:15, 38:16, 38:18, 40:23
**subsections** [1] - 43:7
**subsequently** [2] - 38:22, 44:10
**substituted** [2] - 40:25, 41:1
**sue** [5] - 22:1, 23:2, 23:14, 23:24, 57:8
**suffered** [1] - 26:19
**suffers** [1] - 26:21
**sufficiently** [1] - 50:7
**suggest** [1] - 43:5
**suggestion** [1] - 16:22
**summarize** [1] - 35:22
**support** [5] - 21:21, 26:2, 30:10, 31:16, 32:3
**supports** [2] - 36:19, 49:20
**suppose** [1] - 52:2
**supposed** [2] - 56:2, 60:10
**surely** [1] - 25:18
**surprising** [2] - 20:11, 29:22
**surrebuttal** [1] - 47:1

**survive** [4] - 32:10, 56:16, 57:11, 57:25
**surviving** [1] - 56:22
**susceptible** [1] - 27:5
**suspects** [2] - 13:18, 13:19
**suspicious** [1] - 58:13
**system** [1] - 50:24

## T

**Tara** [2] - 1:13, 2:12
**tax** [2] - 19:22, 36:13
**taxability** [1] - 20:2, 20:16
**taxable** [2] - 20:8
**taxation** [1] - 19:20
**technology** [5] - 10:6, 26:24, 32:18, 49:22
**temporarily** [1] - 36:7
**ten** [1] - 58:17
**tender** [2] - 48:15, 48:16
**tendered** [2] - 48:20, 54:5
**term** [9] - 9:13, 18:13, 18:24, 19:4, 19:5, 23:4, 38:11, 38:17, 39:16
**termination** [1] - 40:17
**terms** [7] - 8:16, 9:3, 11:13, 21:11, 53:1, 55:21, 59:4
**terribly** [1] - 48:21
**test** [3] - 24:19, 24:20, 24:23
**tethered** [1] - 40:4
**THE** [93] - 1:1, 1:1, 1:7, 2:3, 2:5, 2:17, 3:3, 3:7, 4:5, 4:9, 4:15, 4:21, 5:2, 5:7, 5:12, 5:22, 6:2, 6:6, 6:13, 6:19, 6:22, 6:25, 7:17, 7:21, 8:15, 9:8, 9:11, 9:20, 10:3, 10:13, 10:18, 10:24, 11:1, 11:4, 12:15, 14:18, 15:18, 16:21, 17:6, 17:11, 17:22, 18:6, 19:16, 20:19, 20:24, 22:5, 22:13, 23:7, 26:22, 28:19, 29:1, 29:19, 31:7, 32:19, 32:22, 33:2, 33:6, 34:5, 34:9, 35:1, 36:21, 37:13, 37:18, 37:21, 41:22, 42:20, 44:18, 45:22, 46:10, 46:19,

47:3, 48:7, 50:9, 51:3, 51:6, 51:9, 51:18, 52:1, 52:23, 53:8, 53:10, 53:20, 54:11, 54:24, 56:18, 57:13, 59:2, 59:12, 60:13, 60:18, 60:22, 61:4, 61:5
**theft** [1] - 50:24
**themselves** [1] - 10:1
**theoretical** [1] - 45:7
**theoretically** [1] - 45:22
**theory** [2] - 21:14, 26:5
**therefore** [11] - 8:1, 11:5, 15:13, 18:19, 21:9, 24:22, 27:16, 44:13, 44:16, 45:4, 46:5
**thereof** [1] - 43:21
**they've** [1] - 36:13
**thinking** [1] - 50:11
**third** [21] - 14:12, 20:22, 21:3, 21:5, 21:22, 21:25, 22:1, 22:4, 23:2, 23:10, 23:23, 23:24, 24:3, 24:19, 24:20, 24:24, 37:7, 44:4, 49:7, 55:8
**third-party** [12] - 14:12, 20:22, 21:3, 21:5, 21:22, 23:2, 23:10, 23:24, 24:3, 24:19, 24:20, 55:8
**Thomas** [3] - 1:16, 2:13, 3:22
**thousand** [1] - 12:20
**threat** [1] - 13:10
**throwaway** [1] - 52:11
**THURSDAY** [1] - 1:8
**ticket** [1] - 33:8
**tie** [2] - 41:10, 42:13
**tied** [1] - 45:15
**tightening** [1] - 47:16
**timely** [1] - 16:1
**timing** [1] - 32:6
**tiny** [1] - 47:2
**today** [4] - 37:3, 50:12, 52:18, 57:21
**today's** [1] - 7:25
**together** [2] - 35:4, 36:18
**toll** [1] - 55:22
**took** [4] - 50:18, 50:19, 50:20, 53:5
**tornado** [1] - 47:8
**tort** [6] - 20:23, 25:4, 25:10, 25:24, 26:6,

28:16
**totally** [1] - 47:11
**touch** [1] - 28:23
**touched** [1] - 50:4
**traceable** [1] - 15:3
**track** [3] - 36:2, 36:3
**transaction** [4] - 11:16, 11:21, 12:10, 58:13
**transactions** [4] - 12:21, 12:22, 25:6, 27:3
**TRANSCRIPT** [1] - 1:7
**transfer** [1] - 49:2
**Transfer** [9] - 12:4, 34:24, 35:15, 35:22, 36:19, 41:3, 41:18, 54:7, 56:8
**transfers** [1] - 35:5
**Transfers** [1] - 12:7
**transmitting** [2] - 31:13, 31:20
**transparent** [1] - 55:1
**travel** [1] - 33:8
**treated** [3] - 19:18, 39:24, 40:1
**trigger** [2] - 45:9, 45:23
**triggers** [4] - 43:12, 44:17, 45:15, 46:2
**trouble** [1] - 6:23
**true** [4] - 51:11, 52:6, 55:25, 57:16
**Trump** [3] - 36:6, 39:5, 40:18
**Trump's** [1] - 40:8
**try** [2] - 55:1, 60:4
**trying** [1] - 11:7, 16:24, 23:23
**turn** [1] - 21:3
**two** [17] - 3:2, 7:4, 9:14, 10:3, 11:12, 12:13, 19:11, 20:21, 31:9, 53:23, 55:16, 57:3, 60:19, 60:20, 60:21
**two-year** [2] - 9:14, 10:3
**typically** [3] - 18:12, 52:7

## U

**U.S.C** [2] - 38:2, 38:20
**Uber** [1] - 16:19
**ultimately** [2] - 16:3, 46:3
**unable** [2] - 53:1, 60:11
**unauthorized** [9] -

11:16, 11:21, 12:10, 12:21, 13:20, 25:5, 35:5, 35:8, 35:14
**unbanked** [4] - 33:16, 33:17, 51:16, 52:10
**uncommon** [1] - 9:1
**unconnected** [1] - 40:17
**uncontested** [1] - 13:1
**undeniably** [2] - 57:16, 58:9
**under** [39] - 8:17, 13:16, 17:9, 19:15, 19:23, 20:7, 20:10, 31:8, 31:9, 31:19, 35:20, 35:21, 37:11, 37:16, 37:22, 38:2, 38:15, 38:16, 38:17, 38:19, 38:24, 39:11, 39:22, 39:25, 40:10, 44:12, 45:25, 48:18, 48:23, 49:11, 53:6, 53:24, 53:25, 55:3, 56:10, 57:8
**unemployed** [1] - 8:4
**unemployment** [25] - 5:4, 5:6, 5:11, 7:3, 8:6, 16:13, 16:17, 16:24, 17:2, 17:3, 17:11, 18:11, 18:17, 18:21, 19:19, 21:16, 24:10, 25:19, 40:24, 46:20, 59:6, 59:7, 59:8, 59:10
**Unemployment** [1] - 7:2
**unfair** [3] - 31:4, 31:6, 49:22
**unfrozen** [1] - 14:1
**unique** [4] - 16:10, 16:14, 48:24, 48:25
**UNITED** [2] - 1:1, 1:8
**United** [3] - 38:23, 46:16, 47:25
**unlawful** [1] - 13:20
**unnamed** [1] - 31:18
**unrelated** [1] - 60:16
**unsafe** [1] - 30:6
**unsigned** [1] - 8:23
**unusual** [1] - 16:10
**up** [11] - 3:24, 6:20, 16:11, 22:5, 27:15, 30:20, 33:19, 49:15, 50:15, 51:18, 58:14
**updated** [1] - 9:12
**urge** [2] - 58:21, 58:22
**urgency** [1] - 35:24
**uses** [4] - 27:25, 28:13, 32:6, 35:6

## V

**vaccinated** [2] - 2:19, 2:21
**valid** [1] - 54:21
**validation** [1] - 35:11
**value** [3] - 34:17, 35:13, 60:2
**various** [3] - 29:18, 38:12, 43:7
**vendor** [1] - 50:19
**verification** [3] - 35:11, 50:24, 51:12
**verify** [3] - 16:24, 51:15, 51:16
**version** [1] - 8:14
**versus** [1] - 25:7
**veterans** [2] - 35:16
**Vietnam** [1] - 35:16
**view** [23] - 18:23, 35:23, 39:8, 41:18, 42:3, 47:5, 47:21, 47:22, 47:24, 50:6, 52:19, 53:15, 53:25, 54:3, 54:15, 55:1, 55:19, 56:1, 56:10, 59:15, 59:25, 60:5
**views** [3] - 34:20, 47:19, 60:9
**violated** [2] - 31:12, 31:23
**violation** [7] - 14:24, 16:2, 31:5, 32:1, 32:18, 48:22
**violence** [1] - 58:3
**Virginia** [2] - 1:17, 2:15
**virtue** [1] - 54:7
**voice** [1] - 6:20
**vs** [2] - 1:4, 2:6

## W

**wait** [2] - 37:14, 60:25
**walk** [2] - 16:8, 46:2
**walked** [1] - 19:6
**wallet** [1] - 51:14
**wants** [2] - 28:6, 43:2
**War** [1] - 47:16
**warrant** [2] - 38:23, 44:11
**ways** [1] - 18:24
**we'll..** [1] - 43:3
**website** [1] - 9:24
**weeds** [1] - 5:19
**weeks** [1] - 60:25
**welfare** [7] - 24:9, 43:22, 44:3, 44:15, 45:6, 45:21, 46:7
**Wells** [1] - 25:7

**whole** [7] - 11:22, 11:25, 19:12, 24:24, 48:12, 48:16, 56:7
**wholly** [1] - 39:6
**William** [1] - 21:20
**window** [2] - 15:4, 15:16
**wisdom** [1] - 47:24
**wondering** [2] - 4:9, 60:14
**word** [1] - 42:8
**words** [4] - 39:6, 39:8, 39:11, 40:25
**worker** [1] - 46:21
**workers** [1] - 16:18
**works** [3] - 7:23, 11:10, 24:8
**world** [1] - 27:23
**World** [1] - 47:16
**worry** [2] - 13:8, 60:17
**worth** [1] - 12:20
**written** [1] - 41:12
**wrongfully** [1] - 14:23
**wrote** [3] - 33:13, 34:3, 55:9

## Y

**YAGOUB** [1] - 1:3
**year** [4] - 9:14, 10:2, 10:3, 25:8
**years** [4] - 10:11, 12:8, 35:3, 35:7
**yesterday** [3] - 9:24, 54:25, 60:15
**Yick** [2] - 3:15, 3:24

## Z

**zero** [3] - 11:19, 11:24, 15:12
**zoning** [1] - 24:5

## §

**§1005.15** [1] - 18:2
**§1005.2** [1] - 36:23
**§139** [1] - 38:2
**§165** [1] - 38:20

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2023, I electronically filed the foregoing Joint Appendix with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Jessica Garland*
Jessica Garland