No. 22-1954

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

————————————

**YAGOUB M. MOHAMED,**

*Plaintiff-Appellant,*

**v.**

**BANK OF AMERICA, N.A.,**

*Defendant-Appellee.*

————————————

On Appeal from the United States District Court
for the District of Maryland, No. 1:21-cv-1283 (Blake, J.)

————————————

## DEFENDANT-APPELLEE'S RESPONSE BRIEF

————————————

William M. Jay
Thomas M. Hefferon
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
wjay@goodwinlaw.com

*Admitted to practice only in New York
and Virginia; not admitted in the
District of Columbia; practicing under
the supervision of DC-admitted partners
of the firm*

*Counsel for Defendant-Appellee
Bank of America, N.A.*

March 6, 2023

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __22-1954__        Caption: __Mohamed v. Bank of America, N.A.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Bank of America, N.A.__
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?    ☑ YES ☐ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

      Bank of America, N.A. is a direct, wholly owned subsidiary of BAC North America Holding Company. BAC North America Holding Company is a direct, wholly owned subsidiary of NB Holdings Corporation. NB Holdings Corporation is a direct, wholly owned subsidiary of Bank of America Corporation, which is a publicly held company and has no parent corporation.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☑ YES ☐ NO
      If yes, identify all such owners:

      Bank of America, N.A. is an indirect subsidiary of Bank of America Corporation, a publicly held corporation whose shares are traded on the New York Stock Exchange. Bank of America Corporation has no parent corporation. Berkshire Hathaway Inc., 3555 Farnam Street, Omaha, Nebraska 68131, beneficially owns greater than 10% of Bank of America Corporation's outstanding common stock. No publicly held corporation other than Bank of America Corporation owns 10% or more of the stock of Bank of America, N.A.

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

N/A

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

N/A

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

N/A

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

N/A

Signature: /s/ William M. Jay    Date:    03/06/23

Counsel for: Bank of America, N.A.

- 2 -

Print to PDF for Filing

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ........................................................3

ISSUES PRESENTED ...........................................................................3

STATEMENT ..........................................................................................3

SUMMARY OF ARGUMENT ..............................................................19

STANDARD OF REVIEW ....................................................................22

ARGUMENT .........................................................................................22

I.    Mohamed did not plausibly allege, or even argue, that his
      account is a government benefit account. ..................................22

      A.   Mohamed expressly disclaimed any argument that his
           account was "established by a government agency." ..........23

      B.   Mohamed's account is not a government benefit
           account because it was "established by" BANA .................28

II.   Pandemic unemployment assistance payments are qualified
      disaster relief payments made "to promote the general
      welfare." ......................................................................................42

      A.   Mohamed forfeited his argument that the pandemic
           unemployment assistance payments he received were
           not made "to promote the general welfare." .......................43

      B.   Whether pandemic unemployment assistance
           payments are taxed is irrelevant to whether they were
           made to promote the general welfare. ...............................45

CONCLUSION .....................................................................................54

CERTIFICATE OF COMPLIANCE ....................................................55

CERTIFICATE OF SERVICE .............................................................56

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................22

*Bd. of Trs. v. Four-C-Aire, Inc.,*
    42 F.4th 300 (4th Cir. 2022) ...............................................44

*Berg v. Kingdom of Netherlands,*
    24 F.4th 987 (4th Cir. 2022) ...............................................23

*Bubble Room, Inc. v. United States,*
    159 F.3d 553 (Fed. Cir. 1998) ............................................49

*Consolidation Coal Co. v. Necessary,*
    272 F. App'x 273 (4th Cir. 2008).......................................28

*Cox v. SNAP, Inc.,*
    859 F.3d 304 (4th Cir. 2017)...............................................24

*Fairfax v. CBS Corp.,*
    2 F.4th 286 (4th Cir. 2021) .................................................22

*Flemming v. Nestor,*
    363 U.S. 603 (1960)..............................................................49

*Grayson O Co. v. Agadir Int'l LLC,*
    856 F.3d 307 (4th Cir. 2017)...............................................28

*Hannemann v. S. Door Cnty. Sch. Dist.,*
    673 F.3d 746 (7th Cir. 2012)...............................................45

*Johnson v. Oroweat Foods Co.,*
    785 F.2d 503 (4th Cir. 1986)...............................................30

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019)..........................................................29

ii

*Muth v. United States*,
   1 F.3d 246 (4th Cir. 1993)................................................................23

*Nadendia v. WakeMed*,
   24 F.4th 299 (4th Cir. 2022) ..........................................................22

*Nzabandora v. Rectors of Univ. of Va.*,
   749 F. App'x 173 (4th Cir. 2018).....................................................24

*Omni Outdoor Advertising, Inc. v. Columbia Outdoor
   Advertising, Inc.*,
   974 F.2d 502 (4th Cir. 1992) ...........................................................28

*Southern Walk at Broadlands Homeowner's Ass'n v.
   OpenBand at Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013)............................................................29

*In re Triangle Capital Corp. Securities Litig.*,
   988 F.3d 743 (4th Cir. 2021)............................................................30

*United Food & Com. Workers v. Marval Poultry Co.*,
   876 F.2d 346 (4th Cir. 1989)............................................................45

*United Supreme Council v. United Supreme Council of the
   Ancient Accepted Scottish Rite*,
   792 F. App'x 249 (4th Cir. 2019)......................................................23

*Wood v. Crane Co.*,
   764 F.3d 316 (4th Cir. 2014)............................................................24

**Constitution and Statutes:**

U.S. Const. pmbl............................................................................47

U.S. Const. art. I, § 8, cl. 1 ................................................................47

15 U.S.C. § 1693. ................................................................................2

15 U.S.C. § 1693(b) .............................................................................4

15 U.S.C. § 1693a(2) ......................................................................4, 25

iii

15 U.S.C. § 1693a(7) ........................................................................ 4

15 U.S.C. § 1693c ............................................................................. 4

15 U.S.C. § 1693d ............................................................................ 4

15 U.S.C. § 1693f ............................................................................. 4

15 U.S.C. § 1693g ............................................................................ 4

15 U.S.C. § 1693h ............................................................................ 4

15 U.S.C. § 1693o-2 ........................................................................ 36

15 U.S.C. § 9021(a)(3)(A) .............................................................. 15

15 U.S.C. § 9021(b) ......................................................................... 9

15 U.S.C. § 9021(f) .......................................................................... 9

15 U.S.C. § 9021(h) ......................................................................... 9

26 U.S.C. § 61 ................................................................................. 47

26 U.S.C. § 85 ................................................................................. 49

26 U.S.C. § 85(c) ............................................................................ 50

26 U.S.C. § 86(a) ............................................................................ 49

26 U.S.C. § 86(b) ............................................................................ 49

26 U.S.C. § 139 ............................................................................... 44

26 U.S.C. § 139(b) ...................................................................... 7, 46

26 U.S.C. § 139(c)(2) ....................................................................... 7

26 U.S.C. § 139(c)(4) ....................................................................... 7

26 U.S.C. § 165(i)(5)(A) .................................................................. 7

28 U.S.C. § 1331 .............................................................................. 3

iv

28 U.S.C. § 1367 ......................................................................... 3

42 U.S.C. § 5121 ......................................................................... 7

42 U.S.C. § 5170 ......................................................................... 8

42 U.S.C. § 5177(a) ..................................................................... 9

42 U.S.C. § 5191 ......................................................................... 8

American Rescue Plan Act of 2021, Pub. L. No. 117-2:

§ 9011, 135 Stat. 118 ............................................................ 50

§ 9012, 135 Stat. 118 ............................................................ 50

§ 9013, 135 Stat. 119 ............................................................ 50

§ 9014, 135 Stat. 119 ............................................................ 50

§ 9015, 135 Stat. 119 ............................................................ 50

§ 9016, 135 Stat. 119 ............................................................ 50

§ 9017, 135 Stat. 120 ............................................................ 50

§ 9018, 135 Stat. 120 ............................................................ 50

§ 9021, 135 Stat. 120 ............................................................ 50

§ 9022, 135 Stat. 120 ............................................................ 50

§ 9042(a), 135 Stat. 122 ........................................................ 50

§ 9042(c), 135 Stat. 122 ........................................................ 50

Robert T. Stafford Disaster Relief and Emergency Assistance
    Act, Pub. L. No. 93-288, 88 Stat. 43 (1974) (codified as
    amended at 42 U.S.C. § 5121 *et seq.*) .................................. 7

**Rules and Regulations:**

12 C.F.R. Pt. 235 ..................................................................... 36

12 C.F.R. § 235.1 ..................................................................... 36

12 C.F.R. § 1005.2(b) ................................................................ 4

12 C.F.R. § 1005.2(b)(3) ........................................................... 5

12 C.F.R. § 1005.2(b)(3)(i)(A) ................................................. 5

12 C.F.R. § 1005.2(b)(3)(i)(B) ........................................... 5, 29

12 C.F.R. § 1005.2(b)(3)(i)(C) .......................................... 6, 21

12 C.F.R. § 1005.2(b)(3)(i)(D) .......................................... 6, 21

12 C.F.R. § 1005.2(b)(3)(ii)(B) ..................................... 6, 21, 46

12 C.F.R. § 1005.2(b)(3)(ii)(E) ............................................. 5

12 C.F.R. § 1005.9(b) .............................................................. 32

12 C.F.R. § 1005.15 ............................................ 20, 31, 34, 42

12 C.F.R. § 1005.15(a) ............................................................ 31

12 C.F.R. § 1005.15(a)(1) ............................................. 5, 31, 32

12 C.F.R. § 1005.15(a)(2) ............................ 5, 20, 29, 31, 37, 41

12 C.F.R. § 1005.15(b) ............................................................ 32

12 C.F.R. § 1005.15(c) ............................................................. 5

12 C.F.R. § 1005.15(c)(1) ....................................................... 32

12 C.F.R. § 1005.15(d) ............................................................ 5

12 C.F.R. § 1005.15(d)(1) ....................................................... 33

12 C.F.R. § 1005.15(d)(2) ....................................................... 32

12 C.F.R. § 1005.15(e) ............................................................ 5

12 C.F.R. § 1005.15(e)(1)(i) .................................................... 33

12 C.F.R. § 1005.15(e)(3)(i) ....................................................... 33

12 C.F.R. § 1005.15(e)(4)(i) ....................................................... 33

12 C.F.R. § 1005.15(f) ............................................................... 32

12 C.F.R. § 1005.18(a) .............................................................. 32

59 Fed. Reg. 10,678 (Mar. 7, 1994) ...................................... 5, 38

81 Fed. Reg. 83,934 (Nov. 22, 2016) ....................... 6, 37, 38, 52

85 Fed. Reg. 23,217 (Apr. 27, 2020) ........................................ 40

**Other Authorities:**

Bd. of Governors of the Federal Reserve, *Report to Congress:*
    *Government-Administered, General-Use Prepaid Cards*
    (July 2014) ................................................................... 36, 37

Bd. of Governors of the Federal Reserve, *Report to Congress:*
    *Government-Administered, General-Use Prepaid Cards*
    (Oct. 2021) ............................................................. 35, 36, 37

CDC, *First Travel-related Case of 2019 Novel Coronavirus*
    *Detected in United States* (Jan. 21, 2020) ............................ 7

CFPB, *Bulletin 2022-02: Compliance Bulletin on the*
    *Electronic Fund Transfer Act's Compulsory Use*
    *Prohibition and Government Benefit Accounts* (Feb. 15,
    2022) ........................................................................... 39, 40

CFPB, *§ 1005.15 Electronic fund transfer of government*
    *benefits* .......................................................................... 29

147 Cong. Rec. H10127-38 (daily ed. Dec. 13, 2001) ............... 50

*Establish*, Black's Law Dictionary (11th ed. 2019) ............. 30, 38

Jenny Fulginiti, et al., *2020 Timeline: Coronavirus in*
    *Maryland* (Jan. 4, 2022) ................................................... 15

*The Greatest Theft of American Tax Dollars: Unchecked Unemployment Fraud—Hearing Before the House Comm. on Ways and Means*, No. 19-23-003-03-315 (Feb. 8, 2023) ............... 14

H.R. Rep. No. 95-1445 (1978) .................................................................. 50

*Hold*, Black's Law Dictionary (11th ed. 2019) ......................................... 38

IRS Chief Counsel Advice 200648027 (Dec. 1, 2006) ....................... 47, 48

Letter from President Donald J. Trump to Federal Agencies on Emergency Determination Under the Stafford Act (Mar. 13, 2020) ...................................................................................... 8

Md. Dep't of Lab., *Maryland Department of Labor Provides Updates on Fraud Investigation* (Sept. 17, 2020) .................. 13, 14, 15

N.J. Dep't of Labor & Workforce Development: Division of Unemployment Insurance, *How you'll get your money* ..................... 41

N.Y. Dep't of Labor, *Unemployment Insurance Payment Options* ........................................................................................... 41

Rev. Rul. 63-167 (IRS RRU), 1963-2 C.B. 17, 1963 WL 13753 (1963) ...................................................................................... 49

TED: The Economics Daily, *Temporary layoffs remain high following unprecedented surge in early 2020,* Bureau of Labor Statistics (Feb. 10, 2021) ..................................................... 13

U.S. Dep't of Health & Human Servs., *Determination That a Public Health Emergency Exists* (Jan. 31, 2020) ............................... 8

White House, President Donald J. Trump Approves Maryland's Disaster Declaration (Mar. 26, 2020) ............................... 8

## INTRODUCTION

After the COVID-19 pandemic struck in early 2020, millions of Americans lost their jobs or livelihoods as the nation and the economy struggled to endure shutdowns and other disruptions. Congress responded quickly by adopting multiple programs to promote the public welfare in this time of emergency, including "pandemic unemployment assistance," which provided hundreds of billions of dollars in aid to individuals who did not qualify for traditional unemployment benefits.

The State of Maryland worked alongside Bank of America, N.A. (BANA), to distribute these much-needed assistance payments to Maryland claimants through BANA prepaid debit cards. But despite tireless efforts by BANA, Maryland, other States, and the federal government, tens of thousands of criminals descended on unemployment programs and sought to steal benefits from those who needed them. In Maryland and across the country, they launched a slew of sophisticated fraudulent schemes to pocket Congress's disaster relief for themselves.

One of these schemes unfortunately affected Mohamed, whose prepaid debit card loaded with pandemic unemployment assistance benefits was stolen before he even received it. Although BANA has since

credited back to Mohamed the full amount stolen from his account, he contends that BANA's response to the theft failed to comply with the Electronic Fund Transfer Act of 1978 (EFTA), 15 U.S.C. § 1693 *et seq.*, and its implementing regulation, Regulation E. But the district court recognized that Mohamed's account did not fall within EFTA's or Regulation E's scope and dismissed his complaint.

This Court should affirm the district court's judgment. Mohamed has forfeited both of the arguments he asserts in his brief, both of which he raises for the first time on appeal. And both new arguments also fail on the merits. Mohamed's account is not a "government benefit account," because it was established by BANA, not any government agency. And pandemic unemployment assistance is the type of "qualified disaster relief payment" that is expressly excluded from Regulation E, precisely because urgent assistance payments like these need to be distributed as quickly as possible. Because Mohamed's account was loaded only with qualified disaster relief payments, it was not a "prepaid account" subject to the statutory and regulatory requirements Mohamed seeks to invoke.

2

## JURISDICTIONAL STATEMENT

Mohamed's jurisdictional statement is correct, except that the district court had jurisdiction under 28 U.S.C. § 1331 and (for the state-law claims) § 1367.  JA10.

## ISSUES PRESENTED

1.     Whether Mohamed forfeited the two arguments he raises on appeal—that his account is a "government benefit account," and, alternatively, that his account did not fall into the exclusion for "qualified disaster relief payments" because pandemic unemployment assistance was not made "to promote the general welfare"—by failing to raise either of them in the district court.

2.     Whether Mohamed's account fails to qualify as a "government benefit account" because it was not "established by a government agency."

3.     Whether pandemic unemployment assistance payments are qualified disaster relief payments, such that an account containing only such payments is exempted from EFTA and Regulation E.

## STATEMENT

The only claim at issue in this appeal is Mohamed's claim for statutory damages under EFTA.  The district court dismissed that claim

3

because it concluded that pandemic unemployment assistance is exempted from EFTA as a result of the President's disaster declarations in response to the COVID-19 pandemic. As explained below, the arguments Mohamed and his new counsel are making in this Court were not raised in the district court; one of them was even affirmatively conceded.

1.    EFTA is a 1978 statute that regulates "the rights, liabilities, and responsibilities of participants in electronic fund and remittance transfer systems." 15 U.S.C. § 1693(b). It directs financial institutions to make various disclosures about the terms and conditions of electronic funds transfers, *id.* § 1693c; requires documentation of each electronic funds transfer, *id.* § 1693d; creates procedures for resolving a consumer's claim of an error in an electronic funds transfer, *id.* § 1693f; and sets rules for consumers' and financial institutions' liability arising from unauthorized, missed, or erroneous electronic funds transfers, *id.* §§ 1693g-1693h.

EFTA's relevant requirements apply only to a covered "account," which is a defined term under the statute and regulations. *See id.* § 1693a(2) ("account"), (7) ("electronic fund transfer"); 12 C.F.R.

§ 1005.2(b). For many years, EFTA categorically did not apply to accounts created to distribute government benefits, which fell outside the definition of an "account." *See* 59 Fed. Reg. 10,678, 10,679 (Mar. 7, 1994). Through rulemaking, certain accounts of this nature are now subject to a "modified" form of EFTA's requirements, 12 C.F.R. § 1005.15(a)(1), (c)-(e), but others remain excepted or exempted. *See id.* §§ 1005.2(b)(3)(ii)(E), 1005.15(a)(2).

Regulation E, which implements EFTA, regulates many types of consumer financial products, including, as relevant here, prepaid debit cards. The regulation defines an "account" to include a "prepaid account," a defined term that comprises four categories. 12 C.F.R. § 1005.2(b)(3). The first two categories name specific types of accounts. The first is a "payroll card account," which no party claims is at issue here. *Id.* § 1005.2(b)(3)(i)(A). The second category, a "government benefit account," *id.* § 1005.2(b)(3)(i)(B), is "an account established by a government agency for distributing government benefits to a consumer electronically," *id.* § 1005.15(a)(2).

5

The third and fourth categories are written much more broadly,[1] with no specific kind of account named, but they each have an exception that is relevant here:  they exclude any "account that is directly or indirectly established through a third party and loaded only with qualified disaster relief payments."  *Id.* § 1005.2(b)(3)(ii)(B).  The regulatory guidance looks to the Internal  Revenue Code to give meaning to that exception, stating that "qualified disaster relief funds" are "funds made available through a qualified disaster relief program as defined in 26 U.S.C. 139(b)."  81 Fed. Reg. 83,934, 84,347 (Nov. 22, 2016).

In turn, Section 139(b)'s definition of "qualified disaster relief payments" includes, as relevant here, "any amount paid to or for the benefit of an individual" if that "amount is paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection

---

[1] The third category includes any account "that is marketed or labeled as 'prepaid' and that is redeemable upon presentation at multiple, unaffiliated merchants … or usable at automated teller machines."  *Id.* § 1005.2(b)(3)(i)(C).  The fourth category includes any account that "is issued on a prepaid basis" or "capable of being loaded with funds … [w]hose primary function is to conduct transactions," as long as it is "not a checking account, share draft account, or negotiable order of withdrawal account."  *Id.* § 1005.2(b)(3)(i)(D).  As explained in the text, the regulation expressly excludes some types of accounts from these two prongs of the "prepaid account" definition.

with a qualified disaster in order to promote the general welfare." 26 U.S.C. § 139(b). And a "qualified disaster" includes (but is not limited to) a "federally declared disaster," *id.* § 139(c)(2), which is a "disaster subsequently determined by the President of the United States to warrant assistance by the Federal Government under the Robert T. Stafford Disaster Relief and Emergency Assistance Act," *id.* § 165(i)(5)(A).[2]    The "qualified disaster" definition also includes "a disaster which is determined by an applicable Federal, State, or local authority (as determined by the Secretary) to warrant assistance from the Federal, State, or local government or agency or instrumentality thereof." *Id.* § 139(c)(4).[3]

2.    The COVID-19 pandemic was one such disaster. The United States saw its first confirmed case of COVID-19 on January 21, 2020. CDC, *First Travel-related Case of 2019 Novel Coronavirus Detected in*

---

[2] The Stafford Act (Pub. L. No. 93-288, 88 Stat. 43 (1974), as amended) is codified mainly at 42 U.S.C. § 5121 *et seq.*

[3] Because this case involves a federally declared disaster and federal assistance, there is no material difference between (c)(2) and (c)(4). The latter, broader definition specifically applies to this type of disaster-relief payment, *i.e.*, government disaster-assistance payments "described in subsection (b)(4)," which is quoted in the text.

7

*United States* (Jan. 21, 2020), https://www.cdc.gov/media/releases/2020/p 0121-novel-coronavirus-travel-case.html. Ten days later, the U.S. Department of Health and Human Services declared that COVID-19 posed a public health emergency in the United States. *Determination That a Public Health Emergency Exists* (Jan. 31, 2020), https://www.phe. gov/emergency/news/healthactions/phe/Pages/2019-nCoV.aspx (declaring that emergency "has existed since January 27, 2020"). By the end of March, the President had declared the pandemic both an "emergency" and a "major disaster" under the Stafford Act. *See* 42 U.S.C. §§ 5170, 5191; Letter from President Donald J. Trump to Federal Agencies on Emergency Determination Under the Stafford Act (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/letter -president-donald-j-trump-emergency-determination-stafford-act/; White House, President Donald J. Trump Approves Maryland's Disaster Declaration (Mar. 26, 2020), https://trumpwhitehouse.archives.gov/brief ings-statements/president-donald-j-trump-approves-marylands-disaster -declaration/ (declaring that "that a major disaster exists in the State of Maryland").

The President's disaster declarations authorized aid for "any individual unemployed as a result of a major disaster." 42 U.S.C. § 5177(a). And as large swathes of the country were shutting down and it became clear that millions of people faced losing their jobs, Congress enacted and the President signed the Coronavirus Aid, Relief, and Economic Security (CARES) Act. The CARES Act was a sweeping statute directed to propping up the entire U.S. economy and supporting those affected by the pandemic. One particular program the CARES Act created was "pandemic unemployment assistance," which provided direct payments to millions of covered individuals who were "unemployed, partially unemployed, or unable to work" because of the pandemic and "not entitled to any other unemployment compensation." 15 U.S.C. § 9021(b). Consistent with the statutory purpose and context, Congress provided that the pandemic unemployment assistance program would largely follow the Labor Department's regulations implementing the Stafford Act's disaster unemployment assistance program. *Id.* § 9021(h) (providing that 20 C.F.R. part 625 "shall apply to this section" except in the event of a conflict).

9

3. Although pandemic unemployment assistance was federal, the CARES Act allowed states with "adequate system[s] for administering such assistance" to distribute it. *Id.* § 9021(f). Maryland administered pandemic unemployment assistance for its claimants through its Division of Unemployment Insurance, an agency of the state Department of Labor, Licensing and Regulation. JA11 (Compl. ¶ 13).

Since before the pandemic, recipients of unemployment insurance from Maryland received their benefits through either a prepaid debit card or a paper check issued by the State. *See* JA214. For recipients who received prepaid debit cards, Maryland retained BANA to provide these debit cards. *See* JA11 (Compl. ¶ 14); JA15 (Compl. ¶ 32). Maryland had selected BANA following a Request for Proposals ("RFP") outlining the State's debit-card needs. Mohamed incorporated the RFP into the Complaint. JA11 (Compl. ¶ 14) (citing Md. State Treasurer's Off., *Request for Proposals Elec. Payment Card Servs. for Dep't of Lab., Licensing & Regul., Div. of Unemployment Ins.* (Feb. 21, 2013), https://www.treasurer.state.md.us/media/52202/dllr_epc_01172013_rfp.pdf). Mohamed asserts BANA "accepted" the RFP's "enumerated conditions

10

and requirements" as part of its agreement to a blank form contract attached to the complaint." JA12 (Compl. ¶ 19).[4]

Pursuant to the contract, each account was "establish[ed]" by BANA. More specifically: Maryland identified benefits recipients who had chosen to receive their benefits by debit card. JA25 (Compl. ¶ 69) ("Mohamed signed up to receive his benefits on a Bank of America DUI Debit Card ...."); RFP §§ 3.02, 3.04. BANA then was required to "establish cardholder accounts within four business days," issue a debit card linked to the BANA account, and load funds as Maryland directed in the amounts Maryland identified. RFP § 3.04 ("Contractor must establish cardholder accounts within four business days of receiving all necessary cardholder account information."); *see* RFP § 3.02; JA15 (Compl. ¶ 29) (debit cards were "Bank-issued"); JA64.

BANA and each debit-card recipient were subject to an Account Agreement (JA64-74) that governed their contractual relationship. JA16

---

[4] The blank form contract for the prepaid card program incorporated the RFP as one of its exhibits. JA52, JA54; *see* JA12 (Compl. ¶ 19). The blank form contract also incorporated the offeror's proposal in response to the RFP, among other exhibits, JA52, but Mohamed attached none of these exhibits to his complaint. Because this case was dismissed at the pleading stage, the full set of contractual materials was not before the district court.

11

(Compl. ¶¶ 35-36). This agreement allowed BANA to use its initiative to prevent fraud, including by "[f]reezing" accounts BANA "suspect[ed]" were involved in "irregular, unauthorized, or unlawful activities" and "restrict[ing] access" to the debit cards if it "notice[d] suspicious activity." JA65-66. Likewise, BANA could deduct funds deposited into accounts if the debit-card recipients were not entitled to them. JA65.

If a debit-card recipient believed that an error had occurred within the recipient's account, the Account Agreement required that the recipient inform BANA promptly (within 60 or 120 days, depending on circumstances not relevant here). JA71. After receiving such a notification, BANA had 10 business days to "determine whether an error occurred" and would "correct any error promptly." JA71. However, the Account Agreement allowed BANA to take up to 45 days (or 90 days for certain accounts and transactions, JA72) to complete its investigation, so long as BANA provisionally "credit[ed] [the recipient's] Account within 10 business days for the amount [the recipient] think[s] is in error." JA71. Once BANA completed its investigation, it would inform the recipient within three business days. JA72.

4.    As COVID-19 began to race through the country in March 2020, more than 1.5 million people lost their jobs, with an additional two million people being temporarily laid off but expected to return to work within six months.  TED: The Economics Daily, *Temporary layoffs remain high following unprecedented surge in early 2020*, Bureau of Labor Statistics (Feb. 10, 2021), https://www.bls.gov/opub/ted/2021/temporary-layoffs-remain-high-following-unprecedented-surge-in-early-2020.htm. Just one month later, over half a million additional people had lost their jobs and the number of workers temporarily laid off had skyrocketed to eighteen million.  *Id.*

States "faced an unprecedented increase in the number of individuals filing new claims" and "faced significant challenges due to increased fraudulent activity and identity theft."  Md. Dep't of Lab., *Maryland Department of Labor Provides Updates on Fraud Investigation* (Sept. 17, 2020), https://www.dllr.state.md.us/whatsnews/uifraudupdate. shtml ("*Maryland Fraud Update*").  Pandemic unemployment assistance payments in particular were "extremely susceptible to improper payments including fraud," in part because of the "reliance solely on claimant self-certifications without evidence of eligibility and wages"

13

during the first nine months of the program. *The Greatest Theft of American Tax Dollars: Unchecked Unemployment Fraud—Hearing Before the House Comm. on Ways and Means*, No. 19-23-003-03-315, at 9 (Feb. 8, 2023) (testimony of Larry D. Turner, Inspector General, U.S. Dep't of Labor), http://waysandmeans.house.gov/wp-content/uploads/2023/02/DOL-OIG-IG-Turner-Written-Testimony-HWM-_Final-02062023.pdf; *id.* at 16 (noting that pandemic unemployment assistance was one of "the three pandemic UI [unemployment insurance] programs that posed the greatest risk for fraud, waste, and abuse"). The sheer scale of fraudulent activity led the U.S. Department of Labor's Office of Inspector General alone to execute over 700 search warrants and charge over 1,200 individuals "with crimes related to UI fraud." *Id.* at 12.

Maryland was not spared from these "new and emerging fraud schemes." *Maryland Fraud Update*, *supra*. As Maryland and BANA sought to help people seeking unemployment benefits, unscrupulous individuals launched "a massive and sophisticated criminal enterprise that filed tens of thousands of fraudulent unemployment insurance claims." *Id.* Indeed, Maryland discovered that "nearly 95% of claims initially investigated" for fraud were actually fraudulent, and it

14

committed to continuing its "ongoing efforts to prevent and detect unemployment insurance fraud" to ensure that only "legitimate claimants" received unemployment benefits. *Id.*

Mohamed was one of the millions of people whose income was affected by the COVID-19 pandemic and the associated stay-at-home orders.[5]  As a self-employed individual, Mohamed ordinarily would not have been eligible for state unemployment benefits if the CARES Act had not authorized pandemic unemployment assistance for individuals who were otherwise "not eligible for regular compensation or extended benefits."  15 U.S.C. § 9021(a)(3)(A); JA214.  He applied for pandemic unemployment assistance benefits and was approved to receive approximately $14,644 to be paid over the period from July to October 2020.  *See* JA25 (Compl. ¶¶ 67-68, 71); Opening Br. 19-20.  BANA deposited the full $14,644 into an account that it established and linked to a prepaid debit card.  *See* JA214-215.  It mailed the debit card to Mohamed's home address, but Mohamed did not receive the card.  JA26

---

[5] Maryland's stay-at-home protocols varied as the pandemic ebbed and flowed through the latter half of 2020.  Jenny Fulginiti, et al., *2020 Timeline: Coronavirus in Maryland*, WBAL-TV11 (Jan. 4, 2022), https://www.wbaltv.com/article/timeline-coronavirus-in-maryland/31394971#.

(Compl. ¶¶ 75, 81). After Mohamed informed BANA that he had not received the card, BANA sent a new card, which Mohamed received in December 2020. JA26 (Compl. ¶¶ 75-76).

By the time Mohamed activated the new card, however, the $14,644 in funds had already been stolen through a series of unauthorized transactions by someone else. JA26-27 (Compl. ¶¶ 81, 84-85). Mohamed confirmed that he had not authorized those transactions and that he "did not know who had used" his prepaid debit card. JA27 (Compl. ¶ 87). BANA accordingly opened a claim on the account and provided Mohamed with a claim number. JA27 (Compl. ¶¶ 88-89).

Because of the unauthorized transactions, BANA temporarily froze the account in January 2021 pending its investigation. JA29 (Compl. ¶¶ 101-103); JA76. The following month, BANA deposited $1,050 into the account, which Mohamed was able to access and use. JA30 (Compl. ¶¶ 105-106). BANA credited the full amount to Mohamed's account in June 2021. JA216.

5.  Mohamed filed this action in the District of Maryland in May 2021, seeking to represent a class of plaintiffs. JA7. As relevant here, he claimed that BANA's procedures for resolving fraud claims on his

prepaid debit card violated EFTA and its implementing Regulation E. JA37-41. He also asserted various state-law claims.

BANA moved to dismiss. On the EFTA count, BANA argued that Mohamed's pandemic-relief debit-card account was not an account covered by EFTA or Regulation E. BANA explained that Mohamed's account was excluded from the only "relevant part[s]" of Regulation E's definition of "account" (the third and fourth categories) because it was established by a third party and loaded with only qualified disaster relief payments—namely, pandemic unemployment assistance benefits. ECF No. 18-1, at 5-7 & n.4 (SA12-14).[6] BANA also explained that Mohamed's account was not a "government benefit account" under Regulation E because, although the prepaid "debit card is loaded with government funds, it is established by BANA, not by [Maryland]." *Id.* at 6 n.4 (SA13).

Mohamed opposed BANA's motion and argued that (1) pandemic unemployment assistance benefits were not qualified disaster relief payments; (2) "Maryland intended Regulation E to apply to [Mohamed's]

---

[6] BANA has sought leave to file a supplemental appendix containing its motion to dismiss, ECF No. 18-1, and Mohamed's response, ECF No. 22, and has included parallel citations to the proposed supplemental appendix.

account"; and (3) the Account Agreement "[r]eferences Regulation E." ECF No. 22, at 6-12 (SA43-49). More specifically, Mohamed argued that the pandemic unemployment assistance payments made to his card were not qualified disaster relief payments because the CARES Act referred to a "public health emergency," which Mr. Mohamed insisted was "not the [disaster] declaration by the president" and was "not connected to it in any way," JA266, and because these payments are not "one-time or limited-series grant payments" like those administered by FEMA. ECF No. 22, at 8 (SA45). Unlike his position in this Court, Mohamed never disputed that if his benefits *were* qualified disaster relief payments, his account would fall outside Regulation E. At no point did he argue that his account was a "government benefit account" such that the disaster-relief exclusion would not apply. Nor did he claim that the pandemic unemployment assistance payments he received were not made to promote the general welfare.

6.    After a lengthy hearing, the district court granted BANA's motion to dismiss Mohamed's EFTA claim (the only federal claim in the Complaint) and "decline[d] to exercise supplemental jurisdiction over the remaining state law claims." JA213; JA224-225. Mohamed was thus

18

able to refile the state-law claims in state court if he chose. JA224 n.5. He has not done so.

Because Mohamed had not argued either in his briefing or at the motion-to-dismiss hearing that his account was a government benefit account (even though the district court had specifically questioned Mohamed's counsel on this point at the hearing, JA268-269), the court focused on whether his account fell within the "qualified disaster relief payment" exception to Regulation E's definitions of "prepaid account." JA222. Given that the CARES Act authorized payments in connection with the COVID-19 pandemic and the President had twice in March 2020 declared the pandemic to be a disaster under the Stafford Act, the court reasoned, pandemic unemployment assistance payments were qualified disaster relief payments. JA223-224. Mohamed's account containing only such payments therefore was excluded from the definition of "prepaid account," and the court accordingly dismissed Mohamed's EFTA claim. JA224.

## SUMMARY OF ARGUMENT

The district court carefully considered the plethora of arguments Mohamed raised in his opposition to BANA's motion to dismiss. But

19

rather than defend the arguments he made before the district court, Mohamed now asks this Court to reverse on two grounds that he failed to raise at all until this appeal. His forfeiture of these arguments alone requires this Court to affirm the district court's decision.

Even on the merits, however, Mohamed's newly constructed arguments cannot save his EFTA claim. Mohamed and the CFPB first attempt to redefine "government benefit account" to encompass Mohamed's account. But Regulation E's plain and unambiguous definition of that term requires that a "government benefit account" be "established by a government agency." 12 C.F.R. § 1005.15(a)(2). The facts in Mohamed's own complaint make clear that BANA, not Maryland, established Mohamed's account. *See, e.g.*, RFP § 3.04; pp. 10-12, 15-16, *supra*; JA11 (Compl. ¶ 14) (incorporating RFP). What is more, Regulation E imposes numerous requirements on government agencies that establish government benefit accounts—requirements that Maryland would be required to comply with under Mohamed's reading— but the allegations and the record show that Maryland does not even attempt to do so. *See* 12 C.F.R. § 1005.15.

20

Regulation E also excludes from its definition of "prepaid account" accounts that are loaded only with qualified disaster relief payments and were established through a third party, so long as the accounts are not payroll or government benefit accounts. *See id.* § 1005.2(b)(3)(ii)(B) (exclusion applies "for purposes of" 12 C.F.R. § 1005.2(b)(3)(i)(C) and (D)). To avoid falling within this exception, Mohamed now contends that pandemic unemployment assistance payments were not qualified disaster relief payments. His argument on appeal is that unemployment assistance does not promote the general welfare because it is taxable (though he omits that *pandemic* unemployment assistance was granted a partial exclusion from taxable income). But "promoting the general welfare" and tax eligibility are not mutually exclusive. "Promoting the general welfare" has a recognized meaning, which pandemic unemployment insurance readily fits. Indeed, regular unemployment insurance expressly fell into that definition for decades. And although Congress later decided to tax unemployment compensation generally—a decision it later softened during the pandemic—nothing in the relevant statute was based on the notion that these payments somehow did not promote the general welfare. Accordingly, the pandemic unemployment

21

assistance payments Mohamed received were qualified disaster relief payments. His account therefore falls within Regulation E's exception and is not a "prepaid account."

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of a motion to dismiss de novo." *Nadendia v. WakeMed*, 24 F.4th 299, 304 (4th Cir. 2022). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Fairfax v. CBS Corp.*, 2 F.4th 286, 291 (4th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Conclusory statements and facts 'merely consistent with a defendant's liability' do not suffice to carry a complaint over 'the line between possibility and plausibility.'" *Id.* at 292 (quoting *Iqbal*, 556 U.S. at 678).

## ARGUMENT

**I.    Mohamed did not plausibly allege, or even argue, that his account is a government benefit account.**

Mohamed's lead argument—that it does not matter whether the funds on his card were "qualified disaster relief funds" because his account was a "government benefit account"—is both forfeited and incorrect. He did not advance any argument in the district court that his

account was a "government benefit account" that was "established by a government agency." And it was not: it was established by BANA.

### A. Mohamed expressly disclaimed any argument that his account was "established by a government agency."

Mohamed repeatedly faults the district court for "fail[ing] to even analyze" whether Mohamed's account was a government benefit account. Opening Br. 22; *see id.* at 19, 23, 27. That is a remarkable criticism considering that Mohamed failed to raise this issue before the district court. The district court conscientiously inquired into that issue at the hearing, and Mohamed's counsel confirmed that he was not advancing such an argument. JA268-269. The district court was entirely correct in not addressing it, and this Court should not entertain new counsel's attempts to disavow positions Mohamed took below.

"As this [C]ourt has repeatedly held, issues raised for the first time on appeal generally will not be considered." *Berg v. Kingdom of Netherlands*, 24 F.4th 987, 998 (4th Cir. 2022) (quoting *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993)). And this Court has time and again made clear that this longstanding principle applies equally to arguments a party failed to make in response to an opposing party's arguments before the district court. *See, e.g., United Supreme Council v.*

23

*United Supreme Council of the Ancient Accepted Scottish Rite*, 792 F. App'x 249, 259 (4th Cir. 2019) ("[A]fter omitting from its response to [the opposing party's] summary judgment motion any argument on the claims of copyright infringement, unfair competition, and trademark infringement, Grand Orient cannot now raise those issues on appeal"); *Nzabandora v. Rectors of Univ. of Va.*, 749 F. App'x 173, 177 (4th Cir. 2018) (concluding that plaintiff "has forfeited any arguments regarding [an affirmative defense] by failing to make such arguments in response to Defendants' motion for summary judgment"); *Cox v. SNAP, Inc.*, 859 F.3d 304, 308 n.2 (4th Cir. 2017) ("SNAP failed to advance this argument in its summary judgment papers and has therefore waived this defense."). Because "[o]ur litigation system typically operates on a raise-or-waive model," which "forces efficiency and discourages sandbagging," this Court "hold[s] parties to [their] strategic decision[s]" to raise or not raise arguments. *Wood v. Crane Co.*, 764 F.3d 316, 326 (4th Cir. 2014) (footnote omitted).

In its motion to dismiss, BANA argued that Mohamed's account was not covered by Regulation E and offered a detailed explanation as to why none of the four definitions of "prepaid account" was implicated

24

under the facts the Complaint alleged.[7]  ECF No. 18-1, at 5-7 (SA12-14).

Right at the outset, BANA explained that Mohamed's account was not a

"government benefit account" as defined by Regulation E because BANA,

not Maryland, established his account.  *Id.* at 5-6 n.4 (SA12-13).  BANA

also argued, at length, that the only other two potentially relevant

definitions were inapplicable to Mohamed's account because the

exclusion for "qualified disaster relief payments" in each applied.  *Id.* at

5-7 (SA12-14).

In his response to BANA's motion, Mohamed did not contend that

his account was a "government benefit account."  To the contrary, the sole

reason he gave for why "Defendant's argument fails" was that "Pandemic

Unemployment Assistance ('PUA') benefits are not 'qualified disaster

relief payments' under the EFTA."  ECF No. 22, at 6 (SA43).  That

argument would have been irrelevant if Mohamed thought his account

was a "government benefit account," because—as Mohamed now

emphasizes—the exception for "qualified disaster relief payments" does

---

[7] The Complaint did not specify what prong of the definition of "account" Mohamed was invoking.  JA37 (asserting that Mohamed's debit-card account was "an 'account' as defined by the [*sic*] 15 U.S.C. § 1693a(2) of the EFTA").

25

not apply to "government benefit accounts." Yet Mohamed rested entirely on parsing the meaning of "qualified disaster relief payments." *Id.* at 6-10 (SA43-47).[8] Indeed, he acknowledged BANA's point that the account had been "established by a bank, as opposed to a local government," and conspicuously did not dispute it. *Id.* at 10 (SA47). Rather, he argued only that "[s]ince the prepaid account does not meet the qualified disaster relief exception, whether it was a government benefit card does not supply any grounds for dismissal." *Id.* at 11 (SA48).

Mohamed's choice not to dispute BANA's government-benefit-account argument continued at oral argument. At the motion-to-dismiss hearing, when the district court raised the issue first to BANA, the moving party, BANA again stated its position that Mohamed's account was not a government benefit account because it "was not established by the government." JA244-245. Mohamed's counsel delivered his entire argument on the EFTA claim without disagreeing. JA268 ("I don't have any further argument with respect to Count 1."). The district court then

---

[8] After block-quoting the definition, he stated generically that Mohamed's "account satisfies the definitions set forth in 12 C.F.R. § 1005.2, B through D." *Id.* at 6-7. He never specifically argued which paragraph(s) he thought applied.

26

immediately and explicitly asked counsel to confirm that Mohamed was "not relying on an argument that this is a … government benefit account," JA268-269, and counsel stated that that argument would not make a difference: "It is a government benefit account, but, you know, it's Bank of America's view that they are the ones that established it. It's—*I don't think it makes as much a difference in determination whether the EFTA applies*." JA269 (emphasis added). He then pivoted back to "hammer[ing] in one more time" the argument that the President's declaration did not qualify pandemic unemployment assistance for the "disaster relief" exemption. JA269.

Indeed, it appears Mohamed had no intention of arguing this forfeited issue to this Court until well into the appeal. In his appellate docketing statement, the only issue Mohamed listed was "[w]hether the funds at issue constitute a 'qualified disaster relief payment.'" 4th Cir. ECF No. 5, at 3. He said nothing about the government-benefit-account issue until he filed his brief.

Given that he did not dispute before the district court that BANA established the account and that his own counsel declined the district court's invitation to argue that his account was a government benefit

27

account, Mohamed cannot now "turn back the clock and resuscitate the [arguments] that [he] earlier chose not to pursue." *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*, 974 F.2d 502, 505 (4th Cir. 1992).[9]  Mohamed made the tactical decision to argue *only* that his account was outside the exception for accounts loaded only with qualified disaster relief funds.  *See, e.g.*, *Consolidation Coal Co. v. Necessary*, 272 F. App'x 273, 279-80 (4th Cir. 2008).  And given that decision, the district court consciously chose not to discuss this issue.  Mohamed's repeated claim that the district court erroneously *ignored* the issue is not just incorrect but unfair to the thorough district judge.

**B.      Mohamed's account is not a government benefit account because it was "established by" BANA.**

Despite asserting that Regulation E's definition of "government benefit account" is unambiguous, Opening Br. 23; CFPB Br. 16-17, both Mohamed and the CFPB resist applying it, as written, to this case.  The definition expressly requires that the account be "established by a

---

[9] Even if the Court read Mohamed's reference to "B through D" (note 8, *supra*) to be a "passing shot at the issue," that would not be enough to preserve it, *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (citation omitted)—especially given that his counsel then affirmatively disavowed the argument at the hearing.

government agency." 12 C.F.R. § 1005.15(a)(2); *see id.* § 1005.2(b)(3)(i)(B). Because BANA, not Maryland, established Mohamed's account, it is not a government benefit account.

Both Mohamed and the CFPB try to run away from the definition as written by treating it as if it means "any account that is established as a mechanism to distribute government-issued benefits" or even "any account that contains government benefits," each a much broader concept that the agencies administering Regulation E have never adopted. Neither litigants nor agencies can depart from the text of a regulation, adopted after notice and comment, "to create *de facto* a new regulation." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).[10]

1.    As is clear from Mohamed's allegations and the documents that Mohamed himself incorporated into his complaint,[11] BANA, not

---

[10] Mohamed briefly asserts (at 25-26) that this case implicates pre-*Kisor* caselaw implicating deference to official opinions by the regulatory agency. But as the Bureau's website makes clear, there is no "Official Interpretation" of the definition of "government benefit account." *See* CFPB, *§ 1005.15 Electronic fund transfer of government benefits*, https://www.consumerfinance.gov/rules-policy/regulations/1005/15/#a.

[11] "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *Southern Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013). Mohamed never attempted to amend his complaint before the district court and never suggested in his motion papers or at

29

Maryland, "establish[ed] [the] cardholder accounts." RFP § 3.04. In addition, BANA mailed out the prepaid debit cards, JA26 (Compl. ¶ 75); BANA provided account access and account histories, JA26-27, JA30 (Compl. ¶¶ 78-82, 105-108); and BANA investigated and paid Mohamed's unauthorized-transactions claim, JA27-29, JA31-32 (Compl. ¶¶ 83-89, 91-92, 95-96, 101-103, 111-118). Under any meaning of "established," BANA "ma[d]e or form[ed]" these accounts and "br[ought] [them] … into existence." *Establish*, Black's Law Dictionary (11th ed. 2019); *see* Opening Br. 24 (defining "establish"); JA15 (Compl. ¶ 29) (alleging that "the default means of distributing DUI benefits payments was through

---

the hearing that he could cure any deficiency in his EFTA claim through amendment. Indeed, his counsel noted that he "considered filing an amended complaint, and we did not," because "we needed to address the federal claim and get it done with." JA280. (By contrast, he did posit amending as to the *state-law* claims.) He has not even suggested in his appellate brief (much less shown) that the district court abused its discretion by not granting leave to amend in the absence of a request. *See, e.g.*, *In re Triangle Capital Corp. Securities Litig.*, 988 F.3d 743, 750 (4th Cir. 2021) (explaining that amendment is futile if "clearly insufficient or frivolous on its face" and that "district courts are free to deny leave to amend as futile if the complaint fails to withstand Rule 12(b)(6) scrutiny" (quoting *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986))). Mohamed therefore cannot walk away from his own allegations. In any event, given the purely legal issues that Mohamed raises on appeal, no amount of repleading would allow the Complaint to state a claim upon which relief could be granted, and any amendment would thus be futile.

30

Bank-issued and Bank-administered DUI Debit Cards"). And as the litany of requirements that attach to governments establishing accounts makes clear, pp. 31-33, *infra*, the government must do far more than merely request that a financial institution create an account for it to be "deemed … a financial institution" that "established" an account under Regulation E.  12 C.F.R. § 1005.15(a)(1)-(2).

2.    Mohamed's contrary contention that his account is a "government benefit account" has no factual basis at all. It is undisputed that Maryland did not open an account for Mohamed, a task the RFP explicitly assigns to BANA. The larger regulatory context confirms that Mohamed's account is not a government benefit account. Section 1005.15 subjects government agencies to Regulation E's requirements by "deem[ing them] to be a financial institution" when they establish government benefit accounts.  12 C.F.R. § 1005.15(a)(1). In other words, it is the "[g]overnment agency" that is "subject to regulation" under Regulation E and must "comply with all applicable requirements of [EFTA] and [Regulation E] except as modified" specifically for government agencies. *Id.* § 1005.15(a). Yet Mohamed's own allegations

31

show that Maryland did not act at all as though his account was a government benefit account established by the State.

Government agencies that establish government benefit accounts, and are therefore "deemed to be a financial institution" for purposes of Regulation E, must comply with several requirements of Regulation E on the front end. 12 C.F.R. § 1005.15(a)(1); *see also id.* § 1005.18(a) (prepaid-account regulation noting specifically that "[f]or rules governing government benefit accounts, see § 1005.15"). Among other requirements, "[t]he agency" must "verify the identity of the consumer receiving the [access] device by reasonable means before the device is activated," *id.* § 1005.15(b); "comply with the pre-acquisition disclosure requirements applicable to prepaid accounts" before the "consumer acquires a government benefit account," *id.* § 1005.15(c)(1); and "comply with the account information," "disclosure[,] and change-in-term requirements applicable to prepaid accounts," *id.* § 1005.15(d)(2), (f).

Regulation E allows "government agenc[ies]" to choose between providing periodic account statements (which are required for an ordinary account at a private financial institution, *id.* § 1005.9(b)) or instead "mak[ing] available to the consumer" the account balance and

32

transaction history through a combination of telephone, electronic, and written means, all of which "[t]he agency" must disclose to the consumer. *Id.* § 1005.15(d)(1), (e)(1)(i).

Finally, "[t]he agency" must "comply with the requirements of § 1005.11," which governs the procedures for resolving errors, "in response to an oral or written notice of an error from the consumer." *Id.* § 1005.15(e)(4)(i). The timing requirements for reporting an error or an unauthorized transfer are modified if the agency chooses to use an alternative to periodic account statements. *Id.* § 1005.15(e)(3)(i), (e)(4)(i).

Maryland complies with none of these requirements, as the facts alleged and documents attached to the Complaint reveal. Maryland does not create consumers' accounts, does not provide pre-acquisition disclosures, does not have an error-resolution mechanism, and does not furnish periodic statements or, in the alternative, access to account balances and transactions. *See* JA25 (Compl. ¶ 74) ("The [state agency] representative advised that [the state agency] did not mail out the debit cards."); JA23, 26-27 (Compl. ¶¶ 59(f), 75, 78, 80-89) (Mohamed contacting BANA, not Maryland, for account access and account history and reporting unauthorized transactions to BANA). Indeed, and fatally,

the Complaint explains that Maryland "informs [customers] that it has no control over their DUI Debit Card Accounts." JA30 (Compl. ¶ 110).

Concluding that Mohamed's account is a government benefit account that Maryland established would require that Maryland comply with Regulation E's requirements, as modified by 12 C.F.R. § 1005.15. The form contract Mohamed attached to his complaint did provide generally that the contractor "shall comply with all federal, State and local laws, regulations and ordinances." JA59. But that provision applies to the signing party's *own* "activities and obligations under this Contract," JA59, and did not require the signing party to also assume *Maryland's* regulatory responsibilities and obligations. That Maryland does not comply or even attempt to comply with the requirements of Section 1005.15—or Section 1005.11 (as modified by Section 1005.15), the error-resolution provision primarily at issue in this case—only underscores that these accounts are not government benefit accounts.

Importantly, none of this means that Mohamed's debit card account could not be a Regulation E-covered "prepaid account" at all, under one of the other prongs of the prepaid-account definition. But those other prongs include the exemption for qualified disaster relief payments,

34

which Mohamed is trying to avoid and which forecloses his claim, as discussed in Part II, *infra*.

No matter how many times he references the State of Maryland, Mohamed cannot change what the facts in his own complaint show: that BANA created his account, issued a prepaid debit card from his account, and maintained his account—in short, that BANA, not any government agency, "established" his account.

3.    The reports to Congress, interpretive materials, and CFPB bulletins Mohamed relies on cannot save his argument.   Mohamed contends that a "prepaid card program is considered government-administered regardless of whether a federal, state, or local government office … outsources some or all functions to third parties, so long as the program is operated on behalf of a government office."  Opening Br. 26 (quoting Bd. of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* at 1 n.2 (Oct. 2021), https://www.federalreserve.gov/publications/files/government-prepaid-report-202110.pdf (hereinafter, Federal Reserve October 2021 Report)).   But that is another attempt to sidestep the definition of "government benefit account" in Regulation E, under which coverage

35

turns on who "established" the account, not who administers it. Government-administered prepaid cards are distinct from government benefit accounts and, in fact, are governed by an entirely separate section of EFTA, 15 U.S.C. § 1693o-2, and a separate set of regulations, 12 C.F.R. part 235—as the Federal Reserve report itself notes. Federal Reserve October 2021 Report at 1 n.2 (citing 15 U.S.C. § 1693o-2); *see, e.g.*, 12 C.F.R. § 235.1 (explaining that the Federal Reserve issued part 235 pursuant to 15 U.S.C. § 1693o-2 to implement standards with respect to transaction fees and debit-card transactions).

Mohamed's quote from the Federal Reserve's Report also omits the very next sentence, in which the Federal Reserve explained that a prepaid card "program may be government-administered even if a federal, state, or local government office is *not* the source of funds for the program it administers." Federal Reserve October 2021 Report at 1 n.2 (emphasis added); *accord* Bd. of Governors of the Federal Reserve, *Report to Congress: Government-Administered, General-Use Prepaid Cards* at 1 n.2 (July 2014), https://www.federalreserve.gov/publications/other-reports/files/government-prepaid-report-201407.pdf (hereinafter Federal Reserve July 2014 Report) (same). As the Federal Reserve went on to

36

explain, "child support programs are government-administered programs even though individuals fund them." Federal Reserve October 2021 Report at 1 n.2; Federal Reserve July 2014 Report at 1 n.2. This definition of a "government-administered account" directly conflicts with Regulation E's requirement that a government benefit account contain "*government benefits*," not funds from other entities or even individuals. *See* 12 C.F.R. § 1005.15(a)(2) (emphasis added). In other words, Mohamed is trying to conflate two different sets of regulations.

The CFPB makes a similar mistake in its brief. The agency contends that "traditional unemployment benefit accounts have long been deemed government benefit accounts," and relies on a portion of its 2016 prepaid card rulemaking stating that "prepaid cards … (such as unemployment, child support, and pension payments) are currently covered by Regulation E." CFPB Br. 19-20 (quoting 81 Fed. Reg. 83,934, 84,320 n.956 (Nov. 22, 2016)). That "prepaid cards" are subject to Regulation E, however, does not mean that *all* such prepaid cards are government benefit accounts. And the language attached to the footnote on which the CFPB relies makes clear that the 2016 rulemaking did not expand the definition of "government benefit account" to include any

37

prepaid card or any account containing government benefits, but instead "extend[ed] … existing" provisions that already applied to "certain government benefit accounts to all prepaid accounts." *Id.* at 84,320. These general statements simply do not dictate how *Mohamed's* account does, or does not, qualify under Regulation E.

Similarly, Mohamed contends that an interpretive rule the Federal Reserve issued in 1994 means "an account established by a government agency" to distribute benefits is a government benefit account, "whether or not the account is directly held by the agency or a bank or other depository institution." Opening Br. 25 (quoting 59 Fed. Reg. 10,678, 10,680 (Mar. 7, 1994)). But this rule is unhelpful because "holding" an account is not the same as "establishing" one. *Compare Hold*, Black's Law Dictionary (11th ed. 2019) (defining "hold" to mean "[t]o possess or occupy; to be in possession and administration of"), *with Establish*, Black's Law Dictionary (11th ed. 2019) (defining "establish" as "[t]o make or form; to bring about or into existence"). Furthermore, the Federal Reserve's rule repeated the point that a government benefit account must be "established by a government agency," which Mohamed's was not.

38

Mohamed's reliance on the CFPB's Bulletin 2022-02 is likewise misplaced. Contrary to Mohamed's assertions, the CFPB did not state in its bulletin that an account is a government benefit account "when a government agency contracts with a financial institution to provide government benefits even if, to receive those benefits, consumers must 'establish an account for receipt of electronic fund transfers with a particular financial institution.'" Opening Br. 26 (quoting CFPB, *Bulletin 2022-02: Compliance Bulletin on the Electronic Fund Transfer Act's Compulsory Use Prohibition and Government Benefit Accounts* (Feb. 15, 2022), https://www.consumerfinance.gov/compliance/supervisory-gui dance/cfpb-bulletin-2022-02-compliance-bulletin-electronic-fund-transfe r-acts-compulsory-use-prohibition-and-government-benefit-accounts/ (hereinafter Bulletin 2022-02)). What the CFPB actually said was that, even for government benefit accounts, EFTA's compulsory-use prohibition applies so that "no person may require a consumer to establish an account for receipt of electronic fund transfers with a particular financial institution as a condition of receipt of a government benefit." Bulletin 2022-02 at 1. In other words, government agencies cannot force consumers to establish accounts with specific financial

39

institutions if that is the only way they could receive government benefits.[12] *See id.* at 1-2. At no point did the CFPB in its bulletin attempt to expand or redefine the definition of "government benefit accounts"—whether generally to include accounts "established" by anyone other than the government agency or, as Mohamed would have it, "when a government contracts with a financial institution to provide benefits," Opening Br. 26—all of which would have required a rule change, not just a bulletin.

Mohamed also points in a footnote to an unrelated interpretive rule the CFPB issued during the early days of the pandemic in which the CFPB stated that "certain pandemic relief payments are not 'government benefits' for purposes of Regulation E and … EFTA" if consumers do not have to apply to a state agency to receive funds, among other requirements. 85 Fed. Reg. 23,217, 23,217 (Apr. 27, 2020); Opening Br. 27 n.1. Mohamed notes that this rule "does not apply to the pandemic unemployment assistance at issue here" because Mohamed applied to Maryland for his benefits, Opening Br. 27 n.1, so citing the rule does not

---

[12] The compulsory-use prohibition would not be implicated under any circumstances here because Maryland recipients can receive benefits directly from the State by check. JA214.

advance his argument.  Mohamed also misses the point.  Not every account that contains government benefits is a "government benefit account."  *See* 12 C.F.R. § 1005.15(a)(2) (requiring government benefit accounts be "established by a government agency").  Indeed, if the mere presence of government benefits in an account made that account a "government benefit account," any account that received direct deposits of social security, disability, FEMA relief, unemployment insurance[13] or any other government benefit payment would fall within this definition. That cannot be the case.

Regulation E is clear: a "government benefit account" must not only contain government benefits but must also be "established by a government agency," an agency that must then comply with the requirements of Regulation E.  12 C.F.R. § 1005.15(a)(2).  *See generally*

---

[13] Direct deposit of unemployment benefits is a common practice. *See, e.g.*, N.J. Dep't of Labor & Workforce Development: Division of Unemployment Insurance, *How you'll get your money*, https://nj.gov/lab or/myunemployment/before/about/payment/ ("We offer the option of having your benefits deposited directly into your checking or savings account."); N.Y. Dep't of Labor, *Unemployment Insurance Payment Options*, https://dol.ny.gov/unemployment-insurance-payment-options (allowing claimants to receive unemployment insurance payments by direct deposit into their "own bank account").

*id.* § 1005.15. Because BANA, not Maryland, established Mohamed's account, his account is not a "government benefit account."

## II. Pandemic unemployment assistance payments are qualified disaster relief payments made "to promote the general welfare."

On the issue that the district court did decide—whether Mohamed's account falls within the exception to "prepaid accounts" because it contains only qualified disaster relief payments—Mohamed abandons the arguments he made below. Instead, he raises on appeal another new argument that, again, he failed to make before the district court—that the term "in order to promote the general welfare" is a "term of art" with a specialized, atextual meaning that excludes his benefits. Opening Br. 28. Mohamed never claimed below that "to promote the general welfare" carried any interpretive weight. And that argument is without merit: programs like pandemic unemployment assistance are classic examples of spending "to promote the general welfare," and while benefits paid through some such programs are *also* exempt from taxation (wholly or in part), tax treatment is not part of the term's meaning.

Mohamed does not challenge the district court's rejection of the arguments he *did* make below regarding the exception for "qualified

42

disaster relief payments," so those abandoned arguments are now waived.

### A.    Mohamed forfeited his argument that the pandemic unemployment assistance payments he received were not made "to promote the general welfare."

Mohamed argued before the district court that qualified disaster relief funds must be "one-time or limited-series grant payments, typically applied to the effects of natural disasters." ECF No. 22, at 8 (SA45). And he contended that pandemic unemployment assistance does not qualify because "the enactment of the CARES Act is not connected to the declaration of the federally declared disaster by President Trump." JA266. The district court rejected those positions in a well-reasoned analysis. JA222-224.

Mohamed now abandons these arguments and advances a completely new one—that the funds he received could not be "qualified disaster relief payments" because they did not "promote the general welfare," a term he claims has a specialized meaning that excludes any payment to an individual that is subject to federal income tax. Opening Br. 28. But as already explained, *see* Section I.A, *supra*, parties cannot raise on appeal specific arguments that they did not raise below.

43

Although the general issue of whether pandemic unemployment assistance payments were qualified disaster relief payments was certainly before the district court, Mohamed did not argue that pandemic unemployment assistance payments do not qualify for that exception because they do not promote the general welfare. *See* ECF No. 22, at 6-10 (SA43-47). He did not even mention the term "general welfare" in his response, except in block-quoting the entire statutory definition of "qualified disaster relief payment." *Id.* at 8 (SA45) (quoting 26 U.S.C. § 139). He certainly never invoked it as a "term of art." Mohamed did briefly note that FEMA grants (which undisputedly are qualified disaster relief payments) are not taxable income, *id.*, whereas disaster unemployment income is treated differently under the tax code, *id.* at 10 (SA47), but he neither developed this argument nor tied it to the statute's "promote the general welfare" language. *Id.* And a merely "skeletal argument, really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [Mohamed's] did." *Bd. of Trs. v. Four-C-Aire, Inc.*, 42 F.4th 300, 315 (4th Cir. 2022) (citation omitted). It does not suffice that the same "issue may have been before the district court in more general

44

terms." *Hannemann v. S. Door Cnty. Sch. Dist.*, 673 F.3d 746, 754 (7th Cir. 2012) (citation omitted).

A "losing party's 'afterthoughts should not form the basis of continued, protracted litigation in federal courts.'" *United Food & Com. Workers v. Marval Poultry Co.*, 876 F.2d 346, 353 (4th Cir. 1989) (citation omitted). Because Mohamed does not brief the argument he made below and did not argue below the arguments he has briefed, the Court should simply affirm the judgment of the district court.

**B. Whether pandemic unemployment assistance payments are taxed is irrelevant to whether they were made to promote the general welfare.**

Even if Mohamed had not forfeited this argument, he could not show that pandemic unemployment assistance payments were *not* made "to promote the general welfare." And Mohamed no longer disputes that the COVID-19 pandemic is a qualified disaster or that these payments relate to it. Those payments therefore are "qualified disaster relief payments." Mohamed's account is accordingly excluded from the

45

definition of "prepaid account": it was "loaded only with qualified disaster relief payments." 12 C.F.R. § 1005.2(b)(3)(ii)(B).[14]

1. To be a "qualified disaster relief payment," a sum of money need only be "paid by a Federal, State, or local government, or agency or instrumentality thereof, in connection with a qualified disaster in order to promote the general welfare." 26 U.S.C. § 139(b). Mohamed contends that a payment is not "to promote the general welfare" unless it is "non-taxable." Opening Br. 32. But Mohamed confuses the issues. The question is not whether pandemic unemployment assistance payments are taxable for some recipients. The question is whether they were made to promote the general welfare. They were.

It is startling in the extreme for Mohamed to contend in this Court that the key element of the congressional and presidential response to the pandemic, the CARES Act and the funding it authorized, was not "to promote the general welfare." The creation of the pandemic unemployment assistance program, offering a helping hand to citizens who urgently needed assistance but—like Mohamed himself—were

---

[14] Mohamed does not dispute the other element of the exclusion, regarding whether the account was "directly or indirectly established through a third party." *See* Opening Br. 23-27.

ineligible for regular unemployment benefits, was a singular response that indisputably supported millions of people and the larger economy. Few federal actions so undoubtedly promoted the general welfare. *See* U.S. Const. pmbl. & art. I, § 8, cl. 1.

Mohamed nevertheless urges that Regulation E and the statute it cross-references mean something they do not say, just because the IRS has taken the view that "payments under legislatively provided social benefit programs" that are "for the promotion of general welfare" are "not includible in an individual's gross income." Opening Br. 31 (quoting IRS Chief Counsel Advice 200648027 (Dec. 1, 2006)) (internal quotation marks and emphasis omitted). That means the IRS infers that Congress meant to except such payments from its *general* direction that gross income includes "all income from whatever source derived." 26 U.S.C. § 61. But as Mohamed also acknowledges, under that same longstanding IRS view, unemployment compensation *is* for the promotion of general welfare, and therefore was not taxed for decades. Opening Br. 32 n.3. It took an act of Congress to tax it, and as discussed below, Congress partially restored the exemption during the pandemic. *See* p. 50, *infra*.

47

The criteria for this "general welfare" exclusion in tax law are well established:

> In determining whether the general welfare exception applies to payments, the [IRS] generally requires that the payments (1) be made from a governmental general welfare fund; (2) be for the promotion of the general welfare (i.e., on the basis of need rather than to all residents regardless of, for example, … employment status); and (3) not be made for services furnished by the recipient.

*E.g.*, IRS C.C.A. 200648027, *supra*, at 2. Unemployment assistance meets all of these criteria, as Mohamed does not dispute.

Sometimes Congress decides to tax as income payments that would otherwise be within the implicit general-welfare exclusion. But Congress has never changed the IRS's "general welfare" formulation. Rather, it has specifically made those payments taxable to one degree or another, under *specific* provisions of the Internal Revenue Code. That does not mean those payments cease to promote the general welfare, in either common parlance or tax lingo. It just means that they are no longer excluded *per se* from gross income.

Thus, Mohamed is incorrect in arguing that when Congress made unemployment compensation taxable, it "removed unemployment compensation from the 'general welfare' exception." Opening Br. 32. To

48

the contrary, Congress simply provided that unemployment compensation would be included in gross income. 26 U.S.C. § 85. It said nothing to suggest that unemployment compensation does not promote the general welfare, or that the IRS should change its test for what programs promote the general welfare. Instead, the legislative history suggests that Congress simply was not willing to exempt these particular general-welfare payments from income tax any longer.[15] Congress viewed these benefits as "a substitute for taxable wages" and expressed concern that not taxing unemployment compensation "tends to create a work disincentive in that it increases the incentive to remain unemployed, the length of unemployment and the consequent cost of

---

[15] Similarly, the IRS explained in 1963 that "an old-age insurance benefit paid under the Social Security Act … is considered to be a payment in promotion of the general welfare and is not taxed." Rev. Rul. 63-167 (IRS RRU), 1963-2 C.B. 17, 1963 WL 13753, at *3. However, in 1983, Congress chose to include some amounts of Social Security benefits as taxable income for recipients whose gross income exceeded a certain threshold. 26 U.S.C. § 86(a)-(b). But this taxation shift does not mean Social Security benefits are no longer paid to promote the general welfare. *See, e.g.*, *Flemming v. Nestor*, 363 U.S. 603, 609 (1960) ("The Social Security system may be accurately described as a form of social insurance, enacted pursuant to Congress' power to spend money in aid of the general welfare …." (internal citation and quotation marks omitted)); *Bubble Room, Inc. v. United States*, 159 F.3d 553, 554 (Fed. Cir. 1998) ("The purpose of the Social Security Act, stated in its broadest terms, is to provide for the general welfare.").

49

maintaining unemployment coverage."  H.R. Rep. No. 95-1445, at 47-48 (1978).

Moreover, Mohamed never mentions that during the pandemic, Congress *restored* the exclusion from gross income for unemployment compensation for most taxpayers (those earning $150,000 or less), effective for tax year 2020, but only for unemployment compensation up to $10,200.   26 U.S.C. § 85(c).   Mohamed never acknowledges this amendment, but it is intimately connected to pandemic unemployment assistance:  it was adopted in the same subtitle of the American Rescue Plan Act of 2021 ("Crisis Support for Unemployed Workers") that extended the various pandemic unemployment assistance programs. Pub. L. No. 117-2, § 9042(a), (c), 135 Stat. 122 (amendment applies to "taxable years beginning after December 31, 2019"); *see id.* §§ 9011-9022, 135 Stat. 118-120 (extender provisions).[16]

---

[16] Mohamed relies on a "technical explanation" document by the staff of the Joint Committee on Taxation, 147 Cong. Rec. H10127-38 (daily ed. Dec. 13, 2001), prepared relatively late in the process of the consideration of the Victims of Terrorism Tax Relief Act of 2001.  The staff suggested that unemployment compensation is not within the Internal Revenue Code's "general welfare" exception, *id.* at H10130, but as explained in the text, that is a misunderstanding of the language of § 85.  In any event, that 2001 document does not deal with § 85 as it exists today, with certain *pandemic* unemployment assistance excluded from gross income.

The amendment creates a compelling practical reason not to substitute "included in gross income" for "to promote the general welfare" as Mohamed suggests. *Even on Mohamed's view* that taxation is the dispositive question, EFTA's exception would apply to substantial portions of pandemic unemployment assistance—but the exception could not function on such a hybrid basis, because whether a particular payment is exempt from gross income will often depend on knowing, *e.g.*, the taxpayer's final, adjusted gross income for the year. The same would be true of Social Security, for example. *See* note 15, *supra.* The better view is to apply the statutory language, which asks a categorical question: does pandemic unemployment insurance promote the general welfare? The answer is yes.

3.    In one last attempt to avoid Regulation E's qualified-disaster-relief exception, Mohamed argues that this exception was added to the regulation to address concerns from a national relief organization that its use of prepaid cards should be exempted in order to speed funding to those needing relief. Opening Br. 35-37. However, commenters on the proposed rule—who also included "a payment network, an issuing bank," and "several industry trade associations"—offered a variety of arguments

51

for the exemption, including that accounts containing disaster relief funds were "different because consumers who receive these accounts cannot shop for them, and tend to use them for a short period of time without reloading," and that "the proposed pre-acquisition disclosure requirements would delay consumers' receipt of relief funds." 81 Fed. Reg. 83,934, 83,975 (Nov. 22, 2016). Mohamed says the exception does not apply to his account because "[n]one of these concerns are present here." Opening Br. 36.

That argument rests on the flawed premise that a regulation must be interpreted in light of what a select few commenters on the proposed rule said—even though the agency did not adopt those views. Further, Mohamed appears to argue that situations that were not the subject of comments should be interpreted automatically as outside the reach of the exception. That is not a valid way to interpret any part of a rule— whether the exception or the underlying definition.

In any event, at least some of the concerns the commenters posited *do* apply here. Maryland claimants receiving pandemic unemployment assistance could choose a paper check, but if they preferred a debit card, they could not shop around for various debit-card accounts. *See* JA214.

52

And it should go without saying that the COVID-19 pandemic was a tragedy that affected millions of Marylanders, which prompted in the State and private industry a crucial need to deliver relief funds as quickly and effectively as possible. Citizens unable to work because of the pandemic and the associated stay-at-home orders had just as urgent a need for their assistance funds as the victims of a fire or a tornado. By exempting disaster-relief funds broadly, Regulation E's exemption draws no distinction between these types of aid.

*    *    *

The district court got it right. BANA established Mohamed's account, which was loaded only with qualified disaster relief payments. JA223-224. Mohamed's new argument does not change that conclusion. Mohamed's account therefore falls within Regulation E's exception and is not a "prepaid account."

53

# CONCLUSION

The judgment of the district court should be affirmed.

March 6, 2023                          Respectfully submitted.

 /s/ *William M. Jay*
William M. Jay
Thomas M. Hefferon
Rohiniyurie Tashima*
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000
wjay@goodwinlaw.com

*Admitted to practice only in New York and Virginia; not admitted in the District of Columbia; practicing under the supervision of DC-admitted partners of the firm*

54

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Century Schoolbook, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 10,240 words, excluding the parts exempted by Rule 32(f), according to the count of Microsoft Word.

/s/ *William M. Jay*
William M. Jay

## CERTIFICATE OF SERVICE

I, William M. Jay, hereby certify that on March 6, 2023, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *William M. Jay*
William M. Jay